No. 24-6115

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

Heather Smith,
*Plaintiff-Appellee,*

v.

Whaleco Inc. d/b/a Temu,
*Defendant-Appellant.*

---

On appeal from an Order Denying Arbitration
U.S. District Court, W.D. Oklahoma No. 5:23-cv-00559-D
The Honorable Timothy D. DeGuisti

---

**APPELLANT'S OPENING BRIEF**

---

Benjamin G. Shatz (BShatz@Manatt.com)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067-3119
(310) 312-4000 ♦ Fax (310) 312-4224

*Attorney for Appellant*
Whaleco Inc. d/b/a Temu

Oral Argument Requested

1

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................... 11

JURISDICTION .............................................................................. 11

ISSUES PRESENTED & STANDARD OF REVIEW ........................... 12

INTRODUCTION ............................................................................ 12

STATEMENT OF THE CASE ............................................................ 16

    A.   Temu operates an online marketplace and Temu's
         Terms of Use require arbitration to resolve disputes ......... 16

    B.   Smith created a Temu account and logged-in to Temu,
         clicking "Continue" buttons on screens that said
         "By continuing, you agree to our Terms of Use …." ............ 19

    C.   Smith sues Temu in state court; Temu removes
         the case to federal court ....................................................... 21

    D.   Temu moves to compel arbitration, but the court
         denies arbitration ................................................................ 22

SUMMARY OF ARGUMENT .............................................................. 27

ARGUMENT .................................................................................... 28

    A.   Temu presented evidence that Smith had actual notice,
         and Smith failed to rebut actual notice, which she
         could and should easily have done by providing her
         own declaration .................................................................... 28

        1.   The summary judgment standard applies in
            determining the existence of a valid arbitration
            agreement, and Temu met its initial evidentiary
            burden ...................................................................... 28

        2.   Smith failed to meet her evidentiary burden and
            failed to raise a genuine dispute of material fact
            as to the existence of an arbitration agreement ......... 33

        3.   If a genuine dispute of material fact exists
            regarding contract formation, this Court
            should remand for an evidentiary hearing ................. 41

B.    Temu's screens satisfy the inquiry notice test
for contract formation ........................................................... 43

    1.    Temu's screen used placement, color, size,
and other factors to make its Terms of Use
reasonably conspicuous ............................................... 44

        a.    Temu's screen is cleanly designed to
provide adequate notice ..................................... 46

        b.    Temu's Terms of Use hyperlink was
reasonably sized, bolded, and easily visible ...... 49

        c.    Temu's Terms of Use hyperlink was
sufficiently adjacent to the relevant
"Continue" buttons ............................................. 53

        d.    Temu's repetition of the notices across
multiple screens made the notices more
conspicuous ........................................................ 54

    2.    Precedent from many courts supports the
conclusion that Temu's screen provided
reasonably conspicuous notice .................................... 56

    3.    The district court focused too narrowly on
specific design elements, underestimated
the reasonable user, and did not consider
the webpage as a whole ............................................... 64

CONCLUSION ......................................................................... 69

ORAL ARGUMENT REQUEST ........................................... 70

10TH CIRCUIT RULE 28.2 ATTACHMENT:
ORDER ON APPEAL ................................................... 71

CERTIFICATE OF COMPLIANCE FOR BRIEFS
WITH TYPE-VOLUME LIMIT .................................... 84

# TABLE OF AUTHORITIES

## CASES

*Adams v. Am. Guar. & Liab. Ins. Co.*,
   233 F.3d 1242 (10th Cir. 2000) .......................................................... 40

*Adler v. Wal-Mart Stores*,
   144 F.3d 664 (10th Cir. 1998) ............................................................ 36

*Aldrich v. Univ. of Phx., Inc.*,
   661 F.App'x 384 (6th Cir. 2016) ......................................................... 37

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................ 29

*Annett v. Univ. of Kan.*,
   371 F.3d 1233 (10th Cir. 2004) .......................................................... 30

*Atl. Marine Constr. v. W.D. Tex.*,
   571 U.S. 49 (2013) .............................................................................. 12

*Avedon Eng'g, Inc. v. Seatex*,
   126 F.3d 1279 (10th Cir. 1997) .......................................................... 41

*Beattie v. TTEC Healthcare Sols.*,
   2019 WL 2189481 (D. Colo. May 21, 2019) ............................. 30, 32-34

*Bellman v. i3Carbon, LLC*,
   563 F.Appx. 608 (10th Cir. 2014) ............................... 29, 32, 34, 41-43

*Berkson v. Gogo LLC*,
   97 F.Supp.3d 359 (E.D.N.Y. 2015) ..................................................... 55

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ........................................... 44, 53, 66, 67

*Blake v. JPay, LLC*,
   2022 WL 1223634 (D. Kan. Apr. 26, 2022).................................... 31, 36

*BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Bernalillo*,
   853 F.3d 1165 (10th Cir. 2017) ............................................... 29, 31, 42

*Brown v. AutoNation Chrysler Dodge Jeep Ram Sw.*,
   2021 WL 2514524 (D. Colo. June 18, 2021) ....................................... 31

*Clements v. Alto Trust Co.,*
2023 WL 5002472 (D.N.M. Aug. 4, 2023)..........................................36

*Clowdis v. Colo. Hi-Tec Moving & Storage,*
2011 WL 5882191 (D. Colo. Nov. 3, 2011)..........................................30

*Cooper v. Flesner,*
103 P. 1016 (Okla. 1909)...................................................................44

*Cordas v. Uber Technologies,*
228 F.Supp.3d 985 (N.D. Cal. 2017).............................................36, 37

*Cullors v. Cerebral, Inc.,*
2024 WL 3385530 (9th Cir. July 12, 2024) .........................................15

*Davis v. USA Nutra Labs,*
303 F.Supp.3d 1183 (D.N.M. 2018) .............................................30, 45

*Domer v. Menard, Inc.,*
116 F.4th 686 (7th Cir. 2024) ...........................................................16

*Eakins v. Whaleco Inc. d/b/a Temu,*
10th Cir. No. 24-6048.................................................................11, 26

*Edmundson v. Klarna,*
85 F.4th 695 (2d Cir. 2023)........................................16, 45, 47, 49, 67

*Fagerstrom v. Amazon.com, Inc.,*
141 F.Supp.3d 1051 (S.D. Cal. 2015)..................................................49

*Feld v. Postmates, Inc.,*
442 F.Supp.3d 825 (S.D.N.Y. 2020)..................................50, 51, 55, 58

*Ferrell v. to AppFolio, Inc.,*
2024 WL 158103 (C.D. Cal. Jan. 11, 2024) ....................................37-38

*Fitzpatrick v. Lens.com Inc.,*
2024 WL 4555337 (N.D. Ill. Oct. 23, 2024) ...................................50, 62

*Fontanez v. Whaleco, Inc.,*
No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023).......24, 26, 38, 63

*Garcia v. Nabfly, Inc.*,
   2024 WL 1795395 (S.D.N.Y. Apr. 24, 2024) ...................................... 51

*Gennaro v. Avvo, Inc.*,
   2019 WL 13488559 (S.D. Cal. May 6, 2019) ...................................... 62

*Ghazizadeh v. Coursera, Inc.*,
   2024 WL 3455255 (N.D. Cal. June 20, 2024) .......................... 47, 50-51

*Graham v. Bloomberg L.P.*,
   2023 WL 6037974 (S.D.N.Y. Sept. 15, 2023) ...................................... 50

*Ham v. CarMax Auto Superstores*,
   2024 WL 2093655 (D.N.M. May 9, 2024) .......................................... 42

*Hancock v. Am. Tel. & Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012),
   *abrogated on other grounds* ................................... 12, 28-29, 40-41, 43

*HomeAdvisor, Inc. v. Waddell*,
   2020 WL 2988565 (Tex. App. June 4, 2020) ...................................... 62

*Howard v. Ferrellgas Partners*,
   748 F.3d 975 (10th Cir. 2014) ...................................................... 42-43

*Hu v. Whaleco, Inc. d/b/a Temu*,
   2024 WL 4481439
   (E.D.N.Y. Oct. 1, 2024) ............................. 14, 45, 47, 49, 51, 53, 56, 63

*Island Peak Ranch v. FIIK Inv. & Holdings*,
   2008 WL 2673925 (D. Utah July 7, 2008) ........................................ 29

*Ivy Bridge v. Nature's Sunshine Prods.*,
   2022 WL 604857 (D. Utah Mar. 1, 2022) ................................. 32, 34-35

*Johnson v. Whaleco, Inc.*,
   No. 5:23-cv-403-GAP-PRL,
   2023 U.S. Dist. LEXIS 184104
   (M.D. Fla. Oct. 13, 2023) .................................................... 24-26, 63-64

*Keebaugh v. Warner Bros. Entm't*,
100 F.4th 1005 (9th Cir. 2024) ............................................. 16, 44, 64

*L&M Enters. v. BEI Sensors & Systems*,
231 F.3d 1284 (10th Cir. 2000)........................................... 30

*La Force v. GoSmith, Inc.*,
2017 WL 9938681 (N.D. Cal. Dec. 12, 2017) ...................................... 37

*Lee v. DoNotPay, Inc.*,
683 F.Supp.3d 1062 (C.D. Cal. 2023) ................................................. 50

*Lee v. Ticketmaster, L.L.C.*,
817 F.App'x 393 (9th Cir. 2020)......................................................... 49

*Levine v. Vitamin Cottage Nat. Food Markets*,
2021 WL 4439800 (D. Colo. Sept. 27, 2021) ...................................... 35

*Link v. Wabash R. Co.*,
370 U.S. 626 (1962)............................................................................. 39

*Mahram v. Kroger Co.*,
2024 WL 3878309 (Cal. Ct. App. Aug. 19, 2024)................................ 51

*Martinez v. Capstone Rest. Grp.*,
2021 WL 1723776 (D. Colo, Mar. 31, 2021)....................................... 35

*Melnick v. TAMKO Bldg. Prod. LLC*,
2022 WL 4355299 (D. Kan. Sept. 20, 2022) ................................. 29, 39

*Melo v. Zumper, Inc.*,
439 F.Supp.3d 683 (E.D. Va. 2020) ............................................. 55, 61

*Meyer v. Uber Techs.*,
868 F.3d 66 (2d Cir. 2017) .................................... 16, 45, 47, 49, 54, 58

*Moyer v. Chegg, Inc.*,
2023 WL 4771181 (N.D. Cal. July 25, 2023) ................................ 60, 62

*Nardo v. HomeAdvisor, Inc.*,
2022 WL 17547940 (D. Colo. July 27, 2022),
*report & rec. adopted*, 2022 WL 17547938 (Aug. 11, 2022) ......... 31, 34

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........................................................... 38

*Nicosia v. Amazon.com*,
834 F.3d 220 (2d Cir. 2016) .............................................................. 48

*Nicosia v. Amazon.com, Inc.*,
2017 WL 10111078 (E.D.N.Y. Aug. 18, 2017),
*report & rec. adopted,* 384 F.Supp.3d 254 (E.D.N.Y. 2019),
*aff'd*, 815 F.App'x 612 (2d Cir. 2020) .................................................. 39

*Oberstein v. Live Nation Entm't, Inc.*,
60 F.4th 505 (9th Cir. 2023) ............................................... 16, 45, 54

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) ............................................... 16, 44, 52

*Peni v. Daily Harvest, Inc.*,
2022 WL 16849451 (S.D.N.Y. Nov. 10, 2022) ............................ 47, 50

*Peter v. DoorDash, Inc.*,
445 F.Supp.3d 580 (N.D. Cal. 2020) ................................................. 61

*Petrie v. GoSmith, Inc.*,
360 F.Supp.3d 1159 (D. Colo. 2019) ...................................... 30, 32, 37

*Plazza v. Airbnb, Inc.*,
289 F.Supp.3d 537 (S.D.N.Y. 2018) ................................................. 61

*Port-a-Pour, Inc. v. Peak Innovations, Inc.*,
2015 WL 558702 (D. Colo. Feb. 10, 2015) ........................................ 30

*Rainey v. A Place for Rover, Inc.*,
2022 WL 16942849 (C.D. Cal. July 18, 2022) ................................... 59

*Rangel v. Hallmark Cards, Inc.*,
2010 WL 781722 (D. Kan. Mar. 4, 2010) .......................................... 40

*Rose v. Mercedes-Benz USA*,
2023 WL 8544143 (N.D. Ill. Dec. 11, 2023) ...................................... 37

*Route App, Inc. v. Heuberger*,
  2022 WL 2316377 (D. Utah June 28, 2022) ................................ 54, 65

*Selden v. Airbnb, Inc.*,
  2016 WL 6476934 (D.D.C. Nov. 1, 2016),
  *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) ........................................ 54-55, 60

*SRI of N.M. v. Hartford Fire Ins. Co.*,
  2015 WL 12803774 (D.N.M. June 26, 2015) ..................................... 29

*THI of N.M. at Vida Encantada v. Archuleta*,
  2013 WL 2387752 (D.N.M. Apr. 30, 2013) ....................................... 41

*Vernon v. Qwest Commc'ns Int'l*,
  925 F.Supp.2d 1185 (D. Colo. 2013) .................................................. 33

*Walker v. BuildDirect.com Techs.*,
  733 F.3d 1001 (10th Cir. 2013) .......................................................... 43

*Walker v. Neutron Holdings, Inc.*,
  2020 WL 703268 (W.D. Tex. Feb. 11, 2020) ..................................... 57

*Waltrip v. Pilot Travel Ctrs.*,
  2022 WL 684327 (D.N.M. Mar. 8, 2022) ..................................... 29, 36

*Wiseley v. Amazon.com, Inc.*,
  709 Fed. Appx. 862 (9th Cir. 2017)................................................... 50

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
  756 F.2d 1467 (10th Cir. 1985) .......................................................... 30

# TABLE OF AUTHORITIES
## (continued)

## STATUTES

9 U.S.C. § 1 *et seq.* ........................................................ 22, 28, 41-42

9 U.S.C. § 16(a)(1)(B) .................................................................. 11

28 U.S.C. §§ 41, 1291, 1294(1) ................................................... 11

28 U.S.C. § 1332(d) ....................................................................... 22

28 U.S.C. § 1332(d)(2), (5) ........................................................... 11

15 Okla. Stat. § 775C.1 *et seq.* ............................................. 21-22

15 Okla. Stat. §§ 775C.2–775C.4 ................................................ 22

## RULES

Fed. R. App. P. 4(a)(1)(A) ........................................................... 11

Fed. R. Civ. P. 56 ......................................................... 28-31, 34, 38-42

## ARTICLES

Michelle Dunbar, *In Conspicuous Terms—Arbitration Agreements for the Modern Reasonable App User*, 1 Wm. & Mary Bus. L. Rev. 531 (2020) ................................ 45

Sapphire Fox, Online Shopping Statistics & Trends in 2023, https://www.cloudwards.net/online-shopping-statistics/#Sources (June 6, 2023) ............................................................................ 46

## STATEMENT OF RELATED CASES

Appellant Temu is aware of one prior and related appeal pending in this Court: *Eakins v. Whaleco Inc. d/b/a Temu*, 10th Circuit No. 24-6048. This appeal is related to *Eakins* because it involves the same defendant, same procedural posture, and same issues raised on appeal. Indeed, the district court in this case cited, extensively block-quoted, and essentially followed the *Eakins* decision. (App-193, 198-201.)[1]

## JURISDICTION

The United States District Court for the Western District of Oklahoma had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)&(5). (App-9-11.) Plaintiff Heather Smith alleges Oklahoma citizenship for herself and alleges that Defendant Whaleco, Inc. d/b/a Temu is a Massachusetts corporation with corporate headquarters in Massachusetts. (App-16.)

The district court entered its order denying Temu's motion to compel arbitration on July 23, 2024. (App-193.) Orders denying arbitration are appealable. 9 U.S.C. § 16(a)(1)(B). Temu timely appealed under Federal Rule of Appellate Procedure 4(a)(1)(A) on July 29, 2024. (App-205.) This Court has appellate jurisdiction under 28 U.S.C. §§ 41, 1291, 1294(1).

---

[1] Cites to the one-volume appendix take the form "App-[page]."

## ISSUES PRESENTED & STANDARD OF REVIEW

1.      Did Smith have an evidentiary burden to supply evidence to adequately oppose Temu's motion to compel arbitration, and does Smith's failure to supply any evidence mean that Temu's motion should have been granted?

2.      Does Temu's screenflow supply reasonably conspicuous notice of its Terms of Use, thus satisfying the inquiry notice standard?

This Court has *de novo* review regarding contractual assent. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012), *abrogated on other grounds by Atl. Marine Constr. v. W.D. Tex.*, 571 U.S. 49 (2013).

## INTRODUCTION

Through this appeal, Temu seeks to exert its fundamental bargained-for right to have Smith's dispute resolved by arbitration. When Smith signed up for an account to use Temu's mobile smartphone app and thereafter repeatedly used the app, she had actual notice or was (at minimum) on inquiry notice of, and thus assented to, Temu's bolded "**Terms of Use**," which were conspicuously presented to her on Temu's registration/sign-in screen and included a binding agreement to arbitrate any dispute against Temu solely on an individual basis. Nonetheless, after a dispute arose, Smith filed a putative class action complaint against Temu, rather than honor that binding agreement to arbitrate. Temu moved to compel arbitration under the Federal

Arbitration Act, and the district court denied the motion. In so doing, however, the district court erred at least twice: *First*, by ignoring that Temu met its evidentiary burden to demonstrate a valid arbitration agreement, which shifted the burden to Smith to submit contrary evidence, which she failed to do; and *second*, by ignoring the overall design of Temu's screen in its app and instead applying an outdated and incorrect analytical framework focusing on discrete design elements of the screen in isolation, which is an approach courts around the country have consistently rejected. This Court should reverse for both errors.

*First*, Tenth Circuit law is clear that courts apply a burden-shifting framework on a motion to compel arbitration similar to a summary judgment standard. The moving party (here, Temu) has the opportunity to submit evidence to demonstrate by a preponderance of the evidence that there is an enforceable arbitration agreement, and if successful in doing so, the nonmoving party bears the burden to raise a genuine dispute of material fact as to the existence of the agreement, and must do so with competent admissible rebuttal evidence. Here, Temu supplied evidence—in the form of a sworn declaration and authenticated business records—demonstrating that Smith was presented with the Terms of Use and manifested her assent to them at least twice, and thus that a binding arbitration agreement exists. But the district court ignored this, as did Smith. Simply put, the

evidentiary burden shifted to Smith, but she failed to supply *any evidence at all* to satisfy her burden. The district court erred in disregarding that absence of evidence, and that error alone is sufficient to reverse the denial of Temu's motion to compel.[2]

*Second*, the district court erred in holding that Temu did not provide Smith with adequate notice of the Terms of Use. The clear weight of authority asks whether *the overall design* of Temu's registration/sign-in screen gives reasonable notice of Temu's Terms of Use. It plainly does. *See, e.g.*, *Hu v. Whaleco, Inc. d/b/a Temu*, 2024 WL 4481439, *12 (E.D.N.Y. Oct. 1, 2024) (compelling arbitration in a case involving the same app and processes, stating "[b]ecause the Registration Screen appears uncluttered, is visible at once, and the notice and bolded hyperlinks are reasonably conspicuous and spatially and temporally coupled with a user's creation of an account, the Court finds that the Registration Screen provided Plaintiffs 'reasonably conspicuous notice' of the Terms '*in light of the whole [interface]*'") (emphasis added).

The design of Temu's screen is clean and uncluttered, and the registration or sign-in prompt appears on a single screen without the need for the user to scroll anywhere to see the Terms of Use. The

---

[2] While the district court did not consider whether Smith had raised a genuine dispute of material fact, the district court compounded that error by simply denying Temu's motion on its face and not following Section 4 of the FAA and conducting the requisite evidentiary hearing.

hyperlink to the Terms of Use is plainly visible in dark grey bolded font contrasting against a white background, immediately below the options for users to click "Continue" to create an account (through email, or through their Google, Facebook, Apple, or Twitter accounts). Circuit (and other) courts addressing substantially similar screens have held that this provides more than sufficient notice to a reasonably prudent smartphone user.

Here, the district court's analysis of Temu's screens suffered from a fundamental error: It considered each of the design elements in a vacuum and picked apart the individual elements (e.g., the color of the hyperlink, the placement and size of the notice text, etc.), but never, as the case law requires, considered the elements together in context. For example, the district court (1) emphasized that the hyperlink to the Terms of Use text was "small," but ignored that it is only marginally smaller than other text on the screen; (2) observed that the distance between the notice text and the orange "Continue" button was too far apart, but did not consider that it appeared immediately at the end of the row of "Continue" buttons and, accordingly, could not and did not identify where on the screen would be a more appropriate location for the Terms of Use hyperlink; and (3) noted that the Terms of Use hyperlink was in grey font against a white background, but did not consider that other text on the screen that is indisputably designed to catch the user's attention—like the prompts asking the user to enter

their email or phone number, and if the user is having trouble signing in—is in lighter grey font.

This Court, exercising *de novo* review and undertaking a "fact-intensive inquiry" from the viewpoint of a "reasonably prudent Internet user," should reach the same conclusion as other Circuit courts to consider similar screens and should find that Temu's screen provided reasonably conspicuous notice of its Terms of Use and that Smith was at least on inquiry notice that she would be bound by those terms. *See, e.g., Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 513-15 (9th Cir. 2023); *Edmundson v. Klarna*, 85 F.4th 695, 705-07 (2d Cir. 2023); *Meyer v. Uber Techs.*, 868 F.3d 66, 76-79 (2d Cir. 2017); *Domer v. Menard, Inc.*, 116 F.4th 686, 695-99 (7th Cir. 2024); *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 475-77 (9th Cir. 2024); *Keebaugh v. Warner Bros. Entm't*, 100 F.4th 1005, 1013-21 (9th Cir. 2024); *Cullors v. Cerebral, Inc.*, 2024 WL 3385530, *2 (9th Cir. July 12, 2024).

## STATEMENT OF THE CASE

**A.    Temu operates an online marketplace and Temu's Terms of Use require arbitration to resolve disputes.**

Temu operates a global online retail marketplace where consumers can purchase a variety of products through Temu's website (www.temu.com) or mobile app. (App-16, 72, 107-09.) To participate in this marketplace, one must first create an account through Temu's

website or app. (App-108.) In doing so, a user using an Android smartphone is presented with the following screen (App-115):



Users can create an account (1) by entering their email or phone number and pressing a "Continue" button, or (2) by pressing one of the other four white buttons to continue using common online account services. (App-115.) At the bottom of the screen, beneath these sign-in buttons is a statement in that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (App-115 [bold original].) The bolded "Terms of Use" text is hyperlinked, which leads to Temu's Terms of Use containing a mandatory individual arbitration provision. (App-110, 134-35.)

At the outset of the Terms of Use is notice of Temu's arbitration agreement in all-capitalized text. (App-119.) The Terms of Use then sets forth the Arbitration Agreement in paragraph 20, titled "DISPUTE RESOLUTION." (App-134-39.) Paragraph 20 also asserts in all caps and bold text that the Terms of Use "includes an agreement to arbitration which requires, with limited exceptions, that all disputes between you and Whaleco be resolved by binding and final arbitration." (App-135, allcaps and boldface omitted.) Paragraph 20.1 then asserts:

> "you and Whaleco agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Service, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each,

18

a 'Dispute') will be resolved by binding
arbitration ...." (App-135.)

**B.   Smith created a Temu account and logged-in to Temu,
clicking "Continue" buttons on screens that said
"By continuing, you agree to our Terms of Use ...."**

Temu's business records show that on December 30, 2022,
someone using the phone number associated with Smith downloaded
Temu's app to an Android smartphone and completed all registration
and account sign-in steps to create and use a Temu account. (App-16,
109, 141.) Specifically, Smith entered her phone number and clicked the
"Continue with Google" button on a screen that read "By continuing,
you agree to our **Terms of Use** ...." (App-109-10, 115.)

Next, a pop-up window was displayed allowing the user options
to "Cancel" or "Continue." (App-110, 116.) Smith clicked "Continue" and
was then presented with another screen that gave the user the choice
between using a previously identified email address or using another
account (App-110, 117), noting "To continue, Google will share your
name, email address, language preference, and profile picture with
Temu. Before using this app, you can review Temu's **privacy policy**
and **terms of service**"[3] (bold and blue text in original):

---

[3] This hyperlink leads to Temu's "Terms of Use."



Smith clicked the top button to use her existing Google account (anonymized by the pink circle and grey lines in the image above), thereby completing the Temu sign-up process. (App-111.)

Furthermore, on March 30, 2023, someone using Smith's smartphone logged on to the Temu app, clicking the "Continue with Apple" button to do so, using an Apple account associated with that phone. (App-111-12, 141.) The login-in page was the same as before, again presenting the language that "By continuing, you agree to our **Terms of Use** …." (App-111-12, 115.)

Moreover, on January 25, 2023, someone using Smith's phone again accessed Temu, and when presented with a screen titled "Sign up for texts to get" affirmatively subscribed (i.e., provided prior express written consent) to receive marketing text messages from Temu. (App-112, 143 ["You agree to receive autodialed marketing messages on this number."].)

Thus, Temu's records show that, on separate dates, Smith clicked a "Continue" button at least twice on a screen that said "By continuing, you agree to our **Terms of Use**" (App-109-12, 115, 141) and clicked a "Submit" button to "agree to receive" texts from Temu (App-112, 143).

Smith alleges that Temu sent her at least one unsolicited automated text message. (App-18-20, 22.)

## C. Smith sues Temu in state court; Temu removes the case to federal court.

Smith sued Temu in Oklahoma state court, filing a proposed class action under Oklahoma's Telephone Solicitation Act (OTSA), 15 Okla. Stat. § 775C.1 *et seq*., seeking statutory damages and injunctive relief.

(App-15-27.) OTSA prohibits telephonic sales calls, including text messages, to wireless phones if such calls involve an automated system for the selection or dialing of telephone numbers without the prior express consent of the receiving party. *See* 15 Okla. Stat. §§ 775C.2–775C.4. Smith alleged that Temu violated OTSA by sending automated text messages to her cellular phone without her prior express consent. (App-15-20.) Smith sought to represent a class of "at least several thousand" Oklahomans who allegedly received unsolicited text messages from Temu. (App-20-21.)

Temu disputes all of Smith's allegations, believes her lawsuit is meritless, and denies that Smith or her putative class have been harmed or that class treatment is appropriate. (App-9.)

Temu removed Smith's lawsuit to federal court based on federal jurisdiction provided by the Class Action Fairness Act, 28 U.S.C. § 1332(d). (App-7-12.)

## D. Temu moves to compel arbitration, but the court denies arbitration.

Temu moved to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. (App-66-96.) Temu explained that Smith had downloaded Temu's app onto her smartphone and created a Temu account, thereby agreeing to Temu's Terms of Use in December 2022. (App-72-75.) Further, Smith again logged on to her Temu account

and agreed to the Terms of Use in March 2023. (App-78.) Smith also signed up to receive marketing texts from Temu. (App-78, 112, 143.)

Specifically, on December 30, 2022, Smith clicked the "Continue with Google" button to create her account on a screen that had the bolded hyperlinked "**Terms of Use**" in close proximity to the button, along with adjacent text explaining that "By continuing, you agree to our **Terms of Use ….**" (App-75-77.) Then, on March 30, 2023, Smith again agreed to Temu's Terms of Use by logging on to her Temu account using her pre-existing Apple account using her smartphone, using substantially the same process. (App-78.) By doing so, Smith manifested her assent to those terms and, therefore, agreed to arbitrate her underlying claim.

Temu explained that its burden was only to prove the existence of a contract by a preponderance of the evidence, which Temu had done with evidence that Smith registered her account and clicked "Continue" buttons twice to show her assent. (App-80-83.) This shifted the burden to Smith to disprove contract formation. (App-83.) Temu cited cases to establish that the average reasonable adult consumer understands that by signing up online for services, he or she is accepting the terms and conditions of the provider. (App-83-88.)

To remove any doubt about the effectiveness of Temu's enrollment process and screens, Temu cited a case in which a plaintiff/user was found to have assented to Temu's Terms of Use in essentially the same

way that Smith did: *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023). (App-86, 100-04 [*Fontanez* decision].)

Temu noted how its screen presented its Terms of Use in a typical manner similar to that used by many other companies, and approved in many other cases. Specifically, Temu's assent-text was clear, legible, bolded, and proximate to the action button that a user had to click to proceed. (App-88-89.) Therefore, Temu maintained that Smith had actual notice of the Terms of Use, or least had inquiry notice of the Terms of Use, unambiguously manifested her assent to those Terms, and thus was required to arbitrate her underlying claims. (App-89.)

In opposition, Smith argued—albeit only through her counsel and with no supporting admissible evidence—that no arbitration agreement existed given the inconspicuousness of Temu's Terms of Use on the screens, i.e., it was "small, lightly colored," and "well beneath the massive, bright orange 'Continue' button …." (App-149.)[4] Smith cited *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, 2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023), which analyzed Temu's registration/sign-in screen, as precedent that Temu's screen failed to conspicuously notify users that they were agreeing to be bound by

---

[4] When examining the entire screen, it is clear that the top "Continue" button is not any larger than the other "Continue" buttons. (*See* App-115.)

Temu's Terms of Use. (App-149, 154, 159-60, 175-79 [*Johnson* decision].)

Tellingly, Smith's opposition supplied no *evidence* whatsoever. In particular, Smith failed to supply a declaration from her, which could have asserted that she did not know that she was agreeing to Temu's Terms of Use or that she did not see the Terms of Use hyperlink.

Accordingly, Temu's reply began by asserting that its motion to compel arbitration should be granted because Smith failed to meet her evidentiary burden in opposing Temu's motion, given that she never denied seeing, reading, or understanding Temu's Terms of Use. (App-181.) Temu supplied evidence that Smith had actual notice (or at the very least was on inquiry notice) of the Terms of Use and assented to them, and Smith failed to contradict this, e.g., she never denied clicking the "Continue" buttons nor denied knowing that by doing so she was agreeing to be bound by the Terms of Use (and therefore to arbitrate her claims). Instead, Smith's opposition focused solely on the inquiry notice test (i.e., that the Terms of Use hyperlink was inconspicuous). Temu then explained why Smith was also on inquiry notice of the Terms of Use (App-184-87) and distinguished the cases Smith cited (App-187-90).

The district court denied Temu's motion, without an evidentiary hearing. (App-193-204.) The court framed the issue as whether Smith "received conspicuous notice" of the Terms of Use, noting the that the

relevant factors to consider include "the size and color of font used in the notice, the means of denoting a hyperlink," the "spatial connection between the notice and the button intended to manifest assent," and "any visual distractions or features that detract from the clarity of the notice." (App-197.)

The district court included a lengthy excerpt from the *Eakins* district court decision (which in turn was largely based on a fundamentally flawed opinion in the *Johnson* case), indicating its agreement that the first two screens failed to provide reasonably conspicuous notice of its Terms of Use based on a "failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use." (App-197-200.) The district court also adopted the *Eakins* district court's acontextual analysis of the "design and content" of screens, focusing on the color and size of the notice text and its position at the bottom of the screen and distance from the orange "Continue" button that Smith pressed. (App-199-200.)[5]

---

[5] The district court also incorporated the sections of the *Eakins* court's analysis (1) acknowledging *Fontanez v. Whaleco*, which found that Temu's webpage was conspicuous enough to put the reasonably prudent person on notice, but ultimately finding *Fontanez* distinguishable because the plaintiff there used the "Continue with Apple" button and was a plaintiff in other similar class action lawsuits; (2) citing *Johnson v. Whaleco*, which found that Temu's Terms of Use were not conspicuous based on its placement at the bottom of the page and the use of a "very light grey font against a white background, devoid of underlined text or any conspicuous visual cues;" and (3) discounting the

The district court went on to consider the "Choose an account" screen, including that the words "**terms of service**" (a hyperlink to the same Terms of Use on the initial screen) "were in a blue color, which commonly denotes the existence of a hyperlink." (App-202.) On this screen, however, the district court shifted its focus to the language of the disclosure and concluded that the "phrasing d[id] not provide any notice" "that Plaintiff was consenting to a contract with defendant by using this avenue to proceed." (App.-202.)

Temu timely appealed. (App-205.)

## SUMMARY OF ARGUMENT

Temu's motion presented admissible evidence that Smith had actual notice of the Terms of Use, yet Smith failed to rebut actual notice and raise a genuine issue of material fact on that issue, as she was required to do by the burden-shifting framework. Smith's failure to supply even a simple declaration disclaiming assent to Temu's Terms of Use should have sufficed to require the district court to grant Temu's motion, or at least prompted the district court to conduct an evidentiary hearing.

Setting aside the issues of actual notice and the dearth of rebuttal evidence offered by Smith, the motion should also have been granted based on the inquiry notice test. Inquiry notice was satisfied here

_____

value of subsequent accessing of Temu's screens, where the user would have been presented with the Terms of Use notice text again. (App-200.)

because Temu's screens provided reasonably conspicuous notice text and readily visible and bolded hyperlinked **Terms of Use**. A fact-intensive examination of the layout and language of Temu's screens establishes that a reasonable user would have seen the notice text and **Terms of Use**.

## ARGUMENT

**A. Temu presented evidence that Smith had actual notice, and Smith failed to rebut actual notice, which she could and should easily have done by providing her own declaration.**

**1. The summary judgment standard applies in determining the existence of a valid arbitration agreement, and Temu met its initial evidentiary burden.**

In resolving contract formation challenges in opposition to motions to compel arbitration, federal courts in this Circuit must apply the familiar Federal Rule of Civil Procedure rule 56 summary judgment standard to determine whether an arbitration agreement exists. *See, e.g., Hancock,* 701 F.3d at 1261. Thus, where a party raises an arbitration agreement formation challenge, "a court may grant a motion to compel arbitration [under the FAA] if there are no genuine issues of material fact regarding the parties' agreement." *Id.* (citations omitted).

This means that the party seeking to compel arbitration (here, Temu) "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable arbitration agreement."

*Bellman v. i3Carbon, LLC*, 563 F.Appx. 608, 612 (10th Cir. 2014); *see also BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Bernalillo,* 853 F.3d 1165, 1176-77 (10th Cir. 2017) (citing *Hancock*, 701 F.3d at 1261). To meet this burden, a movant need only show the existence of an agreement to arbitrate by a *preponderance of the evidence. See, e.g., Melnick v. TAMKO Bldg. Prod. LLC*, 2022 WL 4355299, *4 (D. Kan. Sept. 20, 2022) (emphasis added); *SRI of N.M. v. Hartford Fire Ins. Co.*, 2015 WL 12803774, *3 (D.N.M. June 26, 2015); *Island Peak Ranch v. FIIK Inv. & Holdings*, 2008 WL 2673925, *9 (D. Utah July 7, 2008).

Once that initial burden is met, the burden shifts to the plaintiff "to raise a genuine dispute of material fact regarding the existence of an [arbitration] agreement." *Bellman*, 563 F.App'x. at 612. Under Rule 56, a fact is "material" if it pertains to an element of a claim or defense, whereas a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Yet, one cannot raise such a dispute in a vacuum under Rule 56, either in the context of a summary judgment motion or a motion to compel arbitration. Rather, a party making an arbitration contract formation challenge can only prevail by submitting admissible evidence establishing a genuine dispute of material fact on that issue. *See, e.g., Waltrip v. Pilot Travel Ctrs.*, 2022 WL 684327, *2 (D.N.M. Mar. 8, 2022)

("Like in the summary judgment context, a party must offer admissible evidence to prove the existence of an [arbitration] agreement.") (citing *Clowdis v. Colo. Hi-Tec Moving & Storage*, 2011 WL 5882191, *8 (D. Colo. Nov. 3, 2011)); *see also World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir. 1985) (only admissible evidence may be considered under Rule 56).

It is also well-established that "'[u]nsupported conclusory allegations … do not create a genuine issue of fact'" under Rule 56. *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1237 (10th Cir. 2004) (quoting *L&M Enters. v. BEI Sensors & Systems*, 231 F.3d 1284, 1287 (10th Cir. 2000)); *see also Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 2015 WL 558702, *1 (D. Colo. Feb. 10, 2015) ("conclusory allegations that are unsupported by evidence do not create a genuine issue of fact").

In the arbitration context, general denials are not enough to raise a genuine issue of material fact as to the existence of arbitration agreement. *See, e.g., Beattie v. TTEC Healthcare Sols.,* 2019 WL 2189481, *2 (D. Colo. May 21, 2019) ("[g]eneral denials and statements that a user does not recall visiting a website or agreeing to arbitrate are insufficient to defeat arbitration") (quoting *Petrie v. GoSmith, Inc.,* 360 F.Supp.3d 1159, 1162 (D. Colo. 2019)); *Davis v. USA Nutra Labs,* 303 F.Supp.3d 1183, 1192 (D.N.M. 2018) ("In the face of Groupon's evidence that Plaintiff could not have completed her purchase without clicking on the button accepting Groupon's Terms of Use, the fact that Plaintiff

does not remember seeing, or agreeing to, Groupon's Terms of Use is insufficient to create a genuine dispute of material fact.").

Nor are speculative arguments in an opposition brief to a motion to compel sufficient to avoid arbitration. *See, e.g., Brown v. AutoNation Chrysler Dodge Jeep Ram Sw*., 2021 WL 2514524, *3 (D. Colo. June 18, 2021) ("conclusory legal arguments" are "insufficient to create a genuine dispute of material fact").

Here, Temu's low evidentiary burden required it only show "evidence sufficient to demonstrate" Smith's actual knowledge. *BOSC*, 853 F.3d at 1177. Temu easily met this burden by submitting authenticated business records demonstrating that, on at least two occasions, Smith was presented with the Terms of Use containing the arbitration provisions, including when she first signed up for the account and when she signed in and used Temu's app. (*See* App-109-112, 141.)

Courts within this Circuit have found similar evidence sufficient to meet the movant's initial burden to demonstrate the existence of a valid agreement to arbitrate and shift the evidentiary burden to the opposing party. *See, e.g.*, *Blake v. JPay, LLC*, 2022 WL 1223634, *4 (D. Kan. Apr. 26, 2022) (sufficient for burden-shifting analysis to proffer statement that plaintiff was presented with Terms of Service, which included agreement to arbitrate); *Nardo v. HomeAdvisor, Inc.*, 2022 WL 17547940, *5 (D. Colo. July 27, 2022), *report & rec. adopted*, 2022 WL

17547938 (Aug. 11, 2022) (sufficient to proffer screenshots showing plaintiff visited the site in question and clicked a button acknowledging assent to the Terms and Conditions); *Ivy Bridge v. Nature's Sunshine Prods.*, 2022 WL 604857, *4 (D. Utah Mar. 1, 2022) (sufficient to proffer declaration stating that the arbitration agreement was emailed to the plaintiffs); *Beattie*, 2019 WL 2189481, *2 (sufficient to proffer screenshots showing plaintiffs were presented with hyperlinks to the arbitration agreement and an accompanying explanation of their assent); *Petrie*, 360 F.Supp.3d at 1162 (sufficient to proffer website data showing plaintiff assented to the Terms of Use containing the arbitration agreement when registering for a website account). The district court did not consider this when denying Temu's motion to compel arbitration. (*See* App-193-204.)

But after Temu shifted the burden to Smith "to raise a genuine dispute of material fact regarding the existence of an [arbitration] agreement," *Bellman*, 563 F.App'x. at 612, Smith's opposition presented no evidence. Smith could simply have submitted a declaration denying the existence of an arbitration agreement. But she failed to supply such a declaration or any other form of evidence. Instead, she relied solely on argument to that effect raised by her counsel in her opposition, which is insufficient as a matter of law to raise a genuine issue of material fact on the issue of contract formation. The district court should have recognized Smith's evidentiary failure and as a result should have

granted Temu's motion. *See Vernon v. Qwest Commc'ns Int'l*, 925 F.Supp.2d 1185, 1191 (D. Colo. 2013) ("We live in an electronic age. It is commonplace these days to enter into agreements electronically."). Therefore, the district court erred when it found that Temu had not met its initial burden to show the existence of the agreement to arbitrate.

### 2. Smith failed to meet her evidentiary burden and failed to raise a genuine dispute of material fact as to the existence of an arbitration agreement.

The district court seemingly overlooked that either actual *or* inquiry notice is sufficient to establish the notice prong of contract formation, and therefore failed to respond to Temu's argument and evidence, as well as Smith's lack of rebuttal evidence, showing that Smith was on actual notice of the terms. The district court considered *only* whether Smith was on inquiry notice. (*See generally* App-196-203.) In so ruling, the district court did not properly apply (or even consider) whether Smith had satisfied her burden to present admissible evidence to raise a genuine dispute of material fact on the contract formation issue. That failure alone constitutes reversible error.

Recent decisions from district courts in this Circuit compelling arbitration on facts similar to those here are instructive. In *Beattie*, for example, the defendants "provided an unsigned copy of the arbitration agreement" and "the dates on which [plaintiffs] 'completed' the arbitration agreement" by "clicking [an] 'Accept' button after having

an opportunity to read it." *Beattie*, 2019 WL 2189481, *1-2. In response to defendant's motion to compel arbitration, the plaintiffs there (like Smith here) did not argue that they did not have actual notice of the applicable terms containing the subject arbitration agreement, nor did they submit any evidence in connection with their opposition brief showing that the terms were never provided to them or that they did not have an opportunity to read them. Instead, they argued only that they "do not recall agreeing" to them. *Id.* at *1.

Consequently, the court granted defendants' motion, holding: "In the face of Defendants' records indicating that [p]laintiffs … assented to the arbitration agreement, [p]laintiffs offer only speculative arguments and their lack of recall. This is not enough to raise a genuine dispute about the existence of the arbitration agreement." *Id.* at *2. *See also Nardo*, 2022 WL 17547940, *5-6, (enforcing agreement where plaintiff did not submit evidence disputing notice and thus did not meet "his burden of raising a genuine issue of material fact in response to the evidence presented" by the defendant) (applying *Bellman*).

Similarly, in *Ivy Bridge,* 2022 WL 604857, *4, the plaintiffs argued the defendant did not meet its initial burden under Rule 56 by failing to proffer evidence of a valid and enforceable agreement to arbitrate that was (1) sent to and received by plaintiffs (2) signed or acknowledged by each plaintiff and (3) that conspicuously informed each plaintiff of the arbitration agreement and plaintiffs' waiver of their right to a jury trial.

In compelling arbitration, the court noted that (1) the defendant had submitted a sworn declaration testifying the subject arbitration agreement was emailed to each of the plaintiffs and, thus, the plaintiffs were "sufficiently notified" of the agreement, and (2) the plaintiffs did not submit a sworn declaration of their own denying receiving that email or any evidence otherwise rebutting the defendant's declaration demonstrating that each of the plaintiffs assented to the agreement. *Id.* Consequently, the court held the "[p]laintiffs' failure to submit any evidence to rebut the [defendant's declaration] precludes the court from finding that there was no agreement to arbitrate" formed. *Id.* at *7.

Numerous other district courts in this Circuit have reached similar conclusions, and have consistently granted motions to compel arbitration like Temu's where the non-movant fails to raise a genuine dispute of material fact on the contract formation issue through competent admissible evidence. *See e.g., Petrie,* 360 F.Supp.3d at 1162-63 (compelling arbitration where plaintiff failed to present "any evidence that would refute the conclusion" that he electronically accepted the defendant's terms); *Levine v. Vitamin Cottage Nat. Food Markets,* 2021 WL 4439800, *7 (D. Colo. Sept. 27, 2021) ("Where the Court has no evidence to suggest that any of these individuals contest the authenticity of the [arbitration] agreements, no issue of material fact is apparent."); *Martinez v. Capstone Rest. Grp.,* 2021 WL 1723776, *3 (D. Colo, Mar. 31, 2021) (compelling arbitration where the defendant

met its initial evidentiary burden of demonstrating the existence of an enforceable arbitration agreement, which the plaintiff failed to overcome with any contrary evidence); *Waltrip*, 2022 WL 684327, *6 (plaintiff who failed to submit a sworn declaration to oppose a motion to compel arbitration "has not shown a genuine question of material fact precluding an order to arbitrate his dispute"; and rejecting the other plaintiffs' self-serving declarations challenging contract formation, which merely stated they did not "recall" seeing the agreement but lacked any competent evidentiary support); *Blake,* 2022 WL 1223634, *5 (plaintiff's "'[v]ague, conclusory statements' that he does not recall the [arbitration] [a]greement 'do not suffice to create a genuine issue of material fact'") (quoting *Adler v. Wal-Mart Stores*, 144 F.3d 664, 674 (10th Cir. 1998)); *Clements v. Alto Trust Co.*, 2023 WL 5002472, *7 (D.N.M. Aug. 4, 2023) (enforcing arbitration where plaintiff presented no evidence suggesting he "was unable to see or click on the hyperlinks" to the operative terms).

These decisions are in accord with many others from courts around the country. In *Cordas v. Uber Technologies,* 228 F.Supp.3d 985, 989 (N.D. Cal. 2017), for example, the court relied on the declaration of an Uber engineer that described the rider sign-up and registration process and on screenshots of the Uber application in determining whether the plaintiff had agreed to Uber's terms and conditions. Rejecting the plaintiff's contract formation challenge, the court noted

that the plaintiff "offer[ed] no evidence to rebut [the Uber engineer's] reasoned declaration other than his own conclusory allegations that he never received notice of the terms and conditions and that [the Uber engineer's] declaration is false and inadequate." *Id.* at 990. Thus, the court held the plaintiff failed to raise a genuine dispute of material fact on the formation issue. *Id.*; *see also, e.g., Aldrich v. Univ. of Phx., Inc.,* 661 F.App'x 384, 390-91 (6th Cir. 2016) (finding there was "no dispute before the district court that the plaintiffs received" the defendant's handbook containing the subject arbitration agreement and "had notice of the arbitration agreement," despite the fact that plaintiffs generally denied having received, seen, or electronically signed the acknowledgment form, where the plaintiffs "cited no evidence (other than their own affidavits) disputing the university's evidence, and there was therefore no dispute of material fact entitling plaintiffs to a jury trial on the issue"); *La Force v. GoSmith, Inc.,* 2017 WL 9938681, *4 (N.D. Cal. Dec. 12, 2017) (compelling arbitration where plaintiff "himself offer[ed] no declaration regarding his registration on the [defendant's] website"); *Rose v. Mercedes-Benz USA,* 2023 WL 8544143, *3 (N.D. Ill. Dec. 11, 2023) (compelling arbitration where defendant submitted evidence that the arbitration agreement was provided to the plaintiffs, who in turn did "not provide[] factual support that they did not receive actual notice … besides a lack of recollection (and not a sworn denial that it did not occur)"); *Ferrell v. to AppFolio, Inc.,* 2024

WL 158103, *2 (C.D. Cal. Jan. 11, 2024) (compelling arbitration, noting "'courts have consistently enforced [click]wrap agreements where the user had *actual notice* of the agreement,' as where the user must 'manifest assent to the [website's] terms and conditions expressly'—by, for example, clicking a button acknowledging that assent") (quoting *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1176 (9th Cir. 2014) (emphasis original)).[6]

*Fontanez v. Whaleco* is instructive. That court applied the same summary judgment standard as under Federal Rule of Civil Procedure 56, and compelled arbitration under these same Terms. There, Temu moved to compel arbitration in a case involving essentially the same sign-in processes Smith used here. (*See* App-99-103.) In granting Temu's motion to compel, the *Fontanez* court noted the plaintiff there likewise "never specifically argue[d] that she did not have actual knowledge of [Temu's] Terms of Use." (App-102-03.) Thus, after considering the layout of Temu's page, the court found that, "by clicking 'Continue,' [that plaintiff] assented to the Terms of Use that contained an arbitration clause." (App-103.)

---

[6] In *Ferrell*, the court compelled arbitration even where the plaintiff admitted in a sworn declaration that she entered into the defendant's clickwrap agreement, but just generally averred that she was "not aware" that she had agreed to arbitrate her claim by doing so, and "did not see an arbitration agreement, or any mention of an arbitration agreement, when [she] signed up." *See* No. 8:23-cv-01353-JWH-DFH (C.D. Cal.), Dkt. 39-1, ¶¶7, 9, 10. *Smith did not even do that much.*

This precedent demonstrates that the district court in this case erred by not considering Smith's failure to meet her evidentiary burden when ruling on Temu's motion. Here, Temu submitted admissible evidence supporting its motion, i.e., authenticated business records, demonstrating that its Terms containing the subject arbitration provisions were provided to Smith at least twice. (*See* App-109-112, 141.) *See also Nicosia v. Amazon.com, Inc.*, 2017 WL 10111078, *10-11 (E.D.N.Y. Aug. 18, 2017), *report & rec. adopted,* 384 F.Supp.3d 254 (E.D.N.Y. 2019), *aff'd*, 815 F.App'x 612 (2d Cir. 2020) (compelling arbitration, holding the plaintiff had actual notice of the defendant's terms, where he placed orders on the defendant's website after the litigation began and his attorneys had been notified of the existence of the arbitration agreement) (citing *Link v. Wabash R. Co.,* 370 U.S. 626, 634 (1962)).

In accord with applicable authority cited below and here, this satisfied Temu's initial burden under Rule 56 to show the existence of an arbitration agreement, and is sufficient to demonstrate that Smith had actual notice of the Terms and Arbitration Provisions and, thus, that a valid arbitration agreement was formed.

In stark contrast, Smith did not attempt to rebut any of Temu's evidence with any evidence of her own in support of her opposition to the motion (*see* App-144-74)—much less admissible evidence, as required under Rule 56. *See also Melnick*, 2022 WL 4355299, *4, *6

(non-movants have the burden to identify specific evidence demonstrating a material disputed issue as to the existence of an arbitration agreement, and that to demonstrate a genuine issue of material fact, the disputed facts must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit) (citing *Rangel v. Hallmark Cards, Inc.*, 2010 WL 781722, *4 (D. Kan. Mar. 4, 2010) and *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000)).

Smith relied solely on the mere arguments of her counsel in her opposition brief. (*See* App-144-74.) But again, that is insufficient to raise a genuine dispute of material fact as to the formation of an arbitration agreement under this Court's binding precedent. *See Hancock* 701 F.3d at 1265-67 (affirming order compelling arbitration where plaintiff did not provide sworn testimony or any other evidence disputing the existence of an arbitration agreement).

Temu even pointed out Smith's failure to carry her evidentiary burden in its reply briefing on the motion (*see* App-181-84), but the district court ignored this point. Nevertheless, because Smith failed to meet her evidentiary burden under Rule 56 and did not present a genuine dispute of material fact as to the existence of a valid arbitration agreement with admissible evidence, as required, the district court erred in denying Temu's motion. This Court should therefore reverse.

### 3. If a genuine dispute of material fact exists regarding contract formation, this Court should remand for an evidentiary hearing.

The district court also erred in denying Temu's motion without first conducting an evidentiary hearing, as is also required. As explained above, courts must apply the Rule 56 summary judgment standard when determining the existence of an arbitration agreement. *See Hancock* and *Bellman*, *supra*. Further, the FAA expressly provides that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

This well-established law dictates that, if there is no genuine issue of material fact concerning the existence of a valid arbitration agreement, a federal court may conclude as a matter of law that the parties entered into such an agreement, and may enforce it without a hearing. *See, e.g., THI of N.M. at Vida Encantada v. Archuleta*, 2013 WL 2387752, *6 (D.N.M. Apr. 30, 2013) ("A court should only decide as a matter of law whether the parties entered into an agreement to arbitrate when there is no genuine issue of material fact concerning the formation of the agreement.") (citing *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997)).

If, however, the non-movant raises a genuine dispute of material fact on the arbitration contract formation issue, FAA Section 4 *requires* the court to "proceed summarily to trial"—i.e., conduct an evidentiary

hearing—to resolve that issue *before* ruling on the motion to compel arbitration. *See Bellman*, 563 F.App'x at 612; *Howard v. Ferrellgas Partners,* 748 F.3d 975, 984 (10th Cir. 2014) ("Summary-judgment-like motions practice may be a permissible and expedient way to resolve arbitrability questions when it's clear no material disputes of fact exist and only legal questions remain. But when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them isn't by round after round of discovery and motions practice. It is by proceeding summarily to trial. *That is the procedure [Section 4 of] the [FAA] requires*") (emphasis added); *Ham v. CarMax Auto Superstores,* 2024 WL 2093655, *4 (D.N.M. May 9, 2024) ("When material issues of fact exist, a trial on the existence of the agreement is warranted (by jury, if requested by a party)" under FAA Section 4.) (citing *BOSC*, 853 F.3d at 1177).

Here, Smith failed to meet her Rule 56 evidentiary burden and thus did not raise a genuine issue of material fact on the contract-formation issue. While the district court erred by not considering whether Smith had raised a genuine dispute of material fact through the submission of competent admissible evidence, it compounded that error by simply denying Temu's motion on its face by not following Section 4 of the FAA and conducting the requisite evidentiary hearing.

Put differently, if the district court concluded (or if this Court concludes) that Smith raised a genuine issue of material fact on

contract formation, despite her failure to submit any evidence, that does not mean that she can simply carry on with prosecuting her underlying claim against Temu in court. Rather, FAA Section 4 mandates that there be an evidentiary hearing to resolve those disputed facts and determine whether this case should be arbitrated before resolving Temu's motion. The district court's failure to conduct a hearing here also constitutes reversible error. *See, e.g., Howard,* 748 F.3d at 984 (reversing and remanding for further proceedings where the district court denied the motion to compel without conducting a trial).

Thus, while this Court should not conclude that Smith raised a genuine dispute of material fact regarding contract formation—given her failure to provide any supporting evidence to oppose Temu's motion—it should at the very least order the district court to conduct an evidentiary hearing to resolve this dispute, if the case is remanded.

## B. Temu's screens satisfy the inquiry notice test for contract formation.

The district court also erred by ruling that Smith was not on inquiry notice of Temu's Terms of Use.

This Court recognizes that, under Oklahoma law, if an agreement provides "reasonable notice of its terms" and the "consumer affirmatively manifests assent to the terms," the consumer is bound by the terms. *Hancock*, 701 F.3d at 1256; *see also Bellman,* 563 F. App'x at 612 (quoting *Walker v. BuildDirect.com Techs.*, 733 F.3d 1001, 1004

(10th Cir. 2013) (courts apply "ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute")).

Courts often call this the "inquiry notice" test and find online consumers to be bound to Terms of Use if a screen provides reasonably conspicuous notice of the terms and the consumer takes some action that manifests assent to those terms. *E.g.*, *Patrick*, 93 F.4th at 477 (notice was conspicuous where it was "on an uncluttered page and is not hidden or obscured" and "clear and legible"); *Keebaugh*, 100 F.4th at 1020. *See generally Cooper v. Flesner*, 103 P. 1016, 1020-21 (Okla. 1909) ("notice" is knowledge of facts and circumstances that would alert a reasonable, prudent person to investigate).

Here, exercising *de novo* review, this Court should find that Temu's screen provides reasonable notice of its Terms of Use such that Smith manifested assent to those terms by creating and using her account (i.e., clicking the "Continue" button above the notice text reading "By continuing, you agree to our **Terms of Use** …").

1. **Temu's screen used placement, color, size, and other factors to make its Terms of Use reasonably conspicuous.**

When assessing inquiry notice, courts engage in a fact-intensive analysis of the design and content of the screens. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-58 (9th Cir. 2022);

*Meyer*, 868 F.3d at 76. Specifically, to evaluate whether an online textual notice is sufficiently conspicuous, courts examine the totality of the visual elements of the screen, considering factors such as text placement, especially its proximity to any button the user must click to continue; the obviousness of any hyperlinks; text color, particularly compared to the background color; text size; and whether any other elements on the screen clutter or obscure the textual notice. *Oberstein*, 60 F.4th at 515 (size, format, placement, and general website design).

Courts evaluate conspicuousness from the standpoint of the "'reasonably prudent' internet or smartphone user" who "is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app." *Edmundson*, 85 F.4th at 703; *Hu v. Whaleco*, 2024 WL 4481439, *12, n.11 (same, citing *Edmundson*); *Davis*, 303 F.Supp.3d at 1191 (applying "reasonably prudent internet user" standard); *cf. Meyer*, 868 F.3d at 77 ("when considering the perspective of a reasonable smartphone user, we need not presume that the user has never before" "entered into a contract using a smartphone"); Michelle Dunbar, *In Conspicuous Terms—Arbitration Agreements for the Modern Reasonable App User*, 11 Wm. & Mary Bus. L. Rev. 531, 561 (2020) ("Modern app users understand what various types of hyperlinks look like" and "understand

what the language "Terms and Conditions" means and what constitutes entering into such contracts").[7]

A fair examination of Temu's screen here compels the conclusion that it provided reasonably conspicuous notice.

### a. Temu's screen is cleanly designed to provide adequate notice.

The overall design of Temu's screen is clean and uncluttered. The background color is white, making text stand out. There is very little in terms of color—apart from Temu's name, in orange, and one "Continue" button, also in orange (which is a color consistent with Temu's logo and branding). There is nothing on the screen to distract a user from seeing all the text on the page, which is all visible on a single screen, without the need for scrolling to see anything. There are no colorful graphics or distracting moving images. The screen merely contains Temu's name at the top, has two icons and text indicating Temu's benefits (i.e., free shipping on all orders and free returns within 90 days), a single box for a user to input either an email or phone

---

[7] Only 7% of American adults do not use the internet. *See* Sapphire Fox, Online Shopping Statistics & Trends in 2023, https://www.cloudwards.net/online-shopping-statistics/#Sources (June 6, 2023) (citing 2021 Pew Research Center). In contrast, 76% of U.S. adults are online shoppers, with 62% considered "regular online shoppers" who buy a product or service online more often than once a month. *Id.* In short, the average American is an internet shopper, and understands how to create and use online accounts—which includes online contracting, i.e., manifesting assent to Terms of Use.

number, and then five identically-sized and -shaped "Continue" buttons, one of which must be clicked to continue.

Beneath these buttons is a simple, declarative sentence asserting: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." This notice is not buried in other text nor concealed in any way. Indeed, there are only 45 words on the entire first screen, including this 14-word notice. (App-115.) *See Hu v. Whaleco*, 2024 WL 4481439, \*12 ("The [Temu] Registration Screen appears 'uncluttered' because it presents users with a single field to enter details, two links—one to the Terms and one to a privacy policy—and five buttons to select either to register for a new account or to connect to four types of pre-existing accounts."); *see also, e.g.*, *Meyer*, 868 F.3d 66 at 78 (finding conspicuous notice where "[t]he entire screen [in the Uber app] is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service."); *Edmundson*, 85 F.4th at 705-07 (similar); *Ghazizadeh v. Coursera, Inc.*, 2024 WL 3455255, \*10 (N.D. Cal. June 20, 2024) (screen provided reasonably conspicuous notice when the "simple and uncluttered" "context of the overall design" did not detract from the notice); *Peni v. Daily Harvest, Inc.*, 2022 WL 16849451, \*4 (S.D.N.Y. Nov. 10, 2022) (finding the interface "uncluttered" when it included "only fields for the user to enter her ZIP code and email address," and a notice stating "'[b]y clicking above, you agree to our Terms of Use and Terms of Sale, and consent to our

Privacy Policy'"). It simply cannot be the case that a reasonably prudent Internet user is free to ignore and disclaim a quarter of the text on the page.

The notice text is in ordinary sans-serif font (as is all text on the page) and is easy to see and read. There are no other surrounding or distracting text or images or graphics. Each screen is designed to be user-friendly, with ample use of white space for easy reading. No other design elements on the screen clutter or obscure the textual notice. Thus, this case is unlike *Nicosia v. Amazon.com*, 834 F.3d 220, 237 (2d Cir. 2016), where the webpage had "between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements."

Furthermore, the actual text of the notice could not be clearer. There is nothing confusing or ambiguous about the simple and direct wording: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The only possible buttons to click on the page had the text "Continue" or "Continue with [service provider]," such that there could be no confusion that pressing any of these buttons was an affirmative act of "continuing" and thereby agreeing to the terms.

### b. Temu's Terms of Use hyperlink was reasonably sized, bolded, and easily visible.

Temu's Terms of Use notice text is in a size slightly smaller than most of the other text on the page. However, it is not significantly smaller, nor so small as to be unreadable.[8] In the context of the screen as a whole, the size of the notice text makes little difference, if any. Moreover, using slightly smaller sized text does not render the text inconspicuous. *See Hu v. Whaleco*, 2024 WL 4481439, *13 ("Although the 'TEMU' page header is the largest font on the Registration Screen, the notice and hyperlink are in a font size comparable to other text, including the 'continue' button options and the 'Email or phone number' and 'Trouble signing in?' text."); *see also Meyer*, 868 F.3d at 78 (even if font is small, the print contrasts with the white background); *Edmundson*, 85 F.4th at 705-06 ("[B]ecause the interface does not include a plethora of clutter or extraneous information, the notice to Klarna's terms—even if in a smaller font—appears sufficiently conspicuous."); *Lee v. Ticketmaster, L.L.C.*, 817 F.App'x 393, 394-95 (9th Cir. 2020) (enforcing arbitration agreements where the text notices were smaller than surrounding text); *Fagerstrom v. Amazon.com, Inc.*,

---

[8] The difference in font size is approximately the same difference as that between a 14-point font (i.e., that used for this brief) and a 12-point font (i.e., the size allowed by many district courts in this Circuit, e.g., D.Colo.LCivR 10.1(d), D.UtahCivR 10-1(a)(3), D.Kan. Rule 5.1(a), D.Wyo.R. 10.1(a), E.D.Okla. LCvR 5.2(a), N.D.Okla LGnR2-4(a), D.N.M. individual judge's rules).

141 F.Supp.3d 1051, 1069 (S.D. Cal. 2015), *aff'd sub nom.*, *Wiseley v. Amazon.com, Inc.*, 709 F.App'x 862 (9th Cir. 2017) (enforcing arbitration agreement where the text was "somewhat smaller" but the hyperlink was easily seen); *Fitzpatrick v. Lens.com Inc.*, 2024 WL 4555337, *4 (N.D. Ill. Oct. 23, 2024) (finding reasonably conspicuous notice when disclosure presented in smaller size font than label on "Continue" button, but not so small that it was "barely legible to the naked eye"); *Ghazizadeh*, 2024 WL 3455255, *10 (screen provided reasonably conspicuous notice the font was small but not so small that the contrast was not apparent); *Lee v. DoNotPay, Inc.*, 683 F.Supp.3d 1062, 1070 (C.D. Cal. 2023) (screen provided reasonably conspicuous notice when it was "printed in a crisp gray font which contrasts [with] the plain-white background," and the font "remains of readable size and the whole screen is visible at once"); *Graham v. Bloomberg L.P.*, 2023 WL 6037974, *5 (S.D.N.Y. Sept. 15, 2023) (notice reasonably conspicuous when, although the text was "not written in a font as large as the page headers, it is in a font size comparable to numerous other text items on that screen such as billing and subscription information"); *Peni*, 2022 WL 16849451, *4 (finding reasonably conspicuous notice when notice text was "written in a font roughly the same size as that of the primary text on the page"); *Feld v. Postmates, Inc.*, 442 F.Supp.3d 825, 831 (S.D.N.Y. 2020) ("That the notice and hyperlinks are in a smaller font size does not render the disclaimer inconspicuous");

*Mahram v. Kroger Co.*, 2024 WL 3878309, *1-2 (Cal. Ct. App. Aug. 19, 2024) (screen provided reasonably conspicuous notice when lettering "contrasted with the color of the other lettering," and was presented in "a small but readable font").

The **Terms of Use** hyperlink is also bolded and so stands out clearly from the white background. The background color for the notice text is white, just like the background for the entire page, including the fillable boxes and clickable buttons (except for the orange "Continue" button, which is a color consistent with Temu's logo and branding). *See Hu v. Whaleco*, 2024 WL 4481439, *13 ("The hyperlink directing a user to the Terms is bolded and in a dark gray font, which contrasts against the light gray font of the remainder of the notice and the white background of the Registration Screen."); *see also, e.g.*, *Garcia v. Nabfly, Inc.*, 2024 WL 1795395, *7 (S.D.N.Y. Apr. 24, 2024) (finding reasonably conspicuous notice when hyperlink was presented in bold but non-underlined black text on a white background); *Ghazizadeh*, 2024 WL 3455255, *5 (screen provided reasonably conspicuous notice when the hyperlinked terms presented in black were darker and bolder than the surrounding grey text and the light grey background); *Feld*, 442 F.Supp.3d at 831 ("[T]he grey and black color contrast against the white background and are clear to the reasonably prudent user creating an account. The hyperlinks to the TOS and Privacy Policy are in a darker, bolder font than the rest of the text, signifying to a reasonably prudent

user that these would be clickable terms."). Thus, again, users can easily read the text and it is not being hidden or camouflaged against a background color making it difficult to read.

The notice text is in a grey color, as is other text on the screen. For instance, the "Email or phone number" text is also in grey. This shading does not interfere with the legibility of the text, and the use of grey for the notice text makes the bolded hyperlinks stand out even more.

The use of a grey color in combination with smaller sized text is very common in online screens. These design choices do not per se indicate that the notice is not reasonably conspicuous. Although older or more traditional webpages often put hyperlinked terms in blue and underlined text, that convention is not required for a screen to pass muster. *E.g.*, *Patrick*, 93 F.4th at 477 ("That the links are not blue, underlined, or capitalized does not undercut" the conclusion that the screen provided reasonably conspicuous notice.).

The font typeface and style for the notice text and **Terms of Use** appear in the same sans-serif style used for all text on the page, and are not modified in any way to distract from reading it. The key phrase "**Terms of Use**" capitalizes "Terms" and "Use," and is bolder and darker than the notice text for emphasis.

The Ninth Circuit has reasoned that "to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user

would have seen it." *Berman*, 30 F.4th at 856. In *Berman*, the text was in a "tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed a font so small that it is barely legible to the naked eye." *Id.* at 856-57. Here, it cannot be said that the notice text on Temu's screen is "barely legible to the naked eye." To the contrary, Temu's notice is in a very readable size.

### c.    Temu's Terms of Use hyperlink was sufficiently adjacent to the relevant "Continue" buttons.

The placement of Temu's notice text and hyperlinked Terms of Use was also user-friendly and readily visible. The notice text is immediately below the last "Continue" button in the column of five similar buttons, one of which must be pressed to continue. Any reasonable online consumer would expect terms of use to appear somewhere on the page, typically on the bottom. And any reasonable online consumer would understand the notice text to apply to any of the "Continue" buttons—i.e., there is no logical basis for thinking that the phrase "By continuing" would *not* refer to clicking any of the "Continue" buttons. Notably, there is no intervening text (or even space) between the notice text and the last "Continue" button in the column. (App-114.) *See Hu v. Whaleco*, 2024 WL 4481439, *14 (finding the notice text and hyperlink "spatially and temporally coupled" because "[t]he text of the notice, with hyperlinks to the Terms and privacy policy, appears directly below the five options to create an account and is provided

53

simultaneously with registration" and stating "the fact that the hyperlink was located at the bottom of the Registration Screen, below the 'Continue' button and other buttons allowing a user to register through existing accounts, does not render it spatially decoupled"); *Route App, Inc. v. Heuberger*, 2022 WL 2316377, *4 (D. Utah June 28, 2022) (notice text need not be "right next to the 'Continue' button" to be sufficiently proximate).

In short, the reasonable consumer, wishing to create an account or log in, would view the column of buttons and recognize that there were multiple options to continue (e.g., entering an email or phone number, or clicking to continue via existing Google, Facebook, Apple, or Twitter accounts). Having looked at each of these options, the reasonable user would also see the notice text immediately below the "Continue" buttons. In short, the user's line of sight would naturally capture the column of possible buttons and the notice text because it all fits on the screen without any need for scrolling down.

### d. Temu's repetition of the notices across multiple screens made the notices more conspicuous.

Repetition of notices on multiple webpages also makes notices more conspicuous. *See, e.g., Oberstein*, 60 F.4th at 518 ("repetition of the notices" is a feature enhancing constructive notice); *Selden v. Airbnb, Inc.*, 2016 WL 6476934, *5 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) (noting that "sign-in-wrap agreements are usually

upheld if notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site" [citation omitted]); *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 401 (E.D.N.Y. 2015) (same); *Feld*, 442 F.Supp.3d at 829 (same); *Melo v. Zumper, Inc.*, 439 F.Supp.3d 683, 698 (E.D. Va. 2020) (same). Here, Smith was presented with the hyperlinks on two separate pages, with two separate appearances: bolded, dark grey text with each word beginning in a capital letter on the first screen, and bolded, bright blue text on the second screen. (*See* App-115, 117.) By the time Smith continued past the second screen, with its **terms of service**, no reasonable Internet user would have been unaware that she was encountering hyperlinks and agreeing to the terms. Moreover, Smith logged into her account again on March 30, 2023 and saw the same log-in page, including the language that "By continuing, you agree to our **Terms of Use** …." (App-111-12, 115, 141.)

Temu's registration screen (which Smith continued past) is all the more conspicuous given that it is shown as the user is creating an account—when they expect to be prompted to agree to the company's terms of service as part of the registration process. *Meyer*, 868 F.3d at 78 ("[A] reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account."); *see also Selden*, 2016 WL 6476934, *5 ("Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a

particular service, he or she is accepting the terms and conditions of the provider.").

*  *  *

In sum, the overall design of Temu's screen—proximate placement, obvious hyperlinks, text color, typeface, style, and size, against a clear visible background, lack of clutter, and repetition and other design factors—provided reasonably conspicuous notice.

**2.   Precedent from many courts supports the conclusion that Temu's screen provided reasonably conspicuous notice.**

In addition to the *Hu v. Whaleco* court, which examined the *exact same screen* and concluded that it provided reasonably conspicuous notice, numerous courts around the country have held that screens with the same or very similar designs to that used by Temu, including a design providing the user with multiple ways to "Continue" past the sign-up screen, provide reasonably conspicuous notice to the typical online user, and thus have routinely enforced arbitration provisions like Temu's here.

For example, the screen in *Walker v. Neutron Holdings, Inc.*, 2020 WL 703268, *3 (W.D. Tex. Feb. 11, 2020) resembles Temu's, in that the notice text is in smaller, grey text, and a single-sentence notice text with Terms of Service (which is bolded, but not in blue or underlined), is below two different sign-in methods with multiple buttons separated by "or":



Similarly, the screen in *Meyer v. Uber Technologies*, 868 F.3d at 81 has the notice text at the bottom of the screen in smaller grey text (with Terms of Service in blue), and is below multiple sign-in options separated by "or" (*see Feld v. Postmates, Inc.*, 442 F.Supp.3d 825, 827 (S.D.N.Y. 2020) (same screenshot at 1:19-cv-03899, Dkt. 23-5)):



These same design elements (multiple-method sign-in boxes, "or" separator, small notice text at bottom, non-underlined Terms of Service) also appear in *Rainey v. A Place for Rover, Inc.*, 2022 WL 16942849, *1 (C.D. Cal. July 18, 2022) (screenshot at No. 2:22-cv-00403-RGK-E, Dkt. 20-1):



The same sort of multiple sign-in methods and "or" separator appears in *Selden v. Airbnb, Inc.*, 2016 WL 6476934, *5 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021), which also uses small grey text and non-underlined Terms of Service (in red):



And again in *Moyer v. Chegg, Inc.*, 2023 WL 4771181, *1 (N.D. Cal. July 25, 2023):



*See also Plazza v. Airbnb, Inc.*, 289 F.Supp.3d 537, 544 (S.D.N.Y. 2018) (screenshot at 16-CV-1085, Dkt. 21-3; "or" separator); *Melo*, 439 F.Supp.3d at 689 (screenshot at No. 3:19-cv-00621, Dkt. 12-1, with "or" separator, grey notice text, non-underlined "Terms and Conditions" hyperlink); *and see Peter v. DoorDash, Inc.*, 445 F.Supp.3d 580, 582 (N.D. Cal. 2020) (screenshot at 19-cv-06098, Dkt. 17-1):



Some screens—similar to Temu's—even use an orange "sign in" button, followed by alternative sign-in methods, all above small notice text with non-underlined terms of use hyperlinks, e.g., *Fitzpatrick*, 2024 WL 4555337, *2 (N.D. Ill. Oct. 23, 2024) (bright red button); *Moyer*, 2023 WL 4771181, *1 (N.D. Cal. July 25, 2023) ("or" separator; orange button; non-underlined "Terms of Use"); *HomeAdvisor, Inc. v. Waddell*, 2020 WL 2988565 (Tex. App. June 4, 2020) (large orange button on uncluttered page); *Gennaro v. Avvo, Inc.*, 2019 WL 13488559, *4 (S.D. Cal. May 6, 2019) (screenshot at 18-cv-2213, Dkt. 27-3):



All of these similar screens should suffice to show that Temu's screen adequately provides the requisite notice. But there is more: Two courts have even examined the same Temu screen and found that its "full-screen user interface design with the 'Continue' button just above the bolded hyperlink to the Terms of Use is conspicuous enough to put a reasonably prudent person on inquiry notice." *Fontanez*, at App-103; *see also Hu v. Whaleco*, 2024 WL 4481439, \*15.

Temu acknowledges that another court examining Temu's screen reached a conclusion contrary to *Fontanez* and *Hu*. In *Johnson*, the court objected to various design features, i.e., that the hyperlink was not "prominent or particularly remarkable," was located "at the bottom of the page," and used "a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Johnson*, 2023 U.S. Dist. LEXIS 184104, \*7-8. The *Johnson* court cited cases where the "light grey color render[ed text] practically unreadable" and where "terms and conditions were buried at the bottom of the page," and concluded that Temu's notice was similarly "tucked away at the bottom of the page in barely visible font." *Id.* at \*8. The *Johnson* court "respectfully disagree[d]" with *Fontanez*. *Id.* at \*9, n.8. Temu respectfully disagrees with *Johnson*. This Court, engaging in *de novo* review, can look at Temu's screen (App-114 and page 11 above) and see for itself that—contrary to *Johnson*—Temu's notice text is not

"camouflaged," is not "practically unreadable," is not "buried," and is not "barely visible." *Id.* at *8.

> ### 3. The district court focused too narrowly on specific design elements, underestimated the reasonable user, and did not consider the webpage as a whole.

The district court's analysis of Temu's screen is out of step with the bulk of precedent and with the realities of online commerce and standard webpage design.

The district court focused on certain design elements that it believed made Temu's notice text and Terms of Use inconspicuous. In particular, the court objected to the use of a "relatively small font" located "at the bottom of the screen," that was "spatially decoupled from the attention-grabbing orange 'Continue' button." (App-200.) These points fail to appreciate what ordinary internet webpages look like.

Calling the orange "Continue" button on Temu's screen "attention-grabbing" seems anachronistic in comparison to pages with vivid graphics appearing on webpages that nonetheless adequately provide notice, like those in *Keebaugh* (screenshots at 22-55982, Dkt. 10):

 

If these battling dragons are not "attention-grabbing" distractions, then it seems hard to say that an oblong orange button is.

Moreover, the use of notice text in a smaller font on the bottom of a screen is more the norm than anything else, as seen in the numerous examples cited above. *See also Route App, Inc.*, 2022 WL 2316377, *4 (although text was small, it sufficiently contrasted with the white background; although the terms of service hyperlink was not adjacent

to the 'continue' button it was in "close enough proximity" and was visible on the same screen).

The district court was particularly concerned with the placement of the notice text, hypothesizing that it could be "unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number." (App-200.) In other words, the court appears to view the "or" separator (between inputting an "Email or phone number" or clicking "Continue with Google," etc.) as disconnecting the notice text from the email/phone number option. This is an unfair stretch. Under that analysis, the notice text would have to be repeated under every one of the Continue buttons, or at least repeated twice on the same page. That would make for a cluttered design. On *de novo* review, this Court should find that any reasonable user of the webpage would realize that clicking *any* of the Continue buttons would be agreement to the Terms of Use.

The court also states that Temu's screen's "most glaring" "failure" is not adequately distinguishing the Terms of Use hyperlink "from its surrounding text," citing *Berman*. (App-200.) This criticism is far off base. Consider the screens in *Berman*, 30 F.4th at 857, Appendices A & B:





*Berman* is the classic example of hiding a Terms of Use hyperlink in a sea of "surrounding text."

In contrast, Temu's webpage has no distracting or surrounding text at all. *See also Edmundson*, 85 F.4th at 704 (screen provides reasonably conspicuous notice when terms are on an uncluttered page, near the operative button, and the user need not scroll beyond what is

immediately visible to find the terms). Temu's notice text and Terms of Use hyperlink stand alone on the page in plain sight, centered at the bottom, where a user's line of sight would naturally go to view all the various sign-in options.

The district court also criticizes Temu's use of "grey font against a white backdrop." (App-200.) But the use of grey colored text is not unusual (especially when appearing on an all-white background), and the selection of that color or shading does not necessarily mean that the text is not reasonably conspicuous. The court continues by pointing out that "the traditional hallmarks of hyperlinked text" are absent, e.g., blue text, underlined text, and/or all caps text. (App-200-01.) The court thus concludes that Temu's "failure to adequately distinguish the hyperlinked text, coupled with its obscure placement" makes the terms not reasonably conspicuous. (App-201.) Temu disagrees and has already cited ample precedent to support its position.

To be sufficiently conspicuous, hyperlinks need not necessarily be in any particular color. What matters is whether the reasonable user can see them. Here, Temu's use of bolded grey text on a white background on a screen without any distractions should suffice—just as it has in many other cases.

Nor is the location of the notice text "obscure"—it is directly beneath the various "Continue" buttons. The idea that the text should be construed as a matter of proximity and design to apply only to the

single button immediately above it ("Continue with Twitter") makes no sense. No reasonable user would interpret the screen that way, nor would any reasonable user want the screen to have the same notice text immediately below every button. Furthermore, there is no recourse to the argument that the notice text would only apply to the "Continue" buttons connected to existing internet accounts (e.g., Twitter, Apple, Facebook, and Google). No reasonable user would interpret the screen to mean that "continuing" via such an account would constitute agreeing to the Terms of Use, but "continuing" via inputting an email address or phone number would *not*. Reasonable users understand that creating an online account (especially with a company selling goods over the internet) comes with terms of use.

## CONCLUSION

The district court erred in several respects. First, the court did not apply the proper evidentiary standards, and did not consider Temu's evidence or Smith's lack of evidence, or conduct an evidentiary hearing. Second, the hyperlink presenting Temu's Terms of Use was conspicuous in the context of the rest of Temu's clean and uncluttered sign-in page that is immediately visible to users on one screen without the need to scroll to find the prompt, which read "By continuing, you agree to our **Terms of Use** …." Its gray bolded text stood out clearly from the white background and the lighter surrounding text, and was immediately below the list of options to "Continue" past that screen. If the hyperlink

text was small, it was not significantly smaller than all of the rest of the text on the page. Any reasonably prudent Internet user would have understood that signing in and clicking "Continue" multiple times manifested assent to the terms. Even Smith does not actually argue that she was not aware that she had agreed to the terms.

Based on this Court's *de novo* review of Temu's screens, and consistent with numerous cases from district courts in other Circuits examining similar screens, this Court should reverse the district court's denial of arbitration and order Smith to arbitrate her claims.

## ORAL ARGUMENT REQUEST

Oral argument is necessary because this appeal raises significant questions of first impression in this Circuit. The district court noted that the validity of electronic agreements is a "frequent issue." (App-196.)

November 15, 2024            Respectfully submitted,

                             MANATT, PHELPS & PHILLIPS, LLP

                             By: *s/Benjamin G. Shatz*
                                 *Attorney for Appellant*
                                 Whaleco Inc. d/b/a Temu

**10th Circuit Rule 28.2 ATTACHMENT**


**ORDER ON APPEAL**

Order Denying Motion to Compel Arbitration in *Smith v. Whaleco*
July 23, 2024 (W.D. Okla. No. Civ-23-559-D)
(Also at Appendix pages 193-204)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

HEATHER SMITH, individually and on )
behalf of all others similarly situated, )
                         )
        Plaintiff, )
                         )
v.                           )    Case No. CIV-23-559-D
                         )
WHALECO INC. d/b/a TEMU, )
                         )
        Defendant. )

## ORDER DENYING MOTION TO COMPEL ARBITRATION

Before the Court is Defendant's Motion to Compel Arbitration [Doc. No. 33] under the Federal Arbitration Act, 9 U.S.C. §§ 1-16. In opposition [Doc. No. 39], Plaintiff disputes that an arbitration agreement exists. Defendant argues in reply [Doc. No. 40] that Plaintiff has failed to overcome its evidence that she agreed to arbitration by accepting Defendant's "Terms of Use" for an online account that she created by downloading and registering for Defendant's smartphone application or App. The sole issue presented is the validity of this type of contract, known as a "sign-in wrap" agreement.

This same issue was recently decided by United States District Judge Bernard M. Jones in *Eakins v. Whaleco Inc.*, Case No. CIV-23-560-J, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024), *appeal pending*, No. 24-6048 (10th Cir. Mar. 18, 2024). Under substantially similar facts, Judge Jones found that no valid agreement was formed. Upon consideration, the Court finds Judge Jones' analysis is persuasive and, for the following reasons, reaches the same conclusion in this case.

193

72

**Factual Background**

Plaintiff brought this putative class action in the District Court of Oklahoma County, Oklahoma, to recover damages for alleged violations of the Telephone Solicitation Act of 2022, Okla. Stat. tit. 15, §§ 775C.1-775.C6. Defendant timely removed the case to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and moved to compel arbitration and to stay or dismiss the case. Over Plaintiff's objection, the Court later allowed Defendant to withdraw its original motion and refile this one.

In a parallel case filed by the same attorneys, a different named plaintiff filed a putative class action against Defendant in the District Court of Washita County, Oklahoma, bringing similar claims, and Defendant removed the case. *See Eakins v. Whaleco Inc.*, Case No. CIV-23-560-J, Notice of Removal (W.D. Okla. June 26, 2023). The *Eakins* case followed an identical procedural history. In March 2024, Judge Jones issued a decision on Defendant's motion. Judge Jones found that the alleged agreement – created by agreeing to the terms of use for Defendant's online ordering service when creating an account using Defendant's App – was not a valid arbitration agreement. *See Eakins*, 3/5/24 Order at 9, 2024 WL 1190766 at *4.

In reaching this conclusion, Judge Jones first determined that the type of online agreement presented is best characterized as a "sign-in wrap" because "Defendant's App notifies the user of its terms of use and, instead of providing an 'I agree' box to check, advises the user that she is agreeing to the terms of use when creating an account." *Eakins*, 2024 WL 1190766 at *3. This form of agreement "does not require the user to click on a box showing acceptance of the 'terms of use' in order to continue" but, instead, "the

2

website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." *Id.* (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015)). Judge Jones observed: "In the context of online agreements, courts engage in fact-intensive inquiries of 'the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms.'" *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). After examining the facts regarding Defendant's App, Judge Jones "conclude[d] that the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when creating her account." *Id.*

### Standard of Decision

The Federal Arbitration Act provides that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. The Act "reflects the fundamental principle that arbitration is a matter of contract." *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Under the Act, a court decides "gateway" issues that determine the arbitrability of a dispute, such as whether the parties agreed to arbitrate a matter. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002); *Rent-A-Center*, 561 U.S. at 68-69. When deciding this issue, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012).

3

Under Section 4 of the Act, "[w]hen parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). The statutory "framework is similar to summary judgment practice." *Hancock*, 701 F.3d at 1261.

> [T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith. When a quick look at the case reveals that no material disputes of fact exist, a district court may decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration.

*BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165, 1177 (10th Cir. 2017) (citations and internal quotations omitted). In this case, Defendant submits in support of its Motion the declaration of an employee and evidentiary materials that are undisputed.

### Discussion

The validity of electronic agreements is becoming a frequent issue in consumer cases. Federal courts generally approach the issue of contract formation using basic contract-law principles that require "the parties' mutual assent to the essential terms of the agreement" and bind "[a] party who manifests assent to a contract's terms." *See Hancock*, 701 F.3d at 1256. However, the determination of whether a contract was formed in a particular case often turns on the specific facts. In *Hancock*, for example, the Tenth Circuit addressed the issue with regard to a "clickwrap" agreement, where a computer user must click a dialogue box, such as an "I agree" button, to signify their assent to terms or

4

conditions on a separate screen or internet page before they can proceed with a transaction. *See Hancock*, 701 F.3d at 1255 (defining "clickwrap" agreement); *id.* at 1257 (describing the agreements in that case); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (describing clickwrap or "click-through" agreements). In that case, the Tenth Circuit had little trouble concluding that the consumers had assented to the service provider's electronic terms, which included an arbitration agreement, and that the clickwrap agreements were valid and enforceable. *See Hancock*, 701 F.3d at 1257-58.

In contrast, a sign-in wrap agreement requires the user's assent to be inferred from the fact they were notified that proceeding with a transaction would signify their agreement to terms or conditions stated on a separate computer screen or internet page, usually accessible through a hyperlink. *See Meyer*, 868 F.3d at 75-76; *Selden v. Airbnb, Inc.*, 4 F.4th 149, 156 (D.C. Cir. 2021) ("a sign-in wrap bundles signing up for a service with agreement to the website's contractual terms"). In such cases, courts consider whether a consumer received conspicuous notice of the terms and his consent to an online agreement. *See Selden*, 4 F.4th at 156. With regard to sign-in wrap agreements, courts often "look to the layout and language of the [computer application] to decide whether it would provide a reasonably prudent smartphone user with reasonable notice that a click – i.e., signing up – will manifest assent to an agreement." *Id.* Relevant facts may include the size and color of font used in the notice, the means of denoting a hyperlink (such as blue highlighted or underlined text), a spatial connection between the notice and the button intended to manifest assent, and any visual distractions or features that detract from the clarity of the notice.

5

197

76

In *Eakins*, Judge Jones conducted this inquiry and determined that Defendant's App did not provide conspicuous notice of the "Terms of Use." Due to the fact-specific nature of this ruling, the Court duplicates in full an image of the sign-in screen and the narrative description in Judge Jones' order:[1]



As shown, a user can create an account (1) by entering their email or phone number and pressing a bright orange "Continue" button, or (2) by pressing one of the other four white buttons. At the bottom of the screen, beneath the "Continue with Twitter" button, is a statement in light grey font that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The "**Terms of Use**" text is hyperlinked and, if pressed, leads to a separate document containing a mandatory arbitration provision.

---

[1] The same image is provided by both parties in their briefs in this case.

6

198

*Eakins*, 2024 WL 1190766 at *1.  The Court also quotes in full Judge Jones' explanation

of his conclusion "that the App failed to provide reasonably conspicuous notice that

Plaintiff was agreeing to Defendant's terms of use when creating her account."  *Id*. at 3.

> For starters, the terms of use agreement appears in relatively small
> font at the bottom of the screen – spatially decoupled from the attention-
> grabbing orange "Continue" button that users click to create their account.
> *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)
> (recognizing courts' refusal to enforce online agreements "[w]here the link
> to a website's terms of use is buried at the bottom of the page or tucked away
> in obscure corners of the website where users are unlikely to see it"); *Starke*,
> 913 F.3d at 294 (rejecting enforcement of arbitration agreement where the
> "Terms & Conditions" hyperlink was "spatially decoupled" from the portion
> of the website "actually requiring [plaintiff's] attention"); *Applebaum v. Lyft,
> Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (rejecting enforcement of
> arbitration agreement where the " 'I agree to Lyft's Terms of Service' [was]
> in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next'
> bar at the bottom of the screen and the bold header 'Add Phone Number' at
> the top").  While other, closer buttons are available, the orange button – in
> both placement and coloring – is set apart.  One could argue it is initially
> unclear whether the terms of use agreement even pertains to the creation of
> an account using email or phone number.
>
> Most glaring, however, is the App's failure to distinguish the "Terms
> of Use" hyperlink from its surrounding text.  *See Berman*, 30 F.4th at 857
> ("[W]hile it is permissible to disclose terms and conditions through a
> hyperlink, the fact that a hyperlink is present must be readily apparent.").
> The notice here appears in grey font against a white backdrop, and while
> "Terms of Use" is a darker shade of grey, the contrast is neither remarkable
> nor presents with the traditional hallmarks of hyperlinked text.  *See id.* ("A
> web designer must do more than simply underscore the hyperlinked text in
> order to ensure that it is sufficiently set apart from the surrounding text.
> Customary design elements denoting the existence of a hyperlink include the
> use of a contrasting font color (typically blue) and the use of all capital letters,
> both of which can alert a user that the particular text differs from other plain
> text in that it provides a clickable pathway to another webpage." (internal
> citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893
> F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same
> characteristics, they are commonly blue and underlined." (internal quotation
> marks omitted)).  Courts have generally "required more than mere coloring
> to indicate the existence of a hyperlink to a contract."  *Applebaum*, 263 F.

Supp. 3d at 467 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them.")). The App's failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use agreement, fails the conspicuous test.

Defendant's reliance on *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023), *see* (*Fontanez* Order) [Doc. No. 33-2], does not alter the Court's conclusion. The *Fontanez* court examined the very online platform at issue here and concluded that its terms of use agreement was "conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* at 6. However, the plaintiff in *Fontanez* created her account with the "Continue with Apple" button "directly above" the terms of use agreement. *Id.* at 5. Moreover, and more importantly, she had already filed "eleven class action lawsuits," and the "reasonable inference [was] that . . . [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements." *Id.* at 3.

*Fontanez*'s persuasive [force] is further tempered by *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL (M.D. Fla. Oct. 13, 2023) (not available on Westlaw), which recently examined Defendant's online platform and concluded that its terms of use agreement was not conspicuously disclosed. The *Johnson* court reasoned, as this Court does here, that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured." *Id.* at *7 (brackets and internal quotation marks omitted). Even more "damning" was the platform's "use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Id.* at *7-8.

Neither is the Court convinced that Plaintiff's subsequent use of the App – where she "was presented with a screen identical to the one she would have seen when she initially registered her account through the App back in January," Def.'s Br. at 13 – weighs in favor of arbitration. If Defendant's notice was inconspicuous when Plaintiff created her account, the Court is unsure how such notice, if unaltered, became any clearer over time.

*Id.* at *3-4 (footnotes omitted). Based on this analysis, Judge Jones determined "that the parties did not enter into a valid arbitration agreement." *Id.* at *4.

All other things being equal, the Court would fully agree with Judge Jones. The parties present the same legal arguments and authorities in this case that were presented in *Eakins*, and like Judge Jones, the Court rejects Defendant's description of the sign-in wrap agreement in its App.[2]  However, the two cases involve slightly different facts.  Although each plaintiff downloaded the same App, they interacted differently with the initial screen and took different paths to sign up.  Plaintiff registered by using an existing Google account while Ms. Eakins created a new account using her email address.[3]  By proceeding to the App through her Google account, Plaintiff encountered another screen that provided a second opportunity to review Defendant's terms.

Recall the image of the App's registration screen shown above.  Below the orange "Continue" button that Ms. Eakins used were four other options, the first being "Continue with Google."  Plaintiff proceeded by clicking this button and saw the following screen:

---

[2]  According to Defendant, "the Terms containing the Arbitration Provisions were conspicuously hyperlinked in a contrasting bold font, presented in close spatial and temporal proximity to the 'Continue' buttons Plaintiff had to click to continue signing up for her account on the App or when logging in later." *See* Def.'s Mot. at 17-18.

[3]  This factual distinction was highlighted when Defendant recently moved for a stay of this case pending the resolution of its interlocutory appeal in *Eakins*.  In opposing a stay, Plaintiff accurately described the differences between how she and Ms. Eakins signed up for an online account using the App. *See* Pl.'s Opp'n Mot. Stay [Doc. No. 44] at 3-4 & n.1.

G  Sign in with Google

Choose an account

to continue to Temu

Use another account

To continue, Google will share your name, email
address, language preference, and profile picture with
Temu. Before using this app, you can review Temu's
privacy policy and terms of service.

English (United States)           ▼

Help      Privacy      Terms

Here, unlike the initial screen where "Terms of Use" appeared in slightly darker grey font and gave no indication of a hyperlink, the words "terms of service" in this screen were in a blue color, which commonly denotes the existence of a hyperlink. Note, however, the context in which this hyperlink appears. This screen did not inform Plaintiff that proceeding to the App by allowing Google to share her information with Defendant would signify an agreement to or acceptance of Defendant's terms of service. Instead, it merely stated that Plaintiff could review Defendant's terms of service before using the App. This phrasing does not provide any notice, and certainly not conspicuous notice, that Plaintiff was consenting to a contract with Defendant by using this avenue to proceed.

10

On the initial screen, Plaintiff chose the "Continue with Google" option located below the bright orange "Continue" button.  Because the Google button was positioned lower on the screen, it was located slightly closer to the statement at the bottom that continuing would signify an agreement to Defendant's Terms of Use.  Arguably, the eyes of a user moving beyond the orange button would be drawn further down the screen and might be more likely to notice the warning.  However, the same remaining facts – a spatial separation, the eye-catching logos of other options in that space (Google, Facebook, Apple, and Twitter), and the smaller light grey font on a white screen with no indication of a hyperlink – lead the Court to the same conclusion that the "by continuing" statement did not provide conspicuous notice to a consumer that they were agreeing to a contract that included the Terms of Use.[4]  As a result, the Court finds that the factual differences between this case and *Eakins* do not affect the outcome.

Accepting the undisputed facts presented by Defendant and considering objectively the alleged sign-in wrap agreement in its App, the Court finds that Plaintiff did not receive conspicuous notice of Defendant's Terms of Use or give her assent to an online agreement containing them.  Therefore, no contract between the parties including an arbitration agreement was formed.

---

[4] Further, the "continue with" logo buttons offered the user easy access to the App with an existing account, requiring no further effort to complete a new sign-up process.  In the Court's view, an individual spying this option and electing to proceed this way would be unlikely to look further down the screen.

### Conclusion

For these reasons, the Court concludes that the parties did not enter into a valid and binding arbitration agreement.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel Arbitration [Doc. No. 33] is **DENIED**.

**IT IS SO ORDERED** this 23rd day of July, 2024.

TIMOTHY D. DeGIUSTI
Chief United States District Judge

204

**Certificate of Compliance
for Briefs with Type-Volume Limit**

1.  This **Appellant's Opening Brief** complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g) and the word limit of Rule 28(e)(2) because, excluding the parts of the document exempted by Rule 32(f), this document contains **12,208** words (within the 13,000-word limit of Rule 32(a)(7)(B)).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the **Microsoft Word** (version Microsoft for Microsoft Word 365 MSO) word processing program in **14-point Century Schoolbook**.

Date: November 15, 2024    _s/Benjamin G. Shatz_
Benjamin G. Shatz
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067

*Attorney for Appellant*
Whaleco Inc. d/b/a Temu