No. 24-6155

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Heather Smith,

*Plaintiff-Appellant,*

v.

Whaleco Inc. dba Temu,

*Defendant-Appellee.*

On appeal from an Order Denying Arbitration
U.S. District Court, W.D. Oklahoma No. 5:23-cv-00559-D
The Honorable Judge Timothy D. DeGiusti

# APPELLANT'S APPENDIX
## Volume 1 of 1, Documents 1-7, Pages 1-206

Benjamin G. Shatz, BShatz@Manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067-3119
(310) 312-4000 ♦ Fax (310) 312-4224

*Attorneys for Appellant*
Whaleco Inc. dba Temu

*Oral Argument Requested*

# INDEX TO APPELLANT'S APPENDIX

| | W.D. Okla. Dkt. No. | DOCUMENT | Date | Page |
|---|---|---|---|---|
| | | **VOLUME 1 of 1** | | |
| 1 | Dkt | U.S.D.C. W.D. Okla. Docket 5:23-cv-00559-D | 8/9/24 | 3 |
| 2 | 1 | Notice of Removal | 6/26/23 | 7 |
| | | Ex. 1 – Class Action Petition | | 14 |
| | | Ex. 2 – Motion to Associate Counsel | | 29 |
| | | Ex. 3 – Order Admitting to Practice | | 37 |
| | | Ex. 4 – Motion to Associate Counsel | | 40 |
| | | Ex. 5 – Order Admitting to Practice | | 50 |
| | | Ex. 6 – Summons | | 53 |
| | | Ex. 7 – Docket | | 57 |
| | | Ex. 8 – Civil Cover Sheet | | 61 |
| 3 | 33 | **Motion** to Compel Arbitration | 11/15/23 | 62 |
| | 33-1 | Brief in support of Motion to Compel Arbitration | | 66 |
| | 33-2 | Ex. 1 – *Fontanez v. Whaleco*, Order | | 99 |
| | 33-3 | Ex. 2 – Declaration of Michael Trinh | | 106 |
| 4 | 39 | **Opposition** to Motion to Compel Arbitration | 1/19/24 | 144 |
| | 39-1 | Ex. A – *Johnson v. Whaleco* Order | | 175 |
| 5 | 40 | **Reply** Supporting Motion to Compel Arbitration | 2/9/24 | 180 |
| 6 | 47 | Order denying Motion to Compel Arbitration | 7/23/24 | 193 |
| 7 | 48 | Notice of Appeal | 7/29/24 | 205 |

403239229.1

**Query    Reports    Utilities    Help    Log Out**

APPEAL,CLOSED,PURCELL,_MR

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:23-cv-00559-D

Smith v. Whaleco Inc                                      Date Filed: 06/26/2023
Assigned to: Chief Judge Timothy D. DeGiusti               Date Terminated: 07/31/2024
Case in other court: Tenth Circuit, 24-06155               Jury Demand: Both
            Oklahoma County District Court, CJ-23-02888   Nature of Suit: 890 Other Statutory Actions
Cause: 28:1331 Fed. Question                               Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 08/08/2024 | 55 | ENTRY of Appearance by Arun Ravindran on behalf of Heather Smith (Ravindran, Arun) (Entered: 08/08/2024) |
| 08/06/2024 | 54 | TRANSCRIPT LETTER advising no transcripts are necessary re 48 Notice of Appeal filed by Whaleco Inc. The record is ready for appeal purposes. (ekw) (Entered: 08/06/2024) |
| 08/06/2024 | 53 | Tenth Circuit USCA Case Number 24-6155 for 48 Notice of Appeal filed by Whaleco Inc. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/30/2024 Docketing statement, transcript order form, disclosure statement and notice of appearance due 08/13/2024 for Whaleco Inc. Notice of appearance due 08/13/2024 for Heather Smith --[Edited 08/06/2024 by MLB to correct party designation and deadlines][24-6155] (ekw) (Entered: 08/06/2024) |
| 08/02/2024 | 52 | TRANSCRIPT Order Form by Whaleco Inc re 48 Notice of Appeal that transcripts N necessary. See order form for dates and proceedings. (Burkhardt, John) (Entered: 08/02/2024) |
| 07/31/2024 | 51 | ADMINISTRATIVE CLOSING ORDER: This action is administratively terminated without prejudice to the rights of the parties to reopen for entry of any stipulation or order, or for any other purpose required to obtain a final determination of the litigation. Unless otherwise ordered, the Clerk shall reopen this case upon receipt of the court of appeals mandate in Smith v. Whaleco, Inc., No. 24-6155 (10th Cir. July 30, 2024). Signed by Chief Judge Timothy D. DeGiusti on 7/31/2024. (jee) (Entered: 07/31/2024) |
| 07/30/2024 | 50 | Tenth Circuit USCA Case Number 24-6155 for 48 Notice of Appeal filed by Whaleco Inc. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/30/2024 Docketing statement, transcript order form and notice of appearance due 08/13/2024 for Heather Smith. Notice of appearance and disclosure statement due on 08/13/2024 for Whaleco Inc. [24-6155] (ekw) (Entered: 07/30/2024) |
| 07/30/2024 | 49 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 48 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(ekw) (Entered: 07/30/2024) |
| 07/29/2024 | 48 | NOTICE OF APPEAL as to 47 Order on Motion to Compel by Whaleco Inc. Filing fee $ 605, receipt number AOKWDC-4484605. (Burkhardt, John) (Entered: 07/29/2024) |
| 07/23/2024 | 47 | ORDER denying 33 Defendants Motion to Compel Arbitration. Signed by Chief Judge Timothy D. DeGiusti on 7/23/2024. (jee) (Entered: 07/23/2024) |
| 04/29/2024 | 46 | ORDER denying 41 Defendants Motion to Temporarily Stay Proceedings Pending Outcome of an Appeal in Related Case. Signed by Chief Judge Timothy D. DeGiusti on 4/29/2024. (jee) (Entered: 04/29/2024) |

| 04/19/2024 | 45 | REPLY to Response to Motion re 41 MOTION to Stay Case *Pending Outcome of An Appeal in Related Case* filed by Whaleco Inc. (Attachments: # 1 Exhibit 1-Discovery Requests, # 2 Exhibit 2-Notice re Briefing Schedule)(Burkhardt, John) (Entered: 04/19/2024) |
|---|---|---|
| 04/12/2024 | 44 | RESPONSE to Motion re 41 MOTION to Stay Case *Pending Outcome of An Appeal in Related Case* filed by Heather Smith. (Attachments: # 1 Exhibit A - March 5, 2024 Order in Eakins v. Whaleco Inc. d/b/a Temu, No. 5:23-cv-00560-J (W.D. Okla.))(Miller, E. Powell) (Entered: 04/12/2024) |
| 03/25/2024 | 43 | ORDER granting 42 Motion to Withdraw as Attorney. Attorney Robert A Stines terminated. Signed by Chief Judge Timothy D. DeGiusti on 3/25/2024. (jee) (Entered: 03/25/2024) |
| 03/25/2024 | 42 | MOTION to Withdraw as Attorney by Whaleco Inc. (Attachments: # 1 Attachment Proposed Order Granting Motion to Withdraw)(Stines, Robert) (Entered: 03/25/2024) |
| 03/22/2024 | 41 | MOTION to Stay Case *Pending Outcome of An Appeal in Related Case* by Whaleco Inc. (Burkhardt, John) (Entered: 03/22/2024) |
| 02/09/2024 | 40 | REPLY by Defendant Whaleco Inc re 33 MOTION to Compel *Arbitration* filed by Whaleco Inc. (Stines, Robert) (Entered: 02/09/2024) |
| 01/19/2024 | 39 | RESPONSE in Opposition re 33 MOTION to Compel *Arbitration* filed by Heather Smith. (Attachments: # 1 Exhibit 1 - Johnson v Whaleco)(Neal, Kathy) (Entered: 01/19/2024) |
| 01/05/2024 | 38 | ORDER granting 37 Joint Motion for Two-Week Extension of Deadlines.Plaintiff shall respond to Defendants Motion to Compel Arbitration [Doc. No. 33] by January 19, 2024. Defendants reply is due by February 9, 2024. Signed by Chief Judge Timothy D. DeGiusti on 1/5/2024. (jee) (Entered: 01/05/2024) |
| 01/04/2024 | 37 | JOINT MOTION to Extend Deadlines or Hearings *related to Defendant's Motion to Compel Arbitration* by Heather Smith. (Neal, Kathy) (Entered: 01/04/2024) |
| 12/11/2023 | 36 | ORDER granting 34 Plaintiffs Motion to Extend Deadlines Related to Defendants Motion to Compel Arbitration 35 Plaintiffs Supplement to Motion to Extend Deadlines Related to Defendants Motion to Compel Arbitration. Plaintiff's response due 1/5/2023. Defendant's reply due 1/26/2024. Signed by Chief Judge Timothy D. DeGiusti on 12/11/2023. (jee) (Entered: 12/11/2023) |
| 12/11/2023 | 35 | MOTION to Supplement *Motion to Extend Deadlines [Dkt 34]* by Heather Smith. (Neal, Kathy) (Entered: 12/11/2023) |
| 12/08/2023 | 34 | MOTION to Extend Deadlines or Hearings *Related to Defendant's Motion to Compel Arbitration* by Heather Smith. (Neal, Kathy) (Entered: 12/08/2023) |
| 11/15/2023 | 33 | MOTION to Compel *Arbitration* by Whaleco Inc. (Attachments: # 1 Attachment Brief in Support of Motion to Compel Arbitration, # 2 Exhibit 1, # 3 Exhibit 2)(Stines, Robert) (Entered: 11/15/2023) |
| 11/08/2023 | 32 | ORDER granting 29 Defendants Request for Leave to Resubmit Its Motion toCompel Arbitration. Defendants Motion to Compel Arbitration and to Stay This Action 10 is deemed withdrawn and will not be considered. Signed by Chief Judge Timothy D. DeGiusti on 11/8/2023. (jee) (Entered: 11/08/2023) |
| 11/07/2023 | 31 | REPLY by Defendant Whaleco Inc re 30 Response in Opposition to Motion, 29 MOTION for Leave *to Resubmit Motion to Compel Arbitration* filed by Whaleco Inc. (Stines, Robert) (Entered: 11/07/2023) |
| 11/06/2023 | 30 | RESPONSE in Opposition re 29 MOTION for Leave *to Resubmit Motion to Compel Arbitration Plaintiffs Response in Opposition to Defendants Motion to File a Different Motion to Compel Arbitration* filed by Heather Smith. (Miller, E. Powell) (Entered: 11/06/2023) |
| 10/27/2023 | 29 | MOTION for Leave *to Resubmit Motion to Compel Arbitration* by Whaleco Inc. (Stines, Robert) (Entered: 10/27/2023) |

**4**

| 10/24/2023 | 28 | ORDER granting 27 Defendants Second Unopposed Motion for an Extension of Time to File a Reply in Support of Its Motion to Compel Arbitration. Reply due 11/9/2023. Signed by Chief Judge Timothy D. DeGiusti on 10/24/2023. (jee) (Entered: 10/24/2023) |
| --- | --- | --- |
| 10/20/2023 | 27 | SECOND MOTION for Extension of Time to File Response/Reply as to 21 Response in Opposition to Motion, 11 Brief, 10 MOTION to Compel *Arbitration and to Stay This Action* by Whaleco Inc. (Stines, Robert) (Entered: 10/20/2023) |
| 10/19/2023 | 26 | NOTICE (other) by Heather Smith re 21 Response in Opposition to Motion *Corrected Notice of Supplemental Authority* (Attachments: # 1 Exhibit A - Johnson v. Whaleco Decision)(Neal, Kathy) (Entered: 10/19/2023) |
| 10/18/2023 | 25 | ORDER Striking 24 Plaintiffs Notice of Supplement Authority.. Signed by Chief Judge Timothy D. DeGiusti on 10/18/2023. (jee) (Entered: 10/18/2023) |
| 10/18/2023 | 24 | SUPPLEMENT re 21 Response in Opposition to Motion *Notice of Supplemental Authority* by Heather Smith. (Attachments: # 1 Exhibit A - Johnson v. Whaleco Decision)(Neal, Kathy) (Entered: 10/18/2023) |
| 10/05/2023 | 23 | ORDER granting [22 Unopposed Motion for Extension of Time to File a Reply to Plaintiffs Response in Opposition to Motion to Compel Arbitration. Reply due 10/26/2023. Signed by Chief Judge Timothy D. DeGiusti on 10/5/2023. (jee) (Entered: 10/05/2023) |
| 10/03/2023 | 22 | FIRST MOTION for Extension of Time to File Response/Reply as to 21 Response in Opposition to Motion *to Compel Arbitration* by Whaleco Inc. (Stines, Robert) (Entered: 10/03/2023) |
| 09/28/2023 | 21 | RESPONSE in Opposition re 10 MOTION to Compel *Arbitration and to Stay This Action* filed by All Plaintiffs. (Neal, Kathy) (Entered: 09/28/2023) |
| 09/15/2023 | 20 | ORDER granting 19 Plaintiffs Motion for Two-Week Extension of Time to Respond to Motion to Compel Arbitration. Response due 9/28/2023. Signed by Chief Judge Timothy D. DeGiusti on 9/15/2023. (jee) (Entered: 09/15/2023) |
| 09/14/2023 | 19 | SECOND MOTION for Extension of Time to File Response/Reply as to 10 MOTION to Compel *Arbitration and to Stay This Action* by Heather Smith. (Neal, Kathy) (Entered: 09/14/2023) |
| 08/14/2023 | 18 | ORDER granting 17 Motion for Extension of Time to File Response 17 UNOPPOSED MOTION for Extension of Time to File Response to 11 Brief, 10 MOTION to Compel *Arbitration and to Stay This Action* , 10 MOTION to Compel *Arbitration and to Stay This Action* Responses due by 9/14/2023. Signed by Chief Judge Timothy D. DeGiusti on 8/14/2023. (jee) (Entered: 08/14/2023) |
| 08/14/2023 | 17 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 11 Brief, 10 MOTION to Compel *Arbitration and to Stay This Action* by Heather Smith. (Neal, Kathy) (Entered: 08/14/2023) |
| 07/28/2023 | 16 | ENTRY of Appearance by Robert A Stines on behalf of Whaleco Inc (Stines, Robert) (Entered: 07/28/2023) |
| 07/27/2023 | 15 | ENTRY of Appearance by E. Powell Miller on behalf of All Plaintiffs (Miller, E. Powell) (Entered: 07/27/2023) |
| 07/26/2023 | 14 | ORDER granting 12 Plaintiffs Motion for Pro Hac Vice Admission of Edwin Powell Miller. Signed by Chief Judge Timothy D. DeGiusti on 7/26/2023. (Eagleston, Jane) (Entered: 07/26/2023) |
| 07/25/2023 | 13 | Receipt for Money Received in the amount of $100, receipt number 500002941 regarding 12 MOTION for Leave to Appear Pro Hac Vice *of Edwin Powell Miller*. (dtb) (Entered: 07/25/2023) |
| 07/25/2023 | 12 | MOTION for Leave to Appear Pro Hac Vice *of Edwin Powell Miller* by Heather Smith. (Attachments: # 1 Exhibit Application)(Neal, Kathy) (Entered: 07/25/2023) |

**5**

| 07/25/2023 | 11 | BRIEF IN SUPPORT re 10 MOTION to Compel *Arbitration and to Stay This Action* by Whaleco Inc. (Attachments: # 1 Exhibit Declaration of Michael Trinh, # 2 Exhibit Consent Form)(Burkhardt, John) (Entered: 07/25/2023) |
| 07/25/2023 | 10 | MOTION to Compel *Arbitration and to Stay This Action* by Whaleco Inc. (Burkhardt, John) (Entered: 07/25/2023) |
| 06/30/2023 | 9 | ORDER granting 5 UNOPPOSED Motion for Extension of Time to Respond toComplaint filed by Defendant Whaleco, Inc. answer due 7/25/2023.. Signed by Chief Judge Timothy D. DeGiusti on 6/30/2023. (mb) (Entered: 06/30/2023) |
| 06/30/2023 | 8 | ORDER granting 4 Motion to Appear Pro Hac Vice of Robert A. Stines. Signed by Chief Judge Timothy D. DeGiusti on 6/30/2023. (mb) (Entered: 06/30/2023) |
| 06/29/2023 | 7 | ENTRY of Appearance by Mary Quinn-Cooper on behalf of Heather Smith (Quinn-Cooper, Mary) (Entered: 06/29/2023) |
| 06/29/2023 | 6 | ENTRY of Appearance by Kathy R Neal on behalf of Heather Smith (Neal, Kathy) (Entered: 06/29/2023) |
| 06/29/2023 | 5 | UNOPPOSED MOTION for Extension of Time to File Answer by Whaleco Inc. (Burkhardt, John) (Entered: 06/29/2023) |
| 06/28/2023 | 4 | MOTION for Leave to Appear Pro Hac Vice *for Robert A. Stines* Filing fee $ 100, receipt number AOKWDC-4195769 by Whaleco Inc. (Attachments: # 1 Attachment Request for PHV Admission)(Burkhardt, John) (Entered: 06/28/2023) |
| 06/28/2023 | 3 | DISCLOSURE STATEMENT - CORPORATE by Whaleco Inc *d/b/a TEMU*. (Burkhardt, John) (Entered: 06/28/2023) |
| 06/28/2023 | 2 | ENTRY of Appearance by John A Burkhardt on behalf of Whaleco Inc (Burkhardt, John) (Entered: 06/28/2023) |
| 06/27/2023 | | PAYMENT FOR A CIVIL CASE Filing fee $ 402, receipt number AOKWDC-4194276. (Stines, Robert) (Entered: 06/27/2023) |
| 06/26/2023 | 1 | NOTICE OF REMOVAL from Oklahoma County District Court, case number CJ-2023-2888 filed by Whaleco Inc. (Attachments: # 1 Exhibit 1 - Petition, # 2 Exhibit 2 - Mtn to Associate Counsel 6.5.23, # 3 Exhibit 3 - Order Admitting to Practice 6.7.23, # 4 Exhibit 4 - Mtn to Associate Counsel 6.9.23, # 5 Exhibit 5 - Order Admitting to Practice 6.12.23, # 6 Exhibit 6 - Summons-Proof of Service, # 7 Exhibit 7 - Docket Sheet, # 8 Civil Cover Sheet)(ekw) (Entered: 06/27/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| | | **Transaction Receipt** | |
| | | 08/09/2024 19:00:27 | |
| **PACER Login:** | bshatz123 | **Client Code:** | 71004-061 |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cv-00559-D Start date: 1/1/1974 End date: 8/9/2024 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) HEATHER SMITH, individual and on behalf of all other similarly situated, | |
| Plaintiff, | Case No: CIV-23-559-D |
| | Class Action |
| v. | |
| (1) WHALECO INC. d/b/a TEMU, | |
| Defendant. | |

**NOTICE OF REMOVAL OF A CIVIL ACTION**

Defendant, Whaleco, Inc. d/b/a Temu ("Defendant"), hereby removes the state court action entitled "*Heather Smith, individually and on behalf of all other similarly situated, v. Whaleco Inc. d/b/a Temu*" bearing Case No. CJ-2023-2888, pending in the District Court of Oklahoma County, State of Oklahoma ("State Court Action"), to the United States District Court for the Western District of Oklahoma, and respectfully represents as follows:

**Procedural History and Timeliness of Removal**

1.      Plaintiff, Heather Smith, filed the referenced state court action against Defendant on May 22, 2023. A true and accurate copy of the Class Action Petition (the "Petition") is attached hereto as **Exhibit 1**, as required by 28 U.S.C. §§ 1441 and 1446.

2.      A true and correct copies of all other process, pleadings, and orders purportedly served upon Defendant in the State Court Action are attached to this Notice as follows: (i) Motion to Associate Counsel (re Edwin Powell Miller) [filed 6/5/2023] attached as **Exhibit 2**; (ii) Order Admitting to Practice (re Edwin Powell Miller) [filed 6/7/2023] attached as **Exhibit 3**; (iii) Motion to Associate Counsel (re Frank Hedin) [filed 6/9/2023] attached as **Exhibit 4**; (iv) Order Admitting to Practice (re Frank Hedin) [filed 6/12/2023] attached as **Exhibit 5.**

3.    Plaintiff purportedly served Defendant with a summons and the Petition in the State Court Action between May 30, 2023 and June 6, 2023. See Return of Service filed in the State Court Action, attached hereto as **Exhibit 6**. This Notice of Removal is therefore timely pursuant to 28 U.S.C. § 1446(b).

4.    A copy of the Oklahoma County, Oklahoma State Court's docket is attached hereto as **Exhibit 7**.

## Joinder

5.    Plaintiff has not named any other defendants in this action, and therefore, no joinder of additional defendants to this removal is necessary.

## Relevant Allegations

6.    Plaintiff's single-count Petition seeks relief from Defendant, on behalf of herself and a putative class of similarly-situated persons, for allegedly "sending automated commercial telephonic sales calls, in the form of text messages, to her cellular telephone and the cellular telephones of numerous other individuals across Oklahoma" in violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C. l, et seq. ("OTSA"). See Petition ¶ 1.

7.    More specifically, Plaintiff's Petition alleges, inter alia, that "the number of persons within the Class is substantial, believed to amount to at least several thousand persons dispersed throughout Oklahoma, who collectively received at least tens of thousands of commercial telephonic sales calls by or on behalf of Defendant since November 1, 2022." Petition ¶ 28. According to the Petition, the claims of Plaintiff are typical of the claims of the members of the Class, and Plaintiff's interests are consistent with and not antagonistic to those of the other Class members she seeks to represent. Petition ¶ 29.

8.     The Petition seeks an award of $500.00 in statutory damages for each violation of the OTSA or $1,500 for each such violation committed willfully or knowingly. Petition ¶ 45.

9.     Defendant disputes all of Plaintiff's allegations, believes the Petition lacks any merit, and denies Plaintiff or the putative class has/have been harmed in any way or that this case is capable of or appropriate for class treatment. By seeking removal, therefore, Defendant does not waive any arguments with respect to the Petition or otherwise in this matter and expressly reserves the right to move to compel arbitration. As demonstrated below, however, this Court has jurisdiction over Plaintiff's claim and removal of this action is proper. *See, e.g., McDaniel v. Fifth Third Bank*, 568 F.App'x. 729, 731 (11th Cir. 2014) (accepting Plaintiff's allegations as true for purposes of jurisdictional analysis); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014).

## **CAFA Jurisdiction**

10.     This Court has jurisdiction over this case pursuant to the Class Action Fairness Act ("CAFA"), specifically 28 U.S.C. § 1332(d)(2) & (5), which together provide, inter alia, that "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which … any member of a class of plaintiffs is a citizen of a State different from any defendant…" and require that the proposed class must contain at least 100 persons. *Dutcher v. Matheson*, 840 F.3d 1183, 1190 (10th Cir. 2016). As shown below, this case readily meets all these requirements. *Dart Cherokee Basin Operating Co.,*, 574 U.S. at 89 ("a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.").

11. The State Court Action is a "class action" under 28 U.S.C. § 1332(d)(2), because Plaintiff seeks to represent a class of similarly situated individuals pursuant to Okla. Stat. tit 12, § 2023. Petition. ¶¶ 21 – 36.

12. There is minimal diversity between Plaintiff and the putative class members on the one hand and Defendant on the other. 28 U.S.C.A. § 1332 (d)(2)(A) ("any member of a class of plaintiffs is a citizen of a State different from any defendant").

13. In this regard, Plaintiff alleges that she was and is a resident of Oklahoma County, Oklahoma and seeks to certify a class of all persons across the nation assigned an Oklahoma area code. Petition ¶¶ 4 & 21. It is worth noting that by Plaintiff's proposed class definition, the class is not limited solely to Oklahoma residents.

14. The Petition alleges that "Defendant is organized and incorporated under the laws of Massachusetts and maintains its corporate headquarters and principal place of business in Boston Massachusetts." Petition ¶ 5.

15. Taking the allegations as true, as the Court must for removal, Plaintiff alleges that the class consists of several thousand people. Petition ¶ 28. Hence, the class is above the 100-person threshold.

16. The plausible amount in controversy exceeds the requisite minimum under CAFA. *See, e.g., Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061-1062 (11th Cir. 2010) ("[C]ourts may use their judicial experience and common sense in determining whether the case stated in a complaint meets federal jurisdictional requirements" and may make "reasonable deductions, reasonable inferences, or other reasonable extrapolations from the pleadings to determine whether it is facially apparent that a case is removable."); *Frederick v. Hartford Underwriters Ins. Co.*, 683

4

10

F.3d 1242, 1247 (10th Cir. 2012)("Regardless of the plaintiff's pleadings, federal jurisdiction is proper if a defendant proves jurisdictional facts by a "preponderance of the evidence" such that the amount in controversy may exceed $5,000,000.")

17.     In particular, and as noted above, Plaintiff alleges that the purported Class received tens of thousands of telephonic sales calls, and Plaintiff is seeking $500 for each call.  The use of the word "tens" implies more than 10 and potentially more than 20.  Defendant disputes this allegation, but taking it as true, and assuming the class received more than 10,000 text messages and Plaintiff is seeking $500 for each text, then the amount in controversy exceeds $5,000,000 (assuming 10,001 text messages, multiplied by $500, equals $5,000,500.).  *Frederick.*, 683 F.3d at 1247(Stating that once a defendant meets this burden on damages, remand is appropriate only if the plaintiff can establish that it is legally impossible to recover more than $5,000,000).

18.     Given the foregoing, the CAFA removal requirements are met in this case and, as such, removal to this Court is proper.

## Venue

19.     Because this action was filed in the District Court of Oklahoma County, Oklahoma, the United States District Court for the Western District of Oklahoma is the proper Court for removal of this action pursuant to 28 U.S.C. § 1441.

20.     Promptly after filing this Notice of Removal, written notice hereof will be given to Plaintiff and will be filed with the Clerk of Court for the District Court of Oklahoma County, Oklahoma, in conformity with 28 U.S.C. § 1446(d).

WHEREFORE, Defendant respectfully requests that this Notice of Removal be accepted as good and sufficient and that the aforementioned action, Case No. CJ-2023-2888 currently

pending in the District Court of Oklahoma County be removed to the United States District Court

for the Western District of Oklahoma, for further proceedings as provided by law.

Respectfully submitted,

*s/John A. Burkhardt*
John A. Burkhardt, OBA #1336
*Attorneys for Defendant, Whaleco Inc., d/b/a Temu*
SCHAFFER HERRING PLLC
7134 S. Yale, Suite 300
Tulsa, OK 74136
Telephone: (918) 550-8105
Facsimile:  (918) 550-8106
Email: john.burkhardt@schafferherring.com

Robert A. Stines (Pro Hac Vice Pending)
SMITH GAMBRELL & RUSSELL LLP
201 North Franklin Street, Suite 3550
Tampa, FL 33602
Telephone:  (813) 488-2920
Facsimile:  (813) 488-2960
Email:  rstines@sgrlaw.com
*Attorneys for Defendant, Whaleco Inc., d/b/a Temu*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, a copy of the foregoing pleading was electronically

filed with the United States District Court for the Western District of Oklahoma. A copy of the

foregoing pleading was also served on the following attorneys of record for Plaintiff by email:

Mary Quinn Cooper, Esq.
Kathy R. Neal, Esq.
McAFEE & TAFT, PC
Williams Center Tower II
2 West Second Street, Suite 1100
Tulsa, OK 74103
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

Frank S. Hedin, Esq.
Arun G. Ravindran, Esq.
HEDIN HALL, LLP
1395 Brickell Avenue, Suite 1140
Miami, FL 33131
fhedin@hedinhall.com
aravindran@hedinhall.com

E. Powell Miller, Esq.
Gregory A. Mitchell, Esq.
THE MILLER LAW FIRM PC
950 W. University Drive, Suite 300
Rochester, MI 48307
epm@millerlawpc.com
gam@millerlawpc.com

*s/John A. Burkhardt*
John A. Burkhardt

# EXHIBIT 1

CJ-23-2888
Dishman



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | **CJ-2023-2888** |
| Plaintiff, | Case No. _____ |
| v. | **CLASS ACTION** |
| WHALECO INC. DBA TEMU, | FILED IN DISTRI OKLAHOMA COUNTY f |
| Defendant. | (JURY TRIAL DEMANDED)  MAY 22 2023 |

RICK WARREN
COURT CLERK
41 _____

### CLASS ACTION PETITION

Plaintiff Heather Smith, individually and on behalf of all others similarly situated, complains and alleges as follows based on personal knowledge as to herself, on the investigation of her counsel, and on information and belief as to all other matters.

### NATURE OF ACTION

1.      Plaintiff brings this Class Action Complaint for legal and equitable remedies resulting from the illegal actions of Whaleco Inc. dba Temu ("Defendant") in sending automated commercial telephonic sales calls, in the form of text messages, to her cellular telephone and the cellular telephones of numerous other individuals across Oklahoma, in clear violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq.* ("OTSA").

### JURISDICTION AND VENUE

2.      The Court has jurisdiction over this case. *See* Okla. Const. art. VII, § 7(c) (establishing that Oklahoma's district courts are courts of general jurisdiction).

3.      Personal jurisdiction and venue are proper because Plaintiff resides within Oklahoma County, Oklahoma, because Defendant engaged in a telemarketing campaign through which it knowingly and intentionally directed numerous OTSA-violative text messages (which form the basis of Plaintiff's claims) into Oklahoma County, Oklahoma, including while she resided in Oklahoma County, Oklahoma, such that a substantial portion of the events alleged herein occurred, and the cause of action arose, within Oklahoma County, Oklahoma. *See* Okla. Stat. tit. 12, §§ 133.

## PARTIES

4.      Plaintiff is a resident and citizen of Oklahoma County, Oklahoma. Plaintiff was at all times mentioned herein the regular user of the telephone number (405) ***-9888 (the "9888 Number").

5.      Defendant Whaleco Inc. dba Temu is an online marketplace.  Defendant is organized and incorporated under the laws of Massachusetts and maintains its corporate headquarters and principal place of business in Boston, Massachusetts.

## OKLAHOMA'S TELEPHONE SOLICITATION ACT OF 2022

6.      "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

7.      Thus, on May 20, 2022, to better protect its residents' privacy from intrusive calls and text messages, Oklahoma enacted the OTSA to prohibit, *inter alia*, the transmission of unsolicited sales calls and text messages to its residents' telephones. The statute became effective on November 1, 2022.

- 2 -

16

8.      The OTSA provides, in pertinent part: "A person may not make or knowingly allow a commercial telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party." Okla. Stat. tit. 15, § 775C.3(A).

9.      "Called party" is defined as "a person who is the regular user of the telephone number that receives a commercial telephonic sales call." *Id.* § 775C.2(1).

10.     "Prior express written consent" is defined, in pertinent part, as "a written agreement that . . . [b]ears the signature of the called party[,] [c]learly authorizes the person making or allowing the placement of a commercial telephonic sales call by telephone call [or] text message . . . to deliver or cause to be delivered to the called party a commercial telephonic sales call using an automated system for the selection or dialing of telephone numbers[,] . . . [i]ncludes the telephone number to which the signatory authorizes a commercial telephonic sales call to be delivered[,] and [i]ncludes a clear and conspicuous disclosure informing the called party that":

> By executing the agreement, the called party authorizes the person making or allowing the placement of a commercial telephonic sales call to deliver or cause to be delivered a commercial telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers . . . ; and

> He or she is not required to sign the written agreement directly or indirectly or to agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

*Id.* § 775C.2(3); *see also id.* § 775C.2(4) ("'Signature' includes an electronic or digital signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.").

11.    "There is a rebuttable presumption that a commercial telephonic sales call made to any area code in this state is made to an Oklahoma resident or to a person in this state at the time of the call." *Id.* § 775C.3(D).

12.    A called party who is aggrieved by a violation of the OTSA may bring an action to enjoin such violations from occurring in the future pursuant to § 775C.6(A)(1), and to recover $500.00 for each violation pursuant to § 775C.6(A)(2) (or up to $1,500.00 for each violation committed knowingly or willfully pursuant to § 775C.6(B)).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

13.    Since November 1, 2022, Plaintiff has received, at the 9888 Number, at least one text message that Defendant made or knowingly allowed another person to make on its behalf.

14.    For example, on or about February 25, 2023, Defendant made, or knowingly allowed to be made on its behalf, a text message to the 9888 Number that stated as follows:

> [Temu] Kudos to you! You just received a SPECIAL treat! It awaits you, but won't be forever. Reveal Now> https://app.temu .com/t/qVoMcJpicr. I X (y STOP to cancel.

15.    The text messages that Defendant made or knowingly allowed another person to make on its behalf to Plaintiff's 9888 Number constituted "commercial telephonic sales calls" within the meaning of the OTSA.

16.    Plaintiff is the "regular user of" the 9888 Number, and is therefore the "called party" with respect to the subject text messages made by or on behalf of Defendant to the 9888 Number. *See* § 775C.2(1).

- 4 -

17.     Each text message sent by or on behalf of Defendant to Plaintiff's 9888 Number originated from the telephone number 52927, which is number leased or owned by or on behalf of Defendant that Defendant uses or knowingly allows another person to use to transmit commercial telephonic sales calls, in the form of text messages, to consumers in an automated and *en masse* fashion.

18.     All telephone contact by Defendant or affiliates, subsidiaries, or agents of Defendant to Plaintiff's 9888 Number occurred using an "automated system for the selection or dialing of telephone numbers" within the meaning of Okla. Stat. tit. 15, § 775C.3(A). Specifically, Defendant utilized an "automated system for the selection or dialing of telephone numbers" to transmit the subject text messages to Plaintiff's 9888 Number because such messages were sent from telephone numbers used to message consumers *en masse*; because Defendant's dialing equipment includes features substantially similar to a predictive dialer, inasmuch as it is capable of making numerous calls or texts simultaneously; and because the hardware and software used by Defendant to send such messages have the capacity to both select numbers to be dialed and to dial such numbers in an automated fashion. And indeed, Defendant (or another person Defendant knowingly allowed to act on its behalf) actually transmitted the text messages at issue in this case to Plaintiff in an automated fashion, with hardware and software that automatically selected and dialed Plaintiff's 9888 Number and the other telephone numbers to which it transmitted such text messages.

19.     Because Plaintiff's cellular phone alerts her whenever she receives a text message, each commercial telephonic sales call by or on behalf of Defendant to Plaintiff's 9888 Number invaded Plaintiff's privacy and intruded upon Plaintiff's seclusion upon receipt.

- 5 -

20.     Plaintiff has never provided her "prior express written consent" to Defendant or any other party acting on Defendant's behalf to authorize the subject commercial telephonic sales calls to the 9888 Number by means of an "automated system for the selection or dialing of telephone numbers" within the meaning of Okla. Stat. tit. 15, § 775C.2(3). Indeed, prior to making (or knowingly allowing another person to make on its behalf) the subject commercial telephonic sales calls to Plaintiff's 9888 Number, Defendant lacked a signed written agreement with Plaintiff that complies with the requirements of Okla. Stat. tit. 15, § 775C.2(3).

## CLASS ALLEGATIONS

21.     <u>Class Definition</u>. Plaintiff brings this civil class action on behalf of herself individually and on behalf of all other similarly situated persons as a class action pursuant to Okla. Stat. tit. 12, § 2023. The "Class" which Plaintiff seeks to represent is comprised of and defined as follows:

> All persons who, at any time since November 1, 2022, received, at a telephone number assigned an Oklahoma area code, a commercial telephonic sales call made by or on behalf of Defendant using the same type of equipment used to make commercial telephonic sales calls to Plaintiff.

Excluded from the class are Defendant, its officers and directors, members of the immediate families of the foregoing, legal representatives, heirs, successors, or assigns of the foregoing, and any entity in which Defendant has a controlling interest.

22.     Plaintiff reserves the right to modify the definition of the Class (or add one or more subclasses) after further discovery.

- 6 -

20

23.     The members of the class are ascertainable because the class is defined by reference to objective criteria. In addition, the members of the class are identifiable in that, upon information and belief, their cellular telephone numbers, names and addresses can be identified in business records maintained by Defendant and/or by third parties.

24.     Plaintiff and all Class members have been impacted and harmed by the acts of Defendant or its affiliates, agents, or subsidiaries acting on its behalf.

25.     This Class Action Complaint seeks injunctive relief and monetary damages.

26.     Defendant or any affiliates, subsidiaries, or agents of Defendant have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiff alleges that the OTSA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

27.     This class action satisfies the numerosity, typicality, adequacy, commonality, predominance, and superiority requirements.

28.     <u>Numerosity</u>. The number of persons within the Class is substantial, believed to amount to at least several thousand persons dispersed throughout Oklahoma, who collectively received at least tens of thousands of commercial telephonic sales calls by or on behalf of Defendant since November 1, 2022. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

29.     Typicality.  Plaintiff received at least one commercial telephonic sales call from Defendant since November 1, 2022 while in Oklahoma, and Defendant lacks any record establishing Plaintiff's "prior express written consent."  Consequently, the claims of Plaintiff are typical of the claims of the members of the Class, and Plaintiff's interests are consistent with and not antagonistic to those of the other Class members she seeks to represent.  Plaintiff and all members of the Class have been impacted by, and face continuing harm arising out of, Defendant's OTSA-violative misconduct as alleged herein.

30.     Adequacy.  As the proposed Class representative, Plaintiff has no interests adverse to or which conflict with the interests of the absent members of the Class, and she is able to fairly and adequately represent and protect the interests of such a Class.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue these claims.  If necessary as the litigation (including discovery) progresses, Plaintiff may seek leave to amend this Class Action Complaint to modify the Class definition set forth above, add additional Class representatives, or assert additional claims.

31.     Competency of Class Counsel.  Plaintiff has retained and is represented by experienced, qualified, and competent counsel committed to prosecuting this action.  Plaintiff's counsel are experienced in handling complex class action claims, including in particular claims brought under consumer protection and data-privacy statutes similar to the OTSA.

32.     Commonality and Predominance. There are well-defined common questions of fact and law that exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary from Class member to Class member and may be determined without reference to the individual circumstances of any Class member, include (but are not limited to) the following:

- 8 -

22

a.   Whether Defendant made or knowingly allowed another person to make the subject text messages to Plaintiff's and Class members' cellular telephones;

b.   Whether such text messages constitute "commercial telephonic sales calls" within the meaning of the OTSA;

c.   Whether such text messages were sent using an "automated system for the selection or dialing of telephone numbers" within the meaning of Okla. Stat. tit. 15, § 775C.3(A);

d.   Whether Defendant can meet its burden to show that it obtained "prior express written consent" to transmit the subject text messages within the meaning of Okla. Stat. tit. 15, § 775C.2(3), assuming such an affirmative defense is timely raised;

e.   Whether any of the violations of the OTSA committed by or on behalf of Defendant were knowing or willful;

f.   The amount of statutory damages to which Plaintiff and the Class are entitled as a result of any violations of the OTSA committed by or on behalf of Defendant; and

g.   Whether Defendant or any affiliates, subsidiaries, or agents of Defendant should be enjoined from engaging in such conduct in the future.

33.   Superiority.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the prosecution of individual litigation on behalf of each Class member is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not; multiple trials of the same factual issues would magnify the delay and expense to all parties and the court system. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court

- 9 -

23

system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. Class wide relief is essential to compel compliance with the OTSA and thus protect consumers' privacy. The interests of Class members in individually controlling the prosecution of separate claims is small because the statutory damages recoverable in an individual action for violation of the OTSA are likewise relatively small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the text messages at issue are all automated and because Defendant lacks any record reflecting that it obtained the requisite prior express written consent from any Class member to be sent such messages. Class members can be readily located and notified of this class action by reference to Defendant's records and, if necessary, the records of Defendant's affiliates, agents, or subsidiaries and cellular telephone providers.

34. Additionally, the prosecution of separate actions by individual Class members would create a risk of multiple adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to such adjudications, thereby substantially impairing or impeding the ability of such nonparty Class members to protect their interests. The prosecution of individual actions by Class members could also establish inconsistent results and/or establish incompatible standards of conduct for Defendant.

35. This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

36.     On application by Plaintiff's counsel for class certification, Plaintiff may also seek certification of subclasses in the interests of manageability, justice, or judicial economy.

**CLAIM FOR RELIEF**
**VIOLATION OF OKLAHOMA'S TELEPHONE SOLICITATION ACT**
**(Okla. Stat. tit. 15, § 775C.1, *et seq.*)**

37.     Plaintiff incorporates by reference the foregoing paragraphs of this Class Action Complaint as if fully stated herein.

38.     Since November 1, 2022, Defendant has made, or knowingly allowed to be made on its behalf by another person, at least one text message to the 9888 Number, and Plaintiff received such text messages in Oklahoma.  The 9888 Number is assigned an area code that corresponds to locations in Oklahoma.

39.     Likewise, since November 1, 2022, Defendant has made, or knowingly allowed to be made on its behalf by another person, at least one text message to each of the telephone numbers regularly used by the members of the Class in Oklahoma.

40.     Because Plaintiff is, and at all relevant times referenced herein was, the "regular user of" the 9888 Number, Plaintiff was the "called party" with respect to each of the text messages made by Defendant (or knowingly allowed to be made on its behalf by another person) to the 9888 Number. *See* Okla. Stat. tit. 15, § 775C.2(1).

41.     At least one of the text messages made by Defendant (or that Defendant knowingly allowed to be made on its behalf by another person) to the 9888 Number constituted a "commercial telephonic sales call" within the meaning of the OTSA.

- 11 -

42.     Likewise, at least one of the text messages made by Defendant (or that Defendant knowingly allowed to be made on its behalf by another person) to each of the telephone numbers regularly used by the members of the Class constituted a "commercial telephonic sales call" within the meaning of the OTSA.

43.     Each of the commercial telephonic sales calls made by Defendant (or that Defendant knowingly allowed to be made on its behalf by another person) to Plaintiff's 9888 Number and to the Class members' telephone numbers occurred using an "automated system for the selection or dialing of telephone numbers" within the meaning of Okla. Stat. tit. 15, § 775C.3(A).

44.     Prior to making or knowingly allowing another person to make on its behalf the subject commercial telephonic sales calls to Plaintiff and the members of the Class, Defendant failed to obtain the "prior express written consent" from Plaintiff or any member of the Class. Indeed, prior to making the subject commercial telephonic sales calls to Plaintiff's 9888 Number and to the telephone numbers regularly used by the members of the Class, Defendant lacked a signed written agreement with Plaintiff or any Class member that complies with the requirements of Okla. Stat. tit. 15, § 775C.2(3).

45.     Plaintiff and all Class members are entitled to, and do seek, injunctive relief prohibiting Defendant's future transmission of commercial telephonic sales calls to the telephone numbers regularly used by Plaintiff and the members of the Class absent their prior express written consent pursuant to Okla. Stat. tit. 15, § 775C.6(A)(1), as well as an award of $500.00 in statutory damages for each violation of the OTSA committed by or on behalf of Defendant pursuant to Okla. Stat. tit. 15, § 775C.6(A)(2) (or $1,500 for each such violation committed willfully or knowingly pursuant to pursuant to Okla. Stat. tit. 15, § 775C.6(B)).

- 12 -

26

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Heather Smith prays for relief and judgment in favor of herself and the Class as follows:

A.      Injunctive relief sufficient to ensure Defendant refrains from violating the OTSA in the future pursuant to Okla. Stat. tit. 15, § 775C.6(A)(1);

B.      Statutory damages of $500.00 for herself and each Class member for each of Defendant's violations of the OTSA (or $1,500.00 for each such violation to the extent committed willfully or knowingly) pursuant to Okla. Stat. tit. 15, § 775C.6(A)(2) & (B);

C.      An Order, pursuant to Okla. Stat. tit. 12, § 2023, certifying this action to be a proper class action, establishing an appropriate Class and any Subclass(es) the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the attorneys representing Plaintiff as counsel for the Class; and

D.      An award of attorneys' fees and costs to Plaintiff's counsel pursuant to Okla. Stat. tit. 12, § 2023(G).

## DEMAND FOR JURY TRIAL

On behalf of herself and all others similarly situated, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated this _22nd_ day of May, 2023

By: _____

Mary Quinn Cooper, OBA #11966
Kathy R. Neal, OBA #674
MCAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:      918-587-0000
Facsimile:      918-599-9317
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

and

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Telephone:      305-357-2107
Facsimile:      305-200-8801
fhedin@hedinhall.com
aravindran@hedinhall.com

(out-of-state registration and pro hac vice
application pending)

E. Powell Miller
Gregory A. Mitchell
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone:      248-841-2200
epm@millerlawpc.com
gam@millerlawpc.com

(out-of-state registration and pro hac vice
application pending)

*Counsel for Plaintiff and the Putative Class*

- 14 -

28

# EXHIBIT 2



FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUN - 5 2023

RICK WARREN
COURT CLERK

73_____

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

HEATHER SMITH, individually and on behalf
of all others similarly situated,

     Plaintiff,

v.

WHALECO INC. DBA TEMU,

     Defendant.

Case No. CJ-2023-2888

<u>CLASS ACTION</u>

(JURY TRIAL DEMANDED)

## <u>MOTION TO ASSOCIATE COUNSEL</u>

Plaintiff Heather Smith hereby moves the Court for an Order permitting Edwin Powell Miller to practice in the above styled and numbered cause pursuant to the Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. Ch. 1, App.1, Art. II. This Motion is supported by the attached "Signed Application" (Exhibit 1), "Certificate of Good Standing (Exhibit 2), and the "Certificate of Compliance" from the Oklahoma Bar Association (Exhibit 3).

Dated this ___5th___ day of June, 2023.

Respectfully Submitted,

Kathy R. Neal, OBA #674
MCAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 11200
Tulsa, Oklahoma 74103
Telephone: 918-587-0000
Facsimile: 918-599-9317
kathy.neal@mcafeetaft.com

**ATTORNEY FOR PLAINTIFF**

# APPLICATION



OUT OF STATE ATTORNEY REGISTRATION

Edwin       Powell       Miller            , Applicant, respectfully represents:
First Name   Middle Name   Last Name

1. Applicant is an attorney at law and a member of the law firm of _____

The Miller Law Firm, P.C.

Applicant's mailing address is  950 W. University Drive, Suite 300
                                                 Mailing Address

Rochester                              , Oakland            , MI    , 48307
City                                        County       State          Zip Code

( 248 ) 841-2200        , (      )              , (248 )  652-2852
Telephone  (Firm)          Telephone (Applicant's Direct Dial)      Fax (Applicant)

epm@millerlawpc.com          .
E-mail Address (Applicant)

2.   Applicant is admitted to practice and is a member in good standing
(certificates of good standing attached) of the bar(s) of the highest state court(s)
of the following state(s):

| State | Date of Admission |
|---|---|
| Michigan | 11/24/1986 |
| | |
| | |

3.  Applicant is admitted to practice before the following United States District
Courts, United States Circuit Courts of Appeal, the Supreme Court of the United
States, and/or other tribunals on the dates indicated for each, and is presently a
member in good standing of the bars of said courts:

| Tribunal | Date of Admission |
|---|---|
| USDC Eastern District of Michigan | 3/30/1987 |
| USDC Western District of Michigan | 4/29/2002 |
| Sixth Circuit Court of Appeals | 6/13/1989 |
| Third Circuit Court of Appeals | 1/3/2007 |



PLAINTIFF'S
EXHIBIT

1

31

4. Have you ever been suspended or disbarred in any court except as hereinafter provided (Give particulars; e.g. court, jurisdiction, date): _____

No _____

5. Are you currently subject to any pending disciplinary proceedings by any organization with authority to discipline attorneys at law except as hereinafter provided (Give particulars; e.g. court, discipline authority, date, status): _____

No _____

6. Have you ever received public discipline including, but not limited to, suspension or disbarment, by any organization with authority to discipline attorneys at law except as hereinafter provided (Give particulars; e.g. court, discipline authority, type of discipline, date, status):_____

No _____

_____

7. Have you ever had any certificate or privilege to appear and practice before any regulatory or administrative body suspended or revoked except as hereinafter provided (Give particulars; e.g. administrative body, date, status of suspension or reinstatement):
No _____

_____

8. Applicant seeks admission to practice in the State of Oklahoma in the

following matter (give particulars; e.g. caption of case, court or agency, type of

matter, party to be represented): **Note - A separate application is to be**

**submitted for each matter in which the applicant seeks admission!**

Heather Smith, individually and on behalf of all others similarly situated,

Plaintiff, vs. Whaleco, Inc. d/b/a TEMU, Defendant

Oklahoma County; Case No.   CJ-2023-2888

Type of Case:    Class Action

Represent Plaintiff

9.    The Oklahoma Bar Association member who is counsel of record for Applicant in this matter is:

| Kathy | R. | Neal | 674 |
|-------|-----|------|-----|
| First Name | Middle Name | Last Name | O.B.A. Number |
| 2 West 2nd Street, Suite 1100 | | Tulsa | OK | 74103 |
| Mailing Address | | City | State | Zip Code |

| ( 918) 587-0000 | ( 918) 574-3120 | kathy.neal@mcafeetaft.com |
|-----------------|-----------------|---------------------------|
| Telephone Number | Fax Number | E-mail Address |

10.    The following accurately represents the names of each party in this matter and the names and addresses of each counsel of record who appear for that party:

| Party Name | Counsel Name | Address of Counsel |
|------------|--------------|--------------------|
| Heather Smith | Kathy R. Neal | McAfee & Taft, P.C. |
| | | Two W. 2nd Street |
| | | Suite 1100 |
| | | Tulsa, OK 74103 |

Whaleco, Inc. dba TEMU - counsel has not entered appearance yet

11.    Applicant certifies that he/she shall be subject to the jurisdiction of the courts and disciplinary boards of this state with respect to the laws of this state governing the conduct of attorneys to the same extent as a member of the Oklahoma Bar Association.

12.    Applicant understands and shall comply with the standards of professional conduct required of members of the Oklahoma Bar Association.

13.    Applicant has disclosed in writing to the client that the Applicant is not admitted to practice in this jurisdiction and the client has consented to such representation.

I, _E. Powell Miller_____, do hereby swear/affirm under penalty of perjury that the assertions of this application are true:

I am the Applicant in the above referenced matter; I have read the foregoing and know the contents thereof; the same is true of my own knowledge except as to those matters therein stated on information and belief, and as to those matters I believe them to be true.

I further certify that I am subject to the jurisdiction of the Courts and disciplinary boards of this state with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the Oklahoma Bar Association; I understand and shall comply with the standards of professional conduct required by members of the Oklahoma Bar Association; and that I am subject to the disciplinary jurisdiction of the Oklahoma Bar Association with respect to any of my actions occurring in the course of such appearance.

DATED this _10th_ day of ___May_____, _2023_.

*E. Powell Miller*

Applicant

Mail with check or money order (payable to the OBA) to:

Out-of-State Attorney Registration
Oklahoma Bar Association
P.O. Box 53036
Oklahoma City, OK   73152-3036

Form 200B



# State Bar of Michigan

## Certificate of Good Standing

This certifies that E. Powell Miller, P39487 of Rochester, Michigan is an active member of the State Bar of Michigan in good standing.

He/She was admitted to practice in Michigan on November 24, 1986 in Wayne County and became a member of the State Bar of Michigan on November 24, 1986.

*Peter W. Cunningham*

Peter W. Cunningham, Executive Director
May 08, 2023

tabbies
PLAINTIFF'S EXHIBIT
2



## Certificate of Compliance

### Oklahoma Bar Association
1901 North Lincoln Boulevard
Post Office Box 53036
Oklahoma City, Oklahoma 73152-3036

The Oklahoma Bar Association, in response to the application of out-of-state attorney, submits the following certificate pursuant to 5 O.S. Ch.1 App.1, Art. II

1.   Applicant has submitted a signed application of out-of-state attorneys, certificate(s) of good standing, and the non-refundable application fee pursuant to the Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. Ch. 1, App. 1, Art. II.

2.   Date of Application: **May 30, 2023**

3.   Application Number: **2023-260**

4.   Applying Attorney:   **Edwin Powell Miller**
     **The Miller Law Firm, P.C.**
     **950 W. University Drive, Suite 300**
     **Rochester, MI 48307**

5.   The Application was: **GRANTED**

Dated this **30**th day of **May**, 20**23**.



Gina L. Hendryx, General Counsel
Oklahoma Bar Association

Form 400C



PLAINTIFF'S
EXHIBIT
3

# EXHIBIT 3



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

HEATHER SMITH, individually and on behalf
of all others similarly situated,

      Plaintiff,

v.

WHALECO INC. DBA TEMU,

      Defendant.

Case No. CJ-2023-2888

CLASS ACTION

(JURY TRIAL DEMANDED)

JUN − 7 2023

RICK WARREN
COURT CLERK

40

### ORDER ADMITTING TO PRACTICE

Kathy R. Neal, having filed her Motion to Associate Counsel pursuant to the Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. Ch. 1. App. 1, Art. II, together with a signed Application, Certificate of Good Standing, and the Oklahoma Bar Association Certificate of Compliance; and said Motion having been noticed, no objections having been made, and the Court being fully apprised in the premises, and good cause appearing, it is hereby;

**ORDERED,** that said Motion is hereby granted, and Edwin Powell Miller is hereby admitted to practice in the above styled and numbered cause of action for the purposes of the above entitled matter only.

Dated this _____5_____ day of _____June_____, 2023.

C. Brent Dishman

The Honorable Brent Dishman
Judge of the District Court

38

Submitted by:

Kathy R. Neal, OBA No. 674
MCAFEE & TAFT
2 W. 2nd Street, Suite 1100
Tulsa OK 74103
Telephone:     918-587-0000
Facsimile:     918-599-9317
Kathy.neal@mcafeetaft.com

*Attorney for Plaintiff*

2

# EXHIBIT 4





FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUN - 9 2023

RICK WARREN
COURT CLERK

36_____

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

HEATHER SMITH, individually and on behalf
of all others similarly situated,

      Plaintiff,

v.

WHALECO INC. DBA TEMU,

      Defendant.

Case No. CJ-2023-2888

<u>CLASS ACTION</u>

(JURY TRIAL DEMANDED)

### <u>MOTION TO ASSOCIATE COUNSEL</u>

Plaintiff Heather Smith hereby moves the Court for an Order permitting Frank Hedin to

practice in the above styled and numbered cause pursuant to the Rules Creating and Controlling the

Oklahoma Bar Association, 5 O.S. Ch. 1, App.1, Art. II. This Motion is supported by the

attached "Signed Application" (Exhibit 1), "Certificate of Good Standing (Exhibit 2), and the

"Certificate of Compliance" from the Oklahoma Bar Association (Exhibit 3).

Dated this 9th day of June, 2023.

Respectfully Submitted,

Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 11200
Tulsa, Oklahoma 74103
Telephone: 918-587-0000
Facsimile: 918-599-9317
kathy.neal@mcafeetaft.com

**ATTORNEY FOR PLAINTIFF**

# APPLICATION

OUT OF STATE ATTORNEY REGISTRATION



__Frank__     __Salisbury__     __Hedin__     , Applicant, respectfully represents:
First Name    Middle Name       Last Name

1. Applicant is an attorney at law and a member of the law firm of _____

     Hedin Hall LLP

Applicant's mailing address is    1395 Brickell Ave., Ste 1140
                                  Mailing Address

__Miami__         , __Miami-Dade__, __FL__ , __33131__        ,
City                County         State     Zip Code
(__305__) __357-2107__   , (__786__) __559-4352__   , (__305__) __200-8801__   ,
Telephone   (Firm)        Telephone (Applicant's Direct Dial)    Fax (Applicant)

__fhedin@hedinhall.com__ .
E-mail Address (Applicant)

2.   Applicant is admitted to practice and is a member in good standing (certificates of good standing attached) of the bar(s) of the highest state court(s) of the following state(s):

| State | Date of Admission |
|---|---|
| Florida | April 30, 2014 |
| California | September 20, 2013 |

3.  Applicant is admitted to practice before the following United States District Courts, United States Circuit Courts of Appeal, the Supreme Court of the United States, and/or other tribunals on the dates indicated for each, and is presently a member in good standing of the bars of said courts:

| Tribunal | Date of Admission |
|---|---|
| See Exhibit A attached. | |

**EXHIBIT**

1

4. Have you ever been suspended or disbarred in any court except as hereinafter provided (Give particulars; e.g. court, jurisdiction, date):   No.

5. Are you currently subject to any pending disciplinary proceedings by any organization with authority to discipline attorneys at law except as hereinafter provided (Give particulars; e.g. court, discipline authority, date, status):   No.

6. Have you ever received public discipline including, but not limited to, suspension or disbarment, by any organization with authority to discipline attorneys at law except as hereinafter provided (Give particulars; e.g. court, discipline authority, type of discipline, date, status):  No.

7. Have you ever had any certificate or privilege to appear and practice before any regulatory or administrative body suspended or revoked except as hereinafter provided (Give particulars; e.g. administrative body, date, status of suspension or reinstatement):   No.

8. Applicant seeks admission to practice in the State of Oklahoma in the

following matter (give particulars; e.g. caption of case, court or agency, type of

matter, party to be represented): **Note - A separate application is to be**

**submitted for each matter in which the applicant seeks admission!**

Heather Smith, individually and an on behalf of all others similarly situated,

Plaintiff v. Whaleco, Inc. d/b/a TEMU, Defendant

Oklahoma County; CJ-2023-2888

Type of Case:  Class Action

Represent Plaintiff

9.   The Oklahoma Bar Association member who is counsel of record for Applicant in this matter is:

| Kathy | R. | Neal | 674 |
|---|---|---|---|
| First Name | Middle Name | Last Name | O.B.A. Number |

| Two W. 2nd Street, Suite 1100 | Tulsa | OK | 74103 |
|---|---|---|---|
| Mailing Address | City | State | Zip Code |

| (918) 587-0000 | (918) 599-9317 | kathy.neal@mcafeetaft.com |
|---|---|---|
| Telephone Number | Fax Number | E-mail Address |

10.   The following accurately represents the names of each party in this matter and the names and addresses of each counsel of record who appear for that party:

| Party Name | Counsel Name | Address of Counsel |
|---|---|---|
| Heather Smith | Kathy R. Neal | McAfee & Taft, P.C. |
|  |  | Two W. 2nd Street |
|  |  | Suite 1100 |
|  |  | Tulsa, OK 74103 |

| Whaleco, Inc. d/b/a TEMU | Counsel has not entered an appearance yet. |
|---|---|

11.   Applicant certifies that he/she shall be subject to the jurisdiction of the courts and disciplinary boards of this state with respect to the laws of this state governing the conduct of attorneys to the same extent as a member of the Oklahoma Bar Association.

12.   Applicant understands and shall comply with the standards of professional conduct required of members of the Oklahoma Bar Association.

13.   Applicant has disclosed in writing to the client that the Applicant is not admitted to practice in this jurisdiction and the client has consented to such representation.

I, _____Frank S. Hedin_____, do hereby swear/affirm under penalty of perjury that the assertions of this application are true:

I am the Applicant in the above referenced matter; I have read the foregoing and know the contents thereof; the same is true of my own knowledge except as to those matters therein stated on information and belief, and as to those matters I believe them to be true.

I further certify that I am subject to the jurisdiction of the Courts and disciplinary boards of this state with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the Oklahoma Bar Association;  I understand and shall comply with the standards of professional conduct required by members of the Oklahoma Bar Association; and that I am subject to the disciplinary jurisdiction of the Oklahoma Bar Association with respect to any of my actions occurring in the course of such appearance.

DATED this _29th_ day of _May_____, _2023_.

_____
Applicant

Mail with check or money order (payable to the OBA) to:

    Out-of-State Attorney Registration
    Oklahoma Bar Association
    P.O. Box 53036
    Oklahoma City, OK  73152-3036

Form 200B

**EXHIBIT A**

| | |
|---|---|
| U.S. District Court, Southern District of Florida | 07/02/2014 |
| U.S. District Court, Middle District of Florida | 01/31/2019 |
| U.S. District Court, Northern District of California | 10/02/2014 |
| U.S. District Court, Central District of California | 07/07/2014 |
| U.S. District Court, Southern District of California | 04/27/2018 |
| U.S. District Court, Eastern District of California | 04/15/2019 |
| U.S. District Court, Western District of Wisconsin | 05/03/2016 |
| U.S. District Court, Western District of Michigan | 10/09/2018 |
| U.S. District Court, Eastern District of Michigan | 06/21/2019 |
| U.S. Court of Appeals, Second Circuit | 08/22/2017 |
| U.S. Court of Appeals, Seventh Circuit | 01/25/2018 |
| U.S. Court of Appeals, Ninth Circuit | 03/10/2021 |



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

State of Florida        )

County of Leon        )

In Re:  0109698
Frank S. Hedin
Hedin Hall LLP
1395 Brickell Ave Ste 1140
Miami, FL 33131-3353

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **April 30, 2014.**

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this _15th_ day of **May, 2023.**

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-228629

EXHIBIT
2

# THE STATE BAR OF CALIFORNIA
# CERTIFICATE OF STANDING

May 15, 2023

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, FRANK S. HEDIN, #291289 was admitted to the practice of law in this state by the Supreme Court of California on September 20, 2013 and has been since that date, and is at date hereof, an ACTIVE licensee of the State Bar of California; and that no recommendation for discipline for professional or other misconduct has ever been made by the Board of Trustees or a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA



Vicky Avila
Custodian of Records



# Certificate of Compliance
## Oklahoma Bar Association
### 1901 North Lincoln Boulevard
### Post Office Box 53036
### Oklahoma City, Oklahoma 73152-3036

The Oklahoma Bar Association, in response to the application of out-of-state attorney, submits the following certificate pursuant to 5 O.S. Ch.1 App.1, Art. II

1.   Applicant has submitted a signed application of out-of-state attorneys, certificate(s) of good standing, and the non-refundable application fee pursuant to the Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. Ch. 1, App. 1, Art. II.

2.   Date of Application: **June 5, 2023**

3.   Application Number: **2023-284**

4.   Applying Attorney:   **Frank Salisbury Hedin**
     **Hedin Hall LLP**
     **1395 Brickell Ave., Ste. 1140**
     **Miami, FL 33131**

5.   The Application was: **GRANTED**

Dated this **5**th day of **June**, 20**23**.



Gina L. Hendryx, General Counsel
Oklahoma Bar Association

EXHIBIT
3

Form 400C

49

# EXHIBIT 5



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

HEATHER SMITH, individually and on behalf
of all others similarly situated,

        Plaintiff,

v.

WHALECO INC. DBA TEMU,

        Defendant.

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

Case No. CJ-2023-2888    JUN 1 2 2023

RICK WARREN
COURT CLERK
<u>CLASS ACTION</u>    38_____

(JURY TRIAL DEMANDED)

## <u>ORDER ADMITTING TO PRACTICE</u>

    Kathy R. Neal, having filed her Motion to Associate Counsel pursuant to the Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S. Ch. 1. App. 1, Art. II, together with a signed Application, Certificate of Good Standing, and the Oklahoma Bar Association Certificate of Compliance; and said Motion having been noticed, no objections having been made, and the Court being fully apprised in the premises, and good cause appearing, it is hereby;

    **ORDERED,** that said Motion is hereby granted, and Frank Hedin is hereby admitted to practice in the above styled and numbered cause of action for the purposes of the above entitled matter only.

    Dated this ___12___ day of ___June___, 2023.

The Honorable Judge Brent Dishman
Judge of the District Court

51

Submitted by:

Kathy R. Neal, OBA No. 674
MCAFEE & TAFT
2 W. 2nd Street, Suite 1100
Tulsa OK  74103
Telephone:      918-587-0000
Facsimile:      918-599-9317
Kathy.neal@mcafeetaft.com

*Attorney for Plaintiff*

2

52

# EXHIBIT 6

**ORIGINAL SUMMONS**



### IN THE DISTRICT COURT OKLAHOMA COUNTY
### STATE OF OKLAHOMA

| | |
|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | Case No. CJ-2023-2888 |
| Plaintiff, | |
| v. | CLASS ACTION |
| WHALECO INC. DBA TEMU, | (JURY TRIAL DEMANDED) |
| Defendant. | |

**FILED IN DISTRICT COURT**
**OKLAHOMA COUNTY**

*Certified Mail*

Whaleco, Inc., d/b/a TEMU
31 St. James Avenue, Suite 355
Boston, MA 02116

JUN - 8 2023

**RICK WARREN**
**COURT CLERK**
73

To the above-named Defendant(s)

  You have been sued by the above named plaintiff(s), and you are directed to file a written answer to the attached petition and order in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.  Unless you answer the petition within the time stated judgment will be rendered against you with costs of the action.

  Issued this _22nd_ day of _May_ , 2023.

          **RICK WARREN, Court Clerk**
          County Court Clerk

      By _____
        Deputy Court Clerk

(Seal)

This summons and order was served on _May 30, 2023_ .

         (Signature of person serving summons)

  YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.  SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THIS SUMMONS.

**Return ORIGINAL for filing.**

### PERSONAL SERVICE

I certify that I received the foregoing Summons the _____ day of _____, 2023, and that I delivered a copy of said Summons with a copy of the Petition to the following named defendant personally in _____ County, _____ at the address and on the date set forth opposite each name, to-wit:

| Name of Defendant | Address | Date of Service |
|---|---|---|
| | | |

### USUAL PLACE OF RESIDENCE

I certify that I received the foregoing Summons on the _____ day of _____, 2023, and that on _____, I served _____ by leaving a copy of said summons with a copy of the attached Petition at _____, which is his/her dwelling house or usual place of abode, with _____, a person then residing therein, who is fifteen (15) years of age or older.

### NOT FOUND

Received this Summons this _____ day of _____, 2023. I certify that the following persons of the defendant within named not found in said County: _____.

### FEES

Fee for service $_____, Mileage $_____, Total $_____
    Dated this _____ day of *, 2023.
                                                    By: _____
                                                          Sheriff of _____ County, _____

### AFFIDAVIT

I, _____, the undersigned, under oath, do say that I served this Summons and made the return thereon, according to law that I am duly authorized to make this affidavit so help me God.

_____
Sheriff of _____ County, _____

Subscribed to and sworn to before me this _____ day of _____, 2023.
My Commission Expires: _____          _____
                              Seal                              Notary Public

## CERTIFICATE OF SERVICE BY MAIL

I certify that I mailed copies of the foregoing summons with a copy of the Petition to the following named defendant at the address shown by certified mail, addressee only, return receipt requested, on the 30th day of _May_, 2023, and receipt thereof on the dates shown:
23rd

| Defendant | Address Where Served | Date Receipted |
|---|---|---|
| Whaleco, Inc. dba TEmu | 31 St. James Ave. #355 Boston, MA 02116 | |

_Kathy R Neal_
Signature of person mailing summons


**UNITED STATES**
**POSTAL SERVICE**

The following is in response to your request for proof of delivery on your item with the tracking number:
**9214 8969 0099 9790 1213 7329 14**.

| Item Details | |
|---|---|
| **Status:** | Delivered, Front Desk/Reception/Mail Room |
| **Status Date / Time:** | May 30, 2023, 12:48 pm |
| **Location:** | BOSTON, MA 02116 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

| Shipment Details | |
|---|---|
| **Weight:** | 0.0oz |

| Recipient Signature | |
|---|---|
| Signature of Recipient: | *W(ru* |
| Address of Recipient: | *31 st. Tim F 758* |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

# EXHIBIT 7



The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

## IN THE DISTRICT COURT IN AND FOR <u>OKLAHOMA COUNTY</u>, OKLAHOMA

| | |
|---|---|
| Heather Smith, INDIVIDUALLY AND ON BHEALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>     Plaintiff,<br>v.<br>Whaleco Inc. DBA TEMU,<br>     Defendant. | **No. CJ-2023-2888**<br>**(Civil relief more than $10,000: CLASS ACTION)**<br><br>Filed: 05/22/2023<br><br><br>Judge: Dishman, C. Brent |

## PARTIES

Smith,  Heather, Plaintiff
Whaleco Inc., Defendant

## ATTORNEYS

| **Attorney** | **Represented Parties** |
|---|---|
| Neal,  Kathy  R (Bar #674)<br>TWO W. SECOND STREET SUITE 1100<br>TULSA, OK 74103 | Smith,   Heather |

## EVENTS

None

## ISSUES

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**      Issue: CLASS ACTION (CLASS)
              Filed By: Smith, Heather
              Filed Date: 05/22/2023

              **Party Name**            **Disposition Information**
                                            Pending.

# DOCKET

| Date | Code | Description | |
|------|------|-------------|---|
| **05-22-2023** | **[ TEXT ]** | | **#**1 |
| | | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | |
| **05-22-2023** | **[ CLASS ]** | | |
| | | CLASS ACTION | |
| **05-22-2023** | **[ DMFE ]** | | $ 7.00 |
| | | DISPUTE MEDIATION FEE | |
| **05-22-2023** | **[ PFE1 ]** | | $ 163.00 |
| | | PETITION | |
| **05-22-2023** | **[ PFE7 ]** | | $ 6.00 |
| | | LAW LIBRARY FEE | |
| **05-22-2023** | **[ OCISR ]** | | $ 25.00 |
| | | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | |
| **05-22-2023** | **[ OCJC ]** | | $ 1.55 |
| | | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | |
| **05-22-2023** | **[ OCASA ]** | | $ 5.00 |
| | | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES | |
| **05-22-2023** | **[ SSFCHSCPC ]** | | $ 10.00 |
| | | SHERIFF'S SERVICE FEE FOR COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | |
| **05-22-2023** | **[ CCADMINCSF ]** | | $ 1.00 |
| | | COURT CLERK ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | |
| **05-22-2023** | **[ CCADMIN0155 ]** | | $ 0.16 |
| | | COURT CLERK ADMINISTRATIVE FEE ON $1.55 COLLECTION | |
| **05-22-2023** | **[ SJFIS ]** | | $ 0.45 |
| | | STATE JUDICIAL REVOLVING FUND - INTERPRETER AND TRANSLATOR SERVICES | |
| **05-22-2023** | **[ DCADMIN155 ]** | | $ 0.23 |
| | | DISTRICT COURT ADMINISTRATIVE FEE ON $1.55 COLLECTIONS | |
| **05-22-2023** | **[ DCADMIN05 ]** | | $ 0.75 |
| | | DISTRICT COURT ADMINISTRATIVE FEE ON $5 COLLECTIONS | |
| **05-22-2023** | **[ DCADMINCSF ]** | | $ 1.50 |
| | | DISTRICT COURT ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | |
| **05-22-2023** | **[ CCRMPF ]** | | $ 10.00 |
| | | COURT CLERK'S RECORDS MANAGEMENT AND PRESERVATION FEE | |
| **05-22-2023** | **[ CCADMIN04 ]** | | $ 0.50 |
| | | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS | |

**05-22-2023** **[ LTF ]**                                                              $ 10.00

LENGTHY TRIAL FUND

---

**05-22-2023** **[ SMF ]**                                                             $ 10.00

SUMMONS FEE (CLERKS FEE)

---

**05-22-2023** **[ P ]**

CLASS ACTION PETITION
Document Available (#1055646135) 🗋TIFF   🗎PDF

---

**05-22-2023** **[ TEXT ]**

OCIS HAS AUTOMATICALLY ASSIGNED JUDGE DISHMAN, C. BRENT TO THIS CASE.

---

**05-22-2023** **[ ACCOUNT ]**

RECEIPT # 2023-5415632 ON 05/22/2023.
PAYOR: MCAFEE & TAFT TOTAL AMOUNT PAID: $ 252.14.
LINE ITEMS:
CJ-2023-2888: $173.00 ON AC01 CLERK FEES.
CJ-2023-2888: $6.00 ON AC23 LAW LIBRARY FEE CIVIL AND CRIMINAL.
CJ-2023-2888: $1.66 ON AC31 COURT CLERK REVOLVING FUND.
CJ-2023-2888: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES.
CJ-2023-2888: $1.55 ON AC59 COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND.
CJ-2023-2888: $7.00 ON AC64 DISPUTE MEDIATION FEES CIVIL ONLY.
CJ-2023-2888: $0.45 ON AC65 STATE JUDICIAL REVOLVING FUND, INTERPRETER SVCS.
CJ-2023-2888: $2.48 ON AC67 DISTRICT COURT REVOLVING FUND.
CJ-2023-2888: $25.00 ON AC79 OCIS REVOLVING FUND.
CJ-2023-2888: $10.00 ON AC81 LENGTHY TRIAL FUND.
CJ-2023-2888: $10.00 ON AC88 SHERIFF'S SERVICE FEE FOR COURT HOUSE SECURITY.
CJ-2023-2888: $10.00 ON AC89 COURT CLERK'S RECORDS MANAGEMENT AND PRESERVATION
FEE.

---

**06-05-2023** **[ MO ]**

MOTION TO ASSOCIATE COUNSEL
Document Available (#1055687021) 🗋TIFF   🗎PDF

---

**06-07-2023** **[ O ]**

ORDER ADMITTING TO PRACTICE
Document Available (#1055692741) 🗋TIFF   🗎PDF

---

**06-08-2023** **[ SMS ]**

ORIGINAL SUMMONS RETURNED, SERVED: WHALECO INC D/B/A TEMU - BY POSTAL SERVICE -
SIGNATURE ILLEG - ON 5-30-23
Document Available (#1055693927) 🗋TIFF   🗎PDF

---

**06-09-2023** **[ MO ]**

MOTION TO ASSOCIATE COUNSEL
Document Available (#1055807165) 🗋TIFF   🗎PDF

---

**06-12-2023** **[ O ]**

ORDER ADMITTING TO PRACTICE
Document Available (#1055810090) 🗋TIFF   🗎PDF

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HEATHER SMITH, , individually and on behalf of all others similarly situated

### DEFENDANTS

WHALECO INC. d/b/a TEMU

**(b)**   County of Residence of First Listed Plaintiff    OKLAHOMA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    SUFFOLK, MA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
MARY QUINN COOPER; KATHY R. NEAL
MCAFEE & TAFT, PC; WILLIAMS CENTER TOWER II
2 WEST SECOND STREET, STE. 1100, TULSA OK 74103

Attorneys *(If Known)*
JOHN A. BURKHARDT
SCHAFFER HERRING PLLC
7134 S. YALE AVE., STE. 300, TULSA OK 74136

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **FEDERAL TAX SUITS** | | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1  Original Proceeding
- ☒ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 U.S.C. 227, et seq.; Okla. Stat. tit. 15 sec. 775 C.1, et seq.

Brief description of cause:
Violation of Telephone Consumer Protection Act and Oklahoma's Telephone Solicitation Act of 2022 (OTSA)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   Judge C. Brent Dishman   DOCKET NUMBER   CJ-2023-2888

DATE   06/26/2023

SIGNATURE OF ATTORNEY OF RECORD   s/John Burkhardt

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

**61**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

HEATHER SMITH, individually and on
behalf of all others similarly situated,

     *Plaintiff,*

     v.

WHALECO INC. d/b/a TEMU,

     *Defendant.*

Case No. 5:23-CV-00559-D

## <u>DEFENDANT'S MOTION TO COMPEL ARBITRATION</u>

Defendant Whaleco Inc. d/b/a Temu ("Temu"), through its undersigned counsel, hereby respectfully moves, pursuant to the Federal Arbitration Act ("FAA") and the Court's order of November 8, 2023 granting leave (*see* Dkt. 32), to compel Plaintiff Heather Smith ("Plaintiff") to submit her claims against Temu to binding individual arbitration, and to dismiss (or alternatively stay) this matter in favor of said arbitration.

As is described more fully in Temu's Brief, which is filed herewith and incorporated herein by reference, Plaintiff sues Temu under the Oklahoma Telephone Solicitation Act (*i.e.*, Okla. Stat. tit. 15, § 775C *et seq*., the "OTSA") based on "telephonic sales calls" (*i.e.*, text messages) she allegedly received from or on behalf of Temu on her cellphone without her consent, and seeks class treatment. However, when she signed up for a Temu account, and when she subsequently logged on to her account, she not only consented to receiving such texts but also agreed to Temu's "Terms of Use" containing a mandatory binding individual arbitration provision and separate class action waiver, requiring her to arbitrate her OTSA claims strictly on an individual basis. Further, while this Court may stay this action under the

FAA in favor of said arbitration, it may also dismiss the entire case in accordance with Tenth Circuit precedent, as all of Plaintiff's claims are subject to arbitration.

WHEREFORE, for the reasons stated above and in the accompanying Brief, and for such other reasons as may be presented to the Court prior to its ruling hereon, Temu respectfully requests that the Court enter an order compelling Plaintiff to submit her claims in this matter to binding individual arbitration as she agreed, and dismissing (or alternatively staying) this matter in favor of said arbitration, along with granting Temu all other relief the Court deems just and proper.

Dated: November 15, 2023                     Respectfully submitted by:

SMITH GAMBRELL & RUSSELL LLP

*/s/ Robert A. Stines*
Robert A. Stines (admitted *pro hac vice*)
Florida Bar No. 78447
201 N. Franklin Street, Suite 3550
Tampa, Florida 33602
T: 813-488-2920
Email: rstines@sgrlaw.com
           vwilliams@sgrlaw.com
           daigotti@sgrlaw.com

John W. McGuinness (*pro hac* to be requested)
A. Paul Heeringa (*pro hac* to be requested)
MANATT, PHELPS & PHILLIPS LLP
151 N. Franklin Street, Ste. 2600
Chicago, Illinois 60606
T: 312-529-6300
Email: jmcguinness@manatt.com
           pheeringa@manatt.com

John A. Burkhardt, OBA #1336
SCHAFFER HERRING PLLC

7134 S. Yale, Ste. 300
Tulsa, Oklahoma 74136
T: 918-856-5378
Email: john.burkhardt@schafferherring.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2023, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice to all counsel of record.

/s/ Robert A. Stines
Robert A. Stines

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | |
| v. | Case No. 5:23-CV-00559-D |
| WHALECO INC. d/b/a TEMU, | |
| *Defendant*. | |

<u>**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION TO COMPEL ARBITRATION**</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS .................................................................. 4

    A.    Plaintiff Voluntarily Agreed to Temu's Terms More Than Once................ 4

    B.    The Terms Mandate Individual Arbitration of All Disputes........................ 7

III.   ARGUMENT ....................................................................................... 9

    A.    A Valid and Binding Agreement to Arbitrate Exists in This Case. ............ 9

    B.    The FAA Applies to the Arbitration Provisions of the Terms. ................. 18

    C.    Any Arbitrability Disputes Have Been Delegated to the Arbitrator. ......... 19

    D.    The Arbitration Provisions are Properly Enforced Under the FAA........... 21

        1.    Plaintiff's OTSA Claims Against Temu In This Case Fall Squarely Within the Scope of the Arbitration Provisions.............. 22

        2.    Plaintiff Has No Valid Arbitrability Challenges. ............................ 23

    E.    The Arbitration Must Proceed Solely on an Individual Basis.................... 24

    F.    Plaintiff's Lawsuit Should Be Dismissed in Its Entirety. .......................... 25

IV.   CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*AllCity Famly Healthcare Ctr. Inc. v. Boss Surgical Grp., LLC*,
  2014 WL 13000602 (E.D.N.Y. Apr. 23, 2014) ........................................ 11

*Allied-Bruce Terminix Cos. v. Dobson*,
  513 U.S. 265 (1995) .................................................................................. 19

*Am. Express Co. v. Italian Colors Rest.*,
  133 S.Ct. 2304--12 (2013) ........................................................................ 24

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ............................................................................. 4, 22

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) .................................................................................. 24

*Avedon Eng'g, Inc. v. Seatex*,
  126 F.3d 1279 (10th Cir. 1997) ................................................................ 10

*Babcock v. Neutron Holdings, Inc.*,
  454 F. Supp. 3d 1222 (S.D. Fla. 2020) ............................................... 17, 18

*Bassett v. Elec. Arts Inc.*,
  2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) ............................................. 13

*Bassett v. Elec. Arts, Inc.*,
  93 F. Supp. 3d 95 (E.D.N.Y. 2015) .......................................................... 10

*Bazak Int'l Corp. v. Tarrant Apparel Group*,
  378 F. Supp. 2d 377 (S.D.N.Y. 2005) ...................................................... 10

*Beattie v. TTEC Healthcare Sols., Inc.*,
  2019 WL 2189481 (D. Colo. May 21, 2019) ....................................... 13, 15

*Bellman v. i3Carbon, LLC*,
  563 F.App'x. 608 (10th Cir. 2014) ....................................................... 10, 11

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ..................................................................... 14

*Bill Barrett Corp. v. YMC Royalty* Co., LP,
  918 F.3d 760 (10th Cir. 2019) .................................................................. 11

*Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*,
  2007 WL 485617 (S.D.N.Y. Feb. 13, 2007) ............................................. 10

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .................................................................. 21

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Buckeye Check Cashing v. Cardegna*,
546 U.S. 440 (2006) ....................................................................... 11, 20, 25

*Carr v. Credit One Bank*,
2015 WL 9077314 (S.D.N.Y. Dec. 16, 2015) ........................................... 24

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2002) ..................................................................................... 19

*Clary v. The Stanley Works*,
2003 WL 21728865 (D. Kan. July 24, 2003) ........................................... 10

*Clements v. Alto Tr. Co.*,
2023 WL 5002472 (D.N.M. Aug. 4, 2023) ............................................... 16

*Conrad v. Phone Dirs. Co.*,
585 F.3d 1376 (10th Cir. 2009) .................................................................. 4

*Davis v. USA Nutra Labs*,
303 F. Supp. 3d 1183 (D.N.M. 2018) ........................................... 13, 15, 20

*Dean Witter Reynolds Inc. v. Byrd*,
470 U.S. 213 (1985) ................................................................................... 22

*DIRECTV, Inc. v. Imburgia*,
136 S.Ct. 463 (2015) .................................................................................. 24

*Errato v. Am. Exp. Co.*,
2019 WL 3997010 (D. Conn. Aug. 23, 2019) ........................................... 10

*Fedor v. United Healthcare, Inc.*,
976 F.3d 1100 (10th Cir. 2020) ................................................................. 20

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ................................................................................... 10

*Fontanez v. Whaleco Inc.*,
Case No. 53-2023CA-000374, slip op. (Fla. Cir. Ct. Aug. 29, 2023) ............. 3, 15, 18

*Graf v. Match.com, LLC*,
2015 WL 4263957 (C.D. Cal. July 10, 2015) ..................................... 16, 24

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) .......................................................................... 4, 12, 22

*Hancock v. Am. Tel. & Tel. Co.*,
701 F.3d 1248 (10th Cir. 2012) .............................................. 10, 11, 13, 14

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S.Ct. 524 (2019) .................................................................................. 20

## TABLE OF AUTHORITIES
(continued)

Page

*Johnson v. Whaleco, Inc.*,
Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) ...................................... 15

*Klein v. Experian Info. Sols., Inc*.,
2020 WL 6365766 (S.D.N.Y. Oct. 29, 2020) ............................................................. 10

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011).......................................................................................................... 9

*Levine v. Vitamin Cottage Nat. Food Markets, Inc.*,
2021 WL 4439800 (D. Colo. Sept. 27, 2021) .............................................................. 11

*Lisa Cooley, LLC v. Native, S.A.*,
2021 WL 860591 (S.D.N.Y. Mar. 5, 2021) .................................................................. 10

*Marmet Health Care Ctr., Inc. v. Brown*,
565 U.S. 530 (2012) ................................................................................................ 12, 23

*Melnick v. TAMKO Bldg. Prod. LLC*,
2022 WL 4355299 (D. Kan. Sept. 20, 2022) ............................................................... 12

*Meyer v. Uber Technologies, Inc.*,
868 F.3d 66 (2d Cir. 2017)...................................................................................... 17, 18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .................................................................................................... 12, 23

*Naizgi v. HSS, Inc.*,
2023 WL 4933183 (D. Colo. Aug. 2, 2023) ................................................................ 20

*Nardo v. HomeAdvisor, Inc.*,
2022 WL 17547940 (D. Colo. July 27, 2022), *report and rec. adopted,* 2022 WL
17547938 (Aug. 11, 2022)............................................................................................ 13

*Nguyen v. Barnes & Noble, Inc.*,
763 F.3d 1171 (9th Cir. 2014) .............................................................................. 12, 14

*Nichols v. Google LLC*,
2023 WL 5938917 (D. Colo. Sept. 12, 2023) .............................................................. 13

*Nicosia v. Amazon.com, Inc.*,
384 F. Supp. 3d 254 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020) .......... 12

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ........................................................................................ 14

*Ostreicher v. TransUnion, LLC*,
2020 WL 3414633 (S.D.N.Y. June 22, 2020) ............................................................. 24

## TABLE OF AUTHORITIES
(continued)

Page

*Pacelli v. Augustus Intel., Inc.*,
459 F. Supp. 3d 597 (S.D.N.Y. 2020) ........................................................... 21

*Petrie v. GoSmith, Inc.*,
360 F. Supp. 3d 1159 (D. Colo. 2019) ......................................................... 13

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967) ............................................................................ 19, 22

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) .............................................................................. 20, 25

*Route App, Inc. v. Heuberger*,
2022 WL 2316377 (D. Utah June 28, 2022) .................................................. 13

*Selden v. Airbnb, Inc.*,
2016 WL 6476934 (D.D.C. Nov. 1, 2016)
*aff'd*, 4 F.4th 148 (D.C. Cir. 2021) ................................................ 13, 17, 18

*Smith v. Fed Ex*,
2022 WL 2819142 (W.D. Okla. July 19, 2022) ........................................ 22, 23

*Starke v. Gilt Groupe, Inc.*,
2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ........................................... 16, 17

*Stein v. Burt-Kuni One, LLC*,
396 F. Supp. 2d 1211 (D. Colo. 2005) .......................................................... 12

*Stolt-Nielsen v. Animalfeeds Int'l Corp.*,
559 U.S. 662 (2010) ................................................................................... 25

*THI of New Mexico at Hobbs Ctr., LLC v. Spradlin*,
893 F. Supp. 2d 1172 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013) ........ 25

*Walker v. Neutron Holdings, Inc.*,
2020 WL 703268 (W.D. Tex. Feb. 11, 2020) ......................................... 16, 17, 18

## STATUTES

9 U.S.C. § 1 ................................................................................................ 3

9 U.S.C. § 2 ............................................................................. 19, 20, 21, 22

9 U.S.C. § 4 .............................................................................................. 25

Okla. Stat. tit. 15, § 775C. ............................................................................ 3

## I.      <u>INTRODUCTION</u>

Whaleco Inc. d/b/a Temu ("Temu") runs a global online retail marketplace where consumers can purchase a variety of products. *See* Declaration of Michael Trinh ("Trinh Decl."), filed herewith, at ¶¶ 3-17. As is common in today's heavily online economy, Temu has a simple e-commerce platform that is utilized by companies in every business sector and well-known to consumers, even those who are not "tech savvy." To participate in the marketplace, one must either download Temu's smartphone application (the "App") or visit its website, www.temu.com (the "Website"), set up an account, and agree to Temu's "Terms of Use" (the "Terms"). *Id.* Importantly, one cannot participate without first completing **all** the account signup steps and agreeing to the Terms, which contain various provisions governing the relationship between Temu and the App or Website users, including in particular a binding individual arbitration provision and separate class action waiver clause (hereafter collectively, the "Arbitration Provisions"). *Id.* Moreover, after registering, a consumer **must** agree to the Terms if they later input their credentials and log on to their account via the App or Website. *Id.* Heather Smith ("Plaintiff") is one such consumer.

On December 30, 2022, Plaintiff downloaded the App on her smartphone and signed up for an account, voluntarily agreeing to the Terms containing the Arbitration Provisions in the process. *Id.* ¶¶ 6-17 and Exhibit ("Ex.") A thereto. This is indisputable. Indeed, from the very outset, the operative Terms to which Plaintiff assented state, in capitalized letters, *inter alia* that: (1) "SECTION 20 OF THE TERMS BELOW … CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED

EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL ARBITRATION" and (2) "EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASSWIDE ARBITRATION." *Id*. ¶ 13 and Ex. B thereto, at p. 1. Similar language appears throughout Section 20, making it clear "***any dispute***" between Plaintiff and Temu of ***any kind***—including any dispute "relating in any way" to the Terms or "any communications" received from or on behalf of Temu—is ***subject to mandatory binding individual arbitration***. *Id*., Ex. B at § 20.1 (emphasis added). The Terms further provide "[t]he arbitration will be conducted by American Arbitration Association (the 'AAA') [] under its rules, including Consumer Arbitration Rules (the 'AAA Rules')." *Id*., Ex. B at § 20.5.

These Terms were presented to Plaintiff in a clear and conspicuous manner, in plain English, and more than once—when she first registered the App and later when she logged on using her smartphone thereafter. *Id*. ¶¶ 8-17. Plaintiff unambiguously manifested her assent to the Terms and the Arbitration Provisions within via a "clickwrap" agreement,[1] where she had to affirmatively click a "Continue" button in close proximity to the conspicuously-hyperlinked Terms and language stating: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id*., Ex. A thereto (emphasis original). Such online agreements are commonplace and routinely enforced by courts across the country,

---

[1] As discussed below, courts in this Circuit have traditionally treated such online agreements like Temu's as "clickwrap" agreements or, to a lesser extent, as "hybrid wrap" or "sign-in wrap" agreements. *See* discussion at fn. 6 *infra*. No matter the label applied here, the Terms are valid and enforceable, and Plaintiff agreed to arbitrate her claims.

2

particularly in the arbitration context. The same is true for Temu's Terms, using the same process here. *See, e.g., Fontanez v. Whaleco Inc.*, Case No. 53-2023CA-000374, slip op. (Fla. Cir. Ct. Aug. 29, 2023) (attached hereto as Exhibit 1). This Court should join them.

In direct contravention of this valid and enforceable agreement to arbitrate, and despite having waived her class action rights, however, Plaintiff filed her putative class action Complaint in state court on May 22, 2023, which was timely removed to this Court on June 26, 2023. *See generally* Dkt. 1-1. In it, she asserts violations of the Oklahoma Telephone Solicitation Act (*i.e*., Okla. Stat. tit. 15, § 775C *et seq*., the "OTSA"), the state analog to the federal Telephone Consumer Protection Act (the "TCPA"), based on "telephonic sales calls" (*i.e.*, text messages) she allegedly received from or on behalf of Temu on her cellphone without her consent. *See id*. Yet, not only do Plaintiff's OTSA claims stem directly from alleged "communications" from Temu (communications that she actually consented to receiving in any event), but she also unequivocally agreed to arbitrate all claims against Temu here ***strictly on an individual basis*** when she agreed to the Terms more than once. Through the instant Motion, therefore, Temu seeks to compel such an arbitration.

As demonstrated below, the Federal Arbitration Act (9 U.S.C. § 1, *et seq*., the "FAA") creates a strong presumption in favor of enforcing arbitration clauses, and requires courts to rigidly enforce arbitration agreements according to their terms—especially where, as here, the parties seek to achieve streamlined proceedings and expeditious results. Moreover, courts in the Tenth Circuit and elsewhere have consistently and routinely enforced online arbitration agreements, just like the one to which Plaintiff assented more than once in this case.

Accordingly, and because the broad scope of the Arbitration Provisions at issue plainly apply to Plaintiff's OTSA claims against Temu as alleged in the Complaint, the Court should grant this Motion and compel Plaintiff to submit her claims to individual arbitration, as she agreed. Further, while this case should be stayed in favor of that arbitration at the minimum under the FAA, Temu submits that dismissal of this entire case is warranted in this instance because all of Plaintiff's claims against Temu are subject to individual arbitration.[2]

## II.  STATEMENT OF FACTS

### A.  Plaintiff Voluntarily Agreed to Temu's Terms More Than Once.

Given the facts, Plaintiff cannot reasonably dispute that she assented to the Terms. Indeed, Temu's records reflect, on December 30, 2022, Plaintiff downloaded the App on her Android smartphone (the number for which ends in 9888) and completed all the steps to complete the registration process, thereby agreeing to be bound by the Terms and, as such, the corresponding Arbitration Provisions. *See* Trinh Decl., ¶¶ 6-17 & Exs. A - C thereto. At that time, Plaintiff was presented with a screen that would have appeared as follows:

---

[2] This Motion addresses only the Arbitration Provisions and not the underlying pleadings, because the Court's role in ruling on a motion to compel arbitration like this is limited to determining whether the parties agreed to arbitrate the claims at issue. *See, e.g., AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649–50 (1986). Nevertheless, the Complaint lacks merit for myriad reasons, which Temu will present to the arbitrator, and this Motion satisfies Temu's immediate obligation to respond to the Complaint. *See, e.g., Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 83 (2000) ("In lieu of an answer, petitioners filed a motion to compel arbitration, to stay the action, or, in the alternative, to dismiss."). Should the Court not compel arbitration, however, Temu respectfully reserves the right to and will file a substantive motion to dismiss or another responsive pleading in accordance with any schedule set by the Court. *See, e.g., Conrad v. Phone Dirs. Co.,* 585 F.3d 1376, 1383 n.2 (10th Cir. 2009) (motion to dismiss may be filed following denial of motion to compel arbitration). Temu does not waive any defenses to the Complaint by this Motion.



*Id.* ¶¶ 9-10 and Ex. A at p. 1. This screen (and others described below) would have appeared

on her smartphone in a single uncluttered window, with an all-white background and with

clearly legible text that was all roughly the same size (meaning that all of the text on the page

was roughly the same size, between 13 to 15 pixels). *Id.* ¶ 9. Plaintiff was given the options

to "Continue" setting up her account using her cell phone number or an email address, or to

"Continue" using other pre-existing Google, Apple, Facebook, or Twitter accounts. *Id.* ¶ 10.

5

On this page, the text at the bottom appearing in close temporal and spatial proximity to the "Continue" buttons clearly stated: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.* ¶ 10 and Ex. A at p. 1. The bolded text represented functional clickable hyperlinks that, if Plaintiff had clicked them, would have taken her to a separate page for the Terms or Temu's privacy and cookie policy. *Id. See also id.* at Ex. B (Terms).

Plaintiff clicked the "Continue with Google" button, after clicking "Continue" on a pop-up message (*id.*, Ex. A at p. 2), was presented with another similarly uncluttered page so that she could finish setting up her Temu account that appeared on her smartphone as follows:



*Id.* ¶ 12 & Ex. A at p. 3. This page gave Plaintiff the option to click a button either associated with her existing Google account she was logged into on her phone, or to "Use another account." *Id.* At the bottom of this page, immediately underneath these two buttons, appeared

6

plainly legible text stating: "To continue, Google will share your name, email address, language preference, and profile picture with Temu. Before using this app, you can review Temu's **privacy policy** and **terms of service**." *Id*. (emphasis original). The bolded text on this page was also in a blue contrasting font, and represented clickable hyperlinks to Temu's Terms and its privacy and cookie policy (*i.e.,* the same ones on the first page, discussed above). *Id*. She clicked the top button on this page (to use her existing Google account), completing the signup process. *Id*. Importantly, Plaintiff could not have set up her Temu account without completing ***all*** these steps and pressing the necessary "Continue" buttons. *Id.* ¶¶ 6, 12, 16 & Ex. C thereto. Around the same time frame, she also consented to receiving marketing texts from or on behalf of Temu, via a separate screen. *Id*. ¶ 18 & Ex. D thereto.

This was not the only instance in which Plaintiff agreed to the Terms, however. Rather, on March 30, 2023, Plaintiff also logged on to her Temu account using her preexisting Apple account using her smartphone. *Id*. ¶¶ 14-15 and Exs. A & C thereto. This time, Plaintiff clicked the "Continue with Apple" button, but the format and process were essentially the same: *i.e.*, the same page with an all-white background, roughly the same size clearly-legible text, the "Continue" login buttons and, importantly, the same text underneath those login option buttons with the conspicuously-hyperlinked (bolded) Terms, informing her that "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.*

## B.     The Terms Mandate Individual Arbitration of All Disputes.

The conspicuously-hyperlinked Terms to which Plaintiff agreed unequivocally state any disputes she may have with Temu are subject to mandatory binding arbitration, strictly

on an individual basis. *See generally* Trinh Decl., Ex. B thereto. This fact is indisputable, and

Plaintiff was clearly on notice of the Arbitration Provisions. Indeed, at the very beginning,

in capitalized letters, the Terms in effect at that time and to which Plaintiff agreed stated:

> PLEASE BE AWARE THAT SECTION 20 OF THE TERMS BELOW …
> CONTAINS … AN AGREEMENT TO ARBITRATE WHICH REQUIRES,
> WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU
> AND WHALECO BE RESOLVED BY BINDING AND FINAL
> ARBITRATION. UNLESS YOU OPT OUT OF THE AGREEMENT TO
> ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE
> AGREEMENT: (1) YOU AND WHALECO WILL ONLY BE PERMITTED
> TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST
> THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A
> PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR
> REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US
> WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION
> LAWSUIT OR CLASSWIDE ARBITRATION; AND (2) EACH OF US IS
> WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND
> SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

*Id.,* Ex. B thereto at p. 1. Beyond this, "Section 20" (*i.e.*, the Arbitration Provisions) states

from the outset, in pertinent part and also in capitalized as well as bold letters, the following:

> PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN
> THIS SECTION ("ARBITRATION AGREEMENT") CAREFULLY. IT
> REQUIRES YOU AND WHALECO TO ARBITRATE AGAINST ONE
> ANOTHER. **PLEASE BE AWARE THAT THIS SECTION 20 …**
> **INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES,**
> **WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN**
> **YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL**
> **ARBITRATION. THIS SECTION 20 ALSO CONTAINS A CLASS**
> **ACTION AND JURY TRIAL WAIVER.**

*Id.,* Ex. B thereto at pp. 16-17. The Arbitration Provisions also clearly state the following:

- "Subject to the terms of this Arbitration Agreement, you and Whaleco [*i.e.,* Temu]
  agree that ***any dispute, claim, or disagreement arising out of or relating in any way***
  ***to*** your access to or use of the Services, ***any communications you receive***, any
  products sold or distributed through the Services, or the Terms, including claims and
  disputes that arose between us before the effective date of the Terms (each, a
  'Dispute') will be resolved by binding arbitration…." *Id.*, § 20.1 (emphasis added).

- "For purposes of this Arbitration Agreement, 'Dispute' will also include disputes that

arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms." *Id.*

- **"YOU AND WHALECO AGREE THAT … EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS."** *Id*, § 20.4 (bolding and capitalization in original).

- "The Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings" and any arbitration would be conducted by the AAA under the AAA Rules. *Id.*, § 20.5.

- "The arbitrator shall have *exclusive authority to resolve any Dispute*, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, *including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement*," except certain disputes, including whether the standalone class action waiver provision in Section 20.4 above is enforceable. *Id*., § 20.7 (emphasis added).

## III.  <u>ARGUMENT</u>

The FAA "requires courts to enforce the bargain of the parties to arbitrate" and "leaves no place for the exercise of discretion by a district court…." *KPMG LLP v. Cocchi,* 565 U.S. 18, 21-22 (2011). As shown above and further discussed below, Plaintiff assented to the Terms, she was on notice of the Arbitration Provisions within, all arbitrability issues have been delegated to the arbitrator, and her OTSA claims are well within the scope of the Terms and she has no possible defenses to enforcement in any event. Thus, Plaintiff should be compelled to arbitrate her claims against Temu on an individual basis, as she agreed.

### A.  <u>A Valid and Binding Agreement to Arbitrate Exists in This Case.</u>

There can be no debate that a valid and enforceable arbitration agreement exists between Plaintiff and Temu, given the facts at bar here. *See* discussion at pp. 4-7, *supra*.

Of course, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). While the FAA exclusively governs the enforceability of the Arbitration Provisions, state law governs the determination of whether an agreement to arbitrate exists in the first instance. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Bellman v. i3Carbon, LLC,* 563 F.App'x. 608, 612 (10th Cir. 2014).

Here, the Terms contain an express New York choice of law provision. *See* Trinh Decl., Ex. B at § 19.4.[3] In New York and Oklahoma—and everywhere else in the United States—mutual assent is a key element to contract formation, particularly in the arbitration agreement context. *See, e.g., Bassett v. Elec. Arts, Inc.,* 93 F. Supp. 3d 95, 104 (E.D.N.Y. 2015); *Hancock v. Am. Tel. & Tel. Co.,* 701 F.3d 1248, 1256 (10th Cir. 2012). Moreover, whether there is assent for contract formation purposes is evaluated ***objectively*** by looking at the totality of the circumstances and reasonable meaning of the parties' ***words and acts***, and not by their subjective unexpressed intentions or understandings. *See, e.g., Bazak Int'l Corp. v. Tarrant Apparel Group,* 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) ("To determine

---

[3] Courts in the Second Circuit have honored choice-of-law clauses to determine the validity of an arbitration agreement, even where the parties dispute formation. *See, e.g., Klein v. Experian Info. Sols., Inc*., 2020 WL 6365766, at *4 (S.D.N.Y. Oct. 29. 2020) (citing *Errato v. Am. Exp. Co.,* 2019 WL 3997010, at *7 (D. Conn. Aug. 23, 2019)); *Lisa Cooley, LLC v. Native, S.A.,* 2021 WL 860591, at *3 (S.D.N.Y. Mar. 5, 2021) (citing, *inter alia, Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.,* 2007 WL 485617, at *8, 11 (S.D.N.Y. Feb. 13, 2007)). Courts in the Tenth Circuit have reached a contrary conclusion where formation is in question, and have conducted a choice-of-law analysis to determine which state's law to apply, notwithstanding any choice-of-law provisions. *See, e.g., Clary v. The Stanley Works*, 2003 WL 21728865, at *2 (D. Kan. July 24, 2003). This Court need not decide which state's law applies here, as New York and Oklahoma law appear to be in accord with respect to the well-accepted basic requirements for contract formation.

the presence of mutual assent, ... [t]he totality of parties' acts, phrases and expressions must be considered, along with the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." (internal quotation marks and citations omitted)); *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 769 (10th Cir. 2019) (holding the defendant's "actions following the execution of the documents" demonstrated the "existence of mutual assent"); *see also AllCity Famly Healthcare Ctr. Inc. v. Boss Surgical Grp., LLC*, 2014 WL 13000602, at *5 (E.D.N.Y. Apr. 23, 2014) ("If the contractual language and the parties' actions objectively show mutual assent to the arbitration clause, then all of plaintiff's other arguments must be resolved by the arbitrator" under the FAA.) (citing *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 443–46 (2006)). As discussed above and further below Plaintiff's acts of registering her account and clicking "Continue" certainly show her assent.

Additionally, where a party disputes the existence of an agreement, "a court may grant a motion to compel arbitration [under the FAA] if there are no genuine issues of material fact regarding the parties' agreement." *Hancock,* 701 F.3d at 1261 (citations omitted). This means Temu "bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to [Plaintiff] to raise a genuine dispute of material fact regarding the existence of an agreement." *Bellman*, 563 F.App'x. at 612. *See also Levine v. Vitamin Cottage Nat. Food Markets, Inc.,* 2021 WL 4439800, at *4 (D. Colo. Sept. 27, 2021) (Under the FAA, courts apply "'a standard similar to that governing motions for summary judgment,'" where the movant "'must present evidence sufficient to demonstrate an enforceable arbitration agreement'" and then "the

burden shifts to [the non-movant] 'to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56.'") (quoting *Stein v. Burt-Kuni One, LLC,* 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005)).

Further, consistent with the strong federal policy in favor of arbitrations generally, Temu only bears the burden of proving the existence of a valid arbitration agreement by a ***preponderance*** of the evidence. *See, e.g., Melnick v. TAMKO Bldg. Prod. LLC,* 2022 WL 4355299, at *4 (D. Kan. Sept. 20, 2022) (collecting cases, compelling arbitration).[4] Thus, it is Plaintiff (not Temu) who bears the burden of proving the Arbitration Provisions are unenforceable. *See Green Tree,* 531 U.S. at 91. But Plaintiff cannot meet this burden here.

Indeed, as one court aptly noted, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Further, as to online contracts, courts have widely recognized "[a]ny reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254,

---

[4] The Supreme Court has held that arbitration agreements must be analyzed against the backdrop of the FAA, which reflects a "liberal federal policy favoring arbitration," and "[a]ny doubts concerning the scope of arbitrable issues [are to] be resolved in favor of arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (internal quotations omitted); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *accord Marmet Health Care Ctr., Inc. v. Brown,* 565 U.S. 530, 533 (2012). That is because Congress enacted the FAA "to reverse longstanding judicial hostility to arbitration agreements and to place them on the same footing as other contracts." *Green Tree*, 531 U.S. at 89 (internal quotation and alterations omitted). Therefore, the FAA is not discretionary and ***mandates*** that courts direct parties to proceed to arbitration on issues subject to their agreement. *See also Concepcion*, 563 U.S. at 344 ("The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'").

278 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020) (quoting *Selden v. Airbnb, Inc.*,

2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) *aff'd*, 4 F.4th 148 (D.C. Cir. 2021)).

As to online arbitration agreements in particular, courts applying Oklahoma law or

New York law (among many others across the country)[5] have generally recognized two main

types: "clickwrap" and "browsewrap." A "clickwrap" agreement, which is the type Temu

submits is most relevant here,[6] is where a user like Plaintiff has to affirmatively click a button

and/or check a box on a website or app, and "the [arbitration] agreement is 'presented via a

hyperlink to a page separate from the one containing the box or button manifesting assent.'"

*Davis v. USA Nutra Labs,* 303 F. Supp. 3d 1183, 1190–91 (D.N.M. 2018) (citing *Bassett v.*

*Elec. Arts Inc.,* 2015 WL 1298644, at *4 (E.D.N.Y. Feb. 9, 2015) (collecting cases)). *See*

*also Nichols v. Google LLC,* 2023 WL 5938917, at *2–4 (D. Colo. Sept. 12, 2023) ("Courts

have held that clicking 'accept' to the terms of a clickwrap agreement, even when the terms

do not appear on the same screen as the 'accept' button but are available with the use of a

hyperlink, is sufficient to form a contract.") (collecting cases, including *Hancock*); *Nardo v.*

---

[5] As the Tenth Circuit noted, Oklahoma "courts have not discussed [clickwrap agreements] in depth" beyond "a few brief references." *Hancock,* 701 F.3d at 1256. That is true today.

[6] Courts in this Circuit have largely treated online agreements like Temu's (including those cited herein and others) as "clickwrap" agreements, to the extent the user has to click a button to agree to the terms. Some have held this is a "hybrid" or "sign-in" wrap agreement, because the terms are not on the same screen as the button and/or the user does not need to click a box in addition to a button. *See, e.g., Beattie v. TTEC Healthcare Sols., Inc.,* 2019 WL 2189481, at *2 (D. Colo. May 21, 2019) (citing *Petrie v. GoSmith, Inc.,* 360 F. Supp. 3d 1159, 1161 n.1 (D. Colo. 2019)); *Route App, Inc. v. Heuberger,* 2022 WL 2316377, at *3 (D. Utah June 28, 2022). Either way, the user is still affirmatively manifesting assent by ***clicking*** something. In contrast, a "browsewrap" is where the terms are on the website somewhere and the user is agreeing to them just by continuing to use the website. *See Route App., Inc.* 2022 WL 2316377, at *3. That is not an issue here. And no matter the label applied in this case, the Terms and Arbitration Provisions within are valid and enforceable.

*HomeAdvisor, Inc.,* 2022 WL 17547940, at *1–6 (D. Colo. July 27, 2022), *report and rec. adopted,* 2022 WL 17547938 (Aug. 11, 2022) (finding agreement was a "clickwrap" where, as here, the plaintiff clicked a button to manifest assent to hyperlinked terms).

This case involves a "clickwrap" agreement, whereby Plaintiff was required to click a "Continue" button to affirmatively indicate her assent to the hyperlinked Terms containing the Arbitration Provisions, both when setting up her Temu account via the App and later when accessing her account on the App or the Website. *See* discussion at pp. 4-7, *supra*. Courts have held such agreements are valid and enforceable where, as here: (1) "the user is required to affirmatively acknowledge the agreement before proceeding with use" of the website or app or (2) the website or app "puts a reasonably prudent [internet] user on inquiry notice of the terms of the contract," which "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1176-77. *See also Hancock,* 701 F.3d at 1256 ("Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms."); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (affirming order compelling arbitration and holding inquiry notice is satisfied where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms") (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). Whether Plaintiff read the Terms is irrelevant. *See Hancock*, 701 F. 3d at 1258.

*Davis v. USA Nutra Labs* is instructive on this point. There, the district court enforced a clickwrap arbitration agreement where, similar to Temu's here, (i) the plaintiff clicked a button that said "Complete Order"; (2) below that button, there was a sentence stating: "'[b]y clicking Complete Order I accept the Terms and Conditions ....'"; and (3) the phrase "Terms and Conditions" was conspicuously hyperlinked, such that plaintiff could view the applicable terms containing the arbitration provisions. 303 F. Supp. 3d at 1190. Thus, the *Davis* court held "[a] reasonably prudent internet user would have known of the existence of the terms in [the] Terms of Use, ... including the arbitration provision." *Id.* at 1191.

Myriad other courts have reached the same conclusion in similar cases and, as such, have routinely enforced online arbitration agreements like the one at bar. In fact, another court recently enforced ***Temu's*** Arbitration Provisions where a plaintiff assented to the Terms in nearly the same fashion as Plaintiff did here. *See Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op. at 3, 5 (Fla. Cir. Ct. Aug. 29, 2023) (attached hereto as Exhibit 1) (holding that "by clicking 'Continue,' [plaintiff] assented to [Temu's] Terms of Use that contained an arbitration clause").[7] *See also Beattie*, 2019 WL 2189481, at *2 (compelling arbitration where defendant submitted evidence showing plaintiffs manifested

---

[7] The only minor difference in *Fontanez* was that the plaintiff there clicked the "Continue with Apple" button initially, whereas in this case Plaintiff clicked the "Continue with Google" and later the "Continue with Apple" buttons, manifesting her assent to the Terms each time. *Cf. Johnson v. Whaleco, Inc.,* Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023), Dkt. 29 (denying motion to compel arbitration involving a different Temu sign-up page where the "Terms of Use" were neither bolded nor underlined, and thus were not distinguishable as a hyperlink). Moreover, and respectfully, *Johnson* was wrongly decided for several reasons, including that the court did not recognize the existence of hybrid-wrap agreements, as other courts in that circuit and elsewhere have. In short, *Johnson* is irrelevant.

assent by clicking "Accept" button on an opt-in page); *Clements v. Alto Tr. Co.,* 2023 WL 5002472, at *7 (D.N.M. Aug. 4, 2023) (enforcing a clickwrap agreement where there was no evidence suggesting plaintiff "was unable to see or click on the hyperlinks" to the terms, holding "a reasonably prudent internet user would have known to follow the links and read the documents to which they were agreeing"); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (ruling that users of Match.com's website agreed to an arbitration provision within its terms "when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review"); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) ("When Starke clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you agree to the Terms of Membership for all Gilt Groupe sites.' Regardless of whether he actually read the contract's terms, Starke was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."). This Court should rule similarly here.

Though Plaintiff may argue otherwise in response to this Motion, the presence of other "Continue" buttons, in addition to the "Continue with Google" or "Continue with Apple" buttons that Plaintiff ultimately pressed, or that the operative contracting language was at the bottom of the same screen, is of no moment. In *Walker v. Neutron Holdings, Inc.,* for example, the user went through a substantially similar process, whereby (1) "[t]he User Agreement notice appear[ed] immediately below the two buttons on the sign-in page, which

16

prompt the user to fill in their phone number and select 'NEXT' or select 'Continue with Facebook'" on an all-white background; (2) the operative contracting text at the bottom of the page (under the second button) stated "By signing up, I confirm that I am at least 18 years old, and that I have read and agreed to Lime's User Agreement & Terms of Service"; and (3) the "User Agreement" and "Terms of Service" were likewise in a contrasting bold text, albeit presented in a much smaller font than Temu's Terms. 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020). Considering all this, the *Walker* court held "a reasonable user would view the [defendant's] sign-in screen and see that the User Agreement is part of the offer to proceed with the transaction by clicking 'NEXT' or 'Continue with Facebook.'" *Id.* at *4. Other courts have reached the same conclusion. *See, e.g., Babcock v. Neutron Holdings, Inc.,* 454 F. Supp. 3d 1222, 1230–34 (S.D. Fla. 2020) (ruling similarly as *Walker* on the same process); *Selden*, 2016 WL 6476934, at *2 (holding plaintiff was on inquiry notice where he was presented with buttons to "Sign up with Facebook," "Sign up with Google," and "Sign up with Email" and the operative text with hyperlink appeared at the bottom); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (holding an "uncluttered" page like Temu's, where there were additional buttons but no "need to scroll beyond what is immediately visible to find notice of the Terms of Service," was enough to put a reasonably prudent user on notice the terms would govern the parties' relationship). In short, these cases (and others) show the assent text need ***not*** be immediately next to the button, and only needs to be presented in a clear and legible fashion in close spatial and temporal proximity to it.

   As all this is applied here, the Terms containing the Arbitration Provisions were

conspicuously hyperlinked in a contrasting bold font, presented in close spatial and temporal proximity to the "Continue" buttons Plaintiff had to click to continue signing up for her account on the App or when logging on later. *See* Trinh Decl., ¶¶ 7-17 and Exs. A & C. The operative assent language—which was presented to her on the same uncluttered all-white page, in an easy-to-read font that was roughly the same size as all the other text on the page— unambiguously stated: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id*. The Terms themselves were presented in plain English and not in complex "legalese," clearly indicating from the outset she was agreeing to arbitrate "any dispute" against Temu on an individual basis and waiving her class action rights. *See* discussion at pp. 7-9, *supra*. And Plaintiff could not have proceeded without clicking one of the "Continue" buttons, thereby demonstrating her assent to the Terms. *See* Trinh Decl., ¶ 16. Again, myriad courts have enforced such arbitration agreements in similar cases. *See*, *e.g., Fontanez*, *Walker, Babcock, Selden*, *Meyer*, *supra*. The result should be the same here.

In sum, by voluntarily clicking one of the "Continue" buttons on the App during registration and later when accessing her account using essentially the same process, Plaintiff unambiguously manifested her assent to the Terms and the Arbitration Provisions, she had actual (or at least "inquiry") notice of the Terms, and it does not matter if she ever read them. Therefore, the Court should find that a valid and enforceable agreement to arbitrate exists in this case, in accordance with the vast weight of applicable federal authority cited above.

## B. <u>The FAA Applies to the Arbitration Provisions of the Terms.</u>

The FAA applies here because the Arbitration Provisions reflect a written provision

in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has interpreted "involving commerce," as used in the FAA, to be "the functional equivalent of the more familiar 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2002). Thus, Section 2 of the FAA is broadly interpreted and applies to any transaction ***directly or indirectly*** affecting interstate commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967); *Citizens Bank*, 539 U.S. at 56-57.

In the present case, the FAA unquestionably applies to the Arbitration Provisions at issue because they appear in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Per the Complaint, Plaintiff is an Oklahoma resident. *See* Dkt. 1-1, ¶ 4. Plaintiff acknowledges Temu runs a global "online" business, and alleges Temu is incorporated in Delaware and maintains its principle place of business in Massachusetts. *Id*. ¶ 5. She further alleges that Temu made "commercial telephonic sales calls" to other "persons dispersed throughout Oklahoma…." *Id*. ¶ 28. Thus, Temu is engaged in business in multiple states (indeed, nationally) and, according to Plaintiff's own pled allegations, the text messages at issue directly concern interstate "commerce." Moreover, the Terms themselves expressly provide that "[t]he Terms evidence a transaction involving interstate commerce" within the meaning of the FAA. Trinh Decl., Ex. B at § 20.5. Therefore, the FAA applies in this case.

### C.    <u>Any Arbitrability Disputes Have Been Delegated to the Arbitrator.</u>

"On a motion to compel arbitration, the district court's role is to determine (1) whether

19

the parties have entered into a valid agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement." *Davis,* 303 F. Supp. 3d at 1189. *See also Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105 (10th Cir. 2020). However, it is well accepted that "parties can agree to arbitrate 'gateway' questions of 'arbitrability'" such as "whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Therefore, once the Court determines an agreement was formed (and one was certainly formed here), and "unless [a plaintiff] challenge[s] [a] delegation provision ***specifically***, [a court] must treat it as valid … and ***must enforce it*** … leaving any challenge to the [overall] validity of the [agreement to arbitrate] ***as a whole*** for the arbitrator." *Id*. at 72 (emphasis added).[8] In short, where the parties "clear[ly] and unmistakab[ly]" delegate these questions to the arbitrator, *id*. at 79, "a court may not override the contract" and "possesses no power to decide the arbitrability issue"—***even if*** it "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 529 (2019).

Moreover, "[v]irtually every [federal] [C]ircuit to have considered the issue has

---

[8] Put differently, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate" because "'[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.'" *Rent-A-Center,* 561 U.S. at 70-71, 84 (quoting *Buckeye,* 546 U.S. at 445 (citing 9 U.S.C. § 2)). *See also Fedor,* 976 F.3d at 1106 ("[W]hile the *Rent-A-Center* Court held that a litigant must specifically challenge the delegation clause in order to allow courts to determine the validity of an arbitration contract as a whole, its holding does not apply in situations where a party alleges that no agreement 'was ever concluded' between the parties.") (quoting 561 U.S. at 70 n.2); *Naizgi v. HSS, Inc.,* 2023 WL 4933183, at *2 (D. Colo. Aug. 2, 2023) (recognizing unconscionability is not a contract formation issue and is a delegable arbitrability issue) (citing, *inter alia, Rent-A-Center*).

determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 608 (S.D.N.Y. 2020) (holding that the incorporation of AAA Rules into an arbitration agreement is—"***standing alone***—'clear and unmistakable evidence' of intent to delegate" all arbitrability issues to the arbitration) (emphasis added). Such is true here.

As noted above, the Arbitration Provisions expressly incorporate the AAA Rules. *See* Trinh Decl., Ex. B at § 20.5. Beyond this, the Arbitration Provisions make clear that the parties delegated all arbitrability issues to the arbitrator: "The arbitrator shall have ***exclusive authority to resolve any Dispute***, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, ***including the enforceability, revocability, scope, or validity of the Arbitration Agreement*** or any portion of the Arbitration Agreement…." *Id.*, § 20.7 (emphasis added). Thus, by incorporating the AAA Rules as well as expressly, the parties have "clearly and unmistakably" placed the issue of arbitrability squarely within the exclusive jurisdiction of the arbitrator, not this Court.

### D.   <u>The Arbitration Provisions are Properly Enforced Under the FAA.</u>

At this point, the Court need not rule further and should grant this Motion. However, should the Court reach the question of arbitrability despite that issue having been clearly delegated to the arbitrator (and it should not), the Arbitration Provisions in the Terms constitute a valid and enforceable contract, mandating this dispute be arbitrated individually.

Again, Section 2 of the FAA provides arbitration provisions in "a contract evidencing

a transaction involving commerce … ***shall be valid, irrevocable, and enforceable***, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). If a court finds a valid agreement to arbitrate exists and it encompasses the dispute, the FAA ***requires*** the court to refer the matter to arbitration. *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 221 (1985) (courts must "rigorously enforce agreements to arbitrate"). Once a court determines a claim is subject to arbitration, it lacks authority to address its merits. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967); *AT&T Techs., Inc.*, 475 U.S. at 649-50. The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *See Green Tree*, 531 U.S. at 91-92. Plaintiff cannot meet this.

> **1.     Plaintiff's OTSA Claims Against Temu In This Case Fall Squarely Within the Scope of the Arbitration Provisions.**

As discussed at length above, an arbitration agreement was certainly formed here. *See* discussion at pp. 9-18, *supra*. Further, though Plaintiff may try to argue her OTSA claims are beyond the scope of the Arbitration Provisions, that would be unavailing on these facts.

Where an arbitration clause is broadly worded, like Temu's, the "presumption of arbitrability" of the claim often carries the day, and courts will generally find that the claim at bar falls within its scope. *Smith v. Fed Ex,* 2022 WL 2819142, at *4–6 (W.D. Okla. July 19, 2022) (citations omitted). Thus, arbitration clauses covering "any" dispute "arising from" or "relating in any way" to an agreement cast the widest net, and cover any dispute between the contracting parties, regardless of whether the dispute relates to the agreement itself. *Id.*

Here, the Arbitration Provisions at issue broadly cover "***any dispute, claim, or***

*disagreement arising out of or relating in any way to your access to or use of the Services*, *any communications you receive*, any products sold or distributed through the Services, or *the Terms*…." Trinh Decl., Ex. B at § 20.1 (emphasis added). Further, the word "Services" is defined in the Terms as including Temu's "applications, products, services and websites" specifically. *Id*. at p. 1. As such, on their face, the Arbitration Provisions cover not only "any disputes … relating in any way" to the Terms generally, but also specifically to the App and Website that Plaintiff used to request text messages from Temu (*see id*. at Exs. C & D) and "any communications" received from Temu specifically. It is indisputable Plaintiff's OTSA claims rest *entirely* on alleged "communications" from or on behalf of Temu. *See* Dkt. 1-1.

Given the foregoing, there is no doubt that Plaintiff's OTSA claims fall entirely within the broad scope of the Arbitration Provisions here. But to the extent any ambiguity exists on this point, and there certainly is none, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; *see also Marmet,* 565 U.S. at 533 (the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution"). Thus, the Court should compel Plaintiff to arbitrate her claims.

## 2.    Plaintiff Has No Valid Arbitrability Challenges.

Plaintiff cannot credibly argue that there is any basis to invalidate the Arbitration Provisions, either. As is plainly evident, the Arbitration Provisions (i) are fair and balanced, (ii) enforceable by either party, (iii) not unreasonably favorable to Temu (if anything, they favor Plaintiff), (iv) do not foreclose OTSA claims (and in fact specifically contemplate them), and (v) were presented to Plaintiff in plain English and not complex legalese—all vis-

à-vis a standard "clickwrap" internet agreement like countless other courts have enforced. *See* discussion at pp. 9-18, *supra*. Moreover, Plaintiff not only was given multiple opportunities to review the Arbitration Provisions, but also had the right to opt-out and was notified of this right on ***the very first page*** of the Terms. *See* Trinh Decl., ¶¶ 7-17 and Ex. B thereto at p. 1. Therefore, the Arbitration Provisions should be enforced. *See, e.g., Carr v. Credit One Bank*, 2015 WL 9077314, at *3 (S.D.N.Y. Dec. 16, 2015) (arbitration clause not substantively unconscionable where it did not foreclose TCPA claims, was enforceable by either party, and permitted appeals); *Graf,* 2015 WL 4263957, at *5 (arbitration provision was not substantively unconscionable where it conspicuously appeared in capitalized letters and was not overly harsh or oppressive); *Ostreicher v. TransUnion, LLC,* 2020 WL 3414633, at *7, n.8 (S.D.N.Y. June 22, 2020) (arbitration provision was not procedurally unconscionable where plaintiff given the opportunity to opt-out). *See also Concepcion*, 563 U.S. at 346-47 (enforcing arbitration provision in an alleged "adhesion" contract, noting "the times in which consumer contracts were anything other than adhesive are long past.").

## E.     The Arbitration Must Proceed Solely on an Individual Basis.

Although Plaintiff seeks class treatment in her Complaint, the Arbitration Provisions make abundantly clear that Plaintiff is only entitled to bring an individual arbitration; and, moreover, the Terms contain a separate, standalone class action waiver. *See* Trinh Decl., Ex. B, § 20.4. It is well-settled that standalone class action waivers in arbitration agreements like the foregoing are enforceable. *See, e.g., Concepcion*, 563 U.S. at 352; *Am. Express Co. v. Italian Colors Rest.*, 133 S.Ct. 2304, 2308-12 (2013); *DIRECTV, Inc. v. Imburgia*, 136 S.Ct.

463, 471 (2015). Moreover, it is axiomatic "courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal punctuation omitted). This Court should rule similarly, and dismiss Plaintiff's class claims accordingly, regardless of whether or how the Court rules on any arbitrability issues (if at all). *See also Rent-A-Center,* 561 U.S. at 70-71 (noting an arbitration provision is severable from the remainder of the contract) (applying *Buckeye*).

### F.  <u>Plaintiff's Lawsuit Should Be Dismissed in Its Entirety.</u>

Finally, rather than entering a stay, this Court may—and indeed should—<u>dismiss</u> this entire case in favor of arbitration. Courts in this Circuit have recognized that when all the claims at issue are subject to arbitration, dismissal is appropriate. *See, e.g., THI of New Mexico at Hobbs Ctr., LLC v. Spradlin,* 893 F. Supp. 2d 1172, 1190 (D.N.M. 2012), *aff'd*, 532 F. App'x 813 (10th Cir. 2013) ("Neither Section 3 nor Section 4 of the FAA requires the Court to stay this case when the only issue before it is whether to compel arbitration, and that issue has been resolved….") (citations omitted). Here, it is clear that all the claims in Plaintiff's Complaint must be arbitrated. As shown above, the Arbitration Provisions in the Terms broadly encompass Plaintiff's alleged receipt of "communications" from or on behalf of Temu. That is the entire basis for her OTSA claims. Thus, dismissal is more appropriate.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss (or alternatively stay) this entire case in favor of arbitration, and order Plaintiff to submit to binding individual arbitration.

Dated: November 15, 2023

Respectfully submitted by,

SMITH GAMBRELL & RUSSELL LLP

*/s/ Robert A. Stines*
Robert A. Stines (admitted *pro hac vice*)
Florida Bar No. 78447
201 N. Franklin Street, Suite 3550
Tampa, Florida 33602
T: 813-488-2920
Email: rstines@sgrlaw.com
　　　　vwilliams@sgrlaw.com
　　　　daigotti@sgrlaw.com

John W. McGuinness (*pro hac* to be
requested)
A. Paul Heeringa (*pro hac* to be requested)
MANATT, PHELPS & PHILLIPS LLP
151 N. Franklin Street, Ste. 2600
Chicago, Illinois 60606
T: 312-529-6300
Email: jmcguinness@manatt.com
　　　　pheeringa@manatt.com

John A. Burkhardt, OBA #1336
SCHAFFER HERRING PLLC
7134 S. Yale, Ste. 300
Tulsa, Oklahoma 74136
T: 918-856-5378
Email: john.burkhardt@schafferherring.com

*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2023, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice to all counsel of record.

*/s/ Robert A. Stines*
Robert A. Stines

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

HEATHER SMITH, individual and on behalf of all other similarly situated,

    Plaintiff,

v.

WHALECO INC. d/b/a TEMU,

    Defendant.

Case No:  CIV-23-559-D

Class Action

## <u>EXHIBIT 1</u>

### *FONTANEZ V. WHALECO*
### Order Granting Defendant's Motion to Compel Arbitration

IN THE CIRCUIT COURT OF THE
TENTH JUDICIAL CIRCUIT IN AND
FOR POLK COUNTY, FLORIDA

CASE NO.: 53-2023CA-000374
SECTION:  04   [CLASS REPRESENTATION]

DORIS FONTANEZ, individually and
on behalf of all others similarly situated,
        Plaintiff,

v.

WHALECO, INC.,
        Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION

**THIS MATTER** came before this Court on June 30, 2023, upon the Defendant's Motion to Compel Arbitration, Plaintiff's Response in Opposition, and Defendant's Reply. There appeared before the Court counsel for the Plaintiff, Morgan A. Dean, Esquire, and counsel for the Defendant, Robert A. Stines, Esquire. The Court, having reviewed the pleadings, heard the arguments of counsel, reviewed the file, and being otherwise fully advised in the premises, finds as follows:

### I.    Findings of Fact

Plaintiff, Doris Fontanez ("Fontanez"), filed her Class Action Complaint ("Complaint") on February 3, 2023, against Defendant, Whaleco, Inc., ("Whaleco") alleging claims under the Florida Telephone Solicitation Act, Florida Statute, section 501.059 (the "FTSA"). *See* Complaint. Whaleco does business as TEMU and operates https://temu.com and its mobile apps on Android and Apple iOS devices. TEMU is an online retail marketplace that connects consumers with sellers, manufacturers and brands around the world. *See* Whaleco's Motion to Compel Arbitration.

Fontanez does not oppose Defendant's request to take judicial notice, pursuant to Florida Statute, Sections 90.202 and 90.203, of Polk County Clerk of Court online records that shows she is the named plaintiff in eleven lawsuits against eleven separate defendants, with essentially eleven identical complaints alleging that each defendant violated the FTSA. Because there is no opposition, the Court takes judicial notice of the Polk County Clerk of Court online records that

Fontanez v. Whaleco, Inc.
53-2023CA-000374
Order Granting Motion to
Compel Arbitration
_____/

shows the eleven class action lawsuits that Fontanez has filed. In the first reported class action lawsuit that Fontanez filed, the defendant (Wolverine) relied on its online Terms and Conditions to file a Motion to Compel Arbitration on November 14, 2022. The reasonable inference is that after November 14, 2022, Fontanez should have been aware that online retailers have "Terms of Use" or "Terms and Conditions" agreements.

Fontanez also does not deny that she accessed Whaleco's online platform and used an AppleID to register for an online account. Hence, those facts are undisputed.

Fontanez argues that the Court should not consider the declaration of Micheal Trinh that was filed in support of Whaleco's Motion because he is relying on Whaleco's records which is hearsay. Trinh, as the Customer Service Manager at Whaleco, states that he has personal knowledge of the following:

(1) On December 17, 2022, anyone who used the TEMU mobile app to register an account with TEMU had to enter information in the full-screen user interface registration form attached as Exhibit A to his declaration;

(2) On December 17, 2022, the Terms of Use attached as Exhibit B to the declaration was hyperlinked to the user interface registration form attached as Exhibit A to his declaration; and

(3) To register for an account, a user must provide login credentials and click one of the "Continue" buttons in the user interface.

Trinh relies on Whaleco's records to declare that on December 17, 2022, someone accessed the TEMU mobile app to register a TEMU account and used the name "Doris Fontanez" with an Apple account identification as their log in credentials. Fontanez did not provide her own affidavit, declaration, testimony or any evidence to refute Trinh's statement. Furthermore, an affiant's personal knowledge may be based on his or her review of the company's file or business records. *See Progressive Exp. Ins. Co. v. Camillo*, 80 So. 3d 394, 399 (Fla. 4th DCA 2012). The Court accepts Trinh's declarations as to how users register for an account with TEMU and that Fontanez registered an account with TEMU on December 17, 2022.

Without any evidence from Fontanez to refute Trinh's declaration, there are no genuine disputes as to any material fact and the matter before the Court is purely a question of law.

2023CA-000374-0000-00        Received in Polk 08/29/2023 11:16 AM        101

Fontanez v. Whaleco, Inc.
53-2023CA-000374
Order Granting Motion to
Compel Arbitration
_____/

## II.    Conclusions of Law

Agreements to arbitrate that fall within the scope and coverage of the Federal Arbitration Act (Act), 9 U.S.C. § 1 et seq., must be enforced in state and federal courts. *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011). State courts "have a prominent role to play as enforcers of agreements to arbitrate." *Id.* Arbitration is a favored means of dispute resolution and courts should resolve doubts concerning the scope of such agreements in favor of arbitration. *Stinson-Head, Inc. v. City of Sanibel*, 661 So. 2d 119, 120 (Fla. 2d DCA 1995). Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). If a trial court finds that the parties' arbitration agreement is binding and that it controls the particular allegations raised in the complaint, the case must be submitted to arbitration. *Grillo v. Raymond James & Assocs., Inc.*, 524 So. 2d 1121, 1122 (Fla. 2d DCA 1988).

Fontanez does not challenge the scope of the agreement or that Whaleco waived the right to arbitrate. Her argument is that "no agreement to arbitrate exists and the alleged agreement upon which Defendant relies is unenforceable as a matter of law." *See* Plaintiff's Response in Opposition to Motion to Compel Arbitration, p. 2. Fontanez makes a secondary argument that Whaleco's "Motion should be denied without prejudice to allow for discovery to determine the validity and enforceability of the alleged arbitration agreement." *Id.* Discovery to determine the validity and enforceability of the arbitration agreement is unnecessary where Fontanez does not dispute creating an account on the TEMU platform in December 2022. The Court will therefore focus on whether there is a valid agreement to arbitrate as a matter of law.

Florida courts have recognized there are two main types of internet contracts, clickwrap and browsewrap agreements. *Metro PCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018). A "browsewrap" agreement occurs when a website or mobile app provides a link to the terms and conditions and allows the purchaser to complete the transaction without visiting the page containing the terms and conditions. *Id.* Courts have enforced browsewrap agreements when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to

3

Fontanez v. Whaleco, Inc.
53-2023CA-000374
Order Granting Motion to
Compel Arbitration
_____/

the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice. *Id.* When faced with browsewrap agreements, courts have evaluated the conspicuousness of the hyperlink to the terms and conditions, and whether the online retailer provided notice that a specific action would demonstrate acceptance of those terms. *See Bell v. Royal Seas Cruises, Inc.*, 2020 WL 5742189, at *6 (S.D. Fla. May 13, 2020), *report and recommendation adopted*, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020) (applying Florida law).

The parties do not dispute that Whaleco's platform has a browsewrap agreement. It is undisputed that on December 17, 2022, Fontanez accessed the TEMU mobile app on her mobile device and registered for an account. To register her account, Fontanez clicked the "Continue with Apple" button, that automatically provided her Apple User ID. The "Continue with Apple" button is directly above the statement: "By continuing, you agree to our Terms of Use and Privacy and Cookie Policy." The word "Terms of Use" was in bold letters and there was a hyperlink to Whaleco's Terms of Use. Fontanez did not have to scroll to see the hyperlink for the Terms of Use.

By clicking "Continue with Apple," she assented to the Terms of Use. Near the top of the Terms of Use, it states in uppercase bold letters:

> PLEASE BE AWARE THAT SECTION 20 OF THE TERMS BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES THAT YOU AND WHALECO HAVE AGAINST EACH OTHER WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE AGREEMENT. SECTION 20 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL ARBITRATION.

Section 20 begins with the following:

> 20. DISPUTE RESOLUTION: PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN THIS SECTION ("ARBITRATION AGREEMENT") CAREFULLY. IT REQUIRES YOU AND WHALECO TO ARBITRATE AGAINST ONE ANOTHER.

To enforce the arbitration clause in the Terms of Use, the Court must find either that Fontanez had actual knowledge of the Terms of Use, or that the hyperlink to the Terms of Use was conspicuous enough to put a reasonably prudent person on inquiry notice. In Fontanez's

Fontanez v. Whaleco, Inc.
53-2023CA-000374
Order Granting Motion to
Compel Arbitration
_____/

response to the motion to compel arbitration, she never specifically argues that she did not have actual knowledge of Whaleco's Terms of Use. Furthermore, the Court finds that Whaleco's full-screen user interface design with the "Continue" button just above the bolded hyperlink to the Terms of Use is conspicuous enough to put a reasonably prudent person on inquiry notice. Hence, by clicking "Continue," Fontanez assented to the Terms of Use that contained an arbitration clause.

Under the Federal Arbitration Act that governs the arbitration clause in the Terms of Use, the agreement to waive class actions and to arbitrate on an individual basis is "valid, irrevocable, and enforceable." 9 U.S.C. § 2; *McKenzie Check Advance of Fla., LLC v. Betts*, 112 So. 3d 1176, 1188 (Fla. 2013); *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 465 (Fla. 2011).

The Parties to this dispute have a valid and binding arbitration agreement, and the issue raised in Fontanez's Complaint is arbitrable.

**It is, therefore, ORDERED and ADJUDGED:**

1. The Motion to Compel Arbitration is **GRANTED**.

2. This matter is stayed pending the outcome of the arbitration.

**ORDERED** in Polk County, Florida on Tuesday, August 29, 2023.

53-2023-CA-000374-0000-00 08/29/2023 10:59:07 AM

Michael McDaniel, Circuit Judge
53-2023-CA-000374-0000-00 08/29/2023 10:59:07 AM

RASLAVICH BENJAMIN W
ben@theKRfirm.com
service1@theKRfirm.com

STINES ROBERT A
rstines@sgrlaw.com
vwilliams@sgrlaw.com

Morgan Ashlee Dean Esq.
morgan@thekrfirm.com

Ian Dankelman
idankelman@sgrlaw.com

Fontanez v. Whaleco, Inc.
53-2023CA-000374
Order Granting Motion to
Compel Arbitration
_____/

daigotti@sgrlaw.com

Morgan A. Dean
morgan@theKRfirm.com

Virginia Williams
vwilliams@sgrlaw.com

6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

HEATHER SMITH, individual and on
behalf of all other similarly situated,

        Plaintiff,

v.

WHALECO INC. d/b/a TEMU,

        Defendant.

Case No:  CIV-23-559-D

Class Action

## EXHIBIT 2

## Declaration of Michael Trinh

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

HEATHER SMITH, individually and on
behalf of all others similarly situated,

        *Plaintiff*,

    v.

WHALECO INC. d/b/a TEMU,

        *Defendant*.

Case No. 5:23-CV-00559-D

## DECLARATION OF MICHAEL TRINH

I, Michael Trinh, declare pursuant to 28 U.S.C. §1746 as follows:

1.      I am over 18 years of age. I have personal knowledge of the facts stated herein, and if called upon to testify thereto, I could and would competently do so.

2.      I submit this Declaration in support of the renewed "Motion to Compel Arbitration" (the "Motion"), filed contemporaneously herewith, by Defendant Whaleco Inc. d/b/a Temu ("Temu") in the above-captioned litigation (the "Action").

3.      I am the Customer Service Manager for Temu. I have held this position since October 2022. In my professional capacity at Temu, I am familiar with and knowledgeable of Temu's business operations, its policies and practices generally, the products it offers and sells to customers, and its various marketing programs and the terms and conditions applicable thereto. This includes, but is not limited to, the processes by which consumers may sign up for and use an account on Temu's website, www.temu.com (the "Website"),

1

107

to download and use Temu's smartphone application (the "App"), and to sign up (*i.e.*, agree) to receive marketing communications (including text messages) from or on behalf of Temu. In my professional capacity, I am also generally familiar with Temu's business records and its records-keeping policies and practices, including records relating to its marketing programs, the Website, and the App.

4.      I have also read and am familiar with the allegations in the Complaint filed in the Action by Plaintiff Heather Smith ("Plaintiff"). I am also familiar with the facts in the Motion, which are further discussed below.

5.      All of the records described herein are regularly kept and/or maintained in the course of business at Temu as part of its regular business practices, were made near or at the time of the act or event recorded or were made reasonably soon thereafter, and were made or maintained by an employee, agent, or other representative of Temu. As part of my job duties, I have access to and have searched for and reviewed such records, and did so for purposes of this Declaration.

6.      Put simply, Temu runs a global online retail marketplace (including the Website and App) where consumers can purchase a variety of products. It operates the marketplace globally and throughout the entire United States. To participate in the marketplace, a consumer must either download Temu's App or visit its Website and set up an account. This is required. A consumer cannot participate in the marketplace without completing all of the account signup or login steps. There are several ways to register or logon to the App or Website. The process used in the Action to register and login is described below.

7.     When a consumer registers the App or signs up for a Temu account through the Website, or each time the consumer logs on to their Temu account via the App or Website using their credentials thereafter (*i.e.,* to the extent he or she is not already logged in when they access or use the App or Website and need to log in again), the consumer must also agree, among other things, to Temu's "Terms of Use" (the "Terms"). This is through the registration and login process described below. They must agree to the Terms to proceed.

8.     Temu's business records reflect that, on December 30, 2022, someone using the phone number 405-***-9888 (hereafter, the "Subject Number") downloaded the App using an Android smartphone associated with the Subject Number, and at that time completed all of the registration and account sign up steps, as further described in the Motion and below, including agreeing to the Terms.[1] My understanding, based on my review of the Complaint, Temu's records, and publicly available information, is that the Subject Number is owned or used by, or is otherwise associated with, Plaintiff.

9.     The signup and registration process for the App on December 30, 2022, as is relevant to Plaintiff and the Action, was as follows: after downloading the App, the first page that the aforementioned user would have seen is accurately reflected in **Exhibit A**, attached hereto (*see* Page 1). This screen (as well as other screens described below) would have appeared on the user's phone in a single window, with an all-white background and with text that was all roughly the same size throughout (roughly between 13 to 15 pixels), with no advertisements or other copy. It is designed to be clear and legible on any device.

---

[1] The full Subject Number has not been provided here for privacy reasons but can be made available upon request.

10.     On that first registration page, the user was presented the options to "Continue" setting up a Temu account using a cell phone number or an email address, or to "Continue" using other pre-existing Google, Apple, Facebook, or Twitter accounts to complete the registration. As relevant to the Action, the latter was used. The text at the bottom of the first page stated "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The bolded text represents functional hyperlinks that, if clicked, would have taken the user to a separate page for the Terms or Temu's privacy and cookie policy.

11.     To continue and complete the App registration and account sign up process, or to subsequently logon to the account if necessary, the user must click on one of the "Continue" login buttons in the middle of the page reflected in Exhibit A. The button must be pressed to proceed. As relevant to Plaintiff and the Action, Temu's records reflect the user clicked the "Continue with Google" button and completed all the steps. The "Continue" buttons are used to allow the user to continue with the registration/logon process and confirm they are agreeing to the Terms or Temu's privacy and cookie policy.

12.     After clicking the "Continue with Google" button, a pop-up window is displayed, giving the user the options to "Cancel" or "Continue." *See* Exhibit A at p. 2. As relevant to the Action, the user in this instance clicked "Continue" and was taken to a separate all white page. *See* Exhibit A at p. 3. This page gave the user the option to click a button either associated with an existing Google account the user may have already been logged into on the phone, or to "Use another account." At the bottom of this page, immediately underneath these two buttons, appeared text stating: "To continue, Google will share your name, email address, language preference, and profile picture with Temu. Before

4

using this app, you can review Temu's **privacy policy** and **terms of service**." The bolded

text on this page was also in a blue contrasting font (in addition to being in bold), and

represented clickable hyperlinks to Temu's Terms and its privacy and cookie policy. As

relevant to Plaintiff and the Action, Temu's records reflect that the user clicked the top button

on this page (*i.e.*, to use an existing Google account), completing the Temu account signup

process. All of these steps would have had to have been completed to set up the account.

13.     A true and correct copy of Temu's operative Terms relevant to the Action is

attached hereto as **<u>Exhibit B</u>**. At all times relevant to the Action, the Terms have contained a

binding individual arbitration agreement and a separate class action waiver provision. The

user must agree to the Terms during the initial sign up/registration process described above

and each time they log on to their account (if needed), either through the App or the Website.

14.     If a user subsequently logs onto their account via the App or Website using

their Google account (or other preexisting accounts, like Apple) after the initial registration

process discussed above, the login screen is identical in appearance to the one reflected in

Exhibit A. The login process is essentially the same as described above (however, the pages

shown after the user clicks a "Continue" button can differ, depending on the account used).

15.     As is relevant to Action, Temu's records reflect that, on March 30, 2023,

someone used an Android smartphone associated with the Subject Number to log on to the

Temu App, clicking the "Continue with Apple" button to do so, using what appears to be

an Apple account associated with that phone. The format of the login page was the same

as is reflected in Exhibit A described above: *i.e.*, the same page with an all-white background,

roughly the same size text, the same "Continue" option login buttons, and the same language

at the bottom (except that this user was taken to a different second page after clicking the "Continue with Apple" button). This user was again informed at that time, on the login page, that "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." The bold text represents clickable hyperlinks to the Terms and privacy and cookie policy.

16.     Plaintiff could not have set up or used her Temu account without completing all of the above steps (including clicking the buttons) and agreeing to the Terms each time.

17.     True and correct copies of Temu's records reflecting the registration and login for the Subject Number described above are attached hereto as **Exhibit C**.[2]

18.     Temu's business records further reflect that, on January 25, 2023, someone using the Subject Number subscribed (*i.e.,* provided express written consent) to receive marketing text messages from or on behalf of Temu. A true and correct copy of the page that a user would have seen at that time is reflected in **Exhibit D**, attached hereto. Plaintiff could not have received any text messages from or on behalf of Temu without completing this page, providing the Subject Number, and pressing the button on that page.

19.     Temu does not make or send any unsolicited telemarketing calls or text messages. Nothing in this Declaration should be understood as an admission of liability by Temu, or an admission of any fact alleged by Plaintiff in the Action.

20.     My previous declaration in this matter should be considered withdrawn. The purpose of this declaration is to complete and correct the factual record regarding the Motion.

---

[2] These records have also been redacted for privacy reasons but are available upon request.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed this 14th day of November 2023, in Boston, Massachusetts.

By: _____

Michael Trinh

# **EXHIBIT A**

## **REGISTRATION FLOW**



Smith v. Temu
Trinh Declaration - EXHIBIT A





## **EXHIBIT B**

## **TEMU TERMS OF USE**

**Terms of Use**
**Last Updated: December 29, 2022**

Thank you for using Temu! These Terms of Use ("Terms") contain the rules and restrictions that govern your use of our applications, products, services and websites ("Services").

For purposes of these Terms and Policies (as defined below), we refer to:

- Whaleco Inc. and its affiliates as "Whaleco," "we" or "us," where Section 1.1 sets forth the applicable entity or affiliate that is providing the Services and that is entering into these Terms with you (the "Contracting Entity");
- Our marketplace platform, website and mobile apps, which allow third parties to set up online stores or otherwise sell products, and which may offer other features, products, services or content, including exchanges of information, as the "Temu platform" or "our marketplace app";
- Third parties that list and sell products and services through the Temu platform and our Services as "Seller(s)," and the products and services they sell as "Products";
- End users, including visitors to Temu platform and those who use our Temu platform to purchase Products from Sellers as "you."

Please read these Terms carefully, and if you have any questions, comments, or concerns regarding these Terms or the Services, please contact us at help@temu.com.

These Terms form a binding agreement between you and the applicable Contracting Party. By clicking completing the registration process and/or browsing the Services, you represent that (1) you have read, understand and agree to be bound by the Terms; (2) you are of legal age to form a binding contract with us; and (3) you have the authority to enter into the Terms personally. **You should not access or use the Services unless you agree to be bound all of these Terms.**

Your use of, and participation in, certain Services may be subject to additional policies we may publish from time to time ("Policies"), including our Privacy & Cookie Policy. If the Terms are inconsistent with the Policies, the Policies shall control with respect to the relevant subject matter. If you have a seller account, your use of the Services is also governed by the Seller Services Agreement. If there is a conflict between the Seller Services Agreement and these Terms, the Seller Services Agreement shall prevail.

PLEASE BE AWARE THAT SECTION 20 OF THE TERMS BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES THAT YOU AND WHALECO HAVE AGAINST EACH OTHER WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE AGREEMENT. SECTION 20 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL ARBITRATION.  UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND WHALECO WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

Smith v. Temu
Trinh Declaration - EXHIBIT B

PLEASE NOTE THAT THE TERMS ARE SUBJECT TO CHANGE BY US IN OUR SOLE DISCRETION AT ANY TIME.  When changes are made, we will make a new copy of the Terms of Use Agreement, and any updated Policies, available on the Temu platform or within the marketplace app.  We will also update the "Last Updated" date at the top of the Terms of Use Agreement.  Any changes to the Terms will be effective immediately for new users of the Services for existing users with Accounts, provided that any material changes shall be effective for users who have an Account with us upon the earlier of thirty (30) days after posting notice of such changes on the Services.  Company may require you to provide consent to the updated Agreement in a specified manner before further use of the Services is permitted.  If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Services. Otherwise, your continued use of the Services constitutes your acceptance of such change(s).  PLEASE REGULARLY CHECK THE WEBSITE TO VIEW THE THEN-CURRENT TERMS.

**1.      Parties and Independence of Sellers**

1.1.   Your location of residence determines the Contracting Party with whom you enter the Terms:

- If you reside in the United States or Canada, you contract with Whaleco Inc., a Delaware company;
- If you do not reside in the United States or Canada, you contract with Elementary Innovation Pte. Ltd., a Singapore company.

The relevant Contracting Party may change as we expand our business.

1.2.   As a marketplace, we do not own or sell the Products listed on the Temu platform. When you purchase a Product from a Seller through the Temu platform, the transaction is solely between you and the Seller. The Seller is responsible for fulfilling your order and for Seller's Products and providing any post-sale services. We provide technical and operational support for our marketplace app and acts as payment collection agent for the Seller for the limited purpose of accepting funds from you.

**2.      Services and Role of Sellers**

2.1    We operate our marketplace app that allows Sellers and users to exchange information and complete purchase transactions.

2.2    Sellers are responsible for setting up and operating their stores on our marketplace app, preparing and uploading Product listing information (including product descriptions and prices) onto their stores, and procuring Products and fulfilling your orders. Sellers may not be located in the same country or region as you are, which may have an effect on taxes, customs or the applicability of consumer protection rules.

2.3    We may, in relation to providing our Services or acting as payment collection agent for Sellers, facilitate payment processing, returns, refunds, and other customer services and transaction services in connection with your purchases of Products from Sellers. We do not have control over and do not guarantee the existence, quality, safety, suitability, or legality of the Products or the truthfulness, accuracy or legality of any information contained in the Product listings or other information provided by Sellers or other users. Furthermore, we are not responsible for the performance or conduct of Sellers or other users, including the ability of Sellers to sell Products or that a Seller will actually complete a transaction for the Products. Except where we clearly indicate otherwise, we do not endorse any Seller, store, Product, or Product listing.

2.4   We act as payment collection agent for Sellers solely for the limited purpose of accepting payments from you. Upon our receipt of your payment in the amount as agreed between you and the Seller, your payment obligation to the Seller for such amount is fulfilled. We are responsible for remitting the funds to the Seller in the manner described in the Seller Services Agreement.

2.5   Please check all descriptions and restrictions regarding the Product you are interested in thoroughly before you place your order with a Seller. If you have any special circumstance (e.g., a medical or health condition and/or special need) that may affect or be affected by the Product you wish to purchase, it is solely your responsibility to inform the Seller before you place your order with the Seller.

**3.     User Requirements and Registration**

3.1   To use the Services, you represent that you are at least eighteen (18) years old and of legal age to form a binding contract. Products for children's use may be sold by Sellers. However, these Products are intended for sale to adults. Certain Products may be intended for individuals of certain ages or "mature audiences" only. By ordering such Products, you certify that you are old enough to view, use, own, or receive them. We are not responsible for third-party content that you may find offensive, indecent, or objectionable.

3.2   You may not use the Services if: (a) you cannot enter into a binding contract with us; (b) you are located in a country embargoed by the United States; (c) you are on a U.S. Agency list of prohibited persons or entities, such as the Treasury Department's list of Specially Designated Nationals; or (d) you are banned from using the Services by us, in our sole discretion.

3.3   You may be required to create an account, and select a password and user name. When creating your account on the Temu platform or the marketplace app ("Account"), you promise to provide true, accurate, complete, and updated information about yourself, including contact details. You are responsible to keep your registration information with us up to date. You are responsible for all activities that occur under your Account.  You agree that you shall monitor your Account to restrict use by minors, and you will accept full responsibility for any unauthorized use of the Services by minors.  You may not select as your user name a name that you don't have the right to use, or another person's name with the intent to impersonate that person. You may not transfer your account to anyone else without our prior written permission. You agree not to create an Account or use the Services if you have been have been permanently banned from any of the Services. You may not share your Account or password with anyone, and you agree to notify us immediately of any unauthorized use of your password or any other breach of security; and exit from your Account at the end of each session.

3.4   You may also register an Account by connecting through a social network service account and its credentials (an "SNS Account"). If you access the Services through a SNS as part of the functionality of the Services, you may link your Account with SNS Accounts by allowing us to access your SNS Account, as is permitted under the applicable terms and conditions that govern your SNS Account.  You represent that you are entitled to grant us access to your SNS Account (including, but not limited to, for use for the purposes described herein) without breach by you of any of the terms and conditions that govern your SNS Account and without obligating us to pay any fees or making us subject to any usage limitations imposed by such SNS.  By granting us access to any SNS Accounts, you understand that we may access, make available and store (if applicable) any Content (as defined below) that you have provided to and stored in your SNS Account (**"SNS Content"**) so that it is available on and through the Services via

your Account.  Unless otherwise specified in the Agreement, all SNS Content shall be considered to be User Submissions for all purposes of the Terms.  Depending on the SNS Accounts you choose and subject to the privacy settings that you have set in such SNS Accounts, personal information that you post to your SNS Accounts may be available on and through your Account on the Services. Please note that if a SNS Account or associated service becomes unavailable, or our access to such SNS Account is terminated by the SNS, then SNS Content will no longer be available on and through the Services.  You have the ability to disable the connection between your Account and your SNS Accounts at any time by accessing the "Settings" section of the Services. PLEASE NOTE THAT YOUR RELATIONSHIP WITH THE SNS PROVIDERS ASSOCIATED WITH YOUR SNS ACCOUNTS IS GOVERNED SOLELY BY YOUR AGREEMENT(S) WITH SUCH SNS PROVIDERS, AND WE DISCLAIM ANY LIABILITY FOR PERSONAL INFORMATION THAT MAY BE PROVIDED TO IT BY SUCH SNS PROVIDERS IN VIOLATION OF THE PRIVACY SETTINGS THAT YOU HAVE SET IN SUCH SNS ACCOUNTS.  We make no effort to review any SNS Content for any purpose, including but not limited to, for accuracy, legality or noninfringement, and we are not responsible for any SNS Content.

**4.    Rules and Restrictions**

4.1    You agree to use the Services for your own use, and not on behalf of or for the benefit of any third party, and only in a manner that complies with these Terms, the Policies, and all laws and regulations applicable to you. If your use of the Services is prohibited by any applicable laws, then you are not authorized to use the Services. We are not responsible if you use the Services in a way that breaks the law.

4.2    You are responsible for all activity associated with your account. Therefore, you must protect the security of your account and password and not share them with any third person. You should notify us immediately of any unauthorized use or security breach of your account.

4.3    You must not create multiple accounts.

4.4    Any sweepstakes, contests, raffles, surveys, games, or similar promotions (collectively, "Promotions") made available through the Services may be governed by separate rules. If the rules for a Promotion conflict with these Terms, such rules will govern.

4.5    When using the Services, you agree and undertake not to take any action or make available any User Submissions through the Services that may:

(1)    infringe or violate another person's rights, including intellectual property rights;
(2)    violate any of these Terms, the Policies, and applicable laws and regulations;
(3)    engage in any unlawful, harmful, abusive, misleading, false, fraudulent, deceptive, threatening, harassing, defamatory, libelous, pornographic, obscene, profane or otherwise objectionable or discriminatory conduct;
(4)    circumvent or attempt to circumvent any of these Terms, the Policies or other rules relating to the Services including the Promotions;
(5)    constitute unauthorized or unsolicited advertising, junk or bulk e-mail;
(6)    collect personal data from other users or use any such information collected from the Services;
(7)    engage in any conduct that is likely to cause a security breach of your account;
(8)    obtain another user's password, account, or other security information;
(9)    use a third party's credentials, conceal your true IP address, or otherwise impersonate or misrepresent your identity or your affiliation with any person or entity;

(10) violate or interfere with the proper functioning or security of any computer network;

(11) run any form of auto-responder or "spam" on the Services, any process that runs or is activated while you are not logged into the Services, or any process that otherwise interferes with the proper functioning of the Services (including by placing an unreasonable load on the Services' infrastructure through overloading, "flooding," "mail bombing" or crashing the Services);

(12) potentially harm the Services, including but not limited to the violation of any security features of the Services, use of manual or automated software or other means to access, "crawl," "scrape," or "spider" any page, data, or portion of or relating to the Services or the introduction of viruses, worms or similar harmful code into the Services;

(13) copy or store any significant portion of the content on the Services without written consent from us;

(14) decompile, reverse engineer, or otherwise obtain the source code or underlying ideas or information of or relating to the Services;

(15) buy any Products which you are not legally allowed to purchase or use;

(16) abuse any promotions, discounts, or other benefits offered by us or Sellers, or manipulate the price of any listed Products or interfere with Seller listings;

(17) attempt to do anything, or permit, encourage, assist, or allow any third party to do anything, prohibited in this list.

In addition to any other remedies available to us, a violation of any of the foregoing is grounds for:

(1) removal or refusal to post any User Submission for any or no reason in our sole discretion;

(2) cancellation of one or more purchases of Products;

(3) cancellation of Rewards or payments due; and/or

(4) suspension or termination of your access or use the Services.

If we become aware of any possible violations by you of the Terms, we reserve the right to investigate such violations.  If, as a result of the investigation, we believe that criminal activity has occurred, we reserve the right to refer the matter to, and to cooperate with, any and all applicable legal authorities.  We are entitled, except to the extent prohibited by applicable law, to disclose any information or materials on or in the Services, including User Submissions, in our possession in connection with your use of the Services, to (i) comply with applicable laws, legal process or governmental request; (ii) enforce the Terms and Policies, (iii) respond to any claims that a User Submission violates the rights of third parties, (iv) respond to your requests for customer service, or (v) protect the rights, property or personal safety of us, our users or the public, and all enforcement or other government officials, as we in our sole discretion believe to be necessary or appropriate.

**5.    Privacy**

5.1    Our Privacy & Cookie Policy provides information about how we collect, use, and disclose your personal information when you access, visit or use the Services. In connection with your use of the Services, you acknowledge and agree that we may collect, access, use, preserve and disclose your personal information (including your account and user information) as described in our Privacy & Cookie Policy. The Privacy Policy is part of and is governed by these Terms and by agreeing to these Terms, you agree to be bound by the terms of the Privacy & Cookie Policy.

5.2    Your purchases are fulfilled by Sellers. In order to fulfill your purchases, Sellers need information about you, such as your mailing address. You acknowledge and agree that when you make a purchase, you authorize us to share your information (including your

name, street address, and phone number) with the Seller you are purchasing from to facilitate the fulfilment of your order.

**6.     Communications**

6.1    By entering into these Terms or using the Services, you agree to receive communications from us, including via e-mail, text message, calls and push notifications. You agree that we may communicate with you using email and text messages, at any email address or telephone number that you provide us, to: (i) notify you regarding your account; (ii) troubleshoot problems with your account; (iii) resolve a dispute; (iv) collect a debt; (v) poll your opinions through surveys or questionnaires; (vi) notify you regarding order, payment and delivery updates; (vii) send you authentication texts; or (viii) as otherwise necessary to service your Account or enforce these Terms, the Policies, applicable laws and regulations, or any other agreement we may have with you. Standard text messaging charges applied by your cell phone carrier will apply to text messages that we send.

6.2    If you would like to receive our marketing materials via mobile texts and alerts, you may sign up to do so. By signing up, you provide your consent to receive marketing texts or other mobile messages from or on behalf of us, including but not limited to our promotional messages on short code 52927, at the mobile number you provide us. Message frequency varies. Message and Data Rates may apply. You acknowledge that you are not required to consent to receive marketing texts as a condition of using the Services. If you wish to opt out of SMS texts from us, you can reply STOP to the corresponding numberfrom your mobile device receiving the messages. However, you acknowledge that opting out of receiving texts may impact your use of the Services. If you would like to resume the subscription, reply UNSTOP to the corresponding number. You may also reply "HELP" for assistance. We will not share your consent, opt-in and opt-out records with any third parties other than text messaging service providers and aggregators. For further assistance, please contact help@temu.com.

6.3    If you wish to opt out of marketing emails, you can unsubscribe from our marketing email list by following the unsubscribe options in the marketing email itself.

6.4    Our communications with you may be through a third-party service provider. You acknowledge and consent that, subject to our Privacy Policy, your communications with us, our agents or Sellers may be recorded, monitored and stored for quality control and training purposes, or to protect your, our and/or Sellers' interests.

**7.     User Submissions**

7.1    "User Submission" means anything posted, uploaded, shared, submitted, stored, or otherwise provided by you through the Services, including suggestions, comments, reviews, ratings, photos, videos, or other feedback or materials, and may be viewable by Sellers and/or other users. Any User Submission posted by you in your Account may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by us in our sole discretion.

7.2    For all User Submissions, you grant us a fully-paid, royalty-free, perpetual, irrevocable, non-exclusive, transferable, sublicensable, worldwide right (including any moral rights) and license to use, license, store, display, reproduce, save, modify (e.g. to make sure the User Submission is viewable on different systems and devices), create derivative works, publicly perform, publicly display, distribute, translate, or otherwise act with respect to such User Submissions as we determine is necessary to operate, market,

and advertise the Services, including to present, display, or perform such User Submissions in accordance with your preferences.

7.3   You acknowledge and agree that all User Submissions (including the user name under which you made them) non-confidential and non-proprietary. We may freely display, disclose, reproduce, modify, license, transfer, distribute and otherwise use the User Submissions in any manner, without any restriction or compensation to you.

7.4   You warrant that you own or otherwise control all rights to the User Submissions and that our use of any User Submission will not infringe upon or violate the rights of any third party or violate any of the rules and restrictions contained in these Terms (including those included in Section 4 herein).

7.5   We do not endorse User Submissions and they do not represent our views. We expressly disclaim any liability for User Submissions or damages resulting from them. We expect users to maintain a high level of integrity when submitting User Submissions that are viewable by other users, especially with respect to ratings and reviews of Products. You undertake that the User Submissions that are viewable by other users are made truthfully in good faith and based only on your firsthand experience. You further undertake that you will prominently indicate as such if the User Submission was sponsored or paid for in any way. You acknowledge that we have no obligation to pre-screen User Submissions, although we reserve the right to pre-screen, refuse, exclude or remove any User Submission for any reason or no reason, at our discretion and without notice to you. By entering into the Terms, you hereby provide your irrevocable consent to such monitoring.  You acknowledge and agree that you have no expectation of privacy concerning the transmission of your User Submissions.  In the event that we pre-screen, refuse, exclude or remove any User Submissions, you acknowledge that we will do so for our benefit, not yours.  Without limiting the foregoing, we shall have the right to remove any User Submissions that violate the Terms or are otherwise objectionable.

## 8.   Ownership

8.1   You acknowledge and agree that all materials displayed, performed, or available on or through the Services, including, but not limited to, text, graphics, data, articles, photos, images, illustrations and User Submissions (collectively, "Content") are protected by copyright and/or other intellectual property laws throughout the world. You undertake to comply with all copyright notices, trademark rules, information, and restrictions contained in the Content, and not to copy, reproduce, modify, translate, publish, broadcast, transmit, distribute, perform, upload, display, license, sell, or otherwise use for any purpose any Content not owned by you without the prior consent of the owner of that Content.

8.2   We respect others' intellectual property rights, and we reserve the right to delete or disable Content alleged to be infringing upon another person's intellectual property rights and to terminate the accounts of the alleged infringers. See our Intellectual Property Policy to learn how to report potentially infringing content.

8.3   You acknowledge and agree that We own or license the Services. You undertake not to modify, publish, transmit, participate in the transfer or sale of, reproduce, create derivative works based on, or otherwise exploit any of the Services, except as expressly provided in this Section 8.

8.4    Subject to your compliance with these Terms and all applicable policies, rules, and guidelines, and your payment of any applicable fees, We or our content providers grant you a limited, non-exclusive, non-transferable, non-sublicensable license to access and make personal and non-commercial use of the Services for the sole purpose of using the Temu platform. All rights not expressly granted to you in these Terms or any policies or guidelines are reserved and retained by us or our licensors, suppliers, publishers, rightsholders, or other content providers. The licenses granted by us terminate if you do not comply with these Terms or any applicable policies, rules, or guidelines.

8.5    You may not make any commercial use of any of the information provided on the Services or make any use of the Services for the benefit of another business unless explicitly permitted by us in advance. You may not solicit, advertise for, or contact in any form users for employment, contracting or any other purpose not related to the Services facilitated through the Temu platform. If you violate this provision, we reserve the right to refuse service, terminate accounts, and/or cancel orders in our discretion.

## 9.    Responsibilities; Third Party Risks

9.1    You acknowledge and agree that any Content publicly posted or privately transmitted through the Services is the sole responsibility of the person that posted or transmitted such Content. You access and use the Content, and interact with other users, at your own risk. We are not responsible for any errors, mistakes, omissions, inaccuracies in the Content. We do not control the Content and have no duty to take any action regarding how you may interpret, use or react to the Content. We have no obligation to review or monitor, and do not approve, endorse, or make any representations or warranties with respect to, Content. You also understand that we cannot guarantee the identities of the users with whom you interact while using the Services and are not responsible for which users gain access to the Services.

9.2    You are responsible for all Content you contribute, in any manner, to the Services, and you represent and warrant you have all rights to contribute such Content to the Services in such manner.

9.3    The Services may contain links or connections to third-party websites or services that are not owned or controlled by us. We have no control over, and assume no responsibility for, the content, accuracy, privacy policies, or practices of or opinions expressed in any third-party websites or services. In addition, we will not and cannot monitor, verify, censor, or edit the content of any third-party website or service. You acknowledge and agree that we are not responsible for any risks resulting from your access or use of any third party websites or services. We encourage you to be aware when you leave the Services and to read the terms of use and privacy policy of each third-party website or service that you visit or use.

9.4    Your interactions with Sellers, other users, other entities or individuals as a result of your use of the Services, including communications, payments, performances and deliveries, are solely between you and such third parties; provided, however, that Company reserves the right, but has no obligation, to intercede in such disputes. You should make whatever investigation and/or seek whatever professional advice as you feel necessary or appropriate before proceeding with any transaction with any of these third parties. You acknowledge and agree that we are not responsible for any loss or damage incurred as the result of such interactions. You agree that Company will not be responsible for any liability incurred as the result of such interactions.

9.5   It is a material breach of these Terms to arrange for the sale of listed items from, or the payment of fees to, Sellers outside the context of the Temu platform for the purposes of circumventing the obligation to pay the fee for Products purchased through the Services.

## 10.   Release

10.1   We expressly disclaim any liability that may arise between users of the Temu platform, including any participants in our marketplace app. If there is a dispute between you and a Seller, another user, or any third party on our marketplace app, we are under no obligation to become involved.  Because we are not a party to the actual contracts between you and Sellers, to the fullest extent permitted under applicable law, you release us, our parents, subsidiaries, affiliates, directors, officers, employees, agents and successors from all claims, demands, and damages of every kind or nature, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or in any way related to such disputes and/or the Services, including relating to the purchase of use of Products and the activities, performance or conduct of any Sellers.

IF YOU ARE A CALIFORNIA RESIDENT, YOU HEREBY WAIVE CALIFORNIA CIVIL CODE SECTION 1542, WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." IF YOU ARE NOT A CALIFORNIA RESIDENT, YOU WAIVE YOUR RIGHTS UNDER ANY STATUTE OR COMMON LAW PRINCIPLE SIMILAR TO SECTION 1542 THAT GOVERNS YOUR RIGHTS IN THE JURISDICTION OF YOUR RESIDENCE.

## 11.   Purchases; Pricing

11.1   You are responsible for reading the full Product listing before purchasing a Product. By confirming your purchase, you agree to pay all applicable fees, taxes, shipping costs and other amounts associated with your purchase. Further, to the extent applicable, you acknowledge your responsibility for sales tax, VAT and customs duties. You agree that, where applicable, you will act as the importer of the products purchased and you hereby authorize us to appoint a freight forwarding agent to act as your direct representative and pay any sales tax, VAT and customs duties on your behalf. Please note that sales tax, VAT, customs duties, and similar charges collected at the time of purchase are estimated values and may be subject to change depending on applicable laws. If additional amounts are assessed, you are responsible for them. We will not be liable if a Product is delayed or denied customs clearance as a result of your failure to pay such amounts. When a purchase is made pursuant to a shipping contract, the risk of loss and title for Product pass to you upon delivery of the Product to the carrier.

11.2   Third-party service providers for payment services ("Payment Processor") may charge you fees for your purchases made through the Services. Such processing fees will be disclosed to you via our marketplace app.  Your use of the Services and the payment processing provided by the Payment Processor is subject to your agreement with the Payment Processor, as may be modified from time to time. As a condition of using the payment services, you must provide accurate and complete information, and you authorize us to share this information with the Payment Processor.

11.3   In order to make purchases, you must provide accurate and complete information for a valid payment method, such as a credit card, that you are authorized to use. You must

promptly update your account with any changes related to your payment method. BY PROVIDING INFORMATION FOR A PAYMENT METHOD, YOU AUTHORIZE US OR OUR AGENTS OR PAYMENT SERVICE PROCESSORS TO CHARGE THE PAYMENT METHOD FOR: (A) AMOUNTS DUE FOR PURCHASED PRODUCTS; (B) ANY AND ALL APPLICABLE CUSTOMS, TAXES AND SHIPPING COSTS; AND (C) ANY OTHER CHARGES INCURRED IN CONNECTION WITH YOUR USE OF THE SERVICES. YOUR PAYMENTS ARE NON-REFUNDABLE EXCEPT AS EXPRESSLY PROVIDED IN APPLICABLE POLICIES.

11.4   You contract directly with Sellers for the purchase of Products, and we are not a party to such sales; however, we facilitate these sales. Sellers set the listing prices (including any reference or strike-through prices) of the Products they offer on our marketplace app. Sellers also provide all other information in the Product listings. While we require Sellers to provide accurate information, we cannot guarantee the truthfulness, accuracy or completeness of the information in Product listings. Therefore, we do not represent, warrant, or guarantee that Sellers actually offered or sold Products at strike-through prices. You should not rely on the strike-through price in your purchase decision. If comparing prices is important to your purchase decision, you should do your own comparison before making a purchase.

11.5   Pricing or availability errors may occur from time to time. We reserve the right to cancel any order with pricing or availability error, with no further obligations to you, even after your receipt of an order confirmation or shipping notice.

## 12.   Refunds, Exchanges and Related

12.1   We want you to be satisfied with your purchases through the Services. You are entitled to refund and may return the purchased products pursuant to our Return and Refund Policy. Please follow the instructions in the policy If you want to request a refund. You acknowledge and agree that: (i) We acting as payment collection agent for Sellers may issue a refund on behalf of the relevant Seller in accordance with the Return and Refund Policy.; and (ii) if you wish to pursue any other remedy, you must seek that remedy directly from the Seller.

Unless otherwise described in the Return and Refund Policy, the refund will not cover customs, taxes, or any return shipping costs you may incur in the refund process.

## 13.   Rewards

13.1   You may receive credits, coupons, cash, gifts or other kinds of reward by use of the Services (collectively, "Rewards"). Some rewards may only be used for discounts on or payment for eligible purchases on or through the Services (but note that not all Products may be eligible) and cannot be redeemed for cash, except in jurisdictions where required by law. You should read carefully the information and applicable rules of different kinds of rewards.

## 14.   Ending Our Relationship

14.1   You are free to stop using the Services at any time. We are also free to terminate or suspend your use of the Services or your account, for any reason in our discretion, including your breach of these Terms. You acknowledge and agree that we have the sole right to decide whether you are in violation of any of the restrictions set forth in these Terms. Even after your use of the Services is terminated or suspended, these Terms will remain enforceable against you and any unpaid amount you owe to us or Sellers will remain due.

14.2  If your account is terminated for any reason, all Content and Reward associated with your account will be destroyed and cancelled. You should try to use any remaining Reward before the date on which such termination becomes effective.

14.3  All provisions of the Terms which by their nature should survive, shall survive termination of these Terms, including without limitation, ownership provisions, warranty disclaimers, and limitation of liability.

## 15.  WARRANTY DISCLAIMER.

15.1  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWWE EXPRESSLY DISCLAIM ALL REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, RELATING TO THE SERVICES, ANY CONTENT OR ANY PRODUCT OFFERED OR PURCHASED ON OR THROUGH THE SERVICES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF PRODUCTS' CONDITION, QUALITY, DURABILITY, PERFORMANCE, ACCURACY, RELIABILITY, MERCHANTABILITY. FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, OR ANY WARRANTIES OF THE CONTENT'S ACCURACY, CORRECTNESS, COMPLETENESS, OR LEGALITY. ALL SUCH WARRANTIES, REPRESENTATIONS, CONDITIONS, AND UNDERTAKINGS ARE HEREBY EXPRESSLY EXCLUDED. NO COMMUNICATION OR INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED FROM OR THROUGH THE SERVICES SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED HEREIN. IN ADDITION, WE MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING SUGGESTIONS OR RECOMMENDATIONS OF PRODUCTS OFFERED OR PURCHASED ON OR THROUGH THE SERVICES. This Section 15 does not affect in any way our Return and Refund Policy for Products purchased on the Services.

15.2  YOUR USE OF THE SERVICES AND YOUR USE OF ANY PRODUCT OFFERED AND PURCHASED ON OR THROUGH THE SERVICES ARE AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNLESS EXPRESSLY PROVIDED OTHERWISE, THE SERVICES, PRODUCTS OFFERED AND PURCHASED ON OR THROUGH THE SERVICES, AND THE CONTENT ARE MADE AVAILABLE TO YOU ON AN "AS-IS" AND "AS-AVAILABLE" BASIS, WITH ALL FAULTS AND WITHOUT WARRANTIES OR ANY KIND.

15.3  YOU ACKNOWLEDGE AND AGREE THAT WHALECO PARTIES (AS DEFINED IN SECTION17.1) ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD WHALECO PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OPERATORS OF EXTERNAL SITES, AND THAT THE RISK OF INJURY FROM SUCH THIRD PARTIES RESTS ENTIRELY WITH YOU. WE MAKE NO PROMISES WITH RESPECT TO, AND EXPRESSLY DISCLAIM ALL LIABILITY FOR: (1) PRODUCTS, SERVICES, INFORMATION, PROGRAMMING, AND/OR ANYTHING ELSE PROVIDED BY A THIRD PARTY THAT IS ACCESSIBLE TO YOU ON OR THROUGH THE SERVICES; OR (2) THE QUALITY OR CONDUCT OF ANY THIRD PARTY YOU ENCOUNTER IN CONNECTION WITH YOUR USE OF THE SERVICES.

15.4  YOU ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU ASSUME FULL RESPONSIBILITY FOR YOUR USE OF THE SERVICES, INCLUDING YOUR INTERACTIONS WITH OTHER USERS OF THE SERVICES, AND THAT ANY INFORMATION YOU SEND OR RECEIVE DURING YOUR USE OF THE SERVICES MAY NOT BE SECURE AND MAY BE INTERCEPTED OR OTHERWISE ACCESSED BY UNAUTHORIZED PARTIES. YOU AGREE THAT,

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE ARE NOT RESPONSIBLE FOR ANY LOSS OR DAMAGE TO YOUR PROPERTY OR DATA THAT RESULTS FROM ANY MATERIALS YOU ACCESS OR DOWNLOAD FROM THE SERVICES.

15.5 IF YOU RELY ON ANY DATA OR INFORMATION OBTAINED ON OR THROUGH THE SERVICES, YOU DO SO AT YOUR OWN RISK. YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE OR LOSS THAT RESULTS FROM YOUR USE OF SUCH DATA OR INFORMATION.

## 16.   LIMITATION OF LIABILITY

16.1 NOTWITHSTANDING US ACTING AS PAYMENT COLLECTION AGENT FOR THE SELLER FOR THE LIMITED PURPOSES OF ACCEPTING FUND FROM YOU, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY (INCLUDING, WITHOUT LIMITATION, TORT, CONTRACT, STRICT LIABILITY, OR OTHERWISE) SHALL WHALECO PARTIES BE LIABLE TO YOU OR TO ANY OTHER PERSON FOR (A) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OF ANY KIND, INCLUDING DAMAGES FOR LOSS OF DATA, PROFITS, REVENUE OR GOODWILL, REPUTATIONAL HARM, BUSINESS INTERRUPTION, ACCURACY OF RESULTS, OR COMPUTER FAILURE OR MALFUNCTION ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR (B) YOUR USE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY INABILITY TO ACCESS OR USE OF THE SERVICES OR THE PURCHASE AND USE OF PRODUCTS OFFERED ON OR THROUGH THE SERVICES, EVEN IF WE OR ANY OTHER PERSON HAS FORSEEN OR BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILTY SHALL NOT APPLY TO LIABLITY OF A WHALECO PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD OR FRAUDULENT MISREPRESENTATION.

16.2 THIS DISCLAIMER APPLIES, WITHOUT LIMITATION, TO THE MAXIMUM EXTENT PERMITTED UNDER LAW, ANY DAMAGES OR PERSONAL INJURY ARISING FROM ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DELETION, DEFECTS, DELAY IN OPERATION OR TRANSMISSION, COMPUTER VIRUS, FILE CORRUPTION, COMMUNICATION-LINE FAILURE, NETWORK OR SYSTEM OUTAGE, ANY THEFT, DESTRUCTION, UNAUTHORIZED ACCESS TO, ALTERATION OF, LOSS OR USE OF, ANY RECORD OR DATA, AND ANY OTHER TANGIBLE OR INTANGIBLE LOSS.

16.3 YOU SPECIFICALLY ACKNOWLEDGE AND AGREE THAT WE SHALL NOT BE LIABLE FOR ANY DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT BY ANY SELLER OR USER OF THE SERVICES.

16.4 TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL THE TOTAL AGGREGATE AMOUNT THAT WHALECO PARTIES ARE LIABLE TO YOU EXCEED THE GREATER OF: (A) THE TOTAL AMOUNT PAID TO US BY YOU DURING THE ONE-MONTH PERIOD PRIOR TO THE ACT, OMISSION OR OCCURRENCE GIVING RISE TO SUCH LIABIITY; (B) $100.00; OR (C) THE REMEDY OR PENALTY IMPOSED BY THE STATUTE UNDER WHICH SUCH CLAIM ARISES. THE FOREGOING CAP ON LIABILTY SHALL NOT APPLY TO LIABLITY OF A WHALECO PARTY FOR (I) DEATH OR PERSONAL INJURY CAUSED BY OUR GROSS NEGLIGENCE; OR FOR (II) ANY INJURY CAUSED BY OUR FRAUD

OR FRAUDULENT MISREPRESENTATION. THE PRECEDING SENTENCE SHALL NOT PRECLUDE THE REQUIREMENT FOR YOU TO PROVE ACTUAL DAMAGES.

16.5   CERTAIN JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES OR IMPLIED WARRANTIES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

16.6   THE LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE ESSENTIAL TO THE AGREEMENT BETWEEN YOU AND US.

## 17.   Indemnity

17.1   To the fullest extent permitted by applicable law, you agree to indemnify and hold us, our parents, subsidiaries, affiliates, directors, officers, agents, employees, suppliers, licensors and partners (each, a "Whaleco Party" and collectively, the "Whaleco Parties") harmless from and against any and all claims, liabilities, damages, losses, and expenses (including reasonable attorneys' fees ) arising from or in connection with any third-party claims relating to: (a) your use of the Services, including without limitation, User Submissions or any actions taken by a third party using your account; (b) your violation of these Terms; (c) your violation of any rights of another party, including without limitation any copyright, property, or privacy right or any third-party agreement; or (d) your violation of any applicable laws, rules, or regulations. In the event of such a claim, suit, or action ("Claim"), we will attempt to provide notice of the Claim to the contact information we have for your account (provided that failure to deliver such notice shall not eliminate or reduce your indemnification obligations under these Terms).

17.2   We reserve the right, at our own cost, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which case you will fully cooperate with us in asserting any available defenses.

17.3   You agree that the provisions in this section will survive any termination of your Account, the Terms and/or your access to the Services.

## 18.   App Stores

18.1   **Application License.**   Subject to your compliance with the Terms, we grant you a limited non-exclusive, non-transferable, non-sublicensable, revocable license to download, install and use a copy of the Temu mobile application ("Application") on a single mobile device or computer that you own or control and to run such copy of the Application solely for your own personal or internal business purposes.  Furthermore, with respect to any Application accessed through or downloaded from the Apple App Store (an "App Store Sourced Application"), you will only use the App Store Sourced Application (a) on an Apple-branded product that runs the iOS (Apple's proprietary operating system) and (b) as permitted by the "Usage Rules" set forth in the Apple App Store Terms of Service. Notwithstanding the first sentence in this section, with respect to any Application accessed through or downloaded from the Google Play store (a "Google Play Sourced Application"), you may have additional license rights with respect to use of the Application on a shared basis within your designated family group.

18.2   **App Stores.**  You acknowledge and agree that the availability of the Application and the Services is dependent on the third party from whom you received the Application license, e.g., the Apple App Store or Google Play (each, an "App **Store**").  You acknowledge that the Terms are between you and Whaleco and not with the App Store.  Whaleco, not the App Store, is solely responsible for The Services, including the Application, the content

thereof, maintenance, support services, and warranty therefor, and addressing any claims relating thereto (e.g., product liability, legal compliance or intellectual property infringement).  In order to use the Application, you must have access to a wireless network, and you agree to pay all fees associated with such access.  You also agree to pay all fees (if any) charged by the App Store in connection with The Services, including the Application.  You agree to comply with, and your license to use the Application is conditioned upon your compliance with all terms of agreement imposed by the applicable App Store when using any Service, including the Application. You acknowledge that the App Store (and its subsidiaries) are third-party beneficiaries of the Terms and will have the right to enforce it.

18.3   **Accessing and Downloading the Application from iTunes.**  The following applies to any App Store Sourced Application accessed through or downloaded from the Apple App Store:

18.3.1   You acknowledge and agree that (i) the Terms are concluded between you and Whaleco only, and not Apple, and (ii) Whaleco, not Apple, is solely responsible for the App Store Sourced Application and content thereof. Your use of the App Store Sourced Application must comply with the App Store Terms of Service.

18.3.2   You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the App Store Sourced Application.

18.3.3   In the event of any failure of the App Store Sourced Application to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price for the App Store Sourced Application to you and to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App Store Sourced Application. As between Whaleco and Apple, any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be the sole responsibility of Whaleco.

18.3.4   You and Whaleco acknowledge that, as between Whaleco and Apple, Apple is not responsible for addressing any claims you have or any claims of any third party relating to the App Store Sourced Application or your possession and use of the App Store Sourced Application, including, but not limited to: (i) product liability claims; (ii) any claim that the App Store Sourced Application fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation.

18.3.5   You and Whaleco acknowledge that, in the event of any third-party claim that the App Store Sourced Application or your possession and use of that App Store Sourced Application infringes that third party's intellectual property rights, as between Whaleco and Apple, Whaleco, not Apple, will be solely responsible for the investigation, defense, settlement and discharge of any such intellectual property infringement claim to the extent required by the Terms.

18.3.6   You and Whaleco acknowledge and agree that Apple, and Apple's subsidiaries, are third-party beneficiaries of the Terms as related to your license of the App Store Sourced Application, and that, upon your acceptance of the terms and conditions of the Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce the Terms as related to your license of the App Store Sourced Application against you as a third-party beneficiary thereof.

18.3.7   Without limiting any other terms of the Terms, you must comply with all applicable third-party terms of agreement when using the App Store Sourced Application.

## 19.   General

19.1.   **Electronic Communications.** The communications between you and Whaleco may take place via electronic means, whether you visit the Services or send Whaleco e-mails, or whether Whaleco posts notices on the Services or communicates with you via e-mail. You consent to receive communications from us electronically, such as emails, texts, mobile push notices, and notices and messages on or through the Services. You acknowledge and agree that all terms and conditions, agreements, notices, disclosures, and other communications and documents that we provide to you electronically constitute and shall have the same legal effect as "in writing." The foregoing does not affect your statutory rights, including but not limited to the Electronic Signatures in Global and National Commerce Act at 15 U.S.C. §7001 et seq. ("E-Sign").

19.2.   **Assignment.** You may not assign, delegate, or transfer these Terms, or your rights and obligations hereunder, to any other person in any way (by operation of law or otherwise) without our prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. We may transfer, assign, or delegate these Terms and its rights and obligations hereunder to any other person without your consent.

19.3.   **Force Majeure.** We shall not be liable for any delay or failure to perform resulting from causes outside its reasonable control, including, but not limited to, acts of God, war, terrorism, riots, embargos, acts of civil or military authorities, fire, floods, accidents, pandemics, strikes, or shortages of transportation facilities, fuel, energy, labor, or materials.

19.4.   **Choice of Law.** These Terms and any dispute of any sort that might arise between you and us hereunder will be governed by the laws of the State of New York and applicable federal laws of the United States of America, consistent with the Federal Arbitration Act, without regard to any principle of conflict-of-laws. The United Nations Convention on Contracts for the International Sale of Goods does not apply to these Terms. If you live outside of the United States, you may be entitled to the protection of the mandatory consumer protection provisions of your local consumer protection law.

19.5.   **Exclusive Venue.** Any dispute of any sort between you and us that arises out of or in connection with the Services and is not subject to arbitration or eligible for small claims action, shall be decided exclusively by a court of competent jurisdiction located in New York, and you hereby consent to, and waive all defense of lack of personal jurisdiction and forum non conveniens with respect to venue and jurisdiction in the state and federal courts of New York, New York.

19.6.   **Statute of Limitations.** You and Whaleco agree that regardless of any statute or law to the contrary, any claim arising out of or related to the Services must commence within one (1) year after the cause of action accrues. Otherwise, such cause of action is permanently barred.

19.7.   **Notice.** You acknowledge and agree that we may give notice to you through email using the latest email address you provided to us, which constitutes effective notice. Therefore, you are responsible for keeping your email address information with us up to date. You may give notice to us at the following addresses:

If to Whaleco Inc.:

Whaleco Inc.
Suite 355, 31 St. James Avenue
Boston, Massachusetts 02116
USA

If to Elementary Innovation Pte. Ltd.:

Elementary Innovation Pte. Ltd.
6 Raffles Quay #14-06
Singapore (048580)

Such notice shall be deemed given when received by us by letter delivered by nationally recognized overnight delivery service or first-class postage prepaid mail at the above address.

19.8. **Export Control.** You undertake to use the Services and Products purchased on or through the Services in compliance with all applicable US or other export and re-export restrictions of relevant jurisdictions. In particular, you acknowledge and agree that the Services, including any products purchased on or through the Services, may not be exported or re-exported (a) into any United States embargoed countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the Services nor the Products purchased on the Services for any purpose prohibited by any applicable law.

19.9. **Consumer Complaints.** In accordance with California Civil Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

19.10.  **Waiver.** Our failure to respond to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches.


19.11.  **Severability.** If any provision of these Terms is found to be unenforceable or invalid, that provision will be limited or eliminated, to the minimum extent necessary, so that these Terms shall otherwise remain in full force and effect and enforceable.

19.12.  **Third-Party Beneficiaries.** There are no third-party beneficiaries intended under these Terms.

19.13.  **Entire Agreement.**  The Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between the parties with respect to such subject matter.

**20.    DISPUTE RESOLUTION**

PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN THIS SECTION ("ARBITRATION AGREEMENT") CAREFULLY. IT REQUIRES YOU AND WHALECO TO

**134**

ARBITRATE AGAINST ONE ANOTHER. **PLEASE BE AWARE THAT THIS SECTION 20 CONTAINS PROVISIONS GOVERNING HOW DISPUTES THAT YOU AND WHALECO HAVE AGAINST EACH OTHER WILL BE RESOLVED. AMONG OTHER THINGS, THIS SECTION 20 INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND WHALECO BE RESOLVED BY BINDING AND FINAL ARBITRATION.   THIS SECTION 20 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. PLEASE READ THIS SECTION 20 CAREFULLY.**

20.1. **Applicability of Arbitration Agreement**. Subject to the terms of this Arbitration Agreement, you and Whaleco agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except that: (1) you and Whaleco may assert claims or seek relief in small claims court if such claims qualify and remain in small claims court; or (2) you or Whaleco may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents); or (3) the law requires otherwise . For purposes of this Arbitration Agreement, "Dispute" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Terms as well as claims that may arise after the termination of the Terms.

20.2. **Informal Dispute Resolution**. There may be instances when a Dispute arises between you and Whaleco. If that occurs, Whaleco is committed to working with you to reach a reasonable resolution. You and Whaleco agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and Whaleco therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("Informal Dispute Resolution Conference"). If you are represented by counsel, your counsel may participate in the conference, but you also agree to participate in the conference. The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("Notice"), which shall occur within forty-five (45) days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties in writing. Notice to Whaleco  that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to dispute@temu.com or regular mail to our offices located at Whaleco Inc., Suite 355, 31 St. James Avenue, Boston, Massachusetts 02116, USA. The Notice must include: (1) your name, telephone number, mailing address, e-mail address associated with your account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee

deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

20.3. **Waiver of Jury Trial**. **YOU AND WHALECO HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY.** You and Whaleco are instead electing that all Disputes shall be resolved by arbitration under this Arbitration Agreement, except as specified in Section 20.1 above. There is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

20.4. **Waiver of Class and Other Non-Individualized Relief**. **YOU AND WHALECO AGREE THAT, EXCEPT AS SPECIFIED IN SECTION 20.9, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.** Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor shall it, affect the terms and conditions under Section 20.9. Notwithstanding anything to the contrary in this Arbitration Agreement, if a court decides by means of a final decision, not subject to any further appeal or recourse, that the limitations of this Section are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), you and Whaleco agree that that particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated in the state or federal courts located in the State of New York. All other Disputes shall be arbitrated or litigated in small claims court. This subsection does not prevent you or Whaleco from participating in a class-wide settlement of claims.

20.5. **Rules and Forum**. The Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within sixty (60) days after receipt of Notice, you and Whaleco agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The arbitration will be conducted by American Arbitration Association (the "AAA"), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the "AAA Rules"), then effect, unless otherwise required by law.  AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879. If AAA is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any AAA fees and costs will be solely as set forth in the applicable AAA rules.

A party who wishes to initiate arbitration must provide the other party with a request for arbitration (the "Request"). The Request must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above;

**136**

and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration.

If the party requesting arbitration is represented by counsel, the Request shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Request. By signing the Request, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Request is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Unless you and Whaleco otherwise agree, or the Batch Arbitration process discussed in Section 20.9 is triggered, the arbitration will be conducted in the county where you reside. Subject to the applicable AAA rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration.

You and Whaleco agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential.

20.6. **Arbitrator.** The arbitrator will be either a retired judge or an attorney licensed to practice law in the State of New York, and will be selected by the parties from the AAA roster of consumer dispute arbitrators. If the parties are unable to agree upon an arbitrator within thirty-five (35) days of delivery of the Request, then AAA will appoint the arbitrator in accordance with the applicable AAA rules, provided that if the Batch Arbitration process under Section 20.9 is triggered, AAA will appoint the arbitrator for each batch.

20.7. **Authority of Arbitrator**. The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to Section 20.4, including any claim that all or part of Section 20.4 is unenforceable, illegal, void or voidable, or that Section 20.4 has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in Section 20.9, all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in Section 20.9. The arbitrator shall have the authority to grant motions dispositive of all or part of any Dispute. The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

20.8. **Attorneys' Fees and Costs**. The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or Whaleco need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs.

20.9. **Batch Arbitration**. To increase the efficiency of administration and resolution of arbitrations, you and Whaleco agree that in the event that there are one hundred (100) or more individual Requests of a substantially similar nature filed against Whaleco by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period (or as soon as possible thereafter), AAA shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration").

All parties agree that Requests are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise AAA, and AAA shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("Administrative Arbitrator"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by Whaleco.

You and Whaleco agree to cooperate in good faith with AAA to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Requests, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings. This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

20.10. **30-Day Right to Opt Out.** You have the right to opt out of the provisions of this Arbitration Agreement by sending written notice of your decision to opt out to: Whaleco Inc., 8 The Green Suite #12868, Dover, DE 19901, within thirty (30) days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address, the email address you used to set up your Account (if you have one), and an unequivocal statement that you want to opt out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply

to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have, or may enter in the future, with us.

20.11.  **Invalidity, Expiration.** Except as provided in Section 20.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. You further agree that any Dispute that you have with Whaleco as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

20.12.  **Modification.** Notwithstanding any provision in the Terms to the contrary, we agree that if Whaleco makes any future material change to this Arbitration Agreement, it will notify you. Unless you reject the change within thirty (30) days of such change becoming effective by writing to Whaleco at: Whaleco Inc., 8 The Green Suite #12868, Dover, DE 19901, your continued use of the Services, including the acceptance of products and services offered on or through the Services, following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of the Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services, any communications you receive, any products sold or distributed through the Services or the Terms, the provisions of this Arbitration Agreement as of the date you first accepted the Terms (or accepted any subsequent changes to the Terms) remain in full force and effect. Whaleco will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of the Terms.

**<u>EXHIBIT C</u>**

**ACCOUNT INFORMATION**

| User ID | Registration/Login Date | Registration/Login Platform | Registration/Login Channel |
|---|---|---|---|
| 31128482403143 | 12/30/2022 | App | Google |
| 31128482403143 | 3/30/2023 | App | Apple |

Smith v. Temu
Trinh Declaration - EXHIBIT C

# **EXHIBIT D**

# **TEXT OPT-IN**



Smith v. Temu
Trinh Declaration - EXHIBIT D

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

HEATHER SMITH, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

WHALECO INC. DBA TEMU,

      Defendant.

Case No. 5:23-cv-00559-D

CLASS ACTION

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

Submitted by:

Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:  918-587-0000
Facsimile:  918-599-9317
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

E. Powell Miller
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone:  248-841-2200
epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

144

## <u>TABLE OF CONTENTS</u>

**I.     INTRODUCTION** ..................................................................................... 1

**II.    THE TEMU FLOW** ................................................................................. 2

**III.   ARGUMENT** ........................................................................................... 5

      **a.    Defendant fails to establish that any agreement, much less an agreement to arbitrate, was ever formed between the parties** .............................................. 6

**IV.   CONCLUSION** ...................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................................. 20

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................................. 10,20

*Boler v. Sec. Health Care, L.L.C.*,
  336 P.3d 468 (Okla. 2014) .................................................................. 25

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018) ................................................... 15, 18, 21

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*,
  No. 01 CV 698 JHP FHM, 2006 WL 1266515 (N.D. Okla. May 8, 2006) ............ 6

*Dunbar Eng'g Corp. v. Rhinosystems, Inc.*,
  232 P.3d 931 .................................................................. 7

*First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb*,
  734 P.2d 852 (Okla.1987) ............................................................. 7

*Forby v. One Techs., LP*,
  2016 WL 1321194 (S.D. Ill. Apr. 5, 2016) ........................................ 10

*Hancock v. Am. Tel. & Tel. Co.*,
  701 F.3d 1248 (10th Cir. 2012) .................................................... 6, 7

*Hart-Parr Co. v. Brockreide*,
  1920 OK 100, 77 Okla. 277, 188 P. 113 ............................................. 7

*Howard v. Ferrellgas Partners, L.P.*,
  748 F.3d 975 (10th Cir. 2014) ...................................................... 25

*Jacks v. CMH Homes, Inc.*,
  856 F.3d 1301 (10th Cir. 2017) ..................................................... 25

*Lopez v. Terra's Kitchen, LLC*,
  331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) ...................................... 14

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*,
   272 Fed. Appx. 782 (11th Cir. 2008) ....................................................... 7

*Meyer v. Uber Technologies, Inc.*,
   868 F.3d 66 (2d Cir. 2017) .......................................... 8, 9, 10, 15, 21, 23

*Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*,
   256 F.3d 995 (10th Cir. 2001) ............................................................... 7

*Nguyen v. Barnes & Noble,*
   763 F.3d 1171 (9th Cir. 2014) ............................................................... 8

*Ragab v. Howard*,
   841 F.3d 1134 (10th Cir. 2016) ............................................................. 6

*Redbox Automated Retail, Inc.*,
   No. 19-cv-01993 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) ............................... 16, 19

*Route App., Inc. v. Heuberger*,
   No. 2:22-CV-291-TS-JCB, 2022 WL 2316377
   (D. Utah June 28, 2022) ................................................................... 9, 13

*Selden v. Airbnb, Inc.,*
   4 F.4th 148 (D.C. Cir. 2021) ................................................................ 9

*Sgouros v. TransUnion Corp,*
   817 F.3d 1029 (7th Cir. 2016) ............................................................... 8

*Sgouros v. TransUnion Corp.*,
   2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029
   (7th Cir. 2016) ............................................................................. 8

*Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*,
   442 F. Supp. 3d 519, 525 (D. Conn. 2020), *aff'd and remanded*,
   999 F.3d 828 (2d Cir. 2021) ............................................................... 14

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17, 29–30 (2d Cir. 2002) ......................................................... 14

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
   925 F.2d 1136 (9th Cir. 1991) ............................................................... 6

*TopstepTrader, LLC v. OneUp Trader, LLC*,
    2018 WL 1859040 (N.D. Ill. Apr. 18, 2018)............................................................ 9

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
    857 F. Supp. 2d 1135 (D. Colo. 2012) .................................................................... 6

*Voss v. City of Okla. City*,
    618 P.2d 925 (Okla. 1980) .................................................................................... 25

**Statutes**

Federal Arbitration Act,
    9 U.S.C. §§ 1-16 .................................................................................................. 1

Oklahoma's Telephone Solicitation Act,
    Okla. Stat. tit. 15, § 775C.1, *et seq* ...................................................................... 1

**Treatises**

17B C.J.S. Contracts § 931 .................................................................................................. 6

Restatement (Second) of Contracts § 19(2) (1981) ............................................................. 7

Plaintiff Heather Smith hereby files her opposition to Defendant Whaleco, Inc. d/b/a TEMU's ("Temu") Motion to Compel Arbitration (hereinafter "the Motion") (ECF No. 33-1) and states as follows:

## I.     INTRODUCTION

In this consumer class action, Plaintiff, individually and on behalf of a proposed class, alleges a single claim against Defendant for transmitting unsolicited marketing text messages to her cellular telephone in violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq.* ("OTSA").  Defendant moves to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA").

The Motion fails because Defendant has failed to establish that the parties formed an agreement (much less an agreement to arbitrate). Defendant now contends that by creating a user account on Defendant's mobile app on December 30, 2022, Plaintiff agreed to Defendant's "Terms of Use" and its incorporated arbitration provision. However, as recently held in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) (attached hereto as Ex. A), the initial registration form that Defendant says Plaintiff completed here fails to clearly and conspicuously notify users that by clicking the "Continue" button at the top middle of the page to advance with the registration flow, site users are agreeing to be bound by the Terms of Use (including its incorporated arbitration provision).  This is because the only mention of the Terms of Use on the initial registration form appeared in small, lightly colored font well beneath the massive, bright orange "Continue" button, buried underneath several other brightly colored buttons having nothing to do with Plaintiff's registration on the app.   The second page Plaintiff

1

encountered did not advise Plaintiff at all that she was assenting to Defendant's Terms of Use at all.   In other words, rather than placing the Terms of Use hyperlink in visual proximity to the button, Defendant purposefully presented the hyperlink at the bottom of the page, in small inconspicuous light grey color set against a white background, so that visitors like Plaintiff would not see the link and not be dissuaded from registering on the site.   The second page (which along with the first is collectively referred to herein as the "Temu Flow") equally failed to communicate that clicking the Continue button amounted to assent to Temu's Terms of Use.   Nor does it matter that Plaintiff may have used the app more than once.

Based on Defendant's app's presentation of the Terms of Use, no consumer who used the Temu Flow received clear and conspicuous notice that by continuing with the registration flow she or he was assenting to the Terms of Use. Because the registration flow failed to adequately notify anyone who used the Temu App of the Terms of Use that appeared below the "Continue" button, Defendant cannot establish that Plaintiff (or any other consumer) objectively manifested their assent to be bound by the Terms of Use by clicking that button.   Accordingly, the motion should be denied.

## II.    THE TEMU FLOW

Defendant now contends that based on its business records Plaintiff registered a Temu account on December 30, 2022 via the Temu Android app, and thereby consented to arbitration. *See* Declaration of Michael Trinh (ECF No. 33-3 (the "Trinh Decl.") ¶ 8).

The Trinh declaration asserts that Plaintiff's registration occurred via the Temu Flow in three steps.   First, Plaintiff allegedly encountered the following initial registration

interface:



(*Id.*, Ex. A).

To begin registering an account via the mobile app, visitors have the option to either: (1) input an email address or phone number at the top of the initial registration screen and then press the large, bright orange "Continue" button located in the upper third of the screen; or (2) click one of the four buttons on the bottom half of the pop-up screen (beneath the orange "Continue" button), which then allows the visitor to register with the site via a Google, Facebook, Twitter, or Apple account.  At the top of the screen are two icons set

3

against an off-white background which in bold black characters promote "**Free shipping**"
and "**Free returns**". The sentence containing the hyperlink to the Terms of Use appears at
the very bottom of the second section of the interface, beneath the four "other ways" to
register.   The sentence "By continuing, you agree to our Terms of Use and Privacy &
Cookie Policy" appears in a light grey color in smaller font size than any of the text on the
buttons above set against a white background.   The Terms of Use hyperlink is bolded, but
still in light grey text set against a white background and is not underlined.

  According to Defendant, Plaintiff clicked "Continue with Google" and encountered
the following screen (Trihn Decl. Ex. A):



  A user has two options to proceed.  The first allows the user to proceed with his or
Google account.  Second allows a user to "use another account".  At the bottom of the

4

screen, separated from the button which allows the user to proceed using a Google account it states "To continue, Google will share your name, email, address, language preference, and profile picture with Temu.  Before using this app you can review Temu's privacy policy and terms of service."  Though the words privacy policy and terms of service are in blue, the user is never advised that they are affirmatively *agreeing* to Temu's privacy policy or terms of service.

Defendant asserts that once an account is established using the Temu Flow, a user sees the same three screens with every login.  (Trihn Dec. ¶ 14).  Defendant claims Plaintiff logged in one other time with an Apple account.  (*Id.*).

### III.   ARGUMENT

Defendant moves to compel Plaintiff to arbitration, arguing that Plaintiff agreed to the Terms of Use, and its incorporated arbitration provision, when she registered via its mobile app or in the subsequent login she allegedly made using the same flow. This argument fails because Defendant cannot establish, given the Temu Flow's configuration and appearance, that Plaintiff (or any other visitor) objectively manifested their assent to the Terms of Use by clicking the "Continue" button or by selecting their Google account either screen at registration or login.  Mutual assent is a necessary element to establishing that an agreement to arbitrate was formed between the parties, and without it there is no basis for Defendant to compel arbitration in this case.

Plaintiff disputes that New York law applies based on a choice of law provision in Defendant's Terms and Conditions because Plaintiff did not assent to these Terms and Conditions.  *See Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119 (2d Cir. 2012) ("Applying

the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").  The Court in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) similarly found that Florida law – the law of the forum and where Plaintiff resided – applied based on the same logic that the New York choice of law provision could not be deemed to apply until the court found the formation of a valid contract. 2023 U.S. Dist. LEXIS 184104, *4.  Here Oklahoma law plainly controls.

"[W]hether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate." *Ragab v. Howard*, 841 F.3d 1134, 1137 (10th Cir. 2016).  Thus, arbitration can be compelled "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd.,* 925 F. Supp. 2d 1185 (D. Colo. 2013) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140-41 (9th Cir. 1991)). "If there is doubt as to whether such an agreement exists," Defendant has failed to carry its burden and the Motion must be denied. *See id*. at 1141.

(a)     **Defendant fails to establish that any agreement, much less an agreement to arbitrate, was ever formed between the parties**

Courts apply state law principles to determine whether a contract has been formed. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012).  Under Oklahoma law, a contract's proponent has the burden to establish its existence.  17B C.J.S. Contracts § 931 ("the burden of proof is on the party seeking to enforce an agreement or to claim rights under it."); *see also Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*, No. 01 CV

6

698 JHP FHM, 2006 WL 1266515, at *22 (N.D. Okla. May 8, 2006), *aff'd*, 242 F. App'x 584 (10th Cir. 2007) (party asserting rights under contract has burden to establish existence of the contract). "[A] district court considering the making of an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences[.]" *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 786 (11th Cir. 2008).

"One of the essential elements of a contract is that there must be mutuality of agreement; both of the contracting parties must assent to its terms. *Hart-Parr Co. v. Brockreide*, 1920 OK 100, 77 Okla. 277, 188 P. 113, 114. Mutuality of assent is judged by <u>an objective standard</u>, looking to the express words of the parties and their visible acts, <u>not their subjective states of mind</u>." *Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1003 (10th Cir. 2001); Restatement (Second) of Contracts § 19(2) (1981) (party's conduct not a manifestation of assent unless "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents").

Because a contract cannot be formed without the parties' mutual assent to the essential terms of the agreement, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d at 1255 (citing *Dunbar Eng'g Corp. v. Rhinosystems, Inc.,* 232 P.3d 931, 935 n. 8 (Okla. Civ. App. Div. 2010)), "basic contract law principles in … Oklahoma indicate that if an [electronic] agreement gives a consumer <u>reasonable notice of its terms and the consumer affirmatively manifests assent to the terms</u>, the consumer is bound by the terms. *Id.* (citing *First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb,* 734 P.2d 852, 854 (Okla.1987)) (emphasis

added).  Courts nationwide are in accord.  *See Meyer v. Uber Tech.'s, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that, in cases involving smartphone or online-based contracts, "[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract…as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement").

However, "a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact." *Sgouros v. TransUnion Corp*, 817 F.3d 1029, 1034-35 (7th Cir. 2016).  In addressing whether a consumer has agreed to be bound by an online-based contract of adhesion, such as the one Defendant says Plaintiff agreed to in this case, courts typically classify consumer-facing websites that purport to bind consumers to certain terms of use as either a "clickwrap" or "browsewrap." A "clickwrap" is where a user clicks a button or checks a box that explicitly affirms acceptance of the terms after having the opportunity to view or scroll through the terms, and this type of agreement is generally enforced. *Sgouros,* 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016); *Nguyen v. Barnes & Noble,* 763 F.3d 1171, 1175-76 (9th Cir. 2014). A "browsewrap," on the other hand, is a page that purports to bind visitors to terms based merely on the visitors navigating or using the website, without requiring them to sign electronic documents or explicitly click an "accept" or "I agree" button. *Sgouros*, 2015 WL 507584, at *6. "Courts enforce browsewrap agreements only when there is actual or constructive knowledge of terms." *Id.*

"Of course, human ingenuity and the constant development of technology means that not all interfaces fit neatly into one of these two categories." *TopstepTrader, LLC v. OneUp Trader, LLC*, 2018 WL 1859040, at *3 (N.D. Ill. Apr. 18, 2018) (citing *Meyer*, 868 F.3d at 75-76). A page that falls in-between the "clickwrap" and the "browsewrap" has been termed a "hybrid" or "sign-in-wrap." *Id*. This type of "hybrid" page "never ha[s] the user take an affirmative action to explicitly agree to the terms of the site, but it does require some form of affirmative action by requiring the user to sign up for an account," or to take some other action such as placing an order for goods or services. *TopstepTrader*, 2018 WL 1859040, at *3. "Usually during [this] process, the webpage states something to the effect of: 'By signing up for an account [or placing an order] with [website provider], you are accepting the [website]'s terms of service.'" *Id*. "While a hyperlink to the Terms is provided, the user is not required to scroll through the terms, read the terms, or otherwise explicitly indicate that he agrees to those terms before pressing the 'Sign Up' [or 'Place Order'] button." *Id*. "In this scenario, the user 'agrees' to the terms by signing up or creating an account," or by placing an order. *Id*.

The Temu Flow is at best of the hybrid, "sign-in-wrap" variety. *See Selden v. Airbnb, Inc.,* 4 F.4th 148, 156 (D.C. Cir. 2021) ("a sign-in wrap bundles signing up for a service with agreement to the website's contractual terms."). "To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application." *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022).

Generally speaking, courts will only find a consumer to have assented to the terms of a "hybrid" web-based form where the website clearly and conspicuously notified the user, next to the operative button, that by clicking the operative button he or she is agreeing to the terms (which must be accessible via a hyperlink), and where the visitor thereafter clicked the operative button. The touchstone of "inquiry notice" is whether the consumer was clearly and conspicuously apprised that their click binds them to linked terms and conditions.  *See Meyer*, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous…a reasonably prudent smartphone user would have constructive notice of the terms. While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015) (noting that courts uphold hybrid agreements "where a hyperlink to the terms and conditions appears next to the only button that will allow the user to continue use of the website"); *e.g.*, *Forby v. One Techs., LP*, 2016 WL 1321194, at *1 (S.D. Ill. Apr. 5, 2016) (enforcing terms where the user clicked the "Continue" button and the following statement, with a hyperlink to the terms, appeared directly *above* the button: "By clicking on the 'Continue' button below, you agree to the Offer Details, to the Terms and Conditions").  Here, the Temu Flow does not amount to inquiry notice because of its design, which *inconspicuously* presented the Terms and Conditions which Defendant asserts control the parties' relationship.

In this case, Defendant contends that Plaintiff assented to the Terms of Service by clicking the buttons on the Temu Flow and in a subsequent login.  However, the Temu Flow's layout and language– the first screen featuring a large bright orange Continue

button far above the "Terms of Use" hyperlink at the very bottom, submerged beneath four other buttons in another section of the registration screen and the second which did not advise a user they were agreeing to any of Temu's policies – failed to clearly and conspicuously notify Plaintiff (or any other consumer who clicked the Continue button) that the user was agreeing to be bound by the Terms of Service by clicking that button. Accordingly, Defendant cannot establish that Plaintiff mutually assented to Terms of Use or its incorporated arbitration provision.

Indeed, a federal court in Florida found just that holding that Defendant could not compel to arbitration a TCPA class action plaintiff based on purported assent to Defendant's Terms and Conditions by the exact registration screen at issue here. The court in *Johnson v. Whaleco, Inc.*, Case No. 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) found that the initial registration screen was a browsewrap agreement because it permitted the plaintiff to register without visiting the terms and conditions. As such, the agreement could only be deemed enforceable if the plaintiff had actual knowledge of the terms or if the hyperlink to the terms and conditions was sufficiently conspicuous. *Id.* at *7.

*Johnson's* holding was based on a thorough examination of the same registration screen, which is reproduced here:



The *Johnson* court concluded the hyperlink was not sufficiently conspicuous to provide inquiry notice because the hyperlink was "not prominent or particularly remarkable at the bottom of the page where it is featured" *Id.* at *7, and that its "inconspicuous nature" was "further compounded by its poor placement on the website." *Id.* at *8. The court found it "not reasonable to expect a user to continue reading below the highly conspicuous purchase button" and explained that "the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue" button. This placement does not put a reasonably prudent

12

user on inquiry notice." *Id.* at *8-9 (internal citations and quotations omitted). Moreover, the court was critical of the font size and color of the linked hyperlink (which it called "barely visible") stating: "Most damning to Defendant's attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues… This camouflaged font contradicts Defendant's assertion that its registration page displays a conspicuous hyperlink to [it]s Terms of Use. And crucially—it evinces an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate." *See Id.* (internal citations and quotations omitted) citing *Volt Info. Sciences, Inc. v. Board of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989) for proposition that "Arbitration under the [FAA] is a matter of consent, not coercion…").[1]

---

[1] Defendant's response to the directly on-point *Johnson* decision, which the Motion addresses in only part of a footnote, is puzzling to say the least. Defendant asserts *Johnson* was wrongly decided because *Johnson* labeled the registration flow a browsewrap and not a "hybrid-wrap" agreement. (Mot. at fn. 7). As explained in note 7, *infra*, Defendant has taken inconsistent positions on whether the flow is a browsewrap or hybrid-wrap. Whatever label *Johnson* ascribed, it is beyond dispute that the analysis undertaken was a "fact-intensive inquiries of the layout and language of a website or application." *See Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022) (explaining process courts use to evaluate enforceability of sign-in-wrap and browsewrap agreements).

Defendant also attempts to distance itself from *Johnson's* holding by characterizing the registration screen in *Johnson* as "a different Temu sign-up page" from that at issue here because in *Johnson* the "Terms of Use" were neither bolded nor underlined, and were thus not distinguishable as a hyperlink". (Mot. at fn. 7). The registration screen at issue in *Johnson* appears identical to the initial registration screen at issue here and is different only from the second registration screen because it lacks the sentence stating that an SMS would be sent to the user's phone. *See* Section II, *supra*. The registration screen in *Johnson* had a bolded hyperlink, just as the one here does. Defendant itself made that point directly to the *Johnson* Court in its Motion to Compel Arbitration stating: The words "**Terms of Use**" was in bold letters and there was a hyperlink to Whaleco's

As for the second screen, Defendant cannot claim that it effectively bound Plaintiff to Temu's Terms and Conditions when it contained no statement at all that by continuing the user was agreeing to be bound. The language Defendant opted to use merely states that a user can review Temu's Terms and Conditions, not that the consequence of advancing the flow by clicking the button was an assent to the Terms and Conditions. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2d Cir. 2002) ("a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms"); *see also Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*, 442 F. Supp. 3d 519, 525 (D. Conn. 2020), *aff'd and remanded*, 999 F.3d 828 (2d Cir. 2021) ("Proximity without more, such as an express statement linking acceptance of the terms to the offer, is insufficient to presume awareness of the terms' applicability."); *Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1101 (S.D. Cal. 2018) ("[T]he proximity of the hyperlink in green typeface to the "place order" button, without affirmative acknowledgment of the agreement before proceeding with the purchase…is not enough to give rise to inquiry notice."). Simply stated, the second screen proposed nothing which would reasonably put Plaintiff or any other user on notice that clicking the Google account button amounted to assent to Temu's Terms and Conditions.

---

Terms of Use[.] (Defendant's Motion to Compel Arbitration, ECF No. 20 at 5-6), August 21, 2023, *Johnson v. Whaleco, Inc. d/b/a Temu*, 5:23-cv-00403-GPA-PRL). Moreover, the Court in *Johnson* specifically noted that the "Terms of Usse" hyperlink was in bold font. 2023 U.S. Dist. LEXIS 184104. at fn. 7. Thus, it is unclear what distinction Defendant is trying draw in its parenthetical citation of *Johnson* at footnote 7 between the *Johnson* registration screen and the one at issue here.

The problematic features of the Temu Flow which the *Johnson* decision evaluates are by no means an outlier.  Online marketers routinely use these tactics to keep customers from understanding the consequences of pressing buttons on a website and Courts frequently reject the notion that presentations like the one Defendant employed in the Temu Flow are capable of manifesting a reasonable consumer's assent to terms of use.  For example, in *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018), the First Circuit reversed the district court's granting of a motion to compel arbitration based on a careful analysis of the sign-in-wrap screens' presentation and layout.  Among the features the First Circuit noted that rendered the screens incapable of manifesting assent were the fact that "Uber's "Terms of Service & Privacy Policy" hyperlink did not have the common appearance of a hyperlink.  The Court stated:

> While not all hyperlinks need to have the same characteristics, they are "commonly blue and underlined*." CR Assocs. L.P. v. Sparefoot, Inc.*, No. 17-10551-LTS, 2018 WL 988056, at *4 n.4 (D. Mass. Feb. 20, 2018); see also e.g., *Meyer*, 868 F.3d at 78 ("[T]he hyperlinks are in blue and underlined."); *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text*."*) ...Here, the "Terms of Service & Privacy Policy" hyperlink was presented in a gray rectangular box in white bold text. Though not dispositive, the characteristics of the hyperlink raise concerns as to whether a reasonable user would have been aware that the gray rectangular box was actually a hyperlink.

*Cullinane*, 893 F.3d at 64

Here, as noted in *Johnson* the linked Terms and Conditions were presented in inconspicuous light grey text on a white background, and not in blue or some other more conspicuous color.  Other courts share the *Johnson* court's skepticism of the use of grey or light grey for notice purposes, what *Johnson* refers to as "an intent to conceal").    *See e.g.*

15

*Cullen v. Shutterfly Lifetouch, LLC*, No. 20-CV-06040-BLF, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021) (finding defendant failed to carry its burden to prove assent to arbitration stating: "The subject language is in tiny print, that appears to be light gray in color, and there is no header or other indicator that would notify an individual of important contractual terms."); *Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 15 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) ("[T]he Court finds the gray disclosure text surrounding the hyperlinks not reasonably conspicuous because there is insufficient contrast between the gray text and the black background."); *see also Fisher v. Sutton Place/Pinnacle A.M.S.*, No. 1:07-CV-1537-DFH-WTL, 2008 WL 2095417, at *2 (S.D. Ind. May 16, 2008) ("The fact that the agreement imposes an obligation to arbitrate disputes is clear and prominent. This was not an arbitration agreement buried in small, light-gray type on the back of an invoice or purchase order. No literate person completing and signing the form could have missed the agreement to arbitrate, which is the subject of five of eight pages in the document.").   For example, an identical contention by the defendant in *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 479, 289 Cal. Rptr. 3d 1, 28 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022) was rejected by the court which found that the following sign-up-wrap presentation did not manifest the plaintiff's assent to be bound to the Terms of Service:

16



The *Sellers* court determined the linked text failed to provide adequate notice because of the presence of features <u>identical</u> to the Temu Flow, namely that "the textual notice on the mobile version is at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page." *Id.* at 479. The Temu Flow equally fails to manifest assent.

Further confirming that no reasonable consumer received clear or conspicuous notice of an agreement to hyperlinked Terms and Conditions on the Temu Flow is the presence of several other brightly colored buttons between the bright orange "Continue" button and the inconspicuous link residing at the bottom of the screens. The presence of these distracting buttons and fields, having nothing to do with Plaintiff's act of pressing the Continue button after inputting her email or phone number, between the Continue button and the Terms of Use sentence beneath those four buttons confirms no consumer

17

**165**

was on objectively reasonable notice that he or she would be assenting to be bound by the Terms of Use by clicking the orange Continue buttons.

In fact, given the distance between the bright orange Continue buttons and small grey sentence which states "By continuing you agree to our Terms of Use and Privacy and Cookie Policy" and the intervening presence of four buttons immediately above that sentence, it is reasonable that the *if* an ordinary consumer saw the sentence  at all – inconspicuous as it is – she or he would believe that the agreement to the "Terms of Service" only applied to registrations made by pressing one of the four immediately adjacent buttons, and not to the registrations via the orange "Continue" button, which appears in the upper third of the screen.

In *Cullinane*, the First Circuit noted that the presence of several buttons on the screen (as here) likely rendered a web-based form incapable of manifesting users' assent to the terms and conditions that were accessible via a hyperlink.  As the court put it: "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous."

Likewise, in *Nicosia v. Amazon.com, Inc.*, where the defendant's order page - similar to the Temu Flow – stated that "by placing your order, you agree to Amazon.com's privacy notice and conditions of use," *Nicosia*, 834 F.3d 220, 237 (2d Cir. 2016) the Second Circuit found that, given the manner in which the statement appeared on the order page, the defendant had "failed to show that [the plaintiff] was on notice and agreed to mandatory

arbitration as a matter of law" when she clicked a "Place your order" button. The court explained its reasoning in pertinent part as follows:

> . . .
> The message itself—"By placing your order, you agree to Amazon.com's…conditions of use"—is not bold, capitalized, or conspicuous in light of the whole webpage.…There are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message. …

*Nicosia*, 834 F.3d at 236-37 (citations omitted).

This was also the case in *Wilson v. Redbox Automated Retail, Inc.*, No. 19-cv-01993 at 11 (ECF No. 32) (N.D. Ill. Mar. 25, 2021) where the court found that linked Terms of Service were not effectively presented because "the button for the Terms of Use and accompanying disclosure [were] not adjacent to the "Pay Now" button. Rather, the "Pay Now" button appears in the middle of the right side of the screen while the Terms of Use and disclosure appear at the bottom.  The court found that the website's checkout page failed to manifest assent to the linked terms of service because of "general clutter" caused by intervening buttons between the "Pay Now" button and linked terms and conditions which stated "by pressing 'Pay Now' you agree to the Terms which "dilute[d]" the effectiveness of the notification." *Id.* at 13.

This is more or less an apt description of the Temu Flow as *Johnson* highlighted: the Continue button is several rows above the linked Terms of Service, not immediately adjacent to it, and separated by a various options including a "Trouble signing in button" and four colorful buttons which provided alternative ways to sign up for a Temu.com account.

In *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) the court found that even though the defendant put text *directly* above the sign in button, which stated that by signing in the user agreed to the terms of use, the disclosure was nonetheless "insufficient to give adequate notice." *Id.* at 404. The court explained that the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold," especially in contrast to the "user-friendly and obvious" "'SIGN IN' button" that appeared "in all caps." *Id.* Accordingly, the court concluded that this "sign-in contract of adhesion" was "not binding on [plaintiff]." *Id.* Here, as in *Berkson*, pressing the Temu Flow's "Continue" buttons does not cause the "'terms of use' [to] appear in a new screen or in a [separate] pop-up window on the same screen," and "[t]he importance of the 'terms of use' [is] obscured by the physical manifestation of assent" to continue the registration flow either by pressing the Continue buttons or selecting one of four alternative ways to continue with the registration. *Id.* Accordingly, the only thing the Temu Flow is capable of manifesting is an intention to start a Temu account, and certainly not anyone's assent to the Terms of Use. *See also, Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (though defendant required plaintiff to click a "box" next to hyperlink with the defendant's terms of service, court concluded that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next' bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen," such that "[a] reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review")

In this case, the Terms of Use link appeared in small grey font well below the giant, bright orange "Continue" button, with four other buttons (also brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple) appearing in between the Continue button at the top and the Terms of Use link at the bottom. As in *Cullinane* the presence of these buttons diminishes the objective likelihood that a consumer would be apt to notice the linked Terms and Conditions. *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018).

In other words, "the layout and language" of the page fails to "give the user reasonable notice that a click [on the Continue button] will manifest assent to [the Terms of Use or its incorporated arbitration provision]." *Meyer*, 868 F.3d at 75. Simply put: the Temu Flow failed to adequately notify, in an objectively clear and conspicuous manner, Plaintiff or any other consumer that, by clicking the giant orange Continue buttons, they were agreeing to be bound by the Terms of Use mentioned at the bottom of the screen. Accordingly, Defendant has failed to satisfy its burden to show that Plaintiff or any other visitor of this page who pressed the Continue button manifested their assent to the Terms of Use (or its incorporated arbitration provision).

The authorities the Motion cites are all readily distinguishable. First, this case does not involve a "clickwrap" as Defendant suggests.[2] (Mot. at 14). At no point was a user

---

[2] Interestingly, in *Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op. Fla. Cir. Ct. Aug. 29, 2023) Defendant took the position that the Temu registration app agreement was a browsewrap. (ECF No. 33-3 at 5). But the label the ascribed to the Temu Flow does not change the essential fact that Defendant failed to present its Terms and Conditions in a clear and conspicuous manner capable of binding a reasonable consumer to those Terms and Conditions by virtue of a click of the "Continue" button.

required to acknowledge acceptance of the Defendant's Terms and Conditions in order to physically advance the flow.[3]

The myriad problems with Defendant's app's Terms and Conditions presentation are laid out above – a distracting interface with multiple colorful buttons with intentionally concealed, inconspicuous-by-design hyperlinks not in visual proximity to the "Continue" buttons which a user clicks to advance the registration flow.  Yet many of the authorities Defendant relies upon fail to address any of the website presentation issues at the heart of this dispute.  *See e.g., Beattie v. TTEC Healthcare Sols.,* 2019 WL 2189481 (D. Colo. May 21, 2019); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (all cited by Mot. at 15-16).  These cases all stand for the basic but irrelevant proposition that a consumer's claimed ignorance of a website's Terms and Conditions will not in and of itself bar a finding of assent.  But the touchstone is whether a website's features, in totality, objectively amount to inquiry notice, which here, they plainly do not.

Other authorities which Defendant cites do feature *some* of the problematic elements of the Temu Flow such as the lack of proximity between the hyperlink and the continue button, or the presence of several distracting buttons, but in these cases, the courts found the websites sufficiently conveyed inquiry notice based on factors which are indisputably not present here.  *See e.g., Oberstein v. Live Nation Ent., Inc.*, 60 F. 4th 505, 515-516 ( 9th

---

[3] Defendant's citation to clickwrap cases such as *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183 (D. N. M. Aug. 4, 2023) and *Clements v. Alto Tr. Co.*, 2023 WL 5002472, at *7 (D.N.M. Aug. 4, 2023) (both cited by Mot. at 15-16) are inapposite.

Cir. 2023) (cited in Mot. at 14) (browsewrap agreement manifested assent because the sign in button was directly above the terms of use hyperlink which "is written in bright blue font, distinguishing it from the surrounding text."); *Walker v. Neutron Holdings, Inc.*, No. 1:19-CV-574-RP, 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020), report and recommendation adopted, No. 1:19-CV-574-RP, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) (sign in wrap agreement provided adequate notice where "the hyperlinked words **"User Agreement** & **Terms of Service"** in dark, bold font stood out from both the white screen and preceding gray text and the "Next" button (equivalent to the "Continue" button here) was separated from the linked terms and conditions by only one other button, not four, as here); *Babcock v. Nuertron Holdings Inc.*, 454 F. Supp. 3d 1222, 1230-34 (S.D. Fla. 2020) (same); *Meye*r *v. Uber Tech's, Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (despite the presence of multiple registration buttons, linked hyperlink adequately conveyed inquiry notice because "Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined.") (all cited by Mot. at 17).

   The only case which Defendant identifies where an interface with multiple, distracting, colored buttons, with hyperlinked terms and conditions set forth in inconspicuous light grey font against a white background without an underline or other effective visual cue and not in visual proximity to the "continue" button was deemed to provide inquiry notice is *Fontanez v. Whaleco, Inc.*, Case No. 53-2023CA-000374, slip op.

Fla. Cir. Ct. Aug. 29, 2023), which involves the same registration screen as *Johnson* and here.[4]

*Fontanez* reached the opposite conclusion as *Johnson* finding that the linked "Terms of Use" was "in bold letters" sufficiently conveyed inquiry notice. *Johnson* examined and rejected this reasoning and *Fontanez's* conclusion. This Court should as well.

*Fontanez* failed to engage in any meaningful analysis of the features of Defendant's App-based registration. Whereas *Johnson* thoroughly parsed multiple features of Defendant's presentation concluding that they intentionally failed to provide inquiry notice, *Fontanez* noted only that the plaintiff did not need to scroll beyond the Apple subscription button which she clicked to see the hyperlink and the hyperlink was in bold. The *Johnson* court stated it disagreed with *Fontanez's* conclusions about the hyperlink's conspicuousness and specifically noted that: "the Court recognizes that the words "Terms of Use" and "Privacy & Cookie Policy" are in bold font. However, because the font color is itself such a light grey, even in bold font the words still appear significantly lighter than the conspicuous black and colorful text used elsewhere on the webpage and do not attract attention." *Johnson v. Whaleco, Inc.,* 2023 U.S. Dist. LEXIS 184104, *fn 7.[5] *Johnson* is obviously the better-reasoned decision and the one this Court should follow.

---

[4] Though the *Fontanez* decision does not include an image of the registration flow, Defendant asserts that the only material difference between Plaintiff's alleged registration and the plaintiff in *Fontanez* is that the *Fontanez* plaintiff registered using the Apple account registration button. (Mot. at fn. 7).

[5] *Johnson* further criticized the *Fontanez* court's s incorrect burden shifting regarding Plaintiff's actual knowledge. In *Fontanez* the court erroneously held that the arbitration agreement was

Defendant's bid to compel arbitration on these facts is offensive to any consumer's reasonable expectations of fair play, and this Court need not go along. Because Defendant has failed to satisfy its burden to show "an objective manifestation of assent", *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 981 (10th Cir. 2014), to the Terms of Use (and its incorporated arbitration agreement) by clicking the Continue button, the Court should find that this proceeding is not "referable to arbitration" and deny the Motion. *See* 9 U.S.C. § 3; *see also, e.g.*, *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304–05 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing.") (citing Okla. Stat. Ann. tit. 15, § 1); *see also Voss v. City of Okla. City*, 618 P.2d 925, 928 (Okla. 1980) ("An agreement for the submission of an issue to arbitrators is a prerequisite to the commencement of a valid arbitration agreement." ); *Boler v. Sec. Health Care, L.L.C.*, 336 P.3d 468, 477 (Okla. 2014) ("Consent to arbitrate is an essential component of an enforceable arbitration agreement.").

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: January 19, 2024

---

separately enforceable because the plaintiff did not disavow actual knowledge of the Terms and Conditions.  *Johnson,* 2023 U.S. Dist. LEXIS 184104, fn. 8.

Respectfully submitted,

/s/  Kathy R. Neal
Mary Quinn-Cooper, OBA # 11966
Kathy R. Neal, OBA #674
McAFEE & TAFT, P.C.
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
Telephone:  918-587-0000
Facsimile:  918-599-9317
Maryquinn.cooper@mcafeetaft.com
Kathy.neal@mcafeetaft.com

E. Powell Miller
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone:  248-841-2200
epm@millerlawpc.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF ELECTRONIC SERVICE AND FILING

I hereby certify that on this 19th day of January, 2024, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to those registered participants of the ECF System.

/s/ Kathy R. Neal

 Neutral
As of: January 20, 2024 12:28 AM Z

## *Johnson v. Whaleco, Inc.*

United States District Court for the Middle District of Florida, Ocala Division

October 13, 2023, Decided; October 13, 2023, Filed

Case No: 5:23-cv-403-GAP-PRL

**Reporter**
2023 U.S. Dist. LEXIS 184104 *

THERESA JOHNSON, Plaintiff, v. WHALECO, INC., Defendant

**Prior History:** *Johnson v. Whaleco, Inc., 2023 U.S. Dist. LEXIS 178500 (M.D. Fla., Sept. 27, 2023)*

## Core Terms

*arbitration*, terms and conditions, website, browsewrap, user, conspicuous, hyperlink, terms, clickwrap, purchaser, button, notice, courts, inquiry notice, registration, bottom

**Counsel: [*1]** For Theresa Johnson, individually and on behalf of all others similarly situated, Plaintiff: Manuel Santiago Hiraldo, LEAD ATTORNEY, Hiraldo PA, Ft. Lauderdale, FL; Michael Eisenband, Eisenband Law, P.A., Fort Lauderdale, FL.

For Whaleco, Inc., doing business as, *TEMU*, Defendant: Robert A Stines, Smith, Gambrell & Russell LLP, Tampa, FL.

**Judges:** GREGORY A. PRESNELL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GREGORY A. PRESNELL

## Opinion

### ORDER

This cause came before the Court for consideration without oral argument on Defendant's motion to compel *arbitration* and dismiss the action (Doc. 20). The Court has also considered Plaintiff's response in opposition (Doc. 21).

### I. Background

On June 27, 2023, Plaintiff Theresa Johnson ("Plaintiff") filed a class action complaint, individually and on behalf of others similarly situated, against Defendant Whaleco, Inc. d/b/a *TEMU* ("Defendant"), an online marketplace for consumer goods, alleging violations of the *Telephone Consumer Protection Act ("TCPA")*. Doc. 1; *see 47 U.S.C. §§ 227, et seq.* The TCPA requires telemarketing companies to maintain do-not-call lists and train their employees to effectively manage and honor those lists. *See 47 C.F.R. § 64.1200(d)*. Plaintiff alleges that she and others requested to be added to Defendant's do-not-call list but that those requests **[*2]** were not honored. Doc. 1, ¶¶ 40-41. She complains that she has suffered invasion of privacy and harassment because of Defendant's actions and seeks injunctive relief and statutory damages. *Id.*, ¶5, 12.

Plaintiff registered to use Defendant's online marketplace on November 10, 2022. Doc. 20 at 81. To register for an account, she was required to enter an email address or phone number, and then click a large, brightly colored "Continue" button. *See id.* at 4-6. At the bottom of the webpage, beneath four other buttons, lies a statement in light grey font that reads: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." *Id.* at 5 (emphasis original). Defendant's form is depicted here:

Iva Ravindran

EXHIBIT A

2023 U.S. Dist. LEXIS 184104, *2



Doc. 20 at 21. Plaintiff maintains that these terms were not conspicuously disclosed to her when she registered to use Defendant's website with this form. Doc. 21 at 1.

On August 21, 2023, Defendant moved to dismiss the case and compel arbitration pursuant to its online terms (the "Agreement"), which include a mandatory arbitration provision. Doc. 20 at 1-3. Defendant argues that its terms and conditions were conspicuously located on its website and, therefore, the valid arbitration clause **[*3]** is binding and the Court must compel Plaintiff to arbitration. *Id.* at 2. Plaintiff argues that Defendant has not demonstrated the existence of an enforceable arbitration agreement and asks the Court to deny the motion. Doc. 21 at 12. The matter is now ripe for review.

## II. Legal Standard

In the Middle District of Florida, "[m]otions to compel are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1)*." *Owings v. T-Mobile USA, Inc., 978 F.Supp.2d 1215, 1222 (M.D. Fla. Aug. 15, 2013)*. Though motions to dismiss under *Rule 12(b)(1)* can be facial or factual, courts have held that "a motion seeking to compel arbitration [is a] factual attack" because it asserts that a provision of an extrinsic document deprives the court of jurisdiction. *Bell v. Atlantic Trucking Co., Inc., No. 3:09-cv-406-J-32MCR, 2009 U.S. Dist. LEXIS 114342, 2009 WL 4730564, *3 (M.D. Fla. Dec. 7, 2009)*. "Factual attacks...challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the

pleadings, such as testimony and affidavits, are considered." *Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)* (internal quotation marks omitted). "A district court evaluating a factual attack on subject matter jurisdiction may proceed as it never could at summary judgment and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Hakki v. Secretary, Dep't of Veterans Affs., 7 F.4th 1012, 1023 (11th Cir. 2021)* (internal quotations and citations omitted). **[*4]** "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence, 919 F.2d at 1529*.

## III. Analysis

Under the *Federal Arbitration Act ("FAA")*, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2*. The FAA "creates a presumption of arbitrability such that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Bazemore v. Jefferson Capital Sys., LLC, 827 F.3d 1325, 1329 (11th Cir. 2016)* (internal quotation marks omitted). However, the presumption of arbitrability "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Id.* "The threshold question of whether an arbitration agreement exists is a matter of contract" governed by state law. *Id. at 1329-30* (quoting *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*).[1]

The parties here agree that whether the Agreement is binding is a question of Florida law.[2] *See, e.g.*, Doc. 20

---

[1] Federal district courts analyze three elements in ruling on motions to compel arbitration in Florida: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Seifert v. U.S. Home Corp., 750 So.2d 633, 636 (Fla. 1999)*. Plaintiff does not dispute the second and third elements of this analysis. *See* Doc. 21.

[2] The Court recognizes that Section 19.4 of the Agreement designates that any disputes arising under the contract will be governed by New York law. Doc. 20 at 62. However, that provision is inapplicable unless and until the Court determines that "the parties actually entered into that agreement in the first place." *Bell v. Royal Seas Cruises, Inc., No. 19-CV-60752-RUIZ/STRAUSS, 2020 U.S. Dist. LEXIS 85273, 2020*

at 7, Doc. 21 at 3. Both parties further agree that Florida courts have recognized two principal types of internet contracts: "clickwrap" agreements and "browsewrap" agreements. *See* Doc. 20 at 7, Doc. 21 at 3. The court in *Bell v. [\*5] Royal Seas Cruises, Inc*., described these types of agreements succinctly:

> "A 'clickwrap' agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions." *Id.* (quoting *Vitacost,*[3] *210 So. 3d at 762*). "A 'browsewrap' agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions." *Id.* (quoting *Vitacost, 210 So. 3d at 762*). Courts generally enforce clickwrap agreements. *Vitacost, 210 So. 3d at 762.* Browsewrap agreements, however, "have only been enforced when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *MetroPCS, 273 So. 3d at 1028* (quoting *Vitacost, 210 So. 3d at 762*).

*No. 19-CV-60752-RUIZ/STRAUSS, 2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189, \*5 (S.D. Fla. May 13, 2020).* Defendant, however, urges the Court to recognize a third hybrid category of "sign-up wrap" agreements, pointing to a purported "body of law in Federal Florida cases." Doc. 20 at 8. But, despite Defendant's mischaracterization, these distinguishable cases were resolved **[\*6]** under Florida's existing clickwrap and browsewrap standards.

In *Bell v. Royal Seas*, the court held that the agreement was close enough to a clickwrap agreement under Florida law to put the plaintiff on notice. *2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189 at \*6*. Moreover, the hyperlink to the terms and conditions there was located directly *above* the "CONTINUE" button and, distinctively, included text explicitly stating that those terms contained a mandatory arbitration provision. *2020 U.S. Dist. LEXIS 85273, [WL] at \*1*. The website at issue in *Valiente v.*

---

WL 5742189, n. 1 (S.D. Fla. May 13, 2020)*; see also *Bazemore, 827 F. 3d at 1329-30*.

[3] *See Vitacost.com, Inc. v. McCants,* 210 So.3d 761, 762 (Fla. 4th DCA 2017).

*StockX, Inc.* likewise bears little resemblance to Defendant's. *645 F.Supp.3d 1331, 1338 (S.D. Fla. Dec. 9, 2022).* There, a user was required to affirmatively check a box—located directly below the registration box—acknowledging that they agreed to the terms and conditions. *Id.* Most importantly, in both of these cases, the district courts found that the registrations constituted clickwrap agreements, not some form of hybrid agreement. *Id.; see also Royal Seas, 2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189 at \*6* ("But in light of the analysis in *MetroPCS*, under Florida law, the design here is close enough to the clickwrap end of the spectrum to provide the requisite inquiry notice.").[4]

Florida courts have held that browsewrap agreements encompass those where **[\*7]** "[t]he purchaser can complete the transaction without visiting the page containing the terms and conditions." *MetroPCS Comms., Inc. v. Porter, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018).* Defendant's website allowed Plaintiff to do just that: complete her registration without visiting the terms and conditions. *See* Doc. 20 at 4-6. Therefore, Defendant's registration site contained a browsewrap agreement which can only be enforced if Plaintiff had actual knowledge of the terms or if the hyperlink was sufficiently conspicuous. *See Royal Seas, 2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189 at \*5.*

Defendant alleges, without support, that Plaintiff "saw the statement."[5] Doc. 20 at 2. However, where "there is no evidence that the website user had actual knowledge

---

[4] Defendant's citations to non-Florida district court cases are likewise inapposite. Doc. 20 at 8, 10-12. For instance, *Guadagno v. E\*Trade Bank* involved an online application which "provid[ed] a highlighted, bullet-pointed, underlined link to the Agreement," and, to proceed, required applicants to check a box acknowledging that they had reviewed such. *592 F.Supp.2d 1263, 1267 (C.D. Cal. Dec. 29, 2008).* *Route App, Inc. v. Heuberger* is also distinguishable. *No. 2:22-CV-291-TS-JCB, 2022 U.S. Dist. LEXIS 115453, 2022 WL 2316377 \*3-\*4 (D. Utah Jun. 28, 2022).* There the text linking to the terms was "underlined in blue font" and it was located *above* the Continue button. *Id.* The cases from New York also involved readily distinguishable website designs. *See Berkson v. Gogo, LLC, 97 F.Supp.3d 359, 399-400 (E.D. N.Y. Apr. 9, 2015)*; *Fteja v. Facebook, Inc., 841 F.Supp.2d 829, 835 (S.D. N.Y. Jan. 24, 2012).*

[5] The Court finds it noteworthy that Defendant chose to highlight the entirety of the relevant statement with bold text in its motion to dismiss, but not on its website. *See* Doc 20 at 2, 21.

of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble, Inc., 763 F.3d 1171, 1177 (9th Cir. 2014)*; *see also MetroPCS, 273 So.3d at 1029*. Because Defendant has produced no evidence that Plaintiff had actual knowledge of the terms, the Court turns to the reasonably prudent user analysis.[6] *See MetroPCS, 273 So.3d at 1029* (quoting *Vitacost, Inc. v. McCants, 210 So.3d 761, 762 (Fla. 4th DCA 2017)*).

Defendant's website design fails this analysis because "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page[] where it is featured." *Fridman v. 1-800 Contacts, Inc., 554 F.Supp.3d 1252, 1263-65 (S.D. Fla. Aug. 13, 2021)*. Most damning to Defendant's attempt to enforce **[*8]** the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues.[7] Doc. 20 at 21; *see also* Report & Recommendation, *Goldstein v. Fandango Media, LLC, No. 9:21-cv-80466-RAR, 2021 U.S. Dist. LEXIS 139153, 2021 WL 6617447, *3 (S.D. Fla. Jul. 27, 2021)* (Reinhart, Mag. J.) ("[T]he comparatively miniscule size of the typeface used to notify the purchaser that [s]he is agreeing to certain [t]erms...and its light grey color render it practically unreadable."). This camouflage font contradicts Defendant's assertion that its registration page displays a "conspicuous hyperlink to [it]s Terms of Use." Doc. 20 at 2. And crucially—it evinces an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate. *See Volt Info. Sciences, Inc. v. Board of Trs. Of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)* ("Arbitration under the [FAA] is a matter of consent, not coercion...").

The inconspicuous nature of the hyperlinks is further

---

[6] *See Royal Seas, 2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189 at *8* ("The party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists.") (quoting *CEFCO v. Odom, 278 So. 3d 347, 352 (Fla. 1st DCA 2019)*).

[7] The Court recognizes that the words "Terms of Use" and "Privacy & Cookie Policy" are in bold font. *See* Doc. 20 at 21. However, because the font color is itself such a light grey, even in bold font the words still appear significantly lighter than the conspicuous black and colorful text used elsewhere on the webpage and do not attract attention. *See id.*

compounded by its poor placement on the website. *See Temple v. Best Rate Holdings, LLC, 360 F.Supp.3d 1289, 1304 (M.D. Fla. Dec. 27, 2018)* (acknowledging the distinction between placing terms and conditions *above* versus *below* the action button on a webpage). "It is not reasonable to expect a user to continue reading below the highly conspicuous purchase button." *Goldstein, 2021 U.S. Dist. LEXIS 139153, 2021 WL 6617447 at *3*; *see also Vitacost.com, Inc., 210 So.3d at 765* ("Uniformly, courts have declined to enforce "browsewrap" **[*9]** agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them."). Here, the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue" button. *See* Doc. 20 at 21. This placement does not put a reasonably prudent user on inquiry notice.[8] *See Nguyen, 763 F.3d at 1177*.

Moreover, in contrast to cases like *Bell v. Royal Seas*, the notice that *does* exist fails to put the user on notice of the mandatory arbitration provision. *See id.; see also Goldstein, 2021 U.S. Dist. LEXIS 139153, 2021 WL 6617447 at *4*. "In Florida, to incorporate a collateral document into an agreement, the agreement must: (i) specifically provide that the collateral document is being incorporated; and (ii) sufficiently describe the collateral document being incorporated." *Vitacost.com, Inc., 210 So.3d at 764-65*. Defendant's notice here, tucked away at the bottom of the page in barely visible font, does not put users "on inquiry notice of the arbitration provision." *Id. at 766*; *see also, e.g., Royal Seas, 2020 U.S. Dist. LEXIS 85273, 2020 WL 5742189 at *7* (finding notice sufficient where the statement *included* explicit notice of mandatory arbitration). Therefore, Plaintiff was not put on notice to **[*10]** the Agreement with Defendant and

---

[8] The Court recognizes that the state circuit court in *Fontanez v. Whaleco, Inc.*, 53-3032CA-00374, (Fla. Polk County Ct. 2023), reached a different conclusion. *See* Doc. 28-1. This Court respectfully disagrees with that court's conclusions regarding the conspicuousness of the hyperlinks, as described above, and also with its shifting of the burden to prove actual knowledge of the agreement. *See id.* at 4-5; *see also infra* note 6. The Court likewise notes that Defendant's other notice of supplemental authority, *Schuster v. Uber Technologies, Inc., No. 8:18-CV-2389-T-35JSS, 2019 U.S. Dist. LEXIS 105975, 2019 WL 2536780, *1 (M.D. Fla. Jun. 13, 2019)*, is inapposite. *See* Doc. 25. While sharing some similarities, in that case Uber's hyperlinks to terms and conditions were in blue, underlined font, which materially distinguishes them from the instant facts. *See* Doc. 25 at 3.

cannot be compelled to arbitrate this dispute.

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion to compel arbitration is hereby **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on October 13, 2023.

/s/ Gregory A. Presnell

**GREGORY A. PRESNELL**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HEATHER SMITH, individually and on        :
behalf of all others similarly situated,
                                          :
          Plaintiff,                            Case No. 5:23-cv-00559-D
                                          :
     v.                                   :
WHALECO INC. d/b/a TEMU,                   :
          Defendant.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DEFENDANT'S REPLY IN FURTHER SUPPORT
<u>OF ITS MOTION TO COMPEL ARBITRATION</u>**

## I.   <u>Introduction</u>

In her Opposition (Dkt. 39) to Temu's Motion to Compel Arbitration ("Motion"),
Plaintiff tellingly never once argues that ***she*** did not actually see, read, or understand the
conspicuously-placed hyperlink to the "Terms of Use" ("Terms") on Temu's account pages,
inviting her ***more than once*** to read the Terms containing an individual arbitration
agreement, when she set up and signed in to her account. She also does not argue she did not
click the "Continue" buttons or did not know that she was agreeing to the Terms by doing
so. She also did not attach any evidence to her brief asserting such facts or rebutting the facts
presented in Temu's Motion or supporting evidence, despite ***her obligation*** to do so.[1] She
also does not dispute, and thus concedes,[2] that: (i) absent a finding in her favor on contract
formation, the arbitration agreement here is legally valid and enforceable; (ii) as such, per
the Terms, she must be compelled to arbitrate her claim against Temu (which is within the
scope of the Terms) on an individual basis; and (iii) this case must be dismissed (or at least
stayed) in favor of such an arbitration. *See* Dkts. 33-1 at 4-25; Dkt. 33-3 and Exhibits thereto.

Rather, the sole issue raised in her Opposition is whether an agreement to arbitrate
was ever formed in the first place. Plaintiff's core (albeit unsupported) argument on this front
can be summarized as follows: there is no agreement simply because, when she set up her
Temu account and later accessed it, some text appeared between the two "Continue with"

---

[1] *Levine v. Vitamin Cottage Nat. Food Markets, Inc.,* 2021 WL 4439800, at *4 (D. Colo.
Sept. 27, 2021) (Under the FAA, courts apply "'a standard similar to that governing motions
for summary judgment'" ***to both parties***) (quoting *Stein v. Burt-Kuni One, LLC,* 396 F. Supp.
2d 1211, 1213 (D. Colo. 2005)). Temu met its evidentiary burden here; Plaintiff did not.

[2] *See, e.g., Acosta v. Allegion, PLC,* 2022 WL 764432, at *7 (D. Kan. Mar. 11, 2022)
(citing *Parker Excavating, Inc. v. Lafarge W., Inc.,* 863 F.3d 1213, 1222 (10th Cir. 2017))
(failure to address an argument in opposition to a motion "constitutes a waiver of the point").

action buttons that she pressed and the easily-readable, bolded, hyperlinked, and unambiguous words on the same page stating "By continuing you agree to our **Terms of Use**" appearing in close temporal and spatial proximity to those action buttons. *See, e.g.,* Dkt. 39 at 17-18; *see also* Dkt. 33-1 at 5-7 and Ex. A thereto. She is wrong on many levels.

## II.    Plaintiff Failed to Meet Her Evidentiary Burden in Opposing the Motion.

As a threshold matter, the Motion should be granted simply because Plaintiff did not meet her evidentiary burden in opposing it.[3] As one court in the Tenth Circuit aptly noted, "[w]ith respect to internet arbitration agreements [like the one at issue here], courts 'routinely' uphold such agreements provided the user had [(1)] 'reasonable notice, either actual or constructive, of the terms of the putative agreement and [(2)] manifested asset to those terms.'" *Petrie v. GoSmith, Inc.,* 360 F. Supp. 3d 1159, 1161 (D. Colo. 2019) (quoting *Vernon v. Qwest Commc'ns Int'l, Inc.,* 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012)). Further, once Temu met its initial burden of presenting evidence sufficient to demonstrate an enforceable arbitration agreement, the ***burden then shifted to Plaintiff*** to present "'evidence comparable to that identified in Fed. R. Civ. P. 56'" with her Opposition raising a genuine issue of fact on the formation issue. *Levine,* 2021 WL 4439800, at *4 (quoting *Stein,* 396 F. Supp. 2d at 1213). Courts in this Circuit frequently grant motions to compel arbitration where non-movants fail to meet this burden. *See, e.g., id.* at *7 (collecting cases). In short,

---

[3] Plaintiff cites *Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co.* to suggest she should receive the benefit of the "doubt" on the formation issue. Dkt. 39 at 7. Yet, the party opposing arbitration there "produced evidence sufficient to substantiate its unequivocal denial." 272 F. App'x 782, 786 (11th Cir. 2008). Plaintiff has not made such a denial. Further, per the Supreme Court, "[a]ny doubts concerning the scope of arbitrable issues [are to] be resolved ***in favor of arbitration***." Dkt. 33-1 at 12, n.4 (quoting *Conception*) (emphasis added).

2

"speculative arguments" in a brief challenging contract formation are "not enough to raise a genuine dispute about the existence of an arbitration agreement." *Beattie v. TTEC Healthcare Sol.*, 2019 WL 2189481, at \*2 (D. Colo. May 21, 2019). Yet, that is all Plaintiff offers here.

*Fontanez v. Whaleco, Inc.*, a recent decision that is attached to the Motion and compelled arbitration under these same Terms, is instructive and on-point. There, Temu moved to compel arbitration in a case involving the exact same sign-in processes Plaintiff used here,[4] with the Terms hyperlinked in a bold contrasting text. *See* Dkt. 33-2, attaching Case No. 53-2023CA-000374, slip op., at pp. 3-4 (Fla. Cir. Ct. Aug. 29, 2023). That court noted the plaintiff there likewise "***never specifically argue[d] that she did not have actual knowledge of [Temu's] Terms of Use***." *Id.* at 4-5 (emphasis added). Thus, after considering the layout of Temu's page, the court found that, "by clicking 'Continue,' [plaintiff] assented to the Terms of Use that contained an arbitration clause." *Id.* at 5. *See also Clements v. Alto Tr. Co.,* 2023 WL 5002472, at \*7 (D.N.M. Aug. 4, 2023) (enforcing online arbitration agreement where, as here, there was no evidence presented suggesting that the plaintiff opposing arbitration "was unable to see or click on the hyperlinks" to the operative terms).

The result should be the same here. Temu indisputably met its initial burden to submit evidence showing the existence of an enforceable contract with the Motion. *See* Dkts. 33-3 and Exs. A and C thereto (sworn declaration and authenticated exhibits showing Plaintiff's

---

[4] The only material difference in *Fontanez* was that the plaintiff there clicked the "Continue with Apple" button once, which is placed slightly below the "Continue with Google" button Plaintiff first clicked here. *See* Dkt. 33-1 at 5. In addition, Plaintiff here was presented the Terms on a subsequent page for her Google account when she signed up, <u>and</u> used the "Continue with Apple" button (using the same initial page) when later logging in. *See id.* at 5-6; Ex. A to Dkt. 33-3. Thus, Plaintiff was presented with the Terms more than once and manifested her assent to them each time by clicking the "Continue" buttons.

sign up and repeated access of her Temu account). In contrast, Plaintiff relies **only** on the unsworn arguments of her counsel and does not offer any supporting evidence with her brief at all, let alone any that is "comparable to that identified" in Rule 56. Yet, Plaintiff's <u>silence</u> does not rebut Temu's <u>evidence</u>. As such, the Motion should be granted. *See Levine* and *Clements*, *supra*. *See also Beattie*, 2019 WL 2189481, at *2 (compelling arbitration where, like here, defendant submitted evidence showing plaintiffs manifested assent by clicking "Accept" button on an opt-in page, and plaintiffs did "not unequivocally deny that they agreed to the arbitration agreement"); *Petrie*, 360 F. Supp. 3d at 1163 (ruling similarly).

### III.   <u>Plaintiff Was At Least on "Inquiry" Notice of and Assented to the Terms.</u>

Assuming *arguendo* Plaintiff did not have actual knowledge of the Terms (which her Opposition does not argue), she is still bound by them if a "reasonably prudent internet user" would have been on "inquiry" notice of them. Dkt. 33-1 at 14-17 (collecting cases). The authorities in the Motion and below show this is all a question of <u>context</u>: (i) the context of how the Terms are presented on the screen, and (ii) the context of the relationship the user is entering into using the account pages. Plaintiff's Opposition focuses only on the former and ignores the latter. *See* Dkt. 39 at 10-24. Regardless, Plaintiff is wrong for several reasons:

<u>First</u>, Plaintiff speculates (1) the "intervening presence" of other "Continue" buttons on the page—*i.e.,* giving users the option to "Continue" the sign-up/sign-in process using the main button "OR" to "Continue with" the process using their Google, Facebook, Twitter or Apple accounts—and (2) the short "distance" between the two "Continue with" buttons she pressed and the operative assent text—*i.e.,* "By continuing, you agree to our **Terms of Use**"—are dispositive on the "inquiry" notice and assent prongs. Dkt. 39 at 18-19. Not so.

As the Court can plainly see, all this information is presented within the same clean, uncluttered, white-backgrounded action box all on a single screen. *See* Ex. A to Dkt. 33-3. The operative text is in plain English, is dark and legible (even in Plaintiff's brief), and is in close proximity to all the buttons. *Id.* The two choices are to: (a) "Continue" using the main button, "OR" (b) "Continue with" the signup/in using a Google, Facebook, Apple, or Twitter account. *Id.* The operative assent text begins "By continuing, you agree . . . " *Id.* ***All these involve "continuing" with the sign-up/sign-in process.*** There is no basis to conclude <u>any</u> reasonably prudent internet user signing up for or accessing a Temu account would think the operative "By continuing, you agree to our **Terms of Use**" text is limited to just the four "Continue with" buttons—even though those are what Plaintiff pressed—as she oddly argues. Rather, through the consistent use of the verb "continue" on the page and the capitalized "OR" between the "Continue" button and the other four "Continue with" buttons, a user would understand that (i) the operative text applies both to those "continuing" with Google, Facebook, Twitter, or Apple accounts <u>and</u> those using the orange "Continue" button; and (ii) by clicking <u>any</u> of those "continue" buttons, he or she was assenting to the Terms.

 <u>**Second**</u>, other courts have found that the "intervening presence" of other buttons and the "distance" of the operative text, alone, does <u>not</u> change the result. For example, in *Walker v. Neutron Holdings, Inc.,* the user went through a substantially similar process, whereby (1) "[t]he User Agreement notice appear[ed] immediately below the two buttons on the sign-in page, which prompt the user to fill in their phone number and select 'NEXT' or select 'Continue with Facebook'" on an all-white background; (2) the operative text at the bottom of the page (under the second button) stated "By signing up, I confirm that I am at least 18

years old, and that I have read and agreed to Lime's User Agreement & Terms of Service";

and (3) the phrases "User Agreement" and "Terms of Service" were in bold (albeit smaller)

text, like for Temu's account pages Plaintiff used here. 2020 WL 703268, at *3 (W.D. Tex.

Feb. 11, 2020). Distinguishing the *Cullinane* case (on which Plaintiff relies and is discussed

below), the *Walker* court held that "a reasonable user would view the [defendant's] sign-in

screen and see that the User Agreement is part of the offer to proceed with the transaction by

clicking 'NEXT' or 'Continue with Facebook.'" *Id*. at *4. *Fontanez* and *Walker* are not

alone, as other courts have reached the same conclusion with sign-up/sign-in pages

substantially similar to Temu's. *See, e.g.,* Dkt. 33-1 at 17 (citing *Babcock, Selden*, *Meyer*).

These on-point cases (and many others)[5] show that the operative assent text need ***not*** be

immediately next to the action button, and only needs to be presented in a clear and legible

fashion, in close spatial and temporal proximity to the button. That all happened in this case.

 **Third**, what Plaintiff ignores is that, through Temu's action box, a user like Plaintiff

is "sign[ing] in" or "register[ing]" for an ***ongoing relationship***—which ***inherently brings***

***with it contractual terms*** to govern the relationship. *Oberstein v. Live Nat'n Entm't, Inc.*, 60

F.4th 505, 516 (9th Cir. 2023) (enforcing terms of use and compelling arbitration). In

*Oberstein*, the court found the expectation of a continuing relationship, the presence of the

notices of the terms inside the action box near the operative buttons, and distinguishing the

links from the rest of the text were sufficient to put a reasonably prudent user on inquiry

---

[5] Plaintiff misconstrues some of Temu's cited authorities in this regard, while ignoring others. *See, e.g.,* Dkt. 39 at 22-23 & n.3 (citing various cases). While local briefing limits do not permit Temu to address all the ways Plaintiff is incorrect here, it is readily apparent that each case cited in the Motion is directly on-point and supports granting the Motion.

notice of the terms, and thus be bound by them. *Id.* This Court should rule similarly.

Here, Plaintiff created and used a Temu account contemplating a continuing relationship between the parties by clicking the "Continue with Google" and "Continue with Apple" buttons in the same action box, thereby putting her on inquiry notice (each time) to look for terms that would govern that continuing relationship.[6] The operative text was in close spatial and temporal proximity to the buttons, "not buried on the bottom of the []page or placed outside the action box," and the link to the Terms was "distinguished from the rest of the text" on the page. *Id.* That is sufficient to show Plaintiff was on inquiry notice of and manifested her assent to the Terms.[7] Nothing in her Opposition compels a contrary result.

## IV.   Plaintiff's Cited Authorities are Distinguishable and Inapposite.

In contrast, Plaintiff's cited authorities are readily distinguishable for several reasons:

**First**, Plaintiff cites *Johnson v. Whaleco* heavily throughout her Opposition. Respectfully, *Johnson* is of no moment here, as that opinion is plainly inapposite, was wrongly-decided, and is contrary to well-settled law in the Tenth Circuit. Indeed, the *Johnson* court, *inter alia,* (**1**) applied Eleventh Circuit and Florida law, which indisputably do not apply here (*see* Dkt. 33-1 at 10 & n.3); (**2**) incorrectly treated the online agreement at issue as a "browsewrap" agreement, whereas the Motion shows that courts in this Circuit and elsewhere have largely considered similar online agreements as "clickwrap" agreements (*see id.* at 13-17 & n.6 (collecting cases)), which are treated differently than browsewraps and are

---

[6] As the *Oberstein* court aptly noted, a reasonable user like Plaintiff who is setting up a user account (as opposed to a user signing up for a free trial or making a one-time purchase, which is merely short-lived) contemplates "some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 516.

[7] *See, e.g., Nichols v. Google LLC,* 2023 WL 5938917, at *2–4 (D. Colo. Sept. 12, 2023).

187

routinely enforced across the country; (**3**) did not correctly recognize the existence of "hybrid" (a.k.a. "sign-in") wrap agreements—like other courts in the Eleventh Circuit[8] and some in this Circuit have (*see* Dkt. 33-1 at 13, n.6)—which are also treated differently and routinely enforced; and (**4**) most significantly, did not apply the Rule 56 summary judgment standard—like courts in this Circuit <u>must</u> do, as the Motion shows (*see* Dkt. 33-1 at 11 (collecting cases))—and thus improperly placed no evidentiary burden on the plaintiff.[9]

**<u>Second</u>**, Plaintiff also misconstrues or misapplies her other cited authorities. For example, she describes *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021), as addressing an "identical contention" on an action box with "features identical" to Temu's action box Dkt. 39 at 16-17. But the *Sellers* action box is <u>not</u> remotely "identical" to Temu's action box—rather, it was very cluttered, had smaller text, and a non-contrasting <u>black</u> background. In contrast, *Fontanez* addressed an "identical contention" about ***the exact same action box at issue here,*** and that court ruled in Temu's favor. *See* Dkt. 33-2 at pp. 3-5.

*Cullen* and *Fisher* involved <u>paper</u> contracts, and should be disregarded for that reason alone. Further, in *Cullen*, the operative text was in papers the court "was hard-pressed to identify, let alone read." *Cullen v. Shutterfly Lifetouch, LLC*, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021). In contrast, Temu's text is obvious and legible. *Fisher* also addressed

---

[8] *E.g., Babcock v. Neutron Hldgs, Inc.,* 454 F. Supp. 3d 1222, 1230–34 (S.D. Fla. 2020).

[9] Indeed, the same standards apply in the Eleventh Circuit. *See, e.g., Bazemore v. Jefferson Cap. Sys., LLC,* 827 F.3d 1325, 1333 (11th Cir. 2016) (holding the Rule 56 standard is to be applied to motions to compel arbitration); *Herrera Cedeno v. Morgan Stanley Smith Barney, LLC,* 154 F. Supp. 3d 1318, 1325 (S.D. Fla. 2016) ("Because it is undisputed that Plaintiff [executed the arbitration agreement at issue], the burden then shifts to Plaintiff to show that no valid contract existed and to meet that burden [ ]he must "***unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial***.'") (quoting *Magnolia Capital*, 272 F.App'x. at 785) (emphasis added).

whether the contract hid the arbitration provision, and held it was "clear and prominent" to a "literate person." *Fisher v. Sutton Place/Pinnacle A.M.S.,* 2008 WL 2095417, at *2 (S.D. Ind. May 16, 2008). The same is true for Temu's provision. *See* Ex. B to Dkt. 33-3, § 20.

The page in *Cullinane* and one of the pages in *Wilson* involved operative text that was gray on a black background—"an insufficient contrast," per the *Wilson* court.[10] While Plaintiff mischaracterizes how the Temu pages appeared,[11] there is no issue with "contrast." Rather, the operative text at issue is dark, clear, and legible (even in Plaintiff's brief), and presented in roughly the same size font as all the other text on the page (including the buttons) against an all-white background on a single page (no scrolling needed). Moreover, in *Berkson* and *Applebaum*,[12] the plaintiffs apparently submitted ***sworn declarations*** in support of their opposition to the defendants' motions to compel arbitration, denying clicking the check box next to the terms at issue (and thus never demonstrating their assent), seeing the hyperlinks to the terms on the page, or reading them. Again, Plaintiff submitted nothing here.

**Third**, although the order page at issue in *Nicosia v. Amazon.com, Inc.*—which was ***decided under Rule 12(b)(6)***, where the court was obligated to accept the pled allegations as true and did not consider any evidence—had its operative text in a dark color against a white background (like in this case), that page otherwise materially differs from the Temu pages

---

[10] *See Cullinane v. Uber Technologies, Inc.* 893 F.3d 53, 57-58, 64 (1st Cir. 2018); *Wilson v. Redbox Automated Retail, Inc.*, 448 F. Supp. 3d 873, 879-80 (N.D. Ill. 2020).

[11] For example, Plaintiff repeatedly asserts that four of the options to "Continue" were "colorful," as if that were dispositive. *See, e.g.,* Dkt. 39 at 17, 20. It is not, and it is also factually inaccurate. Those four "Continue" buttons are the ***same size*** as the main "Continue" button (which is certainly not "giant"), with the same size text, are black text on a white background, and the only color is the logo for each platform (*e.g.,* Google, Apple, etc.).

[12] *See Berkson v. Gogo LLC,* 97 F. Supp. 3d 359, 371-404 (E.D.N.Y. 2015); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 465-67 (S.D.N.Y. 2017).

discussed in the Motion. *Compare* 834 F.3d 220, 241-42 (2d Cir. 2016)*, with* Ex. A to Dkt. 33-3. Contrasting the Second Circuit's concerns about the page in *Nicosia* with Temu's account pages: (**1**) there were "between fifteen to twenty-five links" on the *Nicosia* page (only three here – "Terms of Use," "Privacy Policy & Cookie Policy," and "Trouble signing in?"); (**2**) the "text is displayed in at least four font sizes and six colors" (here, the text in the Temu action box is in three barely-distinguishable font sizes—about 13 to 15 pixels—and all in a dark color); (**3**) there was "various text … alongside multiple buttons and promotional advertisements" (for Temu, zero ads; and the only buttons are the five options to "Continue"); and (**4**) there was a variety of other information on the *Nicosia* page, like the address, credit card info, and purchase summary, that was "sufficiently distracting so as to temper whatever effect the notification has" (here, no such distractions). 834 F.3d at 237.

**Finally**, the Second Circuit distinguished the *Nicosia* page's clutter in *Meyer v. Uber Tech., Inc.*, 868 F.3d 66 (2d Cir. 2017) (which Plaintiff also cited in her brief) in the analogous arbitration motion / Rule 56 context, holding that an "uncluttered" page --

> with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" . . . [and no] need to scroll beyond what is immediately visible to find notice of the Terms of Service

-- is enough to put a reasonably prudent user on notice the terms would govern the relationship, going forward. *Id.* at 78-79. Similarly, the Temu action box Plaintiff used multiple times fits on a single page (no scrolling, no clutter), asks the user only if they wish to "Continue" with signing in or logging on, and informs the user, "By continuing, you agree to our **Terms of Use**…." The *Meyer* agreement was held enforceable. So too is Temu's.

Dated: February 9, 2024

Respectfully submitted by:

SMITH GAMBRELL & RUSSELL LLP

*/s/ Robert A. Stines*
Robert A. Stines (admitted *pro hac vice*)
Florida Bar No. 78447
201 N. Franklin Street, Suite 3550
Tampa, Florida 33602
T: 813-488-2920
Email: rstines@sgrlaw.com
vwilliams@sgrlaw.com
daigotti@sgrlaw.com

John W. McGuinness (*pro hac* to be requested)
A. Paul Heeringa (*pro hac* to be requested)
MANATT, PHELPS & PHILLIPS LLP
151 N. Franklin Street, Ste. 2600
Chicago, Illinois 60606
T: 312-529-6300
Email: jmcguinness@manatt.com
pheeringa@manatt.com

John A. Burkhardt, OBA #1336
SCHAFFER HERRING PLLC
7134 S. Yale, Ste. 300
Tulsa, Oklahoma 74136
T: 918-856-5378
Email: john.burkhardt@schafferherring.com

*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2024, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice to all counsel of record.

*/s/ Robert A. Stines*
Robert A. Stines

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| HEATHER SMITH, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-23-559-D |
| WHALECO INC. d/b/a TEMU, | ) ) | |
| Defendant. | ) ) | |

## <u>ORDER DENYING MOTION TO COMPEL ARBITRATION</u>

Before the Court is Defendant's Motion to Compel Arbitration [Doc. No. 33] under the Federal Arbitration Act, 9 U.S.C. §§ 1-16.   In opposition [Doc. No. 39], Plaintiff disputes that an arbitration agreement exists.  Defendant argues in reply [Doc. No. 40] that Plaintiff has failed to overcome its evidence that she agreed to arbitration by accepting Defendant's "Terms of Use" for an online account that she created by downloading and registering for Defendant's smartphone application or App.  The sole issue presented is the validity of this type of contract, known as a "sign-in wrap" agreement.

This same issue was recently decided by United States District Judge Bernard M. Jones in *Eakins v. Whaleco Inc.*, Case No. CIV-23-560-J, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024), *appeal pending*, No. 24-6048 (10th Cir. Mar. 18, 2024).  Under substantially similar facts, Judge Jones found that no valid agreement was formed.  Upon consideration, the Court finds Judge Jones' analysis is persuasive and, for the following reasons, reaches the same conclusion in this case.

193

**Factual Background**

Plaintiff brought this putative class action in the District Court of Oklahoma County, Oklahoma, to recover damages for alleged violations of the Telephone Solicitation Act of 2022, Okla. Stat. tit. 15, §§ 775C.1-775.C6. Defendant timely removed the case to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and moved to compel arbitration and to stay or dismiss the case. Over Plaintiff's objection, the Court later allowed Defendant to withdraw its original motion and refile this one.

In a parallel case filed by the same attorneys, a different named plaintiff filed a putative class action against Defendant in the District Court of Washita County, Oklahoma, bringing similar claims, and Defendant removed the case. *See Eakins v. Whaleco Inc.*, Case No. CIV-23-560-J, Notice of Removal (W.D. Okla. June 26, 2023). The *Eakins* case followed an identical procedural history. In March 2024, Judge Jones issued a decision on Defendant's motion. Judge Jones found that the alleged agreement – created by agreeing to the terms of use for Defendant's online ordering service when creating an account using Defendant's App – was not a valid arbitration agreement. *See Eakins*, 3/5/24 Order at 9, 2024 WL 1190766 at *4.

In reaching this conclusion, Judge Jones first determined that the type of online agreement presented is best characterized as a "sign-in wrap" because "Defendant's App notifies the user of its terms of use and, instead of providing an 'I agree' box to check, advises the user that she is agreeing to the terms of use when creating an account." *Eakins*, 2024 WL 1190766 at *3. This form of agreement "does not require the user to click on a box showing acceptance of the 'terms of use' in order to continue" but, instead, "the

2

website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." *Id.* (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015)). Judge Jones observed: "In the context of online agreements, courts engage in fact-intensive inquiries of 'the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms.'" *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). After examining the facts regarding Defendant's App, Judge Jones "conclude[d] that the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when creating her account." *Id.*

### Standard of Decision

The Federal Arbitration Act provides that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. The Act "reflects the fundamental principle that arbitration is a matter of contract." *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Under the Act, a court decides "gateway" issues that determine the arbitrability of a dispute, such as whether the parties agreed to arbitrate a matter. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002); *Rent-A-Center*, 561 U.S. at 68-69. When deciding this issue, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012).

3

Under Section 4 of the Act, "[w]hen parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). The statutory "framework is similar to summary judgment practice." *Hancock*, 701 F.3d at 1261.

> [T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith. When a quick look at the case reveals that no material disputes of fact exist, a district court may decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration.

*BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165, 1177 (10th Cir. 2017) (citations and internal quotations omitted). In this case, Defendant submits in support of its Motion the declaration of an employee and evidentiary materials that are undisputed.

## Discussion

The validity of electronic agreements is becoming a frequent issue in consumer cases. Federal courts generally approach the issue of contract formation using basic contract-law principles that require "the parties' mutual assent to the essential terms of the agreement" and bind "[a] party who manifests assent to a contract's terms." *See Hancock*, 701 F.3d at 1256. However, the determination of whether a contract was formed in a particular case often turns on the specific facts. In *Hancock*, for example, the Tenth Circuit addressed the issue with regard to a "clickwrap" agreement, where a computer user must click a dialogue box, such as an "I agree" button, to signify their assent to terms or

4

conditions on a separate screen or internet page before they can proceed with a transaction. *See Hancock*, 701 F.3d at 1255 (defining "clickwrap" agreement); *id.* at 1257 (describing the agreements in that case); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (describing clickwrap or "click-through" agreements). In that case, the Tenth Circuit had little trouble concluding that the consumers had assented to the service provider's electronic terms, which included an arbitration agreement, and that the clickwrap agreements were valid and enforceable. *See Hancock*, 701 F.3d at 1257-58.

In contrast, a sign-in wrap agreement requires the user's assent to be inferred from the fact they were notified that proceeding with a transaction would signify their agreement to terms or conditions stated on a separate computer screen or internet page, usually accessible through a hyperlink. *See Meyer*, 868 F.3d at 75-76; *Selden v. Airbnb, Inc.*, 4 F.4th 149, 156 (D.C. Cir. 2021) ("a sign-in wrap bundles signing up for a service with agreement to the website's contractual terms"). In such cases, courts consider whether a consumer received conspicuous notice of the terms and his consent to an online agreement. *See Selden*, 4 F.4th at 156. With regard to sign-in wrap agreements, courts often "look to the layout and language of the [computer application] to decide whether it would provide a reasonably prudent smartphone user with reasonable notice that a click – i.e., signing up – will manifest assent to an agreement." *Id.* Relevant facts may include the size and color of font used in the notice, the means of denoting a hyperlink (such as blue highlighted or underlined text), a spatial connection between the notice and the button intended to manifest assent, and any visual distractions or features that detract from the clarity of the notice.

In *Eakins*, Judge Jones conducted this inquiry and determined that Defendant's App did not provide conspicuous notice of the "Terms of Use."  Due to the fact-specific nature of this ruling, the Court duplicates in full an image of the sign-in screen and the narrative description in Judge Jones' order:[1]



As shown, a user can create an account (1) by entering their email or phone number and pressing a bright orange "Continue" button, or (2) by pressing one of the other four white buttons.  At the bottom of the screen, beneath the "Continue with Twitter" button, is a statement in light grey font that reads:  "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**."  The "**Terms of Use**" text is hyperlinked and, if pressed, leads to a separate document containing a mandatory arbitration provision.

---

[1]  The same image is provided by both parties in their briefs in this case.

*Eakins*, 2024 WL 1190766 at *1. The Court also quotes in full Judge Jones' explanation

of his conclusion "that the App failed to provide reasonably conspicuous notice that

Plaintiff was agreeing to Defendant's terms of use when creating her account." *Id.* at 3.

> For starters, the terms of use agreement appears in relatively small font at the bottom of the screen – spatially decoupled from the attention-grabbing orange "Continue" button that users click to create their account. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (recognizing courts' refusal to enforce online agreements "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it"); *Starke*, 913 F.3d at 294 (rejecting enforcement of arbitration agreement where the "Terms & Conditions" hyperlink was "spatially decoupled" from the portion of the website "actually requiring [plaintiff's] attention"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (rejecting enforcement of arbitration agreement where the " 'I agree to Lyft's Terms of Service' [was] in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top"). While other, closer buttons are available, the orange button – in both placement and coloring – is set apart. One could argue it is initially unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number.

> Most glaring, however, is the App's failure to distinguish the "Terms of Use" hyperlink from its surrounding text. *See Berman*, 30 F.4th at 857 ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent."). The notice here appears in grey font against a white backdrop, and while "Terms of Use" is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks of hyperlinked text. *See id.* ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." (internal citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)). Courts have generally "required more than mere coloring to indicate the existence of a hyperlink to a contract." *Applebaum*, 263 F.

Supp. 3d at 467 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts . . . have looked for a clear prompt directing the user to read them.")).   The App's failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use agreement, fails the conspicuous test.

Defendant's reliance on *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023), *see* (*Fontanez* Order) [Doc. No. 33-2], does not alter the Court's conclusion.  The *Fontanez* court examined the very online platform at issue here and concluded that its terms of use agreement was "conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* at 6.  However, the plaintiff in *Fontanez* created her account with the "Continue with Apple" button "directly above" the terms of use agreement. *Id.* at 5.  Moreover, and more importantly, she had already filed "eleven class action lawsuits," and the "reasonable inference [was] that . . . [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements." *Id.* at 3.

*Fontanez*'s persuasive [force] is further tempered by *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL (M.D. Fla. Oct. 13, 2023) (not available on Westlaw), which recently examined Defendant's online platform and concluded that its terms of use agreement was not conspicuously disclosed.  The *Johnson* court reasoned, as this Court does here, that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured." *Id.* at *7 (brackets and internal quotation marks omitted).   Even more "damning" was the platform's "use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Id.* at *7-8.

Neither is the Court convinced that Plaintiff's subsequent use of the App – where she "was presented with a screen identical to the one she would have seen when she initially registered her account through the App back in January," Def.'s Br. at 13 – weighs in favor of arbitration.  If Defendant's notice was inconspicuous when Plaintiff created her account, the Court is unsure how such notice, if unaltered, became any clearer over time.

*Id.* at *3-4 (footnotes omitted).  Based on this analysis, Judge Jones determined "that the parties did not enter into a valid arbitration agreement." *Id.* at *4.

All other things being equal, the Court would fully agree with Judge Jones. The parties present the same legal arguments and authorities in this case that were presented in *Eakins*, and like Judge Jones, the Court rejects Defendant's description of the sign-in wrap agreement in its App.[2] However, the two cases involve slightly different facts. Although each plaintiff downloaded the same App, they interacted differently with the initial screen and took different paths to sign up. Plaintiff registered by using an existing Google account while Ms. Eakins created a new account using her email address.[3] By proceeding to the App through her Google account, Plaintiff encountered another screen that provided a second opportunity to review Defendant's terms.

Recall the image of the App's registration screen shown above. Below the orange "Continue" button that Ms. Eakins used were four other options, the first being "Continue with Google." Plaintiff proceeded by clicking this button and saw the following screen:

---

[2] According to Defendant, "the Terms containing the Arbitration Provisions were conspicuously hyperlinked in a contrasting bold font, presented in close spatial and temporal proximity to the 'Continue' buttons Plaintiff had to click to continue signing up for her account on the App or when logging in later." *See* Def.'s Mot. at 17-18.

[3] This factual distinction was highlighted when Defendant recently moved for a stay of this case pending the resolution of its interlocutory appeal in *Eakins*. In opposing a stay, Plaintiff accurately described the differences between how she and Ms. Eakins signed up for an online account using the App. *See* Pl.'s Opp'n Mot. Stay [Doc. No. 44] at 3-4 & n.1.



Here, unlike the initial screen where "Terms of Use" appeared in slightly darker grey font and gave no indication of a hyperlink, the words "terms of service" in this screen were in a blue color, which commonly denotes the existence of a hyperlink. Note, however, the context in which this hyperlink appears. This screen did not inform Plaintiff that proceeding to the App by allowing Google to share her information with Defendant would signify an agreement to or acceptance of Defendant's terms of service. Instead, it merely stated that Plaintiff could review Defendant's terms of service before using the App. This phrasing does not provide any notice, and certainly not conspicuous notice, that Plaintiff was consenting to a contract with Defendant by using this avenue to proceed.

10

On the initial screen, Plaintiff chose the "Continue with Google" option located below the bright orange "Continue" button. Because the Google button was positioned lower on the screen, it was located slightly closer to the statement at the bottom that continuing would signify an agreement to Defendant's Terms of Use. Arguably, the eyes of a user moving beyond the orange button would be drawn further down the screen and might be more likely to notice the warning. However, the same remaining facts – a spatial separation, the eye-catching logos of other options in that space (Google, Facebook, Apple, and Twitter), and the smaller light grey font on a white screen with no indication of a hyperlink – lead the Court to the same conclusion that the "by continuing" statement did not provide conspicuous notice to a consumer that they were agreeing to a contract that included the Terms of Use.[4] As a result, the Court finds that the factual differences between this case and *Eakins* do not affect the outcome.

Accepting the undisputed facts presented by Defendant and considering objectively the alleged sign-in wrap agreement in its App, the Court finds that Plaintiff did not receive conspicuous notice of Defendant's Terms of Use or give her assent to an online agreement containing them. Therefore, no contract between the parties including an arbitration agreement was formed.

---

[4] Further, the "continue with" logo buttons offered the user easy access to the App with an existing account, requiring no further effort to complete a new sign-up process. In the Court's view, an individual spying this option and electing to proceed this way would be unlikely to look further down the screen.

**Conclusion**

For these reasons, the Court concludes that the parties did not enter into a valid and binding arbitration agreement.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel Arbitration [Doc. No. 33] is **DENIED**.

**IT IS SO ORDERED** this 23rd day of July, 2024.

TIMOTHY D. DeGIUSTI
Chief United States District Judge

12

204

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HEATHER SMITH, individually and on
behalf of all others similarly situated,

            Plaintiff,

    v.

WHALECO INC. d/b/a TEMU,

            Defendant.

                          Case No. 5:23-cv-00559-D

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **DEFENDANT'S NOTICE OF APPEAL**

Notice is hereby given that Defendant Whaleco Inc., d/b/a TEMU ("Defendant"),

hereby appeals, to the United States Court of Appeals for the Tenth Circuit, from this

Court's order entered on July 23, 2024 in the above-captioned matter (*see* Dkt. 47) denying

Defendant's motion to compel arbitration (*see* Dkt. 33).

Dated: July 29, 2024

                                Respectfully submitted by:

                                SCHAFFER HERRING PLLC

                                */s/ John A. Burkhardt*
                                John A. Burkhardt, OBA #1336
                                7134 S. Yale, Ste. 300
                                Tulsa, Oklahoma 74136
                                T: 918-856-5378
                                Email: john.burkhardt@schafferherring.com

                                John W. McGuinness (*pro hac* to be requested)
                                A. Paul Heeringa (*pro hac* to be requested)
                                MANATT, PHELPS & PHILLIPS LLP
                                151 N. Franklin Street, Ste. 2600
                                Chicago, Illinois 60606
                                T: 312-529-6300
                                Email: jmcguinness@manatt.com
                                      pheeringa@manatt.com
                                *Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2024, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice to all counsel of record.

*/s/ John. A. Burkhardt*
John A. Burkhardt