No. 24-6155

---

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

## HEATHER SMITH,

Plaintiff-Appellee,

v.

## WHALECO INC., D/B/A TEMU,

Defendant-Appellant.

---

**On appeal from the United States District Court for the Western District of Oklahoma, No. 5:23-cv-00559-D**

**Hon. Timothy D. DeGiusti**

---

APPELLEE'S RESPONSE BRIEF

---

Mary Quinn Cooper
Kathy R. Neal
MCAFEE AND TAFT, P.C.
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
(918) 587-0000
(918) 574-3120 (fax)

Frank S. Hedin
Arun G. Ravindran
HEDIN, LLP
1395 Brickell Ave., Suite 1140
Miami, Florida 33134
(305) 357-2107
(305) 200-8801 (fax)

*Attorneys for Plaintiff-Appellee*

---

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

ISSUES PRESENTED.............................................................................1

STANDARD OF REVIEW ....................................................................1

STATEMENT OF THE CASE................................................................1

    A.   The Temu app gives insufficient notice of the Terms of Use. .......................4

    B.   The District Court found that Temu failed to establish that Ms. Smith assented to arbitration. ...............................................................8

    C.   The *Johnson* decision confirms the District Court's findings.....................14

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .......................................................................................19

    A.   Temu failed to carry its initial burden to establish an agreement to arbitrate. ..............................................................................19

    B.   The District Court correctly found that Temu's app failed to put Plaintiff on inquiry notice of its Terms of Use. .........................................29

        1.    The Temu app's registration flow presented its Terms of Use inconspicuously. ...................................................................30

        2.    The *Fontanez* decision did not undertake a fact-intensive inquiry into the essential features of the Temu app registration flow. ...................49

        3.    The New York *Hu* case is distinguishable .........................................50

CONCLUSION....................................................................................54

ORAL ARGUMENT REQUEST .........................................................55

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Adelson v. Harris*,
  774 F.3d 803 (2d Cir. 2014) .......................................................... 39

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) .................................... 12, 47

*Beattie v. TTEC Healthcare Sols.*,
  2019 WL 2189481 (D. Colo. May 21, 2019) .............................. 26

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ..................................... 30, 46

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ....................................... 8, 12, 21, 32

*Blake v. JPay, LLC*,
  2022 WL 1223634 (D. Kan. Apr. 26, 2022) ................................ 25

*BOSC, Inc. v. Bd. of Cnty. Commissioners of Cnty. of Bernalillo*,
  853 F.3d 1165 (10th Cir. 2017) ................................................... 21

*Brown v. AutoNation Chrysler Dodge Jeep Ram Sw.*,
  2021 WL 2514524 (D. Colo. June 18, 2021) ............................... 24

*Campbell Invs., LLC v. Dickey's Barbecue Restaurants*, Inc.,
  784 F. App'x 627 (10th Cir. 2019) .............................................. 22

*Chegup v. Ute Indian Tribe of Uintah & Ouray Reservation*,
  28 F.4th 1051 (10th Cir. 2022) ................................................... 40

*Clements v. Alto Tr. Co.*,
  685 F. Supp. 3d 1249 (D.N.M. 2023) .......................................... 25

*Cordas v. Uber Techs., Inc.*,
  228 F. Supp. 3d 985 (N.D. Cal. 2017) ......................................... 27

*Cullen v. Shutterfly Lifetouch, LLC*,
  2021 WL 2000247 (N.D. Cal. May 19, 2021)................................................40

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018) ......................................................12, 39, 44, 47

*Davis v. USA Nutra Labs*,
  303 F.Supp.3d 1183 (D.N.M. 2018)............................................................25

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*,
  2006 WL 1266515 (N.D. Okla. May 8, 2006),
  *aff'd*, 242 F. App'x 584 (10th Cir. 2007) ......................................................20

*Eakins v. Whaleco Inc.*,
  721 F. Supp. 3d 1252 (W.D. Okla. 2024)........................3, 8, 9-11, 14-16, 19,
  22, 26, 31, 32, 36-38, 43, 48-50, 54

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ............................................................51

*Elsken v. Network Multi-Fam. Sec. Corp.*,
  49 F.3d 1470 (10th Cir. 1995) ....................................................24

*Fagerstrom v. Amazon.com, Inc.*,
  141 F. Supp. 3d 1051 (S.D. Cal. 2015) ........................................................42

*Ferrell v. to AppFolio, Inc.*,
  2024 WL 158103  (C.D. Cal. Jan. 11, 2024)..........................................25, 28

*Fisher v. Sutton Place/Pinnacle A.M.S.*,
  2008 WL 2095417 (S.D. Ind. May 16, 2008) ..............................................40

*Fontanez v. Whaleco, Inc.*,
  No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023)..........13, 28, 29, 49, 50

*Forby v. One Techs., LP*,
  2016 WL 1321194  (S.D. Ill. Apr. 5, 2016) ................................................30

*Fundamental Admin. Servs., LLC v. Patton*,
  504 F. App'x 694 (10th Cir. 2012)........................................................20, 40

*Gennaro*, *v. Avvo, Inc.*,
 2019 WL 13488559 (S.D. Cal. May 6, 2019) .........................................41, 45

*Hancock v. Am. Tel. & Tel. Co.*,
 701 F.3d 1248, 1255 (10th Cir. 2012) .........................................9, 20, 21, 25

*Howard v. Ferrellgas Partners*,
 748 F.3d 975 (10th Cir. 2014) .......................................................................28

*Hu v. Whaleco, Inc.*,
 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024) ................................3, 50, 51, 54

*Jacks v. CMH Homes, Inc.*,
 856 F.3d 1301 (10th Cir. 2017) ....................................................................20

*Johnson v. Whaleco, Inc.*, No.
 5:23-cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) ..........2, 13-15, 19, 36-40
 49, 50

*Keebaugh v. Warner Bros. Entm't*,
 100 F.4th 1005 (9th Cir. 2024) .....................................................................43

*La Force v. GoSmith, Inc.*,
 2017 WL 9938681 (N.D. Cal. Dec. 12, 2017) ..............................................25

*Lee v. Ticketmaster, L.L.C.*,
 817 F. App'x 393 (9th Cir. 2020)...................................................................42

*Levine v. Vitamin Cottage Nat. Food Markets*,
 2021 WL 4439800 (D. Colo. Sept. 27, 2021) .........................................24, 25

*Lucy v. Zehmer*,
 84 S.E.2d 516 (Va. 1954) ..............................................................................20

*Martinez v. Capstone Rest. Grp.*,
 2021 WL 1723776 (D. Colo, Mar. 31, 2021)................................................24

*McCormick v. Bonfils*,
 60 P. 296 (Okla. 1900)...................................................................................20

*Melnick v. TAMKO Building Prod's., LLC*,
2022 WWL4355299 (D. Kan. Sept. 20, 2022)..............................................22

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ................................................9, 25, 39, 41, 48, 51

*Moyer v. Chegg, Inc.*,
2023 WL 4771181 (N.D. Cal. July 25, 2023) ..............................................41

*Nardo v. HomeAdvisor, Inc.*,
2022 WL 17547940 (D. Colo. July 27, 2022)..............................................27

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)......................................................................11

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) ........................................................................42

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020).........................................................41

*Petrie v. GoSmith, Inc.*,
360 F.Supp.3d 1159 (D. Colo. 2019) ...........................................................25

*Rainey v. A Place for Rover, Inc.*,
2022 WL 16942849 (C.D. Cal. July 18, 2022) ............................................41

*Reeves v. Enter. Prod. Partners, LP*,
17 F.4th 1008 (10th Cir. 2021)......................................................................1

*Rodriguez v. Harley-Davidson Motor Co., Inc.*,
2024 WL 3032945 (C.D. Cal. May 6, 2024).................................................23

*Rose v. Mercedes-Benz USA, LLC*,
2023 WL 8544143 (N.D. Ill. Dec. 11, 2023) ...............................................27

*Route App, Inc. v. Heuberger*,
2022 WL 2316377 (D. Utah June 28, 2022) ................................................30

*Selden v. Airbnb, Inc.*,
　　2016 WL 6476934 (D.D.C. Nov. 1, 2016)....................................41

*Sgouros v. TransUnion Corp.*,
　　817 F.3d 1029 (7th Cir. 2016).......................................................12

*Starke v. SquareTrade, Inc.*,
　　913 F.3d 279 (2d Cir. 2019) ..........................................10, 11, 51

*State v. U.S. Env't Prot. Agency*,
　　989 F.3d 874 (10th Cir. 2021) ....................................................40

*Temple v. Best Rate Holdings, LLC*,
　　360 F.Supp.3d 1289 (M.D. Fla. Dec. 27, 2018) ......................15

*Vernon v. Qwest Commc'ns Int'l*,
　　925 F.Supp.2d 1185 (D. Colo. 2013) .........................................25

*Walker v. Neutron Holdings, Inc.*,
　　2020 WL 703268(W.D. Tex. Feb. 11, 2020) ..............................41

*Waltrip v. Pilot Travel Centers*,
　　2022 WL 684327 (D.N.M. Mar. 8, 2022) ...................................24

*Wilson v. Redbox Automated Retail, LLC*,
　　448 F. Supp. 3d 873 (N.D. Ill. 2020).....................................40, 45

*Wiseley v. Amazon.com, Inc.*,
　　709 F. App'x 862 (9th Cir. 2017)................................................42

## STATUTES AND RULES

9 U.S.C. §§ 1-16　.................................................................................1

Okla. Stat. tit. 15, § 775C.1 ................................................................1

## TREATISES

17B C.J.S. Contracts § 931 ................................................................20

# <u>RELATED APPEALS</u>

*Eakins v. Whaleco Inc., d/b/a Temu,* Case No. 24-6048 (10th Cir.)

## ISSUES PRESENTED

1.      Whether the District Court correctly found that Defendant failed to meet its initial burden to establish an agreement between the parties to arbitrate?

2.      Whether the District Court correctly found that Defendant's mobile app failed to put users on inquiry notice of an arbitration agreement?

## STANDARD OF REVIEW

This Court reviews the District Court's decision to deny the motion to compel arbitration *de novo*. *Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021).

## STATEMENT OF THE CASE

Appellee Heather Smith ("Ms. Smith" or "Plaintiff") is an Oklahoma consumer. Ms. Smith, individually and on behalf of a proposed class, sued the appellant Whaleco, Inc. d/b/a Temu ("Temu" or "Defendant"), an e-commerce retailer, for transmitting unsolicited marketing text messages to her cellular telephone in violation of Oklahoma's Telephone Solicitation Act, Okla. Stat. tit. 15, § 775C.1, *et seq.* ("OTSA"). Temu moved to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"). The District Court denied Temu's motion to compel arbitration. Temu appeals that decision.

In the motion to compel arbitration, Temu asserted that Ms. Smith created a user account on Temu's mobile smartphone application (the "app"). Temu contended that, by creating an account on its app, Ms. Smith agreed to be bound by

Temu's terms of use (the "Terms of Use"), including an arbitration provision incorporated therein. Ms. Smith opposed the motion to compel arbitration on the grounds that Temu failed to adequately notify consumers of the existence of the Terms of Use, much less the incorporated arbitration provision, during the process of creating an account on the app, and therefore cannot establish that she (or anyone else) assented to the Terms of Use (or its arbitration provision) by creating an account.

In a thorough, well-reasoned order, firmly rooted in controlling Tenth Circuit precedent and applicable contract law, the District Court held that Temu had failed to satisfy its initial burden to establish the formation and thus the existence of an agreement between it and Ms. Smith to arbitrate. After closely examining the form and content of the app's registration screens and surveying numerous judicial decisions examining the form and content of similar internet-based enrollment screens, the District Court concluded that Temu cannot establish that Ms. Smith assented to an agreement to arbitrate with Temu because the app "does not provide any notice, and certainly not conspicuous notice, that Plaintiff was consenting to a contract with Defendant by using this avenue to proceed." (App.202).[1]

Two other district courts recently reached the same conclusion after examining the same screens on Temu's app. In *Johnson v. Whaleco, Inc.*, No. 5:23-

---

[1] Citations to the Appendix are designated "App.".

cv-403-GAP-PRL (M.D. Fla., Oct. 13, 2023) (App.176), the court held that Temu cannot demonstrate that consumers assented to the Terms of Use by creating accounts on its app because the app failed to adequately disclose to them that, by creating an account, they were agreeing to the Terms of Use. And prior to the District Court's decision here, another Oklahoma district court concluded that the plaintiff could not be compelled to arbitrate an OTSA claim based upon the app's presentation of the Terms of Use. *Eakins v. Whaleco Inc.*, 721 F. Supp. 3d 1252 (W.D. Okla. 2024) (citing *Johnson*).

As the District Court below explained, "[a]ccepting the undisputed facts presented by Defendant and considering objectively the alleged sign-in wrap agreement in its App, … Plaintiff did not receive conspicuous notice of Defendant's Terms of Use or give her assent to an online agreement containing them." (App.203). Consequently, "no contract between the parties including an arbitration agreement was formed." (*Id.*).[2]

After carefully examining the Temu app's registration screens and considering all of Temu's arguments in support of its position that users agreed to arbitrate their claims based upon those screens, three separate district courts were in

---

[2] A district court in New York recently came to the opposite conclusion in *Hu v. Whaleco, Inc.*, 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024), an unpublished case from New York. As explained in Section B(3) below, this case was wrongly decided for a number of reasons.

agreement that the Temu app fails to adequately notify users of the existence of the Terms of Use (much less that by creating an account they are agreeing to be bound by the Terms of Use), and that Temu therefore cannot demonstrate that any user who created an account on the app (such as Ms. Smith) manifested their assent to the Terms of Use (much less the incorporated arbitration provision).

Temu proposes nothing in its appeal which should cause this Court to diverge from the District Court's well-reasoned denial of the motion to compel arbitration. Temu's primary argument that the District Court incorrectly applied the Rule 56 burden shifting standard to adjudicate the motion to compel arbitration is not well taken because Temu failed in the first instance to meet its own burden to establish the existence of an agreement to arbitrate, and, as such, the burden could not shift to Plaintiff. Its second argument, that app users could be bound to the Terms of Use, ignores the actual presentation of the Terms of Use here and well-established caselaw that such presentations are ineffective to bind consumers. The District Court's ruling should be affirmed.

### A. The Temu app gives insufficient notice of the Terms of Use.

Defendant sought to compel Ms. Smith to arbitration based solely on her registration of a Temu account via the Temu Android mobile app on December 30, 2022. (App.75-78). Temu asserted below that Plaintiff's registration occurred in three steps (referred to herein as the "registration flow" or "sign-in flow"). The most

important for purposes of resolving the motion was step one, where Plaintiff allegedly encountered the following initial registration interface (App.151):



To begin registering an account via the mobile app, visitors have the option to either: (1) input an email address or phone number at the top of the initial registration screen and then press the large, bright orange "Continue" button located in the upper third of the screen; or (2) click one of the four buttons on the bottom half of the pop-up screen (beneath the orange "Continue" button), which allow the visitor to register

with the site via a Google, Facebook, Twitter, or Apple account. At the top of the screen are two icons set against an off-white background which in bold black characters promote "**Free shipping**" and "**Free returns**." Additionally, there is a button a user can push if they have "Trouble signing in." The sentence containing the hyperlink to the Terms of Use appears at the very bottom of the second section of the interface, beneath the four "other ways" to register. The sentence "By continuing, you agree to our Terms of Use and Privacy & Cookie Policy" appears in a light grey color in smaller font size than any of the text on the buttons above and is set against a white background. The Terms of Use hyperlink is bolded, but still in light grey text set against a white background and is not underlined. Temu asserted that Ms. Smith registered by clicking the "Continue with Google" button toward the middle of the screen. (App.77-78). According to Defendant, Plaintiff then encountered the following screen:



Thereafter, a user has two options to proceed. The first allows the user to proceed with an active Google account. The second option allows the user to "use another account." Separated from the buttons allowing the user to proceed with their Google account, at the bottom of the page, is the following language: "To continue, Google will share your name, email, address, language preference, and profile picture with Temu. Before using this app you can review Temu's privacy policy and terms of service." Importantly, even though the words "privacy policy" and "terms of service" are in blue font here, the user is never advised they are affirmatively

agreeing to either.

Temu claims that once an account is established using the Temu registration flow, a user sees the same screens every time they log in. (App.111). It further asserts that after she registered, Ms. Smith logged in another time using an Apple account, on March 30, 2023. (App.78).

**B.     The District Court found that Temu failed to establish that Ms. Smith assented to arbitration.**

The District Court began its analysis by noting that whether Ms. Smith agreed to arbitrate her claim is a question of contract formation. (App.195). In the context of an online consumer agreement, the contracting parties' mutuality of assent depends on whether (1) "a website operator can show that a consumer has actual knowledge of the online agreement" *or* (2) "the website provides **reasonably conspicuous notice** of the terms to which the consumer will be bound" *and* the "consumer **takes some action** such as clicking a button or checking a box, that **unambiguously** manifests his or her assent to those terms. *Eakins*, 721 F. Supp. 3d at 1257 (emphasis added) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)).

The District Court observed that Temu failed to establish that Ms. Smith had actual notice of its Terms of Use. It succinctly stated: "there is nothing to suggest that Plaintiff had actual notice of Defendant's terms of use." (App.198). As such, the Court explained that it "must determine then whether Plaintiff received reasonably

conspicuous notice that she was agreeing to Defendant's terms when creating her account." (*Id.*)

The District Court next explained the framework for evaluating internet-based terms and conditions of use, which primarily come in two forms—"clickwraps" and "browsewraps." In *Eakins*, the District Court summarized the difference between clickwraps and browsewraps:

> [O]ne way in which we have previously distinguished web-based contracts is the manner in which the user manifests assent— namely, "clickwrap"(or "click- through") agreements, which require users to click an "I agree" box after being presented with a list of terms and conditions of use, or "browsewrap" agreements, which generally post terms and conditions on a website via a hyperlink at the bottom of the screen. Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree." Browsewrap agreements, on the other hand, do not require the user to expressly assent. Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.

*Eakins*, 721 F. Supp. 3d at 1257-58 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) and citing *Hancock v. Am. Tel. & Tel. Co.,* 701 F.3d 1248, 1255 (10th Cir. 2012)).

The District Court in *Eakins* found the Temu registration flow was not a "clickwrap" agreement because users do not click an "I agree" button to manifest assent to Temu's Terms of Use. *Eakins*, 721 F. Supp. 3d at 1258. Nor does the app

utilize a traditional "browsewrap" format, the District Court determined, since the Terms of Use do not appear merely at the bottom of the website. *Id.* Instead, the notice of the Terms of Use appears as part of the app's sign-in flow, which the District Court referred to as a "sign-in-wrap" format—a variant of the two main categories. To assess whether terms of use referenced in a "sign-in-wrap" format provide sufficiently conspicuous notice to evince mutual assent and bind a consumer, the court noted its obligation to engage in "fact-intensive inquires." *Id.* These include assessing "the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (internal quotation marks omitted)). The District Court here likewise noted these distinctions and ramifications. (App.196-197).

Undertaking that analysis, the District Court concluded, quoting the *Eakins* decision, that "the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's Terms of Use when creating her account." (App.199). The District Court considered multiple design elements of the registration screen, including (1) the color, size, and location of the Terms of Use hyperlink; (2) the overall complexity of the screen in terms of the placement of images and buttons; and (3) the proximity of the buttons which advance the flow—including the large orange

"Continue" button which Plaintiff clicked—relative to the Terms of Use hyperlink at the bottom of the page.



The District Court quoted with approval Judge Jones's findings and legal conclusions in *Eakins* concerning the screen's features:

> For starters, the terms of use agreement appears in relatively small font at the bottom of the screen—spatially decoupled from the attention-grabbing orange "Continue" button that users click to create their account. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (recognizing courts' refusal to enforce online agreements "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it"); *Starke*, 913 F.3d at 294 (rejecting enforcement of arbitration agreement where the "Terms & Conditions" hyperlink was "spatially decoupled" from the portion of the website "actually

requiring [plaintiff's] attention"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (rejecting enforcement of arbitration agreement where the "'I agree to Lyft's Terms of Service' [was] in the smallest font on the screen, dwarfed by the jumbo- sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top"). While other, closer buttons are available, the orange button—in both placement and coloring—is set apart. One could argue it is initially unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number.

Most glaring, however, is the App's failure to distinguish the "Terms of Use" hyperlink from its surrounding text. *See Berman*, 30 F.4th at 857 ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent."). The notice here appears in grey font against a white backdrop, and while "Terms of Use" is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks of hyperlinked text. *See id.* ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." (internal citation and quotation marks omitted)); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined." (internal quotation marks omitted)). Courts have generally "required more than mere coloring to indicate the existence of a hyperlink to a contract." *Applebaum*, 263 F. Supp. 3d at 467 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("Where the terms are not displayed but must be brought up by using a hyperlink, courts … have looked for a clear prompt directing the user to read them.")). The App's failure to adequately distinguish the hyperlinked text, coupled with its

obscure placement of the terms of use agreement, fails the conspicuous test.

Defendant's reliance on *Fontanez v. Whaleco, Inc.*, No. 53-2023CA-000374 (Fla. Cir. Ct. Aug. 29, 2023)[], does not alter the Court's conclusion. The *Fontanez* court examined the very online platform at issue here and concluded that its terms of use agreement was "conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* at 6. However, the plaintiff in *Fontanez* created her account with the "Continue with Apple" button "directly above" the terms of use agreement. *Id.* at 5. Moreover, and more importantly, she had already filed "eleven class action lawsuits," and the "reasonable inference [was] that … [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements." *Id.* at 3.

*Fontanez*'s persuasive [*sic*] is further tempered by *Johnson v. Whaleco, Inc.*[], which recently examined Defendant's online platform and concluded that its terms of use agreement was not conspicuously disclosed. The *Johnson* court reasoned, as this Court does here, that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured." *Id.* at *7 (brackets and internal quotation marks omitted). Even more "damning" was the platform's "use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues." *Id.* at *7-8.

(App.199-200).

Finally, the District Court further addressed and dispatched Defendant's subsidiary argument that actual notice should be imputed to her based on her multiple uses of the Temu app after initial registration, stating as follows:

Neither is the Court convinced that Plaintiff's subsequent use of the App—where she "was presented with a screen identical to the one she would have seen when she initially registered her account through the App back in January," Def.'s Br. at 13—

weighs in favor of arbitration. If Defendant's notice was inconspicuous when Plaintiff created her account, the Court is unsure how such notice, if unaltered, became any clearer over time.

(App.200).

Discussing the factual distinction between this matter and *Eakins*, the District Court further found that:

This screen did not inform Plaintiff that proceeding to the App by allowing Google to share her information with Defendant would signify an agreement to or acceptance of Defendant's terms of service. Instead, it merely stated that Plaintiff *could review* Defendant's terms of service before using the App. This phrasing does not provide any notice, and certainly not conspicuous notice, that Plaintiff was consenting to a contract with Defendant by using this avenue to proceed.

(App.202) (emphasis added).

Ultimately, following this substantive and detailed analysis, the District Court denied Defendant's motion to compel arbitration.

### C. The *Johnson* decision confirms the District Court's findings.

The district court in *Johnson* undertook the same feature-by-feature assessment as the District Court below. It thoroughly examined each element of the page and similarly concluded that the Temu sign-in flow failed to manifest inquiry notice for the same reasons, stating:[3]

---

[3] *Johnson* involved another putative class action against Temu for non-consensual texting, there allegedly sent in violation of the Telephone Consumer Protection Act's do-not-call provision.

Defendant's website design fails this analysis because the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page[] where it is featured.

Most damning to Defendant's attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues.

The inconspicuous nature of the hyperlinks is further compounded by its poor placement on the website. *See Temple v. Best Rate Holdings, LLC,* 360 F.Supp.3d 1289, 1304 (M.D. Fla. Dec. 27, 2018) (acknowledging the distinction between placing terms and conditions *above* versus *below* the action button on a webpage). It is not reasonable to expect a user to continue reading below the highly conspicuous purchase button … Uniformly, courts have declined to enforce "browsewrap" agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them[]. Here, the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue" button. This placement does not put a reasonably prudent user on inquiry notice.

Moreover … the notice that *does* exist fails to put the user on notice of the mandatory arbitration provision. … Defendant's notice here, tucked away at the bottom of the page in barely visible font, does not put users on inquiry notice of the arbitration provision.

(App.178) (quotations and citations omitted).

*Johnson's* reasoning was persuasive to *Eakins* court, which specifically agreed with *Johnson* that "the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page where it is featured[,]" and found "the platform's use of a very light grey font against a white background, devoid of

underlined text or any conspicuous visual cues" "damning[.]" 721 F. Supp. 3d at 1259-60.

As discussed above, the District Court below adopted the *Eakins* court's feature-by-feature analysis in whole, stating: "All other things being equal, the Court would fully agree with Judge Jones [in the *Eakins* decision]. The parties present the same legal arguments and authorities in this case that were presented in Eakins, and like Judge Jones, the Court rejects Defendant's description of the sign-in wrap agreement in its App." (App.201).

## SUMMARY OF THE ARGUMENT

As the party seeking to enforce an arbitration agreement, Temu carries the burden of establishing in the first instance the existence of an arbitration agreement. The District Court properly found that Temu failed to carry its burden to establish the Parties' agreement to arbitrate and denied the motion on that basis.

To carry its initial burden Temu had to establish through record evidence either (1) Ms. Smith's actual knowledge of the arbitration provision, or, as is more common in the context of internet-based consumer contracts, (2) that a registered user of the Temu app's assent to its terms and conditions (which contain an arbitration provision) is apparent from the site's design; stated differently, that the site put the registered user on so-called "inquiry notice" of the existence of, and

agreement to, the terms and conditions as a consequence of signing up for a Temu account.

Temu only pursued the second avenue in attempting to prove an agreement to arbitrate. It did not introduce a signed contract or other indicia that Ms. Smith had actual knowledge of the Terms of Use or the arbitration provision contained therein. The District Court easily found that Temu failed to establish Ms. Smith's actual knowledge.

As such, the thrust of the District Court's decision was its fact-intensive inquiry into the features of Temu's registration flow—screen captures of which Temu submitted in support of the motion—to determine whether users were provided sufficiently conspicuous notice of the app's terms and conditions. Ultimately, the court found that the design of Temu's registration flow— specifically, the fact that the linked terms and conditions were presented in miniscule, light grey font, submerged at the bottom the screen, and the presence of several icons and buttons between the "Continue" button and the Terms of Use— rendered the registration flow *incapable* of passing the conspicuousness test for inquiry notice.

Temu's argument before this Court is that the District Court erred both procedurally and substantively. Neither basis has merit. Procedurally, Temu asserts that the District Court improperly relieved Plaintiff of a purported burden to establish

that she was unaware of the arbitration provision. Plaintiff had no such burden and Temu's suggestion that she did completely misapprehends the basics of enforcing an arbitration agreement. It is elementary that the party seeking to enforce an arbitration agreement bears the initial burden of establishing a valid agreement to arbitrate exists. If, and only if, that burden is met, is the resisting party obligated to come forward with evidence to dispute the formation of the agreement.

Here, Temu only argued that its app registration flow provided inquiry notice. It did not submit evidence that Ms. Smith had actual notice, only that she logged into the app. Having failed to establish either inquiry or actual notice, Temu failed to meet its initial burden to establish the existence of an arbitration agreement—as the District Court rightly concluded. Temu's argument that the District Court erred by denying its motion in the absence of an affidavit from Ms. Smith attesting to her ignorance of the arbitration provision is misplaced. Plaintiff was not obliged to rebut a fact which Temu, the party bearing the burden, never established in the first place.

Temu fares no better in its criticism of the District Court's ruling and conclusion that the app's registration flow fails to provide inquiry notice. The District Court thoroughly evaluated Temu's registration flow and considered the screen's essential features, including the presentation of the terms and conditions, the proximity of the terms and conditions to the "Continue" button, the presence of other buttons, graphics, and colors, and the overall design and layout, and it also

thoroughly analyzed and considered the second screen that Plaintiff encountered as she proceeded to sign in to the app through her Google account. Faithfully applying principles from a legion of District Court and appellate caselaw on the formation of internet-based consumer contracts, the District Court found Temu's registration flow did not amount to inquiry notice. The correctness of this holding is confirmed by the rulings of two other district courts in *Johnson* and *Eakins* examining the same registration flow and reaching the same conclusion. Considering Defendant's procedural and substantive challenges to the District Court's ruling on the motion to compel arbitration *de novo*, the record below, and the applicable authorities, this Court should affirm the District Court's denial of the motion to compel arbitration.

## ARGUMENT

### A. Temu failed to carry its initial burden to establish an agreement to arbitrate.

Temu argues that the District Court "did not properly apply (or even consider) whether Smith had satisfied her burden to present admissible evidence to raise a genuine dispute of material fact on the contract formation issue" and that such "failure" was "reversable error." (Appellant's Brief ("Br.") at 33). Temu misapprehends which party bears the burden in the first instance and when, if ever, it shifts.

"Although the FAA provides a procedure for parties to compel arbitration the existence of an agreement to arbitrate is a threshold matter which must be established

before the FAA can be invoked. The party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (citations and quotations omitted). Courts apply state law principles to determine whether a contract has been formed. *Hancock*, 701 F.3d at 1255. Under Oklahoma law, a contract's proponent has the burden to establish its existence. 17B C.J.S. Contracts § 931 ("the burden of proof is on the party seeking to enforce an agreement or to claim rights under it"); *see also Dollar Rent A Car Sys., Inc. v. P.R.P. Enter's., Inc.*, 2006 WL 1266515, at *22 (N.D. Okla. May 8, 2006), *aff'd*, 242 F. App'x 584 (10th Cir. 2007) (party asserting rights under contract has burden to establish existence of the contract).

Thus, to meet its initial burden to establish an agreement to arbitrate, Temu needed to establish Ms. Smith's assent to arbitrate. *See Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("As every first-year law student knows, "[a]n agreement or mutual assent is of course essential to a valid contract.") (quoting *Lucy v. Zehmer*, 84 S.E.2d 516, 522 (Va. 1954)). This basic rule of contracts was axiomatic in Oklahoma even before its admission to the Union: "The gist and meaning of the word 'contract' is that the minds of the parties must meet and agree upon a given proposition." *McCormick v. Bonfils*, 60 P. 296, 299-300 (Okla. 1900).

The axiom remains unchanged in the epoch of internet-based consumer agreements. A website operator seeking to compel a user to arbitration still shoulders the burden to establish either the user's actual or imputed knowledge of the existence of an arbitration agreement. *See Berman*, 30 F.4th at 856 ("Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.").

If the party seeking arbitration establishes an agreement to arbitrate, the burden shifts, as it would under Federal Rule of Civil Procedure 56, to the non-moving party to raise a genuine dispute of fact concerning the formation or enforceability of the agreement. *See, e.g.*, *Hancock*, 701 F.3d at 126 ("Defendants as the moving parties had the burden to show that the Forum Selection and Arbitration Clauses apply to Plaintiffs. *If that initial burden was met*, Plaintiffs could attempt to rebut that showing with evidence establishing a genuine dispute as to whether the provisions apply.") (emphasis added); *see also BOSC, Inc. v. Bd. of Cnty. Commissioners of Cnty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (internal quotation omitted) ("The [motion to compel arbitration] framework is similar to summary judgment practice: the party moving to compel arbitration bears

the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; *if it does so*, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith.") (emphasis added). However, "*only if* the moving party [presents evidence sufficient to demonstrate the existence of an enforceable agreement] will the burden shift." *Campbell Invs., LLC v. Dickey's Barbecue Restaurants*, Inc., 784 F. App'x 627, 634 (10th Cir. 2019) (emphasis added).

In the context of a motion to compel arbitration, the Rule 56 standard requires the moving party to establish the existence of arbitration agreement by the preponderance of the evidence. *Melnick v. TAMKO Building Prod's., LLC*, 2022 WWL4355299 at *4 (D. Kan. Sept. 20, 2022). Here, Temu failed to present any evidence whatsoever of Ms. Smith's actual knowledge of the app's Terms of Use. The *Eakins* court, facing nearly identical facts, noted as much, stating "there is nothing to suggest that Plaintiff had actual notice of Defendant's terms of use." *Eakins*, 721 F. Supp. 3d at 1257. Temu proceeded solely on the theory that its app's registration flow provided inquiry notice (App.83-89) and, as the District Court found, failed as well to make that showing. (App.203). Temu raised the issue that Plaintiff did not include an affidavit attesting to her ignorance of the arbitration provision in its reply memorandum before the District Court (App.182-183), but,

then as now, the point is of no import. Under the burden-shifting framework applicable to a motion to compel arbitration, Ms. Smith was not required to come forward with evidence to rebut actual knowledge of the Terms of Use unless Defendant first established the existence of an agreement to arbitrate, either through a showing of her actual knowledge or that the app's layout put a user on inquiry notice through the conspicuous display of the Terms of Use. Stated differently, Ms. Smith was not required to rebut something which had never been proven in the first place. *See Rodriguez v. Harley-Davidson Motor Co., Inc.*, 2024 WL 3032945, at *3 (C.D. Cal. May 6, 2024) ("Defendant does not present evidence Petitioner viewed or had actual knowledge of the arbitration provision or any other term stated in the Terms of Use. Defendant, likewise, does not present any evidence the website prompts users to take any affirmative action to demonstrate assent to the Terms of Use, prior to viewing videos or otherwise using the website. Defendant, thus, fails to establish the existence of an arbitration agreement between the parties.").

The authorities Temu cites in its brief are inapposite precisely because they overlook that in each instance the court found the defendant *met its initial burden* by proving a plaintiff's knowledge of and assent to the arbitration agreement, either by use of an internet-based consumer agreement which sufficiently provided inquiry notice, actual notice, or both. In analogizing the present case to those cases,

Defendant puts the cart before the horse, questioning Plaintiff's failure to rebut a fact which was unproven in the first place.

Generally, Temu's cited authorities fall into three categories. The first is the category where the defendants met their initial burden through proving actual notice by producing a <u>signed contract</u>. *See, e.g.*, *Waltrip v. Pilot Travel Centers*, 2022 WL 684327 (D.N.M. Mar. 8, 2022) (Br. at 29-30, 36) (involving signed arbitration agreement contained within an employment agreement).[4] Under Oklahoma law, a signed contract is prima facie evidence of assent to its terms. *See Elsken v. Network Multi-Fam. Sec. Corp.*, 49 F.3d 1470, 1474 (10th Cir. 1995) (citation omitted) ("Under Oklahoma law, where a party signs a written agreement, in the absence of false representation or fraud, he is bound by it, although ignorant of its contents."). Temu, of course, produced no signed contract in support of its Motion. That the district courts in these signed contract cases compelled arbitration is unsurprising, but also not instructive given no signed contract exists here.

Second, Temu points to a number of cases where defendants successfully compelled arbitration based on the use of <u>clickwrap agreements</u>. This line of cases

---

[4] *See also Brown v. AutoNation Chrysler Dodge Jeep Ram Sw*., 2021 WL 2514524 (D. Colo. June 18, 2021) (Br. at 31) (automobile purchase contract signed by plaintiff); *Levine v. Vitamin Cottage Nat. Food Markets*, 2021 WL 4439800 (D. Colo. Sept. 27, 2021) (Br. at 35) (defendant produced plaintiffs' electronic signature on arbitration agreements); *Martinez v. Capstone Rest. Grp.*, 2021 WL 1723776 (D. Colo, Mar. 31, 2021) (Br. at 35) (same).

is also inapposite. For instance, in *Blake v. JPay, LLC*, 2022 WL 1223634, at *3 (D.

Kan. Apr. 26, 2022) (citation omitted) (cited in Br. at 31) the court explained:

> In determining whether JPay has met its initial burden, the Court examines whether the evidence presented demonstrates that the "clickwrap" agreement utilized by JPay in its Terms of Service and Arbitration Agreement constitutes an enforceable agreement to arbitrate. For context, a clickwrap agreement is one that appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction. This is precisely the type of agreement utilized by JPay[.][5]

*Blake* exemplifies the now well-established rule that "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of the agreement by clicking 'I agree.'" *Meyer*, 868 F.3d at 75; *see also Hancock*, 701 F. 3d at 1256 (citation omitted) ("Clickwrap agreements are increasingly common and 'have routinely been upheld.'").

The clickwrap cases Temu cites each involved the court first concluding that the defendant met its initial burden to establish an agreement to arbitrate by using a clickwrap agreement and then addressed the plaintiff's inability to undermine the

---

[5] *See also Davis v. USA Nutra Labs*, 303 F.Supp.3d 1183 (D.N.M. 2018) (Br. at 30) (clickwrap arbitration agreement); *Vernon v. Qwest Commc'ns Int'l,* 925 F.Supp.2d 1185 (D. Colo. 2013) (Br. at 33) (same); *Petrie v. GoSmith, Inc.*, 360 F.Supp.3d 1159 (D. Colo. 2019) (Br. at 30, 32, 37) (same); *Clements v. Alto Tr. Co.*, 685 F. Supp. 3d 1249, 1260 (D.N.M. 2023) (Br. at 36) (same); *La Force v. GoSmith, Inc.*, 2017 WL 9938681 (N.D. Cal. Dec. 12, 2017) (Br. at 37) (same); *Ferrell v. to AppFolio, Inc.*, 2024 WL 158103, at *2 (C.D. Cal. Jan. 11, 2024) (Br. at 37-38) (same); *Levine*, 2021 WL 4439800 (Br. at 35) (clickwrap agreement in addition to obtaining plaintiff's electronic signature).

existence of a binding agreement with counterevidence. The District Court rejected Temu's attempt to characterize its app's registration flow as a clickwrap as unfounded, simply noting that its registration interface lacked the critical checkbox which signifies assent to a site's terms of use and which is the hallmark of a clickwrap. *Eakins*, 721 F. Supp. 3d at 1258 n.4 ("But Defendant's App did not require Plaintiff to check a separate box indicating her assent to Defendant's terms. Indeed, she could create an account without ever viewing Defendant's terms. The Court finds the agreement here is best characterized as a sign-in-wrap."). Defendant's citation to these clickwrap cases, yet again, misses the point. A plaintiff's obligation to produce rebuttal evidence is only triggered upon a defendant's first showing the existence of a binding agreement, which Temu has not done.

Third and finally, Temu cites cases where courts found, or plaintiffs conceded, that defendants met their initial burden to establish an arbitration agreement exists, *but* where the plaintiffs contended they should not be compelled to arbitration for some other reason, such as not reading the agreement, having no recollection of signing the agreement, their inability to consult an attorney, and the like, and were ultimately compelled to arbitrate. *See, e.g.*, *Beattie v. TTEC Healthcare Sols.*, 2019 WL 2189481 at *2 (D. Colo. May 21, 2019) (Br. at 33-34) (court found defendant met its initial burden through the presence of conspicuously linked terms and

conditions and plaintiffs' explanations for why they should not be bound once the burden shifted did not amount to a disputed issue of material fact).[6] Again, these authorities are of no moment for a familiar reason: Temu did not carry its initial burden to establish an agreement to arbitrate. As a result, Plaintiff was not obligated to bring forward any evidence in rebuttal.[7]

---

[6] *See also Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (Br. at 36-37) ("Cordas raises no *genuine* dispute of any *material* fact, and it is proper to conclude, as a matter of law, that he was on notice of Uber's terms and conditions, and assented to them in signing up for Uber.") (emphasis in original); *Rose v. Mercedes-Benz USA, LLC*, 2023 WL 8544143, at *3 (N.D. Ill. Dec. 11, 2023) (Br. at 37) (court found defendant provided actual notice of the arbitration agreement and plaintiffs' failure to recall receiving such notice did not amount to a disputed issue of material fact); *Nardo v. HomeAdvisor, Inc*., 2022 WL 17547940 at *5 (D. Colo. July 27, 2022) (Br. at 31) (plaintiff conceded and court found that defendant established a valid arbitration agreement existed and plaintiff failed to raise a disputed issue of material fact where he clicked the button to accept the terms and conditions but never actually read the terms and conditions).

[7] Temu makes an additional procedural argument that the District Court erred by not proceeding summarily to trial under Section 4 of the FAA. (Br. at 41-43). The argument is baseless. There was no triable issue of fact to be resolved. The District Court found as a matter of law that Temu failed to establish the existence of an agreement to arbitrate based on the contents of its app's registration flow holding as follows: "considering objectively the alleged sign-in wrap agreement in its App, the Court finds that Plaintiff did not receive conspicuous notice of Defendant's Terms of Use or give her assent to an online agreement containing them. Therefore, no contract between the parties including an arbitration agreement was formed." (App.203).

Temu claims on the one hand that "Smith's failure to supply even a simple declaration disclaiming assent to Temu's Terms of Use should have sufficed to require the district court to grant Temu's motion" (Br. at 27), while on the other, it asserts that the District Court should have ordered an evidentiary hearing. (Br. at 43). Temu's obviously inconsistent position is grasping at straws.

Temu additionally submits that this court should follow a Florida state court decision, *Fontanez*, involving alleged violation of the Florida Telephone Solicitation Act. There, the court compelled the plaintiff to arbitration based on the plaintiff's use of the Temu app. But there, the *Fontanez* court took judicial notice of the fact that the plaintiff had previously filed *eleven* FTSA class action lawsuits in the jurisdiction, and that in the first of those suits, the defendant corporation moved to compel plaintiff to arbitration based on its terms and conditions. (App.100). The court inferred that, from this earlier experience, the plaintiff had actual notice that an e-commerce site like Temu subjects users to terms of use. (App.100-101). Because Plaintiff supposedly had actual knowledge, the agreement to arbitrate had been proven. The *Fontanez* court reasoned that because the plaintiff did not deny she had actual knowledge—a fact which had been established in the record evidence through judicial notice and, apparently, an inference—Plaintiff was bound to arbitrate her claims.

---

Temu's citation to *Howard v. Ferrellgas Partners*, 748 F.3d 975, 984 (10th Cir. 2014) (Br. at 42-43) is misplaced. *Howard* involved a district court's determination without a hearing or trial of factual questions the court itself acknowledged were unresolved concerning the formation of an arbitration agreement. *Id.* The instant matter, of course, presents no unresolved factual questions. The District Court examined the screenshots of the app registration flow that Temu submitted in support of its motion and denied the motion as matter of law on the basis that Temu's app "failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when creating her account." (App.195).

*Fontanez*'s reasoning is unsound. *See Johnson*, 2023 U.S. Dist. LEXIS 18404, at *7, (App.179) (noting disagreement with the *Fontanez* court's application of the burden-shifting analysis and its use of judicial notice and inferences to find Plaintiff's actual knowledge of the terms and conditions). Even if it were presumed to be sound, *Fontanez* would be of no moment here because Plaintiff here has not filed a spate of prior class actions concerning telemarketing, nor previously confronted a motion to arbitrate in any such case. Nor has Temu established, in any event, that Plaintiff had actual notice of its terms and conditions.

Temu's procedural arguments raise no valid grounds for why the Court should reverse the District Court's ruling on the motion to compel arbitration. The District Court properly made its conclusion of law based on undisputed record evidence, which this Court should affirm on *de novo* review.

## B. The District Court correctly found that Temu's app failed to put Plaintiff on inquiry notice of its Terms of Use.

This Court should affirm the District Court's thorough and well-reasoned conclusion that Temu's inconspicuous presentation of a link to its Terms of Use in the app's registration flow failed to place Plaintiff on inquiry notice and evince assent to an agreement to arbitrate her claim.

1. <u>The Temu app's registration flow presented its Terms of Use inconspicuously.</u>

The District Court followed the well-trodden path of "engag[ing] in fact-intensive inquiries of the layout and language of a website or application" to determine whether Temu app's registration flow amounted to a binding agreement. *Route App, Inc. v. Heuberger*, 2022 WL 2316377, at \*3 (D. Utah June 28, 2022). Generally speaking, courts will only find that a consumer assented to the terms of a "hybrid" web-based form such as the Temu app flow where the website clearly and conspicuously notified the user, next to the operative button, that by clicking the operative button he or she is agreeing to the terms (which must be accessible via a hyperlink), and where the visitor thereafter clicked the operative button. The touchstone of "inquiry notice" is whether consumers were clearly and conspicuously apprised that their click binds them to linked terms and conditions. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 401 (E.D.N.Y. 2015) (noting courts uphold hybrid agreements "where a hyperlink to the terms and conditions appears next to the only button that will allow the user to continue use of the website"); *see, e.g.*, *Forby v. One Techs., LP*, 2016 WL 1321194, at \*1 (S.D. Ill. Apr. 5, 2016) (enforcing terms where the user clicked the "Continue" button and the following statement, with a hyperlink to the terms, appeared directly *above* the button: "By clicking on the 'Continue' button below, you agree to the Offer Details, to the Terms and

Conditions"). Here, the Temu Flow does not amount to inquiry notice because of its design, which *inconspicuously* presented the Terms and Conditions:



The District Court here rejected Temu's asserted inquiry notice based on the simultaneous presence of several factors concerning the registration screen's design, quoting extensively from *Eakins*. First, "the terms of use agreement appears in relatively small font at the bottom of the screen – spatially decoupled from the attention-grabbing orange 'Continue' button that users click to create their account." (App.199). Second, again quoting *Eakins*: "while other, closer buttons are available, the orange button—in both placement and coloring—is set apart. One could argue it

is initially unclear whether the terms of use agreement even pertains to the creation of an account using email or phone number." (*Id*.) Third, and again agreeing with *Eakins*, the "most glaring" issue is the "App's failure to distinguish the 'Terms of Use' hyperlink" – the Terms of Use notice "appears in grey font against a white backdrop, and while "Terms of Use" is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks from its surrounding text." (*Id.*). With respect to this point, in *Eakins*, and here, the district courts relied on the Ninth Circuit's decision in *Berman*, 30 F.4th at 856, quoting *Berman* as follows:

> [W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent … A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.

(*Id.*).

Fourth, and related to the Temu app's display of the "Terms of Use" under other sign-in pathways that Ms. Smith did not use, the District Court wrote (again quoting *Eakins*): "[t]he App's failure to adequately distinguish the hyperlinked text, coupled with its obscure placement of the terms of use agreement, fails the conspicuous test." (App.200). Notably, while the obscured display of the "Terms of

Use" hyperlink in muted grey tones in tiny font was the most problematic aspect of the Temu app's registration flow to the District Court, the District Court did not treat any one factor as dispositive. Rather, implicit in the District Court's ruling was its determination that the factors it discussed, in concert, rendered the registration screen incapable of putting a user on inquiry notice.

Additionally, the registration path followed by Ms. Smith here differed slightly from that followed by the plaintiff in *Eakins*. (App.201). In *Eakins*, the plaintiff clicked the first orange "Continue" button to create a new account with her email address; while here, Ms. Smith clicked the second of five large oval buttons labeled "Continue with Google", which included the colorful Google icon. (*Id.*). "By proceeding to the App through her Google account, Plaintiff encountered another screen that provided a second opportunity to review Defendant's terms[,]" (*id.*), reproduced below:



Temu points out that, on this screen, the terms of use are actually in blue. (Br. at 19-20). But Temu also acknowledges that the District Court fully considered this difference, noting that the vague language of the disclosure failed to provide notice. (Br. at 27). As found by the District Court:

> Here, unlike the initial screen where "Terms of Use" appeared in slightly darker grey font and gave no indication of a hyperlink, the words "terms of service" in this screen were in a blue color, which commonly denotes the existence of a hyperlink. Note, however, the context in which this hyperlink appears. This screen did not inform Plaintiff that proceeding to the App by allowing Google to share her information with Defendant would signify an agreement to or acceptance of Defendant's terms of service. Instead, it merely stated that Plaintiff could review Defendant's terms of service before using the App. This phrasing does not provide any notice, and certainly not conspicuous notice, that Plaintiff was consenting to a contract with Defendant by using this avenue to proceed.

(App.202). The District Court was correct and Temu's brief fails to address this analysis. Temu's own language, that an individual "can review" its terms, does not come close to manifesting consent to a contract with Temu.

Additionally, comparing the initial sign-up screen with the Google sign up page highlights another difference. On the initial screen, the Terms are labeled as the "Terms of Use" (capitalized), while on the sign in with Google page they are titled as "terms of service" (lower case and titled differently).

Temu also argues that the spatial separation from the "Continue with Google" button is in relatively close proximity to the Terms of Use on the main sign in page. (Br. at 23). But, again, the District Court properly considered and rejected this argument, noting that "the Google button was positioned lower on the screen" and so "it was located slightly closer to the statement at the bottom that continuing would signify an agreement to Defendant's Terms of Use" and so "[a]rguably, the eyes of a user moving beyond the orange button would be drawn further down the screen and might be more likely to notice the warning." (App.203). The District Court correctly concluded that:

> However, the same remaining facts – a spatial separation, the eye-catching logos of other options in that space (Google, Facebook, Apple, and Twitter), and the smaller light grey font on a white screen with no indication of a hyperlink – lead the Court to the same conclusion that the "by continuing" statement did not provide conspicuous notice to a consumer that they were agreeing to a contract that included the Terms of Use." As a

result, the Court finds that the factual differences between this
case and Eakins do not affect the outcome."

(*Id.*).

The District Court also found that the placement of "Continue with Google" button being one button lower than the bright orange "Continue" button was of little import, because, again, one's eyes would have no reason to continue to gaze further down to view non-descript text, especially after making the decision to click to continue. The District Court further found that "the 'continue with' logo buttons offered the user easy access to the App with an existing account, requiring no further effort to complete a new sign-up process. In the Court's view, an individual spying this option and electing to proceed this way would be unlikely to look further down the screen." (App.203). The District Court was correct. Once an individual spies the appropriate "Continue" button, while viewing an interface from top to bottom, the individual would have no reason to continue viewing the page and once the continue button is selected, the individual is naturally taken to a new screen.

As discussed, multiple other courts reject the notion that the Temu app's registration flow amounts to inquiry notice. The district court in *Johnson* made the same observations and concluded that the hyperlinked text "Terms of Use" was not sufficiently conspicuous to provide inquiry notice, finding that the hyperlink was "not prominent or particularly remarkable at the bottom of the page where it is featured" and that its "inconspicuous nature" was "further compounded by its poor

placement on the website." (App.178) The court found it "not reasonable to expect a user to continue reading below the highly conspicuous purchase button" and explained that "the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange "Continue" button. This placement does not put a reasonably prudent user on inquiry notice." (*Id.*)

Like the District Court here, the *Johnson* court singled out the design choices related to the presentation of the "barely visible"[8] Terms of Use stating: "Most damning to Defendant's attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues … This camouflaged font contradicts Defendant's assertion that its registration page displays a conspicuous hyperlink to [it]s Terms of Use. And crucially—it evinces an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate." (App.178).

The published *Eakins* also rejected Temu's contention that the Temu app's registration flow provided inquiry notice: "The Court turns its attention to Defendant's App. In doing so, it concludes that the App failed to provide reasonably conspicuous notice that Plaintiff was agreeing to Defendant's terms of use when

---

[8] For its part, Temu characterizes its notice as "very readable." (Br. at 53).

creating her account." *Eakins*, 721 F. Supp. 3d at 1258. The *Eakins* court, like the District Court below, identified "the size and color of font used in the notice, the means of denoting a hyperlink (such as blue highlighted or underlined text), a spatial connection between the notice and the button intended to manifest assent, and any visual distractions or features that detract from the clarity of the notice" as factors to examine when assessing whether a webpage provides inquiry notice. (App.197). The District Court here concurred in full with Judge Jones's assessment in *Eakins* and explicitly rejected Temu's characterization of the Temu registration flow, which it rehashes here,[9] that "the Terms were presented to Plaintiff in a clear and conspicuous manner, in plain English, and more than once … where [there was] a 'Continue' button in close proximity to the conspicuously-hyperlinked Terms[.]." (App.73).

The problematic features of the Temu app registration flow discussed by the District Court here and in *Johnson* and *Eakins* are by no means outliers. Online marketers routinely use these tactics to keep customers from understanding the consequences of pressing buttons on a website and courts frequently reject the notion that presentations like the one Temu employed in the registration flow are capable

---

[9] Specifically, in its opening brief Temu states: "In sum, the overall design of Temu's screen—proximate placement, obvious hyperlinks, text color, typeface, style, and size, against a clear visible background, lack of clutter, and repetition and other design factors—provided reasonably conspicuous notice." (Br. at 56).

of manifesting a reasonable consumer's assent to terms of use. For example, in *Cullinane*, 893 F.3d at 63-64, the First Circuit reversed the district court's granting of a motion to compel arbitration based on a careful analysis of the sign-in-wrap screens' presentation and layout. Among the features the First Circuit noted that rendered the screens incapable of manifesting assent were the fact that "Uber's "Terms of Service & Privacy Policy" hyperlink did not have the common appearance of a hyperlink, stating:

> While not all hyperlinks need to have the same characteristics, they are "commonly blue and underlined." *CR Assocs. L.P. v. Sparefoot, Inc.*, 2018 WL 988056, at *4 n.4 (D. Mass. Feb. 20, 2018); *see also e.g.*, *Meyer*, 868 F.3d at 78 ("[T]he hyperlinks are in blue and underlined."); *Adelson v. Harris*, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text.") … Here, the "Terms of Service & Privacy Policy" hyperlink was presented in a gray rectangular box in white bold text. Though not dispositive, the characteristics of the hyperlink raise concerns as to whether a reasonable user would have been aware that the gray rectangular box was actually a hyperlink.

*Cullinane*, 893 F.3d at 64.

The District Court zeroed in the hyperlink presentation as being the most significant factor in its determination that the app's registration flow failed to provide inquiry notice. *Johnson* went even further and flatly stated that the use of a light grey font (where traditionally blue is used) against a white background for notice purposes evidenced "an intent to *conceal*[.]" (App.178) (emphasis in

original). The skepticism expressed by *Johnson* about this design choice is not unique. *See, e.g.*, *Cullen v. Shutterfly Lifetouch, LLC*, 2021 WL 2000247, at *8 (N.D. Cal. May 19, 2021) (finding defendant failed to carry its burden to prove assent to arbitration stating: "The subject language is in tiny print, that appears to be light gray in color, and there is no header or other indicator that would notify an individual of important contractual terms."); *Wilson v. Redbox Automated Retail, LLC,* 448 F. Supp. 3d 873, 886 (N.D. Ill. 2020) ("[T]he Court finds the gray disclosure text surrounding the hyperlinks not reasonably conspicuous because there is insufficient contrast between the gray text and the black background."); *Cf. Fisher v. Sutton Place/Pinnacle A.M.S.*, 2008 WL 2095417, at *2 (S.D. Ind. May 16, 2008) ("The fact that the agreement imposes an obligation to arbitrate disputes is clear and prominent. This was not an arbitration agreement buried in small, light-gray type on the back of an invoice or purchase order. No literate person completing and signing the form could have missed the agreement to arbitrate, which is the subject of five of eight pages in the document.").

Tellingly, Temu presents twelve exemplar registration screens which courts have determined manifest inquiry notice. (Br. at 57-67).[10] The common thread

---

[10] Temu presented no such examples to the District Court. This Court should not consider them now. *See Chegup v. Ute Indian Tribe of Uintah & Ouray Reservation*, 28 F.4th 1051, 1070 (10th Cir. 2022) ("[W]e are a court of review, not first view."); *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021) ("The principle of party presentation is a fundamental premise of our adversarial system … [W]e

amongst them all is that, *unlike the Temu screen*, these all appear designed to call attention to the linked terms of use. Invariably, the links are in a color offset from the surrounding notice language (most frequently blue), and in many cases are in all capital letters, or underlined.[11]

---

rely on the parties to frame the issues for decision … [so] courts normally decide only questions presented by the parties.") (quotation omitted).

[11] *Walker v. Neutron Holdings, Inc.*, 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020) (Br. at 57) ("The court also found the notice to be legible, and that the hyperlinked words "**User Agreement & Terms of Service**" in dark, bold font stood out from both the white screen and preceding gray text … Based on these circumstances, the court found, a reasonably prudent smartphone user would understand that by signing up for Lime, he or she is assenting to the User Agreement."); *Meye*r, 868 F.3d at 78-79 (Br. at 58) ("Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined."); *Selden v. Airbnb, Inc*., 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (Br. at 60) ("The text 'By signing up, I agree to Airbnb's Terms of Service' is conspicuous. It is placed in roughly the middle of the page, in close proximity to all three sign-up buttons. The text also appears in dark font, in sharp contrast to the white background."); *Rainey v. A Place for Rover, Inc.*, 2022 WL 16942849, at *2 (C.D. Cal. July 18, 2022) (Br. at 59) ("Here, the text that puts customers on notice of the Terms is conspicuously located directly below the button that allows the user to create an account. The Terms are hyperlinked in blue text and stand out against the rest of the white page."); *Moyer v. Chegg, Inc.*, 2023 WL 4771181, at *5 (N.D. Cal. July 25, 2023) (Br. at 60) ("The notice appears in black writing against a white background with the phrase, 'Terms of use,' in blue, hyperlinked text. Moreover, very minimal text or imagery appears on the same page."); *Peter v. DoorDash, Inc*., 445 F. Supp. 3d 580, 586-87 (N.D. Cal. 2020) (internal citations omitted) (Br. at 61) ("DoorDash's sign-up page looks markedly similar to the page approved by *Meyer*. The screens are similarly uncluttered and wholly visible, and the notice text appears even closer to the sign-up button on DoorDash's page than on Uber's … DoorDash's sign-in page includes two hyperlinks, to its T & C and privacy statement … The hyperlinks are both in blue, indicating to users that they are clickable[.]"); *Gennaro, v. Avvo, Inc.*, 2019 WL 13488559, at *4 (S.D. Cal. May 6, 2019) (Br. at 62) ("the words 'terms of use' were

Further confirming that the Temu app screen is incapable of conveying inquiry notice is the number of buttons on the screen, and the attending attraction which they draw. Between the bright orange "Continue" button and the inconspicuous link residing at the bottom of the screen are five other buttons, four of them colored. The District Court noted that it was altogether unclear whether, based on the overall layout and placement of buttons on the screen, the statement "By continuing, you agree to our Terms of Use and Privacy Policy" applied only to

_____

in blue font and hyperlinked to a page containing the Terms of Use. The remainder of the sentence is in black font. Under normal viewing conditions, the 'Sign in' button is in close enough proximity to the sentence '[b]y signing in, you agree to Avvo's terms of use' that a user would not have to scroll down the page to see it[.]").

Temu cites *Lee v. Ticketmaster, L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020) (Br. at 49) for the proposition that the court approved of notice which was smaller than the surrounding text. The *Lee* opinion, however, makes no reference to the relative size of the terms of use notice compared to the surrounding text. The opinion, though, does specifically note that the hyperlinked Terms of Use appeared twice in the sign in flow in *blue* font which favored a finding of inquiry notice. Similarly, the court in *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015*), aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017) (Br. at 49) made the same observation about the notice's visibility being enhanced by being "set off in blue-colored font." *Id.*

Temu also cites *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) for the proposition that there is nothing talismanic about the color blue when it comes to hyperlinks. (Br. at 52). That may be true, but, in *Patrick*, the touchstone of what made the hyperlink obvious was that it was "colored bright green – contrasted against the surrounding white background and adjacent black text." Here the surrounding text of the clickable light grey hyperlink is slightly lighter grey.

the four buttons which resided under the bright orange continue button or to any button on the screen.

Notwithstanding this jumble of buttons, Temu claims that "[t]here are no other surrounding or distracting text or images or graphics on the screen. Each screen is designed to be user-friendly, with ample use of white space for easy reading. No other design elements on the screen clutter or obscure the textual notice." (Br. at 48). The District Court, *Johnson*, and the published *Eakins* decision, all found the opposite to be true. (App.199). Rather, these courts all rightfully determined that, in contrast to the large brightly colored buttons above, the slightly different shades of grey at the bottom did more to hide than to reveal the Terms of Use.[12] (*Id.*).

---

[12] Temu cites registration screens from the mobile app Game of Thrones Conquest that the court found conveyed inquiry notice in *Keebaugh v. Warner Bros. Entm't*, 100 F.4th 1005, 1020 (9th Cir. 2024). (Br. at 64-65). The registration screens contained images of battling dragons, which Temu asserts are more "attention-grabbing" than the orange "Continue" button in its app. But the notice is far more conspicuous in *Keebaugh* than on Temu's app. Among other differences, the arrangement of the page elements in *Keebaugh* are much simpler. The registration page there contained only the images, the game's name, a 'Play' button, a disclosure that "by tapping 'Play' I [agree to the terms and conditions]," and links to the terms of service and the privacy policy. This is half as many design elements as the Temu app's registration page. Moreover, the notice and link to the terms of use in *Keebaugh* appear immediately below the 'Play' button, are in white text against a black background, and the hyperlink to the 'terms of use' is emphasized by a white box which appears to form a clickable button. In Temu's app, by contrast, the notice is separated from the "Continue" button by nearly an entire screen length and half-dozen design elements (including four clickable buttons), and the hyperlink is not clearly presented to the user as a clickable link.

In *Cullinane*, the First Circuit noted that the presence of several buttons on the screen (as here) likely rendered a web-based form incapable of manifesting users' assent to the terms and conditions that were accessible via a hyperlink. *Cullinane*, 893 F.3d at 63-64. As the court put it: "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous." *Id.* at 64.

Likewise, in *Nicosia*, where the defendant's order page – similar to the Temu app sign-in-wrap registration flow – stated that "by placing your order, you agree to Amazon.com's privacy notice and conditions of use," *Nicosia*, 834 F.3d at 237, the Second Circuit found that, given the manner in which the statement appeared on the order page, the defendant had "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law" when she clicked a "Place your order" button. The court explained its reasoning in pertinent part as follows:

> The message itself – "By placing your order, you agree to Amazon.com's … conditions of use" – is not bold, capitalized, or conspicuous in light of the whole webpage … There are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message[.]

*Id.* at 236-37 (citations omitted).

This was also the case in *Redbox*, where the court found that linked Terms of Service were not effectively presented because, crucially, "the button for the Terms of Use and accompanying disclosure [were] not adjacent to the 'Pay Now' button." *Redbox*, 448 F. Supp. 3d at 883. Rather, the "Pay Now" button appeared in the middle of the right side of the screen while the Terms of Use and disclosure appeared at the bottom. *Id*. at 883-84. The court found that the website's checkout page failed to manifest assent to the linked terms of service because of "general clutter" caused by intervening buttons between the "Pay Now" button and the linked terms and conditions. *Id*. at 884. It found that this arrangement "dilute[d]" the effectiveness of the notification." *Id.*

This is an apt description of the Temu app's registration flow: the "Continue" button is several rows above the linked Terms of Use, not immediately adjacent to it, and separated by various options including a "Trouble signing in button" and four colorful buttons which provided alternative ways to sign up for a Temu account. All but one of the exemplar registration screens which Defendant submits shares a common theme: they have fewer than the eight buttons on the Temu app's registration screen. (*See* Br. 57-67).[13] Moreover, in each of these, the button which advances the flow is substantially closer to the hyperlinked notice than the Temu app

---

[13] The screen used in *Gennaro*, 2019 WL 13488559, at *4 (Br. at 62) also has eight buttons including a "forgot your password button" but, notably, includes terms of use in contrasting *blue* font.

registration flow, whose notice is submerged at the bottom—the "Continue with Google" button which Plaintiff clicked is towards the top of the page. Finally, the notice does not jump off the screen, as it is presented in a subdued light gray against a white background—unlike the large and colorful oval buttons, the first two from top to bottom being "Continue", presented in bright orange, and "Continue with Google" with the colorful Google logo.

In *Berkson*, the court found that even though the defendant put text *directly* above the sign in button, which stated that by signing in the user agreed to the terms of use, the disclosure was nonetheless "insufficient to give adequate notice." *Berkson*, 97 F. Supp. 3d at 404. The court explained that the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold," especially in contrast to the "user-friendly and obvious" "'SIGN IN' button" that appeared "in all caps." *Id.* Accordingly, the court concluded that this "sign-in contract of adhesion" was "not binding on [plaintiff]." *Id.* Here, as in *Berkson*, pressing the Temu app's registration flow "Continue with Google" button does not cause the "'terms of use' [to] appear in a new screen or in a [separate] pop-up window on the same screen," and "[t]he importance of the 'terms of use' [is] obscured by the physical manifestation of assent" to continue the registration flow either by pressing the "Continue" button or selecting one of four alternative ways to continue with the registration. *Id.* Accordingly, the only thing the Temu flow is capable of manifesting is an intention

to start a Temu account, and certainly not anyone's assent to the Terms of Use. *See also Applebaum*, 263 F. Supp. 3d at 466-67 (though defendant required plaintiff to click a "box" next to hyperlink with the defendant's terms of service, court concluded that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next' bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen," such that "[a] reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review").

Here, the Terms of Use link appears in small light grey font well below the giant, bright orange "Continue" button, along with five other buttons (four of which are brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple) appearing in between the "Continue" button at the top and the Terms of Use link at the bottom. As in *Cullinane*, the presence of these buttons diminishes the objective likelihood that a consumer would perceive the linked Terms of Use. *See Cullinane*, 893 F.3d 53 at 63-64.

The second page, after one clicks "Continue with Google," fares no better. As the District Court found, the second page, unlike the initial sign up page, does *not* inform users "that proceeding to the app by allowing Google to share her information with Defendant would signify an agreement to or acceptance of Defendant's terms

of service." (App. 202). It only states that a user "could review" Temu's terms before using the app. (*Id.*). "This phrasing," the District Court found, "does not provide any notice, and certainly not conspicuous notice" as is required for users to consent to a contract. (*Id.*).

In other words, "the layout *and* language" of the page fails to "give the user reasonable notice that a click [on the Continue button] will manifest assent to [the Terms of Use or its incorporated arbitration provision]." *Meyer*, 868 F.3d at 75 (emphasis added). The District Court thus found that the factual differences between the users' log-ins in *Eakins* and this case "do not affect the outcome." (App.203).

Simply put, the Temu app registration flow fails to adequately notify users in an objectively clear and conspicuous manner that by clicking the giant orange "Continue" or the colorful "Continue with Google" button they were agreeing to be bound by the Terms of Use noted at the bottom of the screen. For this reason, the District Court, *Johnson*, and *Eakins* all held that the Temu app's registration screen failed to put Plaintiff, or any other user of the app who pressed a "Continue" button on notice that, by so doing, they manifested their assent to the Terms of Use (or its incorporated arbitration provision).

2.  The *Fontanez* decision did not undertake a fact-intensive inquiry into the essential features of the Temu app registration flow.

As noted, Temu urges the Court to follow *Fontanez*, a Florida state court decision which held that the Temu app registration screen provides inquiry notice. *Fontanez*'s reasoning is unsound. First, as discussed, the court's first found that the plaintiff was a serial litigant who had actual notice of Temu's terms—by virtue of the fact that she had filed eleven similar class action lawsuits within the same court. (App.100).

As far as evaluating the site itself, the *Fontanez* court's inquiry began and ended with noting that the "Terms of Use" were bolded and hyperlinked and did not require scrolling to view. The court failed to examine "the size and color of font used in the notice, the means of denoting a hyperlink (such as blue highlighted or underlined text), the spatial connection between the notice and the button intended to manifest assent, and any visual distractions or features that detract from the clarity of the notice"—factors which the District Court here distilled from the body of internet contract formation as among the most relevant (App.197), and which the District Courts in *Eakins* and *Johnson* applied. On balance, *Fontanez* failed to meaningfully analyze the inconspicuousness of a feint hyperlink. Based on this lack

of this holistic analysis, the District Court below was unconvinced by *Fontanez*, a view shared by *Johnson* and *Eakins*. (App.200; App.178).[14]

This Court should affirm the District Court's denial of the motion to compel arbitration, which, like *Johnson* and *Eakins*, followed the thorough analytical approach regularly used by courts charged with determining whether internet-based consumer terms and conditions of use reasonably convey inquiry notice.

### 3. The New York *Hu* case is distinguishable

As discussed by Temu, another district court reviewed Temu's app and came to a different conclusion in *Hu v. Whaleco, Inc.*, 2024 WL 4481439 (E.D.N.Y. Oct. 1, 2024), an unpublished decision from a Second Circuit district court.

In *Hu*, the court discusses the reasoning of the District Court here and in *Eakins*, and, notably, does not criticize either. 2024 WL 4481439 *11 (E.D.N.Y. Oct. 1, 2024). Rather, it holds that a different conclusion is warranted under Second Circuit caselaw. *Id.* However, the *Hu* court erroneously applies and analogizes Second Circuit precedent in holding that the conspicuousness of the Temu interface

---

[14] Temu further argues that *Fontanez* is applicable because it involves a case in which a user signed up similar to how Ms. Smith did. (Br. at 23-24) (Fontanez signed up using Apple account). But Temu then acknowledges that the District Court ultimately distinguished *Fontanez* because, incorporating the reasoning from *Eakins*, the District Court still found that, even using the second "Continue" button, the "Continue with Google" button, the Terms of Use were not sufficiently conspicuous, due to "its placement at the bottom of the page and the use of a 'very light grey font against a white background, devoid of underlined text or any conspicuous visual cues[.]'" (Br. at 26).

lands in favor of compelling arbitration. The Second Circuit cases relied on by the *Hu* court involve notably different presentations of the terms of service than that of Temu. *See, e.g.*, *Meyer*, 868 F.3d at 78 (terms of service in dark print contrasting with bright white background, with blue underlined hyperlinks); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 706 (2d Cir. 2023) (terms underlined and in a color sharply contrasting with color of interfaces' backgrounds).

The *Hu* court analyzed the interfaces in *Meyer* and *Edmundson* (where the interfaces were found to have provided inquiry notice) and compared them with interfaces in *Nicosia* and *Starke* (where the interfaces were found to have not provided inquiry notice). Focusing on the presentation of the Terms of Use specifically, *Meyer* and *Edmundson* do not resemble Temu. Both of those involved substantial color contrasts and underlined text, which are traditional indica of hyperlinks. While in *Nicosia* and *Starke*, these features were notably absent. The *Hu* court erroneously fixates on comparing merely the amount of color and casts aside a holistic analysis of the interface. *Hu*'s images reproduced below:



Interface in *Edmundson*



Interfaces in *Meyer*



Email in *Starke*



Interface in *Nicosia*

*Hu*, 2024 WL 4481439, at *12.

In further error, *Hu* ignored the fact that the differing colors of grey on the interface are barely perceptible. It called the two colors light and "dark" grey. *Id.* at *13. As the District Court found, "while 'Terms of Use' is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks of hyperlinked text." (App.199) (quoting *Eakins*). *See also* (Br. at 17) (image of interface reproduced by Temu—the shade appears barely darker, presenting minimal, if any, contrast). The District Court went further than the court in *Eakins*, describing the color of the Terms as "light grey" while also noting that the Terms came "with no indication of a hyperlink[.]" (App.203). The *Hu* court erred in its analysis, relying on a description of the text in the Temu interface as being "dark" grey. On balance, *Hu's* analysis is flawed in that it sidesteps a wholistic review of the registration's overall presentation and inapposite insofar as it relies on markedly different presentations from Second Circuit cases.

## CONCLUSION

Temu's appeal presupposes it established an otherwise valid arbitration agreement that it did not. The burden-shifting framework for which it argues first asks this Court to supplant the considered judgment of the District Court with its own. This Court should affirm the District Court's denial of the motion to compel arbitration.

## ORAL ARGUMENT REQUEST

Oral argument is unnecessary because this case does not raise any significant new questions of law such that oral argument would meaningfully assist in the disposition of the appeal.

Respectfully submitted,

*/s/ Kathy R. Neal*
Mary Quinn Cooper
Kathy R. Neal
MCAFEE & TAFT, P.C.
Two W. Second Street, Suite 1100
Tulsa, Oklahoma 74103
(918) 587-0000
(918) 574-3120 (fax)

Frank S. Hedin
Arun G. Ravindran
HEDIN, LLP
1395 Brickell Ave., Suite 1140
Miami, Florida 33134
(305) 357-2107
(305) 200-8801 (fax)

*Attorneys for Plaintiff-Appellee*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify on January 17, 2025, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of Court will transmit a notice of Electronic Filing to all ECF registrants on file for this case.

Benjamin G. Shatz
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067-3119

*/s/ Kathy R. Neal*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,995 words. I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: January 17, 2025

*/s/ Kathy R. Neal*

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing, as submitted in digital form via the Court's ECF system, has been scanned for viruses with Windows Defender Antivirus, Security Intelligence Version 1.399.1183.0, and, according to the program, is free of viruses. I hereby certify that the digital form is an exact copy of the written document filed with the Clerk of this Court. I hereby certify that all required privacy redactions have been made per 10th Cir. R. 25.5.

Dated: January 17, 2025

*/s/ Kathy R. Neal*